## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF
## TEXAS - HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHT TOWER RENTALS, INC. *et al.*,[1] | ) Case No. 16-34284 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

Patricia B. Tomasco (State Bar No. 01797600)
Matthew D. Cavenaugh (State Bar No. 24062656)
Jennifer F. Wertz (State Bar No. 24072822)
**JACKSON WALKER LLP**
1401 McKinney Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4242
Email: ptomasco@jw.com
        mcavenaugh@jw.com
        jwertz@jw.com

-and-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Light Tower Rentals, Inc. (4893); LTR Holdco, Inc. (8813); LTR Shelters, Inc. (5396); and LTR Investco, Inc. (3819). The location of the Debtors' service address is:  2330 E. Interstate 20 S. Service Road, Odessa, Texas 79766.

Philip M. Abelson, Esq.
Ehud Barak, Esq.
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: pabelson@proskauer.com
       ebarak@proskauer.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  August 22, 2016

## IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT

### DISCLOSURE STATEMENT, DATED AUGUST 22, 2016

### SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF LIGHT TOWER RENTALS, INC., *ET AL.* PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

### FROM THE HOLDERS OF OUTSTANDING:

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| CLASS 4 | NOTEHOLDER CLAIMS |
| CLASS 8 | INVESTCO CONVERTIBLE PREFERRED INTERESTS |
| CLASS 9 | INVESTCO PREFERRED INTERESTS |

**IF YOU ARE IN CLASSES 4, 8, OR 9, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

### DELIVERY OF BALLOTS

**BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON SEPTEMBER 20, 2016, AS PER THE INSTRUCTIONS ON YOUR BALLOT**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE**

> **CALL THE DEBTORS' RESTRUCTURING HOTLINE AT:**
>
> **855-628-7540 (TOLL-FREE) OR 917-651-0325 (INTERNATIONAL)**

This disclosure statement ("<u>Disclosure Statement</u>") provides information regarding the *Debtors' Joint Prepackaged Chapter 11 Plan* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"), that the Debtors seek to have confirmed by the Bankruptcy Court.[2] A copy of the Plan is attached hereto as <u>Exhibit A</u>.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims and Interests for purposes of soliciting votes to accept or reject the Plan.

The Plan is supported by the Debtors, holders of approximately 80 percent of the Class 4 Noteholder Claims, holders of 100 percent of the Class 8 Investco Convertible Preferred Interests, holders of 100 percent of the Class 9 Investco Preferred Interests, and holders of approximately 90.1 percent of the Class 10 Investco Common Interests.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement (including the Risk Factors described in Article VI hereof) and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction or distribution contemplated by the Plan.

The Debtors strongly encourage holders of Claims and Interests in Classes 4, 8, and 9 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

> <u>RECOMMENDATION BY THE DEBTORS</u>
>
> EACH OF THE DEBTORS AND THEIR BOARDS OF DIRECTORS HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan.

PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST OPTION FOR ACCOMPLISHING THE DEBTORS' RESTRUCTURING OBJECTIVES.   THE DEBTORS THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>SEPTEMBER 20, 2016, AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u>.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 (as amended, the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws").  Neither the solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.  The Debtors are relying on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain holders of Noteholder Claims, Investco Convertible Preferred Interests, and Investco Preferred Interests of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

The offering, issuance, and distribution of any securities pursuant to the Plan will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.

Each holder of a Noteholder Claim will only be entitled to vote on the Plan if it is an Accredited Investor or Qualified Institutional Buyer and will be required to certify on its Ballot whether it is an Accredited Investor or Qualified Institutional Buyer.

Each holder of an Investco Convertible Preferred Interest or Investco Preferred Interest will only be entitled to vote on the Plan if it is an Accredited Investor, Qualified Institutional Buyer, or a person other than a U.S. person, and will be required to certify on its Ballot whether it is an Accredited Investor, Qualified Institutional Buyer, or a person other than a U.S. person.

The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  Any representation to the contrary is a criminal offense.

## DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information.  The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan.  All holders of Claims and Interests entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting.  The Debtors believe that these summaries are fair and accurate.  The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.  The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan.  The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified.  Holders of Claims and Interests reviewing this Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement.  No holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan.  This Disclosure Statement does not constitute legal, business, financial, or tax advice.  Any Person or Entity desiring any such advice should consult with their own advisors.  Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws.  The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise.  The Debtors' management, in consultation with their advisors, has prepared the financial projections attached hereto as **Exhibit B** and described in this Disclosure Statement.  The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management.  Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors.  The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved.  Therefore,

the financial projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules.  As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to holders of Claims and Interests against or Interests in, the Debtors or any other party in interest.  Please refer to <u>Article VI</u> of this Disclosure Statement, entitled "Certain Factors To Be Considered" for a discussion of certain risk factors that holders of Claims and Interests voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors.  No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.  If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein.  When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**TABLE OF CONTENTS**

                                                                                      **Page**

**INTRODUCTION**..................................................................................................................1

**ARTICLE I** THE PLAN..........................................................................................................3
    **1.1**    Discharge of Claims and Interests ..............................................................3
    **1.2**    New Capital Structure .................................................................................3
    **1.3**    Unclassified Claims ....................................................................................7
    **1.4**    Classified Claims and Interests ..................................................................9
    **1.5**    Liquidation Analysis .................................................................................17
    **1.6**    Valuation Analysis ...................................................................................17
    **1.7**    Financial Information and Projections ......................................................18

**ARTICLE II** VOTING PROCEDURES AND REQUIREMENTS ........................................18
    **2.1**    Classes Entitled to Vote on the Plan ........................................................18
    **2.2**    Votes Required for Acceptance by a Class................................................19
    **2.3**    Certain Factors to Be Considered Prior to Voting....................................19
    **2.4**    Classes Not Entitled To Vote on the Plan ................................................19
    **2.5**    Solicitation Procedures .............................................................................20
    **2.6**    Voting Procedures ....................................................................................21

**ARTICLE III** BUSINESS DESCRIPTION .........................................................................22
    **3.1**    Corporate Overview and Organizational Structure...................................22
    **3.2**    Current Organizational Structure ..............................................................23
    **3.3**    Reorganized Organizational Structure ......................................................23
    **3.4**    The Debtors' Business Operations............................................................24
    **3.5**    The Debtors' Key Assets ..........................................................................28
    **3.6**    The Debtors' Prepetition Funded Debt .....................................................29
    **3.7**    Directors and Officers ..............................................................................30

**ARTICLE IV** EVENTS LEADING TO THE CHAPTER 11 CASES .................................31
    **4.1**    Macroeconomic Forces Drive Decline in Demand....................................31
    **4.2**    Change in Operating Results .....................................................................32
    **4.3**    The Debtors' Capital Expenditures to Expand Their Business .................34
    **4.4**    The Debtors' Efforts to Address Liquidity Issues ....................................36

**ARTICLE V** OTHER KEY ASPECTS OF THE PLAN .....................................................37
    **5.1**    Distributions..............................................................................................37
    **5.2**    Restructuring Transactions ........................................................................40
    **5.3**    Assumption of Executory Contracts and Unexpired Leases.....................40
    **5.4**    Cure of Defaults and Objections to Cure and Assumption.......................41

i

| | | |
|---|---|---|
| **5.5** | Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date............................................................................................42 | |
| **5.6** | Insurance Policies ............................................................................................42 | |
| **5.7** | Nonoccurrence of Effective Date.....................................................................42 | |
| **5.8** | Reservation of Rights.......................................................................................42 | |
| **5.9** | Release, Injunction, and Related Provisions....................................................42 | |
| **5.10** | Protection Against Discriminatory Treatment ..................................................46 | |
| **5.11** | Indemnification ................................................................................................46 | |
| **5.12** | Recoupment .....................................................................................................47 | |
| **5.13** | Release of Liens...............................................................................................47 | |
| **5.14** | Reimbursement or Contribution .......................................................................47 | |
| **5.15** | Incentive Plans and Employee and Retiree Benefits ........................................47 | |
| **5.16** | Professional Fees and Expenses.......................................................................48 | |
| **5.17** | Vesting of Assets in the Reorganized Debtors .................................................48 | |
| **5.18** | Cancellation of Notes, Instruments, Certificates, and Other Documents ...........48 | |
| **5.19** | New Organizational Documents .......................................................................49 | |
| **5.20** | Modification of Plan ........................................................................................49 | |
| **5.21** | Effect of Confirmation on Modifications .........................................................50 | |
| **5.22** | Withdrawal of Plan ..........................................................................................50 | |
| **5.23** | Reservation of Rights.......................................................................................50 | |
| **5.24** | Plan Supplement Exhibits ................................................................................50 | |
| **5.25** | Conditions Precedent to the Effective Date .....................................................50 | |
| **5.26** | Waiver of Conditions Precedent ......................................................................52 | |
| **5.27** | Effect of Non-Occurrence of Conditions to Consummation .............................52 | |
| **ARTICLE VI** | **CERTAIN FACTORS TO BE CONSIDERED**..................................................53 | |
| **6.1** | General .............................................................................................................53 | |
| **6.2** | Risks Relating to the Plan and Other Bankruptcy Law Considerations ...............53 | |
| **6.3** | Risks Relating to the Restructuring Transactions .............................................59 | |
| **6.4** | Risks Relating to the New Notes ......................................................................61 | |
| **6.5** | Risks Relating to New LTR Holdings Interests.................................................69 | |
| **6.6** | Risks Relating to the Debtors' Business...........................................................71 | |
| **6.7** | Certain Tax Implications of the Chapter 11 Cases ...........................................82 | |
| **6.8** | Disclosure Statement Disclaimer......................................................................82 | |
| **ARTICLE VII** | **CONFIRMATION PROCEDURES**....................................................................84 | |
| **7.1** | The Confirmation Hearing ...............................................................................85 | |
| **7.2** | Confirmation Standards ...................................................................................85 | |
| **7.3** | Best Interests Test / Liquidation Analysis .......................................................86 | |
| **7.4** | Feasibility.........................................................................................................87 | |
| **7.5** | Confirmation Without Acceptance by All Impaired Classes...............................87 | |
| **7.6** | Alternatives to Confirmation and Consummation of the Plan............................88 | |

**ARTICLE VIII** IMPORTANT SECURITIES LAW DISCLOSURE .........................................88

    **8.1**    Plan Securities...................................................................................88

    **8.2**    Issuance and Resale of Plan Securities Under the Plan .....................88

**ARTICLE IX** CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES.......................91

    **9.1**    Introduction.......................................................................................91

    **9.2**    Certain U.S. Federal Income Tax Consequences to the Debtors.........93

    **9.3**    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests.........................................................................94

    **9.4**    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims or Interests .............................................................101

**ARTICLE X** CONCLUSION AND RECOMMENDATION..................................................109

## <u>EXHIBITS</u>

<u>Exhibit A</u>          Debtors' Joint Prepackaged Chapter 11 Plan

<u>Exhibit B</u>          Financial Projections

<u>Exhibit C</u>          Unaudited Liquidation Analysis

<u>Exhibit D</u>          Unaudited Valuation Analysis

<u>Exhibit E</u>          Debtors' Financial Report, dated June 30, 2016

<u>Exhibit F</u>          Restructuring Support Agreement

## INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, "LTR" or the "Debtors") are a diversified specialty equipment rental and services company focused on the oil and gas sector. LTR offers a diverse portfolio of surface rental equipment that can provide customers with a specific product, or when combined with other products, a comprehensive wellsite rental solution. LTR's equipment rental fleet includes power generation units, fluid handling equipment, light towers, heaters, trailers and other equipment. LTR's service operations include delivery, set-up, fuel and trucking. LTR has become a leader in mobile natural gas generator rentals in the oil and gas sector and is the provider of choice to a top-tier customer base that includes some of the largest, most active exploration and production ("E&P") companies in North America.

LTR has a national network of facilities with a highly trained support staff. Each major branch location is staffed with mechanics, technicians, service staff, and field-level salespeople equipped to respond to customer requests in a timely manner. LTR's major operating areas (basins) include the Permian, Eagle Ford, Bakken, Marcellus, Eaglebine/Eagle Ford East, Barnett, Fayetteville, Haynesville, Granite Wash and Woodford basins. The Permian basin, still one of the highest-producing oil and gas regions in the United States, is LTR's largest revenue generating operating area with a favorable mixture of equipment rental and service revenue from well drilling, completion and production. LTR is headquartered in Odessa, Texas.

As of the date hereof, the Debtors' funded debt consists of $330 million in 8.125% Senior Secured Notes due 2019 (the "Old Notes") and an undrawn revolving ABL facility (the "ABL Facility"). For the year ended December 31, 2015, the Debtors reported approximately $171 million of total revenue.

The Debtors' business has recently come under significant pressure from macroeconomic forces beyond their control. In the fall of 2014, oil prices plummeted due to global oversupply and have yet to recover. The natural gas market, which has experienced continued growth in domestic production, has experienced depressed natural gas prices over the last few years, which may persist for the foreseeable future. In response to the global oversupply of oil, upstream producers have reduced their need for ongoing drilling and completion activities. These declining drilling and completion activities have significantly reduced the demand for the rental products and related services that LTR offers. The lower demand for these rental products in the oilfield sector has created an oversupply of rental equipment available in the market. This oversupply is driving intense pricing concessions amongst those companies with which LTR competes.

Because the current market and operating conditions and attendant liquidity challenges have made servicing the Debtors' debt obligations unsustainable, the Debtors and their advisors engaged with holders constituting the majority of the Old Notes regarding various restructuring alternatives—both out-of-court and in-court—to strengthen the Debtors' future needs.

After extensive negotiations, the Debtors, certain holders of approximately 80 percent of the Class 4 Noteholder Claims, holders of 100 percent of the Class 8 Investco Convertible

Preferred Interests, holders of 100 percent of the Class 9 Investco Preferred Interests, and holders of approximately 90.1 percent of the Class 10 Investco Common Interests reached an agreement for a consensual, balance-sheet restructuring to be implemented through a prepackaged chapter 11 plan of reorganization—namely, the Plan—that significantly deleverages the Debtors, provides liquidity through a potential Exit Facility, and minimizes the time and expense associated with the restructuring.   In exchange for the compromises contained in the Plan, holders of the Class 4 Noteholder Claims will each receive (i) their pro rata share of 100% of the New LTR Holdings Interests (subject to dilution by the Equity Warrants and the MIP) and (ii) their pro rata share of the New Notes, which will be in an aggregate principal amount of $30 million.   Significantly, the Plan provides full recoveries for other secured claimholders, priority claimholders, and unsecured claimholders.   Holders of Investco Convertible Preferred Interests will each receive their pro rata share of Equity Warrants to be issued under the Plan, and holders of Investco Preferred Interests will each receive their pro rata share of the Management Warrants (as specified in the Plan), while holders of Investco Common Interests will not receive any distribution under the Plan on account of such interests.

The Debtors believe that LTR's core strengths, the durability of its business model, including the experience of its executive management team, the strategic location of its assets, and its ability to pursue growth opportunities, will allow it to implement the balance-sheet restructuring contemplated by the RSA and the Plan and therefore ensure their long-term viability.

# ARTICLE I

# THE PLAN

## 1.1      Discharge of Claims and Interests

The Plan provides for the discharge of Claims and Interests through:  (a) the issuance of New LTR Holdings Interests, New Notes, and Equity Warrants; (b) payment in full in Cash of certain Claims; (c) treatment rendering certain Claims and Interests Unimpaired; or (d) the cancellation and extinguishment of certain Claims and Interests.

## 1.2      New Capital Structure

On the Effective Date, the Debtors will effectuate the Plan by: (a) issuing the New Notes; (b) issuing the New LTR Holdings Interests; (c) issuing the Equity Warrants; (d) entering into the Exit Facility (if any); and (e) entering into all related documents to which the Reorganized Debtors are contemplated to be a party on the Effective Date.  All such documents shall become effective in accordance with their terms and the Plan.

### (a)      New Notes

On the Effective Date, Reorganized LTR shall issue new secured notes, guaranteed by each of its subsidiaries (except for any immaterial subsidiaries, consistent with the LTR Indenture) and its parent company (which shall be a subsidiary of New LTR Holdings), in the aggregate principal amount of $30 million, (i) bearing interest at 10% per annum, payable in cash or in kind at the option of the Reorganized LTR for the period commencing on the Effective Date and ending on the third anniversary thereof, and payable solely in cash thereafter, (ii) maturing on the fifth anniversary of the Effective Date, (iii) being callable (a) prior to the second anniversary of the Effective Date at a price equal to 101% of the aggregate principal amount outstanding, (b) during the period commencing on the second anniversary of the Effective Date through the day prior to the third anniversary of the Effective Date at a price equal to 106.75% of the aggregate principal amount outstanding, (c) during the period commencing on the third anniversary of the Effective Date through the day prior to the fourth anniversary of the Effective Date at a price equal to 104.50% of the aggregate principal amount outstanding, and (d) at a price equal to 100% of the aggregate outstanding amount from the fourth anniversary of the Effective Date and thereafter, and (iv) containing terms and covenants substantially similar to those under the LTR Indenture, with such modifications acceptable to the Required Consenting Noteholders.  A form of the New Notes Indenture shall be filed with the Plan Supplement.  For the avoidance of doubt, the Noteholders will not be required to purchase the New Notes from the Reorganized Debtors with new money and shall receive New Notes on account of their prepetition Claims and as part of their distribution pursuant to Article III of the Plan.

On the Effective Date, the applicable Reorganized Debtors may enter into the New Notes Debt Documents.  Confirmation of the Plan shall be deemed approval of the New Notes and the New Notes Debt Documents, if applicable, and all transactions contemplated thereby, including, without limitation, any actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees,

indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Notes Debt Documents and such other documents as may be required to effectuate the treatment afforded thereunder, if applicable. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Notes Debt Documents, if applicable, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Debt Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Notes Debt Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise may be necessary under applicable law to give notice of such Liens and security interests to third parties. The collateral agent (if any) of the New Notes and the agent for the lenders under the Exit Facility (if any) may enter into a customary intercreditor agreement setting forth the respective rights of Creditors to the collateral, including that the obligations under the New Notes may be secured by (a) a first priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Notes Priority Collateral (which is expected to be defined substantially similarly to the LTR Indenture) and (b) a second priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Credit Facility Priority Collateral (which is expected to be defined substantially similarly to the LTR Indenture), in each case subject to certain exceptions and permitted liens, and the terms of the intercreditor agreement (if any).

(b)   **Issuance and Distribution of the New LTR Holdings Interests**

All existing Interests in Investco shall be cancelled as of the Effective Date, and Reorganized Investco shall issue 100% of its Interests to New LTR Holdings. New LTR Holdings shall issue the New LTR Holdings Interests pursuant to the Plan. The issuance of the New LTR Holdings Interests (including Interests reserved under the Management Incentive Plan and the Equity Warrants), shall be authorized without the need for any further corporate or limited liability company action and without any further action by the holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable. The New LTR Holdings Organizational Documents shall authorize the issuance and distribution on the Effective Date of the New LTR Holdings Interests to the Distribution Agent for the benefit of Entities entitled to receive the New LTR Holdings Interests on the Effective Date pursuant to the Plan. All of the New LTR Holdings Interests issued under the Plan shall be duly authorized and validly issued, and the holders of Allowed Noteholder Claims that will receive New LTR Holdings Interests shall not be required to execute any of the New LTR Holdings Interests Documents before receiving their respective distributions of New LTR Holdings Interests under the Plan. Any such Noteholder who does not execute one or all of the New LTR Holdings Interests Documents shall

be automatically deemed to have executed and accepted the terms of each such unexecuted New LTR Holdings Interests Document (in such Person's capacity as a unitholder of New LTR Holdings) and to be party thereto without further action.  Each of the New LTR Holdings Interests Documents shall be adopted on the Effective Date and shall be deemed to be valid, binding and enforceable in accordance with its terms, and each holder of New LTR Holdings Interests shall be bound thereby.  Each distribution and issuance of the New LTR Holdings Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, none of the New LTR Holdings Interests will be registered under the Securities Act or listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date.  In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Exchange Act, except in connection with a public offering, the New Organizational Documents may impose certain trading restrictions, and the New LTR Holdings Interests may be subject to certain transfer and/or other restrictions pursuant to the New Organizational Documents designed to maintain the Reorganized Debtors as private, non-reporting companies.

(c)     **Equity Warrants**

The terms of the Equity Warrants shall be substantially similar in all respects with those provided in the RSA.  For the avoidance of doubt, the Equity Warrants shall consist of (i) penny warrants exercisable into New LTR Holdings Interests constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the Management Incentive Plan and future equity issuances), (ii) warrants exercisable into New LTR Holdings Interests constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the Management Incentive Plan and future equity issuances), at an initial strike price implying a total equity value of the Reorganized Debtors of $300 million, and (iii) warrants exercisable into New LTR Holdings Interests constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the Management Incentive Plan and future equity issuances), at an initial strike price implying a total equity value of the Reorganized Debtors of $457 million. The strike price on each of the Equity Warrants shall be increased or decreased to reflect appropriate adjustments on account of any capital contributions made to (whether in Cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in Cash, cash equivalents, promissory obligations, or the fair market value of other property which is distributed or deemed to have been distributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date.  Each class of the Equity Warrants shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of such Equity Warrants shall be entitled only to participation in the portion of the proceeds in

excess of the applicable strike price. For the avoidance of doubt, holders entitled to receive the Equity Warrants hereunder shall, in their capacity as such, neither execute, nor be deemed to have executed and accepted the terms of, the New LTR Holdings Interests Documents as of the Effective Date. For the further avoidance of doubt, such holders shall, upon exercise of the Equity Warrants, execute or be deemed to have executed and accepted, and be bound by, the New LTR Holdings Interests Documents.

(d)    **Management Incentive Plan**

After the Effective Date, the Reorganized Debtors, including New LTR Holdings, shall implement the Management Incentive Plan on terms approved by the directors of New LTR Holdings Board, but which shall provide for: (i) penny warrants or options (the "Management Warrants") exercisable into, or, alternatively, restricted units representing, New LTR Holdings Interests constituting 1.5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), separate from and in addition to the Management Warrants constituting 1.0% of the total equity of New LTR Holdings in respect of the Class 9 Interests; and (ii) options (the "Management Options" and, together with the Management Warrants, the "Management Securities") (A) to purchase New LTR Holdings Interests constituting 2.5% of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), at an initial strike price implying a total equity value of the Reorganized Debtors of $157 million; and (B) to purchase New LTR Holdings Interests constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), (xx) one third (1/3) of which are exercisable at an initial strike price implying a total equity value of the Reorganized Debtors of $232 million, (yy) one third (1/3) of which are exercisable at an initial strike price implying a total equity value of the Reorganized Debtors of $300 million, and (zz) one third (1/3) of which are exercisable at an initial strike price implying a total equity value of the Reorganized Debtors of $457 million. The strike price on each of the Management Securities shall be increased or decreased to reflect appropriate adjustment on account of any capital contributions made to (whether in Cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in Cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date. The Management Securities shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of Management Securities shall be entitled only to participation in the portion of the proceeds in excess of the applicable strike price. The Management Options shall vest over a five (5) year period from grant with 20% of such Management Options vesting each year, subject in each case to continued employment with the Reorganized Debtors through each such vesting date, and subject to customary repurchase and forfeiture provisions. The other terms (including vesting) of the Management Warrants will be negotiated in good faith, acceptable to the Required Consenting Noteholders, and documented in the Plan Supplement. For the avoidance of doubt, (1) allocation of the Management Warrants and Management Options shall be made at the discretion of the New LTR Holdings Board, and (2) eligible parties under the Management Incentive Plan shall, in their capacity as such, neither execute, nor be deemed to have executed and accepted the terms of, the New LTR Holdings Interests Documents

as of the Effective Date.  For the further avoidance of doubt, such eligible parties shall, upon exercise of the Management Securities, execute or be deemed to have executed and accepted, and be bound by, the New LTR Holdings Interests Documents.

(e)  **Exit Facility**

On the Effective Date, the Reorganized Debtors may enter into the Exit Facility, the terms of which will be set forth in the Exit Facility Documents.  Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, if applicable, and all transactions contemplated thereby, including, without limitation, any supplemental or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facility, if applicable.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents, if applicable, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The collateral agent (if any) of the New Notes and the agent for the lenders under the Exit Facility (if any) may enter into a customary intercreditor agreement setting forth the respective rights of Creditors to the collateral, including that the obligations under the Exit Facility (if any) may be secured by (a) a first priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Credit Facility Priority Collateral and (b) a second priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Notes Priority Collateral, in each case subject to certain exceptions and permitted liens, and the terms of the intercreditor agreement (if any).

**1.3    Unclassified Claims**

(a)  **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded

from the Classes of Claims set forth in <u>Article III</u> of the Plan.  The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in Full in Cash | 100% |
| Professional Claims | Paid in Full in Cash | 100% |
| Priority Tax Claims | Paid in Full in Cash | 100% |

     (b)    **<u>Unclassified Claims</u>**

     (1)    **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (in consultation with the Required Consenting Noteholders) or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

     (2)    **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.  Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than five Business Days prior to the anticipated Effective Date.  For the

avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  No funds in the Professional Fee Escrow Account shall be property of the Estates.  Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(3)     **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**1.4     Classified Claims and Interests**

(a)     **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests.  The table below summarizes the classification, treatment, and projected recoveries of the Claims and Interests, by Class, under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE PLAN'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |

---

[3] Plan recoveries are based on an assumed enterprise value range of $170 to $213 million, total debt of $30 million and estimated cash at emergence of $12.2 million. Recoveries include the effect of Management Warrants and Equity Warrants that are exercisable at the Effective Date and exclude all other warrants and Management Options.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
| 1 | Other Secured Claims | Each holder of an Allowed Class 1 Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders: (i)     payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) Reinstatement of its Allowed Class 1 Claim; or (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Estimated at $0 | 100% |
| 2 | Other Priority Claims | Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim. | $1.8 million | 100% |
| 3 | Revolving Facility Claims | Each holder of an Allowed Class 3 Claim shall receive Cash in an amount equal to such Allowed Class 3 Claim. | $0 | 100% |
| 4 | Noteholder Claims | Each holder of an Allowed Class 4 Claim shall receive (i) its Pro Rata share of the Noteholder Equity Recovery and (ii) its Pro Rata share of the New Notes. | $345.8 million | 49% - 61% |
| 5 | General Unsecured Claims | Each holder of an Allowed Class 5 Claim shall receive Cash in an amount equal to such Allowed Class 5 Claim on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 5 Claim. | $5.5 million | 100% |
| 6 | Debtor Intercompany Claims | Each Allowed Class 6 Claim shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders, either: (i) Reinstated; or (ii) canceled and released without any distribution on account of such Claims. | N/A | 100% |
| 7 | Interests in Debtors other than Investco | Class 7 Interests shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders, either: (i) Reinstated; or (ii) canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 7 Interests will not receive any distribution on account of such Class 7 Interests. | N/A | 100% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
| 8 | Investco Convertible Preferred Interests | Class 8 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each holder of an Allowed Class 8 Interest shall receive its Pro Rata share of Equity Warrants, as more fully described in Article IV.C of the Plan. | $97.6 million* | 7% - 10%* |
| 9 | Investco Preferred Interests | Class 9 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.  Each holder of an Allowed Class 9 Interest shall receive its Pro Rata share of Management Warrants, issued on the same terms as the Management Incentive Plan, representing New LTR Holdings Interests constituting 1.0% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances).  Except as expressly set forth in Article IV.D of the Plan, the other terms (including vesting) of the Management Warrants will be negotiated in good faith, acceptable to the Required Consenting Noteholders, and documented in the Plan Supplement. | N/A** | N/A** |
| 10 | Investco Common Interests | Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests. | N/A | 0% |
| 11 | Section 510(b) Claims | Class 11 Claims, if any, will be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | $0 | N/A |

\* Investco Convertible Preferred Interests have a liquidation preference of $4.036 per share and 24,175,941 shares outstanding. Total recovery to the Investco Convertible Preferred Interests is estimated at $7.5 to $9.6 million.

\*\* The Investco Preferred Interests have 300,000 shares outstanding with a floating liquidation preference. Assuming the Investco Preferred Interests receive 1% of total equity, total recovery is estimated at $1.5 to $2.0 million.

    (b)    **Classified Claims and Interests Details**

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by:  (a) the Debtors; (b) the holder of such Allowed Claim or Allowed Interest, as applicable; and (c) the Required Consenting Noteholders.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1. **Class 1 — Other Secured Claims**

    (a) *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

    (b) *Treatment*:  Each holder of an Allowed Class 1 Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders:

        (i) payment in full in Cash of its Allowed Class 1 Claim;

        (ii) the collateral securing its Allowed Class 1 Claim;

        (iii) Reinstatement of its Allowed Class 1 Claim; or

        (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c) *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

2. **Class 2 — Other Priority Claims**

    (a) *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

    (b) *Treatment*:  Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim.

    (c) *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

3. **Class 3 — Revolving Facility Claims**

    (a)    *Classification*:  Class 3 consists of any Revolving Facility Claims.

    (b)    *Allowance*: On the Effective Date, Class 3 Revolving Facility Claims shall be Allowed in the aggregate principal amount of $0, plus any liquidated amounts for reasonable and documented costs and expenses, as of the Petition Date, that are reimbursable under the Revolving Facility Documents.

    (c)    *Treatment*:  Each holder of an Allowed Class 3 Claim shall receive Cash in an amount equal to such Allowed Class 3 Claim.

    (d)    *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

4.    **Class 4 — Noteholder Claims**

    (a)    *Classification*:  Class 4 consists of all Noteholder Claims.

    (b)    *Allowance:*  On the Effective Date, Class 4 Claims shall be Allowed in the aggregate principal amount of $330,000,000, plus any accrued but unpaid interest thereon as of the Petition Date, in each case in accordance with the terms and conditions under the LTR Indenture.

    (c)    *Treatment*:  Each holder of an Allowed Class 4 Claim shall receive (i) its Pro Rata share of the Noteholder Equity Recovery and (ii) its Pro Rata share of the New Notes.

    (d)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5.    **Class 5 — General Unsecured Claims**

    (a)    *Classification*:  Class 5 consists of any General Unsecured Claims against any Debtor.

    (b)    *Treatment*:  Each holder of an Allowed Class 5 Claim shall receive Cash in an amount equal to such Allowed Class 5 Claim on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 5 Claim.

    (c)    *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Allowed Class 5 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan.

6. **Class 6 — Debtor Intercompany Claims**

    (a)    *Classification*:  Class 6 consists of any Debtor Intercompany Claims.

    (b)    *Treatment*:  Each Allowed Class 6 Claim shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders, either:

        (i)    Reinstated; or

        (ii)    cancelled and released without any distribution on account of such Claims.

    (c)    *Voting*:  Holders of Allowed Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

7. **Class 7 — Interests in Debtors other than Investco**

    (a)    *Classification*:  Class 7 consists of Interests in Debtors other than Investco.

    (b)    *Treatment*:  Class 7 Interests shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders, either:

        (i)    Reinstated; or

        (ii)    cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 7 Interests will not receive any distribution on account of such Class 7 Interests.

    (c)    *Voting*:  Holders of Class 7 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of Class 7 Interests are not entitled to vote to accept or reject the Plan.

8. **Class 8 — Investco Convertible Preferred Interests**

    (a)    *Classification*:   Class 8 consists of the Investco Convertible Preferred Interests.

    (b)    *Treatment*:  Class 8 Interests will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each

holder of an Allowed Class 8 Interest shall receive its Pro Rata share of Equity Warrants, as more fully described in Article IV.C of the Plan.

(c) *Voting*: Class 8 is Impaired under the Plan. Holders of Allowed Class 8 Interests are entitled to vote to accept or reject the Plan.

9. **Class 9 — Investco Preferred Interests**

(a) *Classification*: Class 9 consists of the Investco Preferred Interests.

(b) *Treatment*: Class 9 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect. Each holder of an Allowed Class 9 Interest shall receive its Pro Rata share of Management Warrants, issued on the same terms as the Management Incentive Plan, representing New LTR Holdings Interests constituting 1.0% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances). Except as expressly set forth in Article IV.D of the Plan, the other terms (including vesting) of the Management Warrants will be negotiated in good faith, acceptable to the Required Consenting Noteholders, and documented in the Plan Supplement.

(c) *Voting*: Class 9 is Impaired under the Plan. Holders of Class 9 Interests are entitled to vote to accept or reject the Plan.

10. **Class 10 — Investco Common Interests**

(a) *Classification*: Class 10 consists of the Investco Common Interests.

(b) *Treatment*: Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests.

(c) *Voting*: Class 10 is Impaired under the Plan. Holders of Class 10 Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 10 Interests are not entitled to vote to accept or reject the Plan.

11. **Class 11 — Section 510(b) Claims**

(a) *Classification*: Class 11 consists of any Section 510(b) Claims against any Debtor.

(b) *Allowance*: Notwithstanding anything to the contrary herein, a Class 11 Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Class 11 Claim and believe that no such Class 11 Claim exists.

(c)     *Treatment*: Class 11 Claims, if any, will be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)     *Voting*: Class 11 is Impaired under the Plan.  Holders (if any) of Allowed Class 11 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders (if any) of Allowed Class 11 Claims are not entitled to vote to accept or reject the Plan.

(c)     **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

(d)     **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(e)     **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the holders of such Claims or Interests in such Class; *provided*, *however*, that such Class will not be used as an impaired accepting class pursuant to Bankruptcy Code section 1129(a)(10).

(f)     **Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of New LTR Holdings Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor that owns such subsidiary.

(g)     **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

(h)     **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors, with the consent of the Required Consenting Noteholders, reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## 1.5     Liquidation Analysis

The Debtors believe that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including:  (a) the absence of a robust market for the sale of the Debtors' assets and services in which such assets and services could be marketed and sold; and (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation.

The Debtors, with the assistance of Zolfo Cooper LLC ("Zolfo Cooper"), have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit C** (the "Liquidation Analysis"), to assist holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

## 1.6     Valuation Analysis

GuideCap Partners LLC ("GuideCap"), at the request of the Debtors, has performed an analysis, a summary of which is attached hereto as **Exhibit D**, of the estimated implied value of the Debtors on a hypothetical enterprise valuation on a going-concern basis as of the Effective Date (the "Valuation Analysis").  The Summary of the Valuation Analysis, including the

17

procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with ARTICLE VI of this Disclosure Statement, entitled "Certain Factors To Be Considered." The Valuation Analysis is based on data and information as of July 31, 2016. GuideCap makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

**1.7     Financial Information and Projections**

In connection with the planning and development of the Plan, the Debtors, with the assistance of their advisors, prepared projections for the fiscal years 2016 through 2020, including management's assumptions related thereto, which are attached hereto as **Exhibit B**, to present the anticipated impact of the Plan. For purposes of the financial projections, the Debtors have assumed an Effective Date of October 1, 2016. The projections assume that the Plan will be implemented in accordance with its stated terms. The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the projections due to a material change in the Debtors' prospects.

The projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, commodity prices, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement. Accordingly, the estimates and assumptions underlying the projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties. Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and other financial information.

**ARTICLE II**

**VOTING PROCEDURES AND REQUIREMENTS**

**2.1     Classes Entitled to Vote on the Plan**

The following Classes are entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 4 | Noteholder Claims | Impaired |
| 8 | Investco Convertible Preferred Interests | Impaired |
| 9 | Investco Preferred Interests | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you have not received a Solicitation Package, including a ballot setting forth detailed voting instructions. If your Claim or Interest is included in the Voting Classes, you should read your ballot and carefully follow the instructions included in the ballot. Please use only the ballot that

accompanies this Disclosure Statement or the ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.

**2.2     Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of more than two-thirds in amount of the total allowed interests that have voted.

**2.3     Certain Factors to Be Considered Prior to Voting**

There are a variety of factors that all holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims or Interests in the Voting Classes.

For a further discussion of risk factors, please refer to Article VI, entitled "Certain Factors to Be Considered" of this Disclosure Statement.

**2.4     Classes Not Entitled To Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property

under the plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Revolving Facility Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Debtor Intercompany Claims | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| 7 | Interests in Debtors other than Investco | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| 10 | Investco Common Interests | Impaired | Deemed to Reject |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |

## 2.5   Solicitation Procedures

### (a)   Solicitation Agent

The Debtors have retained Prime Clerk LLC to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

### (b)   Solicitation Package

The following materials constitute the solicitation package (the "Solicitation Package") distributed to holders of Claims and Interests in the Voting Classes:

- the Debtors' cover letter in support of the Plan;

- the appropriate ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

### (c)   Distribution of the Solicitation Package and Plan Supplement

The Solicitation Package (except the ballots) may also be obtained from the Solicitation Agent by:  (1) calling the Debtors' restructuring hotline at 855-628-7540 (Toll-Free) or 917-651-

0325 (International), (2) emailing ltrballots@primeclerk.com and referencing "LTR" in the subject line, and/or (3) writing to the Solicitation Agent at LTR Ballot Processing, c/o Prime Clerk Corporate Restructuring, 830 Third Avenue, 3rd Floor, New York, NY 10022.  When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, http://cases.primeclerk.com/LTR, or for a fee via PACER at https://www.pacer.gov/.

No later than five days before the Confirmation Hearing, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by:  (1) calling the Debtors' restructuring hotline at the telephone number set forth above; (2) visiting the Debtors' restructuring website, http://cases.primeclerk.com/LTR; and/or (3) writing to the Solicitation Agent at LTR Ballot Processing, c/o Prime Clerk Corporate Restructuring, 830 Third Avenue, 3rd Floor, New York, NY 10022.

## 2.6    Voting Procedures

August 18, 2016 (the "Voting Record Date") was the date used for determining which holders of Claims and Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' claimholders, interest holders, and other parties in interest.

In order for the holder of a Claim or Interest in the Voting Classes to have such holder's ballot counted as a vote to accept or reject the Plan, such holder's ballot must be properly completed, executed, and delivered as per the instructions on the ballot, so that such holder's ballot is actually received by the Solicitation Agent on or before the Voting Deadline, i.e. September 20, 2016 at 4:00 p.m. prevailing Central Time.

If a holder of a Claim or Interest in a Voting Class transfers all of such Claim or Interest to one or more parties on or after the Voting Record Date and before the holder has cast its vote on the Plan, such Claim or Interest holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the holder's Claim or Interest, and such purchaser(s) shall be deemed to be the holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the transfer complies with the applicable requirements under the RSA, if applicable.

BALLOTS ARE ONLY BEING SOLICITED FROM HOLDERS AS OF THE VOTING RECORD DATE THAT ARE ACCREDITED INVESTORS OR QUALIFIED INSTITUTIONAL BUYERS.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR

REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.   BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS OR INTERESTS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## ARTICLE III

## BUSINESS DESCRIPTION

### 3.1   Corporate Overview and Organizational Structure

LTR is a diversified specialty equipment rental and services company focused on the oil and gas sector.   LTR offers a diverse portfolio of surface rental equipment that provides customers with a specific product, or when combined with other products, a comprehensive well site rental solution.   The equipment rental fleet includes power generation units, fluid handling equipment, light towers, heaters, trailers and other equipment.   Service operations include delivery, set-up, fuel and trucking.   LTR is considered a leader in mobile natural gas generator rentals in the oil and gas sector.

Since inception in 1994, LTR has expanded its product and service offerings, establishing itself as a nationally recognized brand operating a well-maintained fleet of rental equipment in key domestic oil and gas producing regions.   LTR has a national network of facilities with a highly trained support staff.   Each major branch location is staffed with mechanics, technicians, service staff and field-level salespeople equipped to respond to customer requests in a timely manner.   The major operating areas (basins) include the Permian, Eagle Ford, Bakken, Marcellus, Eaglebine / Eagle Ford East, Barnett, Fayetteville, Haynesville, Granite Wash and Woodford basins.   The Permian basin, one of the highest-producing oil and gas regions in the United States, is LTR's largest revenue generating market with a favorable mixture of equipment rental and service revenue from drilling, completion and production activities.

LTR has a diverse customer base made up of blue-chip operators, including Concho Resources, Devon Energy, Energen, EOG Resources, Occidental Petroleum, Anadarko Petroleum, Oasis Petroleum, Chesapeake Energy and WPX Energy.  Many customers choose LTR over other rental companies due to their extensive equipment suite, commitment to service and multi-basin platform.  As a result, LTR has become the provider of choice for a wide array of specialty rental products and services offerings to a top-tier customer base that includes some of the largest, most active E&P companies in North America.  LTR had over 400 master service agreements in place at the end of 2015. No single customer represented more than 8% of revenue in 2015, and no single customer represented more than 8% of revenue for the last twelve months ended June 30, 2016.

**3.2     Current Organizational Structure**

The chart below depicts a condensed summary of the Debtors' organizational structure as of the date of this Disclosure Statement:



The Debtors also have two non-Debtor affiliates, LTR Holdco 2, Inc. and LTR Compressco, Inc., which are shell corporations without any assets or liabilities and are not depicted in the chart above.  These corporations were formed in anticipation of certain operations and/or potential acquisitions, but they were ultimately never utilized and their stock was never issued.  Further, the Debtors recently dissolved Wellsite and On Site (both as defined below), so these entities are also not depicted in the chart above.

**3.3     Reorganized Organizational Structure**

The chart below depicts a condensed summary of the Reorganized Debtors' organizational structure as of the Effective Date of the Plan:



### 3.4    The Debtors' Business Operations

The table below provides a summary of the Debtors' consolidated historical revenue by service line over the last three fiscal years.

| | | YEAR ENDED DECEMBER 31, | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **2013** | | | **2014** | | | **2015** |
| | $ | % of Total Revenue | | $ | % of Total Revenue | | $ | % of Total Revenue |
| *Revenue by division:* | | | | | | | | |
| Power Generation | $  61.2 | 31.0% | $ | 95.4 | 35.0% | $ | 78.2 | 46.0% |
| Light Towers | 17.2 | 9.0% | | 19.1 | 7.0% | | 8.9 | 5.0% |
| Fluid Handling | 27.0 | 13.0% | | 34.0 | 12.0% | | 19.2 | 11.0% |
| Heaters | 5.6 | 3.0% | | 10.5 | 4.0% | | 6.9 | 4.0% |
| Trailers | 3.8 | 2.0% | | 4.2 | 2.0% | | 2.4 | 1.0% |
| Other[1] | 17.9 | 9.0% | | 22.7 | 8.0% | | 9.4 | 6.0% |
| **Equipment Rental Revenue** | $  132.7 | 67.0% | $ | 185.9 | 68.0% | $ | 125.0 | 73.0% |
| Delivery | $  11.1 | 6.0% | $ | 12.6 | 4.0% | $ | 8.0 | 5.0% |
| Fuel | 18.2 | 9.0% | | 18.6 | 7.0% | | 8.9 | 5.0% |
| Trucking | 9.2 | 4.0% | | 10.0 | 4.0% | | 6.0 | 4.0% |
| Water Management[2] | 3.9 | 2.0% | | 12.4 | 4.0% | | 2.4 | 1.0% |
| Other | 23.4 | 11.0% | | 35.8 | 13.0% | | 20.6 | 12.0% |
| **Service Revenue** | 65.8 | 33.0% | | 89.4 | 32.0% | | 45.9 | 27.0% |
| **Total Revenue** | $  198.5 | 100% | $ | 275.3 | 100% | $ | 170.9 | 100% |

(1)  Includes revenue for the safe house division, which was discontinued in 2014.

(2)  Water Management division was discontinued in 2015.

Equipment rental accounted for 73% of LTR's revenue in 2015 and services accounted for the remaining 27%. Approximately 46% of LTR's 2015 revenue came from power generation equipment rentals (diesel and natural gas generators). Equipment rental accounted for

78% of LTR's revenue in the three months ended June 30, 2016 and services accounted for the remaining 22%. Approximately 55% of LTR's revenue for the three months ended June 30, 2016 came from power generation equipment rentals (diesel and natural gas generators).

(a)      **Fleet Statistics by Product Category**

The following table outlines LTR's average and period-ending fleet size by product category. The table also outlines average utilization, average day rate and revenue by product category for the year ended December 31, 2015 and for the twelve months ended June 30, 2016.

| PRODUCT CATEGORY[5] | FLEET SIZE (UNITS) | | | | FOR THE TWELVE MONTHS ENDED | | | | | |
| | AVERAGE OF THE PERIOD[1] | | AS OF[2] | | AVERAGE UTILIZATION | | AVERAGE DAY RATE[3] | | REVENUE[4] | |
| | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Diesel Generators.............. | 1,799 | 1,773 | 1,722 | 1,735 | 32.8% | 19.9% | $ 152 | $ 131 | $ 32.9 | $ 16.9 |
| Natural Gas Generators...... | 644 | 717 | 722 | 735 | 49.7% | 41.9% | 388 | 308 | 45.3 | 33.8 |
| Light Towers...................... | 1,416 | 1,387 | 1,403 | 1,323 | 31.6% | 19.9% | 54 | 44 | 8.9 | 4.4 |
| Tanks.................................. | 2,705 | 2,711 | 2,711 | 2,707 | 44.5% | 29.6% | 44 | 35 | 19.2 | 10.3 |
| Heaters................................ | 381 | 381 | 382 | 378 | 26.0% | 19.0% | 191 | 106 | 6.9 | 31.2 |
| Other Rental Equipment & Service Revenue................ | | | | | | | | | 57.8 | 31.2 |
| **Total Revenue....................** | | | | | | | | | **$ 170.9** | **$99.4** |
| Gross Profit ........................ | | | | | | | | | 103.9 | 57.8 |
| Gross Margin...................... | | | | | | | | | 60.8% | 58.1% |
| Adjusted SG&A[6]............... | | | | | | | | | 40.1 | 31.1 |
| **Adjusted EBITDA...............** | | | | | | | | | **$ 63.8** | **$26.7** |
| Adjusted EBITDA Margin.... | | | | | | | | | 37.3% | 26.9% |

[1] Average fleet size for the twelve months ended for each period shown.

[2] Fleet size as at date shown.

[3] Average day rate is influenced by product mix changes (for example, size and quantity of generators) within each category.

[4] Revenue by product category for the twelve months ended for each period shown ($ in millions).

[5] Consists of various product sizes of generators, light towers and/or various equipment subcategories.

[6] Adjusted SG&A includes SG&A costs and other adjustments in the net income to Adjusted EBITDA reconciliation.

(b)      **Products**

(1)      **Diesel Generators**

Certain of LTR's generators are diesel-powered, trailer-mounted generators, ranging in size from 25 kVA to 600 kVA.  The majority of LTR's fleet of diesel generators is manufactured by top-tier OEMs.   Since most wells are in remote locations and do not have electricity running to the site, operators depend on LTR's generators to power their mobile offices, accommodations and artificial lift equipment.  LTR sets a rental price for generators by offering an "all-in" day rate and include the cost of certain service operations (e.g., oil changes).  The segment provides

attractive unit economics with uplift from ancillary fuel sales and other associated services. Revenue for this product category was $32.9 million in 2015 and $2.7 million for the three months ended June 30, 2016. As of June 30, 2016, LTR owned 1,735 diesel generators.

(2)    **Natural Gas Generators**

Natural gas generators are well suited for the oilfield because they run on natural gas or propane.  Natural gas emanating off some oil and natural gas liquids-focused wells, particularly wells that do not have a connection to natural gas processing facilities and natural gas pipelines, is often considered a waste product and in many cases is flared. LTR can use this natural gas to fuel the generators.  Compared to traditional diesel generators, natural gas-powered generators emit less carbon dioxide and are viewed by customers to be an environmentally superior option. LTR's current portfolio of natural gas generators range in size from 30 kVA to 400 kVA and are manufactured by a top-tier OEM.  Revenue for this product category was $45.3 million in 2015 and $5.2 million for the three months ended June 30, 2016.  As of June 30, 2016, LTR owned 735 natural gas generators.

(3)    **Fluid Handling Products**

LTR offers a broad range of fluid handling products, including frac tanks, acid tanks, mud tanks, super vac tanks and Mobile Pond™, as well as the trucking and logistical support for each product.  These items are crucial to both the drilling and completion phases of a well. These products have minimal maintenance requirements, high gross margins, long useful lives of approximately 20 years and attractive payback periods.  LTR rents fluid handling products in conjunction with its water management services, resulting in numerous rental product and service bundling opportunities.  Revenue for this product category was $19.2 million in 2015 and $1.2 million for the three months ended June 30, 2016.  As of June 30, 2016, LTR had a fleet of 2,707 tanks.

(4)    **Light Towers**

LTR believes that it owns one of the largest private fleets of rental light towers in the U.S.  In the oil and gas industry, they are used by E&P operators to safely light up work spaces around active wellsites, and service similar applications in various other industries, such as construction.  As of June 30, 2016, LTR had a fleet of 1,323 light towers, which are diesel-powered, range in size from 8kW to 20kW and a majority of which are manufactured by top-tier OEMs.  Light towers have low capital costs and have minimal operation and maintenance costs while deployed in the field.  They are an attractive product offering given the high gross margins, relatively short payback period and a typical useful life between five and six years.  Revenue for this product category was $8.9 million in 2015 and $0.6 million for the three months ended June 30, 2016.

(5)    **Heaters**

LTR offers both flameless and indirect heaters that can create temperatures up to 180°F. LTR's fleet of flameless heaters utilizes a safe and efficient flameless technology with the capability to produce 400,000 to 1.2 million BTUs.  LTR's indirect heaters are indirectly fired with no combustible gases in their airflow and have the capability to produce 800,000 to 1.2

million BTUs.  The demand for heaters is driven by operations in cold-weather basins like the Bakken and Marcellus.  Rental season generally commences mid-October and slows down mid-March.  LTR had a fleet of 378 heaters as of June 30, 2016.  Revenue for this product category was $6.9 million in 2015 and $0.1 million for the three months ended June 30, 2016.

(6)   **Trailers**

LTR currently offers one- and two-bedroom trailer homes that are used to provide housing for clients' employees in the field.  In select markets, LTR also provides office trailers and meeting centers to customers at the wellsite.  The trailer houses come equipped with heating and air conditioning.  The office trailers have a commercial-grade superstructure and chassis, custom cabinetry, commercial-grade flooring and extra bright fluorescent ceiling lights.  The assets have low capital requirements, are rented on a day rate basis and can generate high gross margins.  As of December 31, 2015, LTR's fleet consisted of 157 trailers.  Revenue for this product category was $2.4 million in 2015 and $0.2 million for the three months ended June 30, 2016.

(7)   **Other Rental Items**

In addition to LTR's core rental offerings, LTR also offers ancillary rental items necessary for drilling and completion operations, including lay-flat hose, pumps, emergency eye wash and shower units, cooling trailers, fresh water stations and pressure washers.  For the most part, these products are highly synergistic with LTR's main surface equipment product lines and logistic services and enable LTR to package bundled product and service solutions for LTR's customers.  Because they represent a small portion of LTR's total revenue, LTR signed agreements with third parties to manage its downhole tool and drill pipe inventory.  Revenue for the downhole tools and pipe product category was $0.3 million in 2015 and $0.0 million for the three months ended June 30, 2016.

(c)   **<u>Services</u>**

(1)   **Delivery / Set-Up, Fuel, Trucking and Other Services**

As of June 30, 2016, LTR utilized a fleet of light-duty trucks to address the logistical needs of its customers, including equipment delivery, relocation and retrieval.  Revenues are based on equipment delivered and distance traveled.  LTR's logistics fleet also includes heavy-haul trucks specifically designed to deliver large equipment, including frac tanks and mud tanks.  Heavy haul logistics revenues are based on per-hour charges. Revenue from these logistical services was $14.0 million in 2015 and $1.2 million for the three months ended June 30, 2016.

(2)   **Water Management**

In addition to LTR's broad range of fluid handling rental products, LTR offered other related services that were crucial to the drilling and completion of a well until 2015, when it discontinued its water management division.  Up to December 31, 2014, LTR offered water management services, including on-site frac support, pit-to-pit water transfer, long distance water transfer set-up and gate-guard services.  Water management had similar business drivers as fluid handling rental equipment and could often be sold together.

### 3.5    The Debtors' Key Assets

For purposes of book value, the Debtors' key assets consist of its well-maintained fleet of rental equipment in key U.S. oil and gas producing regions. As described in greater detail in the Liquidation Analysis, attached hereto as **Exhibit C**, given the deep decline in drilling and completion activity, as well as the oversaturation of equipment on the market, the liquidation value of the Debtors' property and equipment at this time pales in comparison to the value of the equipment to the Debtors' on a going-concern basis. The chart below summarizes the book value of LTR's assets over the four-month period from March 31, 2016 – June 30, 2016 (all dollar values expressed in thousands).

| | March 31, 2016 | April 30, 2016 | May 31, 2016 | June 30, 2016 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents | $ 15,355 | $ 19,568 | $ 22,253 | $ 22,871 |
| Account receivable, net | 18,269 | 14,548 | 12,243 | 10,765 |
| Prepaid expenses and other current assets | 1,816 | 2,072 | 2,193 | 2,586 |
| Notes receivable | 4,633 | 4,517 | 4,540 | 4,562 |
| Prepaid income taxes | 6,811 | 8,311 | 9,911 | 9,611 |
| Deferred tax asset | 1,600 | 1,600 | 1,600 | 1,600 |
| **Total current assets** | 48,484 | 50,616 | 52,740 | 51,995 |
| **PROPERTY AND EQUIPMENT, NET** | 258,568 | 255,032 | 251,136 | 247,975 |
| **OTHER ASSETS** | | | | |
| Intangibles, net | 19,879 | 19,718 | 19,559 | — |
| Goodwill | 8,657 | 8,657 | 8,657 | — |
| **Total other assets** | 28,536 | 28,375 | 28,216 | — |
| **TOTAL ASSETS** | $ 335,588 | $ 334,023 | $ 332,092 | $ 299,970 |

With respect to the Notes receivable above, on September 25, 2015, LTR entered into a short-term loan receivable with Total Operations and Production Services of Midland, LLC (the "Borrower"). Under the agreement, the Borrower received a loan from LTR with interest

28

accruing at 6% per year on the balance outstanding and payable upon maturity. The loan is collateralized by the Borrower's assets and matures the earlier of (i) thirty days after written demand for payment is given by the Company to the Borrower, and (ii) December 31, 2016. As of June 30, 2016, the loan principal and interest receivable total approximately $4.56 million.

### 3.6    **The Debtors' Prepetition Funded Debt**

As of the date hereof, the Debtors' funded debt is comprised of approximately $330 million in principal and approximately $15.8 million in unpaid interest outstanding under the Old Notes (as defined below). Further, the Debtors have a fully undrawn ABL Facility, all as more fully described below.

(a)    **ABL Facility**

On July 21, 2014, LTR entered into an ABL Facility for borrowings up to the lesser of (a) $30 million and (b) a borrowing base of 85% of eligible receivables of LTR less reserves. The ABL Facility also provides for an uncommitted incremental facility of up to $12 million.

The ABL Facility is secured by (i) a first priority lien on all of the existing and future property and assets of LTR and the Old Notes Guarantors (as defined below) constituting Credit Facility Priority Collateral (as defined in the Old Notes Indenture) and (ii) a second priority lien on all of the existing and future property and assets of LTR and the Old Notes Guarantors constituting Notes Priority Collateral (as defined in the Old Notes Indenture). Interest rates on any amounts drawn under the ABL Facility equal either (a) prime rate plus an applicable margin of 0.75% to 1.25% or (b) the Eurodollar rate for the selected interest period plus an applicable margin of 1.75% to 2.25%. LTR also pays a commitment fee equal to 0.375% to 0.50% per annum on the unused portion of the ABL Facility. As of June 30, 2016, LTR had no amounts outstanding under its ABL Facility.

LTR is exploring whether to terminate the ABL Facility prior to the Effective Date. LTR has the right to voluntarily terminate the commitments under the ABL Facility upon three business days' notice to the administrative agent under the ABL Facility. Upon termination of the commitments and the payment of any accrued fees and expenses through the date of termination, the liens and guarantees under the ABL Facility would automatically terminate and be released pursuant to the terms of the ABL Facility. Terminating the ABL Facility may be beneficial to LTR given that the ABL Facility is undrawn and LTR would benefit from an overall reduction in fees following termination of the ABL Facility.

(b)    **8.125% Senior Secured Notes due 2019**

LTR is the issuer of 8.125% senior secured notes due 2019 (as used herein, the "Old Notes") under that certain Indenture (the "Old Notes Indenture"), dated July 21, 2014, by and among Light Tower Rentals, Inc., as issuer, LTR Holdco, Inc. and LTR Shelters, Inc. as guarantors party thereto (the "Old Notes Guarantors"), and The Bank of New York Mellon Trust Company, N.A. as trustee and collateral agent. The Old Notes bear an annual coupon of 8.125%, which is payable on February 1 and August 1 of each year. The Old Notes mature on August 1, 2019 with all principal paid at maturity.

The Old Notes and the guarantees are secured by (i) a first priority lien on all of LTR's existing and future property and assets constituting Notes Priority Collateral (as defined in the Old Notes Indenture) and (ii) a second priority lien on all of the existing and future property and assets of LTR and the Old Notes Guarantors on the Credit Facility Priority Collateral (as defined in the Old Notes Indenture). Consequently, the Old Notes and the guarantees are effectively subordinated to the ABL Facility to the extent of the ABL Facility's first lien on certain collateral. The Old Notes and the guarantees are effectively senior to all of LTR's existing and future unsecured indebtedness to the extent of the value of the collateral securing the Old Notes and to LTR's obligations under the ABL Facility to the extent of the value of the Notes Priority Collateral (as defined in the Old Notes Indenture).

LTR had an interest payment of approximately $13.4 million due under the Old Notes Indenture on August 1, 2016, which it did not pay. The Old Notes Indenture provides a 30-day grace period for LTR to make this interest payment. LTR does not expect to make this interest payment before the end of the grace period under the Old Notes Indenture. If LTR does not make this interest payment before the end of the grace period (and otherwise does not receive the necessary approvals of the Plan before the end of the grace period), the non-payment will become an event of default under the Old Notes Indenture and may result in the acceleration of all of LTR's indebtedness, including the Old Notes.

## 3.7    Directors and Officers

LTR's executive management team includes seven individuals who in the aggregate have over 150 years of relevant industry experience. As of the date of this Disclosure Statement, the Debtors' officers include: (a) Ted Hogan, Chief Executive Officer; (b) John Avary, Senior Vice President; (c) Pat Bond, President and Chief Operating Officer; and (d) Keith Muncy, Chief Financial Officer, Secretary and Treasurer.

As of June 30, 2016, LTR's executive management led a team of more than 250 employees. A majority of those employees are hourly employees, providing LTR with significant operational flexibility that enables LTR to scale its workforce up and down to meet demand. LTR's employees are not represented by a union.

It is anticipated that the Debtors' senior officers as of the Petition Date shall continue to occupy such roles until and upon the Effective Date. In accordance with section 1129(a)(5) of the Bankruptcy Code, the members of the New LTR Holdings Board and the officers, directors, and/or managers of each of New LTR Holdings and the Reorganized Debtors will be identified in the Plan Supplement or before the Confirmation Hearing. On the Effective Date, the New LTR Holdings Board will consist of five members. The members of the New LTR Holdings Board shall be determined in accordance with the terms of the RSA and designated as follows: (i) Clearlake Capital Group, L.P. or its affiliates ("Clearlake") is entitled to designate two (2) directors; (ii) the Consenting Noteholders other than Clearlake is entitled to designate one (1) director; (iii) the chief executive officer of LTR shall be a director; (iv) holders of the majority of the New LTR Holdings Interests shall designate one (1) director; and (v) for so long as such holders continue to hold at least 50% of each series of Equity Warrants (and units issuable upon exercise thereof), the holders of Investco Convertible Preferred Interests in possession of the majority of the Equity Warrants (and units issuable upon exercise thereof) shall designate one (1)

board observer.  The members of the board of directors of any Reorganized Debtor subsidiary of New LTR Holdings shall be acceptable to the Required Consenting Noteholders.  On the Effective Date, the existing officers of the Debtors shall serve in their current capacities for the Reorganized Debtors.  From and after the Effective Date, each director, officer, or manager of New LTR Holdings and the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and applicable laws of New LTR Holdings' and/or the respective Reorganized Debtor's jurisdiction of formation

The Debtors shall purchase, on or before the Effective Date, and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.

## ARTICLE IV

## EVENTS LEADING TO THE CHAPTER 11 CASES

### 4.1    Macroeconomic Forces Drive Decline in Demand

As noted above, LTR's business recently has come under significant pressure from macroeconomic forces beyond its control.  These trends include:

- significant declines in oil and natural gas commodity prices;

- lower levels of drilling and completion activity in the oil and natural gas sector;

- an oversupply of wellsite rental equipment in the markets in which LTR operates;

- reductions in the exploration, development, and production budgets for most of LTR's customers; and

- increased price competition for the services that LTR offers.

The Debtors' difficulties are consistent with the difficulties industry-wide.  Rig counts, a common indicator of new upstream drilling activity, are down nearly 60 percent over the past year.  In response to the recent market contraction, E&P companies have drastically reduced their drilling activities, and many have been forced to file for chapter 11 protection since the downturn in commodities prices, including Warren Resources, Inc., Sandridge Energy, Inc., Goodrich Petroleum Corporation, American Eagle Energy Corporation, Quicksilver Resources Inc., Saratoga Resources Inc., Sabine Oil & Gas Corporation, Samson Resources Corporation, Magnum Hunter Resources Corporation, Swift Energy Company, Energy & Exploration Partners, LLC, Energy XXI, Ltd., Ultra Petroleum Corporation, and Midstates Petroleum Company, Inc.  A growing number of other similarly situated companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.

## 4.2    Change in Operating Results

The following table sets forth amounts for the unaudited interim consolidated financial information for the three months ended June 30, 2016 compared to three months ended June 30, 2015.  The table illustrates the deeply negative impact the declines in oil and natural gas commodities have had on LTR's operations in the past year alone.

| | QUARTER ENDED JUNE 30, | | QUARTER V. QUARTER VARIANCE | |
| | 2016 | 2015 | $ CHANGE Increase/(decrease) | % CHANGE |
|---|---|---|---|---|
| **Results of Operations:** | | | | |
| Total revenue | $  14.1 | $  43.1 | $  (29.0) | 67.3 % |
| Cost of sales | 6.8 | 17.1 | (10.3) | 60.2 % |
| Gross profit | 7.3 | 26.0 | (18.7) | 71.9 % |
| Selling, general and administrative expenses [1] | 6.8 | 10.4 | (3.6) | 34.6 % |
| Depreciation and amortization expense | 19.8 | 14.0 | 5.8 | 41.4 % |
| Income (loss) from operations | (19.3) | 1.6 | (20.9) | NMI |
| Other expense | | | | |
| Interest expense | 7.2 | 7.1 | 0.1 | 1.4 % |
| Loss (gain) on sale of assets | (0.2) | 0.0 | (0.2) | |
| Impairment loss | 19.4 | 0.0 | 19.4 | |
| Total other expense | 26.4 | 7.1 | 19.3 | |
| Income (loss) before income taxes | (45.7) | (5.5) | (40.2) | NMI |
| Provision for income taxes | | | | |
| Total income tax expense (benefit) | (15.0) | (1.5) | (13.5) | NMI |
| Net income (loss) | $  (30.7) | (4.0) | $  (26.7) | NMI |
| **Non-GAAP Measures:** | | | | |
| EBITDA | $  (18.7) | $  15.6 | $  (34.3) | 219.9 % |
| Adjusted EBITDA | $  1.3 | $  16.3 | $  (15.0) | 92.0 % |
| Utilization | 18.9% | 38.6% | | |

**(In millions)**

(1)  Includes $0.4 million and $0.4 million of stock-based compensation in 2016 and 2015, respectively.

NMI – Not meaningful information

***Revenue.***  The total revenue decreased $29.0 million, or 67.3%, to $14.1 million for the three months ended June 30, 2016, as compared to the corresponding quarter in 2015. The equipment rental division accounted for $11.0 million, or 78.0%, of revenue for the three months ended June 30, 2016, as compared to $31.4 million, or 72.9%, of revenue for the corresponding quarter in 2015. The service division accounted for $3.1 million, or 22.0%, of revenue for the three months ended June 30, 2016, as compared to $11.7 million, or 27.1% of revenue for the

corresponding quarter in 2015.

Revenue from the equipment rental division decreased $20.4 million, or 65.0%, for the three months ended June 30, 2016, from revenue of $31.4 million during the corresponding quarter in 2015. This decrease is due to the reduced rental revenue from all core products, including diesel generators, natural gas generators, tanks, and light towers.  This revenue reduction is a result of both reduced utilization rates achieved on the rental equipment fleet and reduced rental rates earned on equipment rental.

Revenue from the service division decreased $8.6 million, or 73.5%, for the three months ended June 30, 2016, from revenue of $11.7 million during the corresponding quarter in 2015. This decrease is primarily related to the reduced sales of services (e.g. fuel and delivery) associated with the reduced rental of diesel generators and light towers, reduced trucking associated with the reduced rental of fluid handling equipment, and reduced re-rental revenue from the rental of non-owned equipment.  In addition, the water management branches in Minot, ND and Midland, TX were closed during 2015, therefore no water management revenue was generated in the second quarter of 2016.

*Cost of sales*.  Cost of sales decreased $10.3 million, or 60.2%, for the three months ended June 30, 2016, from cost of sales of $17.1 million for the corresponding quarter in 2015. This cost decrease reflects the reduction in direct costs necessary to support revenue.

*Gross profit*. Gross profit decreased $18.7 million or 71.9% to $7.3 million for the quarter. Gross profit margin decreased to 51.8% of total revenue as compared to 60.3% in the same quarter last year.  The ongoing decrease in the gross profit margin reflects the impact of ongoing rental price reductions across all rental products that have not been offset proportionately by operating cost reductions as well as any ongoing operating cost changes which are lagging behind the ongoing reduction in revenues.

*Selling, general and administrative expenses*.  Selling, general and administrative expenses decreased $3.6 million, or 34.6%, for the three months ended June 30, 2016, from selling, general and administrative expenses of $10.4 million for the corresponding quarter in 2015. The majority of the expense reductions were made through headcount reductions, elimination of incentive compensation, reduction in benefit programs, and a reduction in other costs directly associated with reduced headcount. Selling, general and administrative expenses currently represent 48.2% of total revenue in the current quarter as compared to 24.1% in the same quarter last year.  The decrease in the quarterly selling general and administrative expenses continues to lag behind the reduction in revenues due to the more fixed nature of these expenses and management's decision to not further reduce certain key corporate functions that are considered vital for the longer term health of the company.

*Depreciation and amortization expense*. Depreciation and amortization expense increased $5.8 million, or 41.4%, for the three months ended June 30, 2016, from depreciation and amortization of $14.0 million for the corresponding quarter in 2015. In the fourth quarter of 2015, the Company revised the estimated useful lives of certain rental assets based on the then current utilization rates therefore the current quarter depreciation expense does reflect the reduced depreciation rates. The second quarter of 2016 includes a write off in the amount of $8.7 million of goodwill associated with prior acquisitions.

33

*Interest expense.* Interest expense of $7.2 million for the three months ended June 30, 2016, was consistent with the corresponding quarter in 2015.  Amortization expense related to debt issuance costs totaled $0.5 million for the quarter ended June 30, 2015, consistent with the same quarter last year.

*Impairment loss.*  Impairment loss of $19.4 million as at June 30, 2016 reflects the write-off of the remaining carrying value of the customer lists and non-compete agreements associated with prior acquisitions.

*EBITDA.* EBITDA decreased $34.3 million or 219.9% to $(18.7) million for the three months ended June 30, 2016.  The reduction in the EBITDA in the second quarter of 2016 versus the same quarter last year is due to the combined impact of the reduction in the gross profit and the impairment loss of $19.4 million in the quarter being partially offset by reductions in the selling, general and administrative expenses.

*Adjusted EBITDA*. Adjusted EBITDA decreased $15.0 million or 92.0% to $1.3 million for the second quarter of 2016.  Adjusted EBITDA represented 9.2% of total revenue for the quarter, as compared to 37.8% in the same period last year.

*Utilization*. Utilization of the rental equipment for the second quarter of 2016 amounted to 18.9% as compared to 38.6% in the second quarter of 2015. The overall reduction in utilization was due to reduced demand for rental days across all core products including diesel generators, natural gas generators, light towers, and fluid handling equipment.

## 4.3     The Debtors' Capital Expenditures to Expand Their Business

Coinciding with the energy market recovery following the overall industry downturn in 2009, the Company embarked on an aggressive growth program (including both organic growth and acquisitions).  Organic growth included geographic expansion into new basins, the addition of new locations in the basins which the company already had a presence and the growth of existing locations in which the company was already operating.  In addition to the demand for new rental equipment for those expansion locations, the Company was also experiencing increased demand for its equipment in those basins that it already had an established presence.  To meet that demand, the Company recommenced the reinvestment of all its free cash flow into rental equipment and supporting operations.  Combined spending on property, plant and equipment in the fiscal years of 2012 to 2015 inclusive amounted to $282 million.  During that time, the Company also increased its borrowings to provide additional cash resources to fund additional property plant and equipment purchases that were unable to be funded by the Company's own free cash flows.  Until the end of the 2014 fiscal year, the Company's equipment purchasing program for the new equipment was closely matching the demand for the rental equipment as the utilization rate (a measure of the amount of the equipment fleet is on rent during any particular month generating revenue for the Company) was slowly increasing over time.  In early 2015, the demand for the rental equipment started to decrease significantly and the Company began to have a significant inventory of rental equipment in each of its locations that was no longer on rent and generating revenue for the Company.  The utilization rate of the rental equipment has continued to decrease on a steady basis to date as the Company, during the

second quarter of 2016, just experienced the lowest equipment utilization rate on its equipment fleet in recent years.

The timing of this historic market downturn could not have been worse for LTR, as LTR has undergone a recent corporate expansion and raised significant capital to repay existing indebtedness and fund certain corporate activities.

On December 27, 2012, the Company purchased 100% of the outstanding stock of Wellsite Leasing, Inc., ("Wellsite") an oilfield equipment rental company, and 100% of the outstanding membership interests of On Site Water, LLC, ("On Site") an oilfield water transfer company.  Both companies were headquartered in Dickinson, North Dakota and had additional locations in Watford City, North Dakota, Stanley, North Dakota and Minot, North Dakota. These acquisitions were made for the purpose of increasing LTR's rental base in the North Dakota area with an expanded rental fleet, additional customer relationships and experienced regional management.  In connection with the acquisition of Wellsite, LTR was required to pay the former owners of Wellsite the following: (i) on the closing of the acquisition, $28.0 million in cash and $4.0 million in common stock of LTR Investco, Inc.; and (ii) after the closing date of the acquisition, additional consideration that was payable in two tranches, each consisting of $2.0 million in cash and $2.0 million in common stock of LTR Investco, Inc. The first tranche was due in the thirteenth month following the closing of the acquisition (the "First Wellsite Tranche") and the second tranche was due in the twenty-fifth month following the closing of the acquisition of Wellsite (the "Second Wellsite Tranche"), each subject to the achievement of certain revenue targets. Upon settlement of the First Wellsite Tranche, LTR had a cash distribution of $1.49 million and a stock distribution of $1.49 million to the former owners of Wellsite.  The remaining contingent stock consideration not initially owing under the Second Wellsite Tranche was reduced as a result of LTR's refinancing in July 2014 and equity placement in August 2014, respectively.  Proceeds from the refinancing and equity placement were used to settle the cancellation of a portion of the remaining contingent stock issuance.  The contingent cash consideration of $2.0 million in the Second Wellsite Tranche was due and paid on January 31, 2015 and $0.5 million was distributed to the former owners of Wellsite.  In connection with the acquisition of On Site, LTR was required to pay the former owners of On Site the following: (i) on the closing of the acquisition, $2.8 million in cash and $1.8 million in common stock of LTR Investco, Inc.; and (ii) after the closing date of the acquisition, additional contingent consideration consisting of $1.7 million in cash.  The contingent cash consideration of $1.7 million was due and paid in January 2014.

The water transfer business, originally acquired in the On Site acquisition, was discontinued at the end of 2015 due to declining revenues and unprofitable financial performance.  The entities associated with the Wellsite acquisition were dissolved in July 2016, and the entities associated with the On Site acquisition were dissolved in June 2016.

On January 10, 2014, LTR signed a purchase agreement to acquire certain assets of Riverside Rentals, LLP ("Riverside Rentals"), a rental equipment company in the oil and gas industry, with operations in Williston, Northern Dakota for a total consideration of $3.6 million, including $2.3 million in cash and a $1.3 million promissory note, which was due and paid in January 2015.  This acquisition was made to broaden LTR's presence in the North Dakota and

the Montana area with additional customer relationships and a new satellite branch location in Williston, North Dakota.

In July 2014, LTR issued the Old Notes, the proceeds of which were used to (i) fund a distribution to LTR's equityholders, (ii) to permanently repay the approximately $107 million in borrowings under an existing credit facility, (iii) to pay related transaction fees and expenses and (iv) for general corporate purposes.  At the time the Old Notes were issued, oil prices were expected to remain strong and, as a result, would lead to continued North American shale development.  Further, shale opportunities had driven the return of majors, including Exxon Mobil, Shell, BP, Chevron, and Conoco, back to the U.S. onshore market, contributing to robust capital spending in the E&P sphere.

## 4.4    The Debtors' Efforts to Address Liquidity Issues

### (a)    Restructuring Options

In the months leading up to the filing of the Plan, LTR engaged Credit Suisse Securities (USA) LLC ("Credit Suisse") to analyse its financial condition and assist LTR in pursuing restructuring options to address its liquidity challenges.  In May 2016, Credit Suisse presented a number of restructuring alternatives to LTR's board, which included (i) a comprehensive recapitalization, (ii) a new money plan, which would include a partial equitization, an exchange of Old Notes for New Notes and a new equity contribution from the existing stockholders, and (iii) an out-of-court exchange offer that would replace the Old Notes with new PIK notes.  The paths presented to LTR were all highly dependent on the Old Noteholders' willingness to engage in the potential transactions.

LTR resolved to pursue the out-of-court exchange offer, whereby Old Noteholders would convert their entire position into a combination of New Notes and equity in New LTR Holdings (the "Exchange Offer").  LTR engaged holders of a majority of Old Notes in extensive negotiations regarding the Exchange Offer.  As negotiations progressed, however, uncertainty arose as to LTR's short-term liquidity and ability to achieve the necessary threshold of Old Noteholder consents before the 30-day grace period to make the August 1, 2016 interest payment under the Old Notes Indenture expired and triggered an event of default.  As a result, LTR decided to pursue a prepackaged chapter 11 plan of reorganization.

### (b)    The Restructuring Support Agreement

On August 8, 2016, the Debtors entered into the RSA, attached as **Exhibit F** to this Disclosure Statement, with (i) certain beneficial holders, or investment advisors or managers for the account of beneficial holders, of the Old Notes, (ii) Clairvest Equity Partners III Limited Partnership, CEP III Co-investment Limited Partnership, Mojopa, Ltd. and Avary Family Limited Partnership, as holders of approximately 90.1% of the Investco Common Interests, (iii) Keith Muncy, Pat Bond, Mark Beckstrom and Nina Valles (members of the executive management team), as holders of 100% of the Investco Preferred Interests, and (iv) Stepstone Capital Partners III, L.P. and its affiliated entities listed on the signature pages thereto, Allstate Insurance Company and its affiliated entities listed on the signature pages thereto, and USS-Constitution Co-Investment Fund II, LP and its affiliated entities listed on the signature pages

thereto, as holders of 100% of the Investco Convertible Preferred Interests.  Under the terms of the RSA, the holders of the Old Notes have agreed, among others things, to support and take all reasonable actions necessary to consummate the restructuring and the Plan in a timely manner, to timely vote all of its claims to accept the Plan and to support and take all reasonable actions necessary to facilitate the solicitation of votes on the Plan, approval of this Disclosure Statement, and confirmation and consummation of the Plan.  The Restructuring Support Agreement may be terminated upon the occurrence or failure to occur of certain events generally related to progress toward confirmation and consummation of the Plan.

(c)     **Conclusion**

The Debtors believe that the restructuring embodied in the RSA and Plan gives them the best opportunity to withstand current adverse market conditions, maintain adequate liquidity for their operations going forward, avoid an enterprise-wide, piecemeal liquidation, and maximize value for the benefit of their stakeholders.  Under the terms of the RSA and the Plan, the Debtors anticipate emerging from bankruptcy in approximately two months.   The restructuring contemplated by the RSA and the Plan preserves the Debtors' value as a going concern. Consummation of the restructuring contemplated by the RSA and Plan will deleverage the Debtors' balance sheet by approximately 90 percent, leave general unsecured creditors unimpaired, and otherwise has support from the vast majority of the Debtors' stakeholders.  The Debtors' negotiation of this result represents a significant achievement against such a challenging market backdrop.   Based on the foregoing, the Debtors may, subject to ultimate approval by the Debtors' board of directors, commence the Chapter 11 Cases to implement the terms of the RSA and the Plan.

## ARTICLE V

## OTHER KEY ASPECTS OF THE PLAN

### 5.1     Distributions

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of or Interest in the Debtors.

(a)     **Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on the Effective Date or as soon as practicable thereafter, subject to the Reorganized Debtors' right to object to Claims and Interests; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the

Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no less frequently than once in every 30 day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

(b)     **Rights and Powers of Distribution Agent**

(1)     **Powers of the Distribution Agent**

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

(2)     **Expenses Incurred on or after the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

(c)     **Record Date for Distributions to Holders of Non-Publicly Traded Securities**

On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate, is transferred and the Debtors have been notified in writing of such transfer less than 10 days before the Effective Date, the Distribution Agent shall make distributions to the transferee (rather than the transferor) only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.  Notwithstanding the foregoing, publicly held securities shall not be subject to the distribution record date.

(d)     **Disputed Claims Process**

Except as otherwise provided herein, if a party files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan.  For the avoidance of doubt, there is no

requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan.  **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

(e)      **Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.Q of the Plan.

(f)      **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

(g)      **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

(h)      **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**5.2**     **Restructuring Transactions**

On or after the Confirmation Date, or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, consistent with and pursuant to the terms and conditions of the RSA, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, including such transactions as are acceptable to the Required Consenting Noteholders to cause New LTR Holdings to become the ultimate parent company of the Reorganized Debtors and to effect (i) the issuance and distribution of the New LTR Holdings Interests, Equity Warrants, and any equity or equity-linked interests associated with the Management Incentive Plan, (ii) the issuance by Reorganized LTR of the New Notes and execution and delivery of the New Notes Debt Documents, and (iii) the guaranty of the New Notes by Reorganized Holdings; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the Exit Facility Documents, if applicable; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

Each of the matters provided for by the Plan involving the corporate structure of New LTR Holdings and/or the Debtors or corporate or related actions to be taken by or required of New LTR Holdings and/or the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further action and without any further action by New LTR Holdings, the Debtors or the Reorganized Debtors, as applicable. Such actions may include, among others, the following: (a) the adoption and filing of the New Organizational Documents; (b) the selection of the directors, managers, and officers for New LTR Holdings and the Reorganized Debtors, including the appointment of the New LTR Holdings Board; (c) the authorization, issuance, and distribution of New LTR Holdings Interests, New Notes, Equity Warrants, and any equity or equity-linked interests associated with the Management Incentive Plan; (d) the assumption of Executory Contracts or Unexpired Leases; (e) the entry into the Exit Facility, if applicable, and the execution and delivery of the Exit Facility Documents, if applicable and the New Notes Debt Documents; and (f) the adoption of the Management Incentive Plan, at the discretion of (and on terms and conditions determined by) the New LTR Holdings Board and in accordance with the RSA.

**5.3**     **Assumption of Executory Contracts and Unexpired Leases**

Each Executory Contract and Unexpired Lease that has otherwise not been rejected shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code. The

assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors, the Required Consenting Noteholders, and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**5.4     Cure of Defaults and Objections to Cure and Assumption**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed and served on the Reorganized Debtors on or before 30 days after the Effective Date. If such Cure dispute is not resolved within 7 days of the Reorganized Debtors' receiving such Cure dispute, the counterparty to the applicable assumed Executory Contract or Unexpired Lease shall timely file an objection with the Bankruptcy Court within 7 days. **Any such request and/or objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the

Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim (but, for the avoidance of doubt, not including Cures) based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

## 5.5   Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

## 5.6   Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

## 5.7   Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## 5.8   Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## 5.9   Release, Injunction, and Related Provisions

(a)   **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

(b)     **Releases by the Debtors**

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Exit Facility, if applicable, or any Restructuring Transaction, contract, instrument, release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or

Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

        (c)      **Releases by Holders of Claims and Interests**

Notwithstanding anything contained in this Plan to the contrary, as of the Effective Date, for good and valuable consideration, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Exit Facility, if applicable, or any Restructuring Transaction, contract, instrument, release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

        (d)      **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facility, if applicable, or any Restructuring Transaction, contract, instrument, release or other Plan Transaction Document, agreement, or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution

of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(e)  **Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following:  (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date, except for Causes of Action brought as counterclaims or defenses to claims asserted against the Reorganized Debtors and their Affiliates; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

(f)  **Injunction**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have**

45

held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

## 5.10    Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## 5.11    Indemnification

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

**5.12    Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**5.13    Release of Liens**

Except (a) with respect to the Liens securing the Exit Facility, if applicable, the New Notes, and Other Secured Claims (depending on the treatment of such Claims), or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

**5.14    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**5.15    Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New LTR Holdings Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall: (a) amend, adopt, assume, and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans (other than any equity incentive plan (if any) or other prepetition senior management incentive plan, which in each case shall be replaced by the Management Incentive Plan), health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees

employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

## 5.16   Professional Fees and Expenses

On the Effective Date, the Debtors or the Reorganized Debtors shall pay in Cash all accrued and unpaid reasonable and documented fees and expenses of the Consenting Noteholders' professionals (which shall be limited to Kirkland & Ellis LLP, a financial advisor, a due diligence consultant, and any other professionals agreed to by the Debtors or the Reorganized Debtors, as applicable (with such agreement not to be unreasonably withheld)) and the LTR Indenture Trustee.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors shall pay in Cash all accrued and unpaid fees and expenses owed to Credit Suisse Securities (USA) LLC under its letter, dated April 12, 2016, with LTR, including, without limitation, the "Transaction Fee" referred to therein, and such payment shall be deemed reasonable.  The outstanding portion of the Transaction Fee is approximately $2.6 million.

## 5.17   Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## 5.18   Cancellation of Notes, Instruments, Certificates, and Other Documents

On the Effective Date, except with respect to assumed Executory Contracts and Unexpired Leases and to the extent otherwise provided herein, all notes, instruments, Certificates, plans (including the 2012 Stock Option Plan of Debtor LTR Investco, Inc.), agreements and other documents (including that certain Clairvest Management Fee Agreement and any prepetition shareholders' agreement or investor rights agreement) evidencing Claims or Interests, shall be cancelled and the obligations thereunder (or in any way related thereto) of the Debtors, the Reorganized Debtors, or any other counterparty shall be discharged and canceled; *provided, however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims to receive distributions under the Plan and (b) allowing the beneficiaries of any Indemnification Provisions to be indemnified.

Any Claims (the following, collectively, "Old Equity Claims") arising from the cancellation or rejection of any prepetition organizational documents, shareholders' agreement or investor rights agreement, and any related-party consulting or management services agreements, including that certain Clairvest Management Fee Agreement, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Old Equity Claims have agreed to waive, not pursue, and not receive any distribution on account of such Claims.

The LTR Indenture shall continue in effect to: (i) allow the LTR Indenture Trustee to make all distributions to Noteholders; (ii) permit the LTR Indenture Trustee to assert its charging lien in accordance with the terms of the LTR Indenture; (iii) permit the LTR Indenture Trustee to appear before the Bankruptcy Court or any other court of competent jurisdiction after the Effective Date; and (iv) permit the LTR Indenture Trustee to perform any functions that are necessary to effectuate the foregoing.

## 5.19    New Organizational Documents

On the Effective Date, the Debtors shall enter into new formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) as may be necessary to effectuate the transactions contemplated by the Plan and shall be in form and substance acceptable to the Debtors and the Required Consenting Noteholders. The Debtors' respective formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) shall be amended, cancelled, or otherwise modified as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code. The New Organizational Documents shall be included as exhibits to the Plan Supplement and shall, among other things: (a) be in form and substance acceptable to the Debtors and Required Consenting Noteholders; and (b) authorize the issuance of the New LTR Holdings Interests. After the Effective Date, each of New LTR Holdings and each of the Reorganized Debtors may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

## 5.20    Modification of Plan

Effective as of the date hereof, (a) the Debtors, with the consent of the Required Consenting Noteholders (not to be unreasonably withheld), reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Required Consenting Noteholders or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**5.21    Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**5.22    Withdrawal of Plan**

The Debtors, subject to and in accordance with the RSA, reserve the right to withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**5.23    Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**5.24    Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://cases.primeclerk.com/LTR or the Bankruptcy Court's website, available via PACER.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**5.25    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Plan and Plan Transaction Documents shall be in a form and substance consistent in all material respects with the RSA;

2.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors and the Required Consenting Noteholders, and shall:

     (e)      authorize the Debtors or the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

     (f)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

     (g)      authorize the Debtors, as applicable or necessary, to:  (1) implement the Restructuring Transactions; (2) distribute the New Notes, the New LTR Holdings Interests, and the Equity Warrants pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (3) make all distributions and issuances as required under the Plan, including Cash, the New Notes, the New LTR Holdings Interests, and the Equity Warrants; and (4) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan;

     (h)      authorize the implementation of the Plan in accordance with its terms; and

     (i)      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the Exit Facility, if applicable, and the New Notes);

3.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors and the Required Consenting Noteholders;

5.      the New Organizational Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation, limited liability company, or alternative comparable laws, as applicable;

6.      all Professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

7.      all fees and expenses of the Consenting Noteholders, including the fees and expenses of counsel and financial advisor to the Consenting Noteholders, shall have been paid in full in Cash;

8.      the RSA shall not have terminated and shall be in full force and effect and shall not be (a) identified on the Schedule of Rejected Contracts and Leases or (b) subject of a pending motion to reject Executory Contracts, and the Debtors shall be in compliance therewith;

9.      the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Plan and, without limiting any definition contained in Article I.A of the Plan or other provision of the Plan, according to documentation acceptable to the Debtors and the Required Consenting Noteholders; and

10.     if applicable, the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility, if applicable, shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility, if applicable, shall be deemed to occur concurrently with the occurrence of the Effective Date.

**5.26    Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld), may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**5.27    Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE VI[4]

## CERTAIN FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.

### 6.1    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, as noted, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### 6.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations

(a)    *A Claim or Interest holder may object to, and the Bankruptcy Court may disagree with, the Debtors' classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class only contains Claims or Interests that are substantially similar to the other Claims and Interests in such Class.  A holder of a Claim or Interest could challenge the Debtors' classification, however.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan.  Such modification could require re-solicitation of votes on the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

(b)    *The Debtors may not be able to satisfy the voting requirements for Confirmation of the Plan*

---

[4] In this Article, the use of the term "Debtors" includes "Reorganized Debtors," and the use of the term "Reorganized Debtors" includes "Debtors," where appropriate.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation. If the Plan does not receive the required support from Class 4, the Debtors may elect, subject to the terms of the RSA, to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

(c) ***The Bankruptcy Court may not confirm the Plan or may require the Debtors to re-solicit votes with respect to the Plan***

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. With respect to impaired classes of claims or interests that do not accept the plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation, satisfaction of the "absolute priority rule") and not discriminate unfairly with respect to such classes. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Plan.

The Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded. The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement. Typically, this process involves a 60- to 90-day period and includes a Bankruptcy Court hearing with respect to the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Bankruptcy Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests and the Debtors' liquidation analysis are set forth under the unaudited Liquidation Analysis, attached hereto as **Exhibit C**. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

- the absence of a market for the Debtors' assets on a going concern basis;

- additional administrative expenses involved in the appointment of a trustee; and

- additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

(d)    ***The Debtors may object to the amount or classification of a Claim or Interest***

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(e)    ***Even if the Debtors receive all necessary acceptances for the Plan to become effective, the Debtors may fail to meet all conditions precedent to effectiveness of the Plan***

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.

(f)    ***Contingencies may affect distributions to holders of Allowed Claims and Interests***

The distributions available to holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions under the Plan.

(g)    ***The Bankruptcy Court may find the solicitation of acceptances inadequate***

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).   Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code).   While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(h)   *The Bankruptcy Court may dismiss some or all of the Chapter 11 Cases*

Certain parties in interest may contest the Debtors' authority to commence and/or prosecute the Chapter 11 Cases.  If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason (including for cause or any grounds supporting abstention), the Debtors may be unable to consummate the transactions contemplated by the RSA and the Plan, and any parties providing restructuring support in the form of an exit facility may be unwilling to proceed with such funding.  If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding and/or liquidate their businesses in another forum to the detriment of all parties in interest.

(i)   *The United States Trustee or other parties may object to the Plan on account of the third-party release provisions*

Any party in interest, including the United States Trustee (the "U.S. Trustee"), could object to the Plan on the grounds that the third-party release contained in Article VIII.C of the Plan is not given consensually or in a permissible non-consensual manner.  In response to such an objection, the Bankruptcy Court could determine that the third-party release is not valid under the Bankruptcy Code.  If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third-party release.  This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

(j)   *The Debtors may seek to amend, waive, modify, or withdraw the Plan at any time prior to Confirmation*

The Debtors, with the consent of the Required Consenting Noteholders, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the RSA, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the RSA and

necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

(k)     *The Plan may have a material adverse effect on the Debtors' operations*

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective users, employees, partners, and other parties. Such adverse effects could materially impair the Debtors' operations.

(l)     *The Debtors cannot predict the amount of time spent in bankruptcy for the purpose of implementing the Plan, and a lengthy bankruptcy proceeding could disrupt the Debtors' businesses, as well as impair the prospect for reorganization on the terms contained in the Plan*

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 60 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- producers, suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or

otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed.  A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses, and could increase both the probability and the magnitude of the adverse effects described above.

(m)     *Other parties in interest might be permitted to propose alternative plans of reorganization that may be less favorable to certain of the Debtors' constituencies than the Plan*

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date.  Such exclusivity period, however, can be reduced or terminated upon order of the Bankruptcy Court.  Other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Claims and Interests.  An alternative plan of reorganization also may result in less favorable treatment for a number of constituencies, including the holders of Claims and Interests, as applicable, in Classes 4, 8 and 9.

The Debtors consider maintaining relationships with their stakeholders, customers, and other partners as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly.  However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, more litigious, and much more expensive.  If this were to occur, or if the Debtors' stakeholders or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing sections also could occur.

(n)     *The Debtors' business may be negatively affected if the Debtors are unable to assume their Executory Contracts*

An executory contract is a contract on which performance remains due to some extent by both parties to the contract.  The Plan provides for the assumption of all Executory Contracts and Unexpired Leases that are not otherwise identified for rejection.  The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. With respect to some limited classes of Executory Contracts (including licenses with respect to patents or trademarks), however, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract.  There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive.  The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

(o)     ***The Debtors may be unsuccessful in obtaining first day orders to permit them to pay their vendors or continue operating their businesses in the ordinary course of business***

The Debtors have attempted to address potential concerns of their customers, vendors, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course.  There can be no guarantee, however, that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

(p)     ***The Bankruptcy Court may not approve the Debtors' use of cash collateral***

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to secured lenders, which requests will be in accordance with the terms of the RSA.  Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Cases.  There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested.  Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral.  There is no assurance that the Debtors will be able to obtain the right to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

(q)     ***Certain Claims may not be discharged and could have a material adverse effect on the Debtors' financial condition and results of operations***

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## 6.3    Risks Relating to the Restructuring Transactions

(a)     ***The Debtors will be subject to business uncertainties and contractual restrictions prior to the Effective Date***

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors.  These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change

existing business relationships with the Debtors.  In addition, if key employees depart because of uncertainty about their future roles and the potential complexities of the Restructuring Transactions, the Debtors' businesses could be harmed.

(b)      ***The support of the Consenting Noteholders is subject to the terms of the RSA, which is subject to termination in certain circumstances***

Pursuant to the RSA, the Consenting Noteholders are obligated to support the Restructuring Transactions discussed above and the Plan.  Nevertheless, the RSA is subject to termination upon the occurrence of certain termination events.  Accordingly, the RSA may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of the Consenting Noteholders and Existing Equityholders.

(c)      ***There is inherent uncertainty in the Debtors' financial projections***

The financial projections attached hereto as **Exhibit B** include projections covering the Debtors' operations through 2020.  These projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New LTR Holdings Interests and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' or the Reorganized Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors or Reorganized Debtors and their business plans.  Any deviations from the existing business plan would necessarily cause a deviation from the attached projections, and could result in materially different outcomes from those projected.

(d) ***The Debtors must continue to retain, motivate, and recruit executives and other key employees, which may be difficult in light of uncertainty regarding the Plan, and failure to do so could negatively affect the Debtors' business***

For the Debtors' restructuring to be successful, during the period before the Effective Date, the Debtors must continue to retain, motivate, recruit executives and other key employees and maintain employee morale. Moreover, the Debtors must be successful at retaining and motivating key employees following the Effective Date. Employees of the Debtors may feel uncertain about their roles with the Debtors until, or even after, future strategies are announced or executed. The potential distractions of the Debtors' restructuring may adversely affect the ability of the Debtors to retain, motivate, and recruit executives and other key employees and keep them focused on applicable strategies and goals. Additionally, the Debtors' employees could seek employment with one of the Debtors' competitors, which, in light of the Chapter 11 Cases, may seek to lure the employees at a time when such employees may be fearful about the Debtors' future. To be sure, a failure by the Debtors to attract, retain, and motivate executives and other employees during the period prior to or after the Effective Date could have a negative impact on the Debtors' businesses.

(e) ***Failure to confirm and consummate the Plan could negatively impact the Debtors***

If the Plan is not confirmed and consummated, the ongoing businesses of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' businesses caused by the failure to pursue other beneficial opportunities due to the focus on the Debtors' restructuring, without realizing any of the anticipated benefits of the Debtors' restructuring;

- the incurrence of substantial costs by the Debtors in connection with the Debtors' restructuring, without realizing any of the anticipated benefits of the Debtors' restructuring;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing traditional chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and interest holders that are less than contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

## 6.4   Risks Relating to the New Notes

(a) ***The Reorganized Debtors' indebtedness could adversely affect their financial condition***

The Reorganized Debtors' indebtedness could have important consequences to the holders of the New Notes and could have significant effects on the Reorganized Debtors' business, including the following:

61

- it may be more difficult for the Reorganized Debtors to satisfy their financial obligations, including with respect to the New Notes;

- the Reorganized Debtors' ability to obtain additional financing for working capital, capital expenditures, strategic acquisitions or general corporate purposes may be impaired;

- the Reorganized Debtors must use a portion of their cash flow from operations to pay interest on the New Notes and their other indebtedness, which will reduce the funds available to use for operations and other purposes;

- the Reorganized Debtors' ability to fund a change of control offer may be limited;

- the Reorganized Debtors' level of indebtedness could place them at a competitive disadvantage compared to their competitors that may have proportionately less debt;

- the Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business and the industry in which they operate may be limited; and

- the Reorganized Debtors' level of indebtedness may make them more vulnerable to economic downturns and adverse developments in their business.

It is anticipated that the Reorganized Debtors will obtain the funds to pay their expenses from their operations and, in the case of their indebtedness, from the refinancing thereof.  The Reorganized Debtors' ability to meet their expenses and make these payments therefore depends on their future performance, which will be affected by financial, business, economic and other factors, many of which they cannot control. The Reorganized Debtors' business may not generate sufficient cash flow from operations in the future, and their currently anticipated growth in revenue and cash flow may not be realized, either or both of which could result in their being unable to repay indebtedness, including the New Notes, or to fund other liquidity needs. If they do not have enough funds, the Reorganized Debtors may be required to refinance all or part of their then existing debt, sell assets or borrow more funds, which they may not be able to accomplish on terms acceptable to the Debtors, or at all. In addition, the terms of existing or future debt agreements may restrict the Reorganized Debtors from pursuing any of these alternatives.

(b)     ***The Reorganized Debtors and any of their existing or future subsidiaries may still be able to incur substantially more debt, which could exacerbate the risks associated with their pro forma leverage***

The Reorganized Debtors and any of their existing and future subsidiaries may be able to incur substantial additional indebtedness in the future. Although the terms of the New Notes Indenture may contain limitations on the Reorganized Debtors' ability to incur additional indebtedness, these restrictions are subject to a number of qualifications and exceptions.

The New Notes and guarantees may be secured by (i) a first priority lien on all of the existing and future property and assets of the Company and the guarantors constituting Notes Priority Collateral and (ii) a second priority lien on all of the existing and future property and

assets of the Reorganized Debtors constituting Credit Facility Priority Collateral, in each case subject to certain exceptions and permitted liens. If the Reorganized Debtors incur any additional indebtedness that ranks equally with the New Notes, the holders of that additional debt will be entitled to share ratably with the holders of the New Notes in any assets or proceeds thereof that do not constitute collateral securing the New Notes distributed in connection with any insolvency, liquidation, reorganization, dissolution or other winding up of the Reorganized Debtors.

(c)   ***The New Notes Indenture may impose significant operating and financial restrictions, which may prevent the Reorganized Debtors from pursuing certain business opportunities and taking certain actions***

The New Notes Indenture may impose, and future debt agreements may impose, operating and financial restrictions on the Reorganized Debtors. These restrictions may limit or prohibit, among other things, the Reorganized Debtors' ability to:

- incur additional indebtedness or issue certain preferred stock;

- pay dividends, redeem subordinated debt or make other restricted payments;

- make certain investments or acquisitions;

- grant or permit certain liens on their assets;

- enter into certain transactions with affiliates;

- merge, consolidate or transfer substantially all of their assets;

- incur dividend or other payment restrictions affecting certain of their subsidiaries;

- transfer, sell or acquire assets, including capital stock of their subsidiaries; and

- change the business they conduct.

These covenants could adversely affect the Reorganized Debtors' ability to finance their future operations or capital needs, withstand a future downturn in their business or the economy in general, engage in business activities, including future opportunities that may be in their interest, and plan for or react to market conditions or otherwise execute their business strategies. A breach of any of these covenants could result in a default in respect of the related indebtedness. If a default occurs, the relevant lenders or holders of such indebtedness could elect to declare the indebtedness, together with accrued interest and other fees, to be immediately due and payable and proceed against any collateral securing that indebtedness.  Acceleration of the Reorganized Debtors' other indebtedness could result in a default under the terms of the New Notes Indenture. There is no guarantee that the Reorganized Debtors would be able to satisfy their obligations if any of their indebtedness is accelerated.

(d)   ***The Reorganized Debtors' may not be able to generate sufficient cash to service all of their indebtedness, including the New Notes, and may be forced to take***

*other actions to satisfy their obligations under their debt agreements, which may not be successful*

The Reorganized Debtors' ability to make scheduled payments on or to refinance their debt obligations depends on their financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond their control. The Reorganized Debtors' business may not generate sufficient cash flow from operations in the future and their currently anticipated levels of revenue and cash flow may not be realized, either or both of which could result in their being unable to repay indebtedness, including the New Notes, or to fund other liquidity needs. Therefore, the Reorganized Debtors may not be able to maintain or realize a level of cash flows from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the New Notes.

If the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations, they may be forced to reduce or delay investments and capital expenditures, sell assets, seek additional capital or restructure or refinance their indebtedness, including the New Notes.  The Reorganized Debtors' ability to restructure or refinance their debt will depend on the condition of the capital markets and their financial condition at such time. Any refinancing of the Reorganized Debtors' debt could be at higher interest rates and may require them to comply with more onerous borrowing covenants, which could further restrict their business operations.  The terms of existing or future debt instruments, including the New Notes Indenture, may restrict the Reorganized Debtors from adopting some of these alternatives. In addition, any failure to make payments of principal and interest on their outstanding indebtedness on a timely basis would likely result in a reduction of the Reorganized Debtors' credit rating (if any), which could harm their ability to incur additional indebtedness. These alternative measures may not be successful and may not permit the Reorganized Debtors to meet their scheduled debt service obligations.

(e)     *The imposition of certain permitted liens may cause the assets on which such liens are imposed to be excluded from the collateral securing the New Notes and the guarantees. There are also certain other categories of property that may be excluded from the collateral*

The New Notes Indenture may permit liens in favor of third parties to secure certain indebtedness, such as purchase money indebtedness and capital lease obligations, and assets subject to such liens will in certain circumstances be excluded from the collateral securing the New Notes and the guarantees.  In addition, certain categories of assets may be excluded from the collateral securing the New Notes and the guarantees. If an event of default occurs and the New Notes are accelerated, the New Notes and the guarantees may rank equally with the holders of other unsubordinated and unsecured indebtedness of the relevant entity with respect to such excluded property and effectively subordinated to holders of obligations secured by a lien on such excluded property.

(f)     *The value of the collateral securing the New Notes may not be sufficient to pay the amounts owed under the New Notes. As a result, holders of the New Notes may not receive full payment on their New Notes following an event of default*

The proceeds of any sale of collateral securing the New Notes following an event of default with respect thereto may not be sufficient to satisfy, and may be substantially less than, amounts due on the New Notes.  No appraisal has been made of the collateral.

The value of the collateral in the event of liquidation will depend upon market and economic conditions, the availability of buyers and similar factors. The collateral does not include contracts, agreements, licenses and other rights that by their express terms prohibit the assignment thereof or the grant of a security interest therein. Some of these may be material to the Reorganized Debtors, and such exclusion could have a material adverse effect on the value of the collateral. The value of the collateral could be impaired in the future as a result of changing economic and market conditions, their failure to successfully implement their business strategy, competition and other factors. By its nature, some or all of the collateral may not have a readily ascertainable market value or may not be saleable or, if saleable, there may be substantial delays in its liquidation.

To the extent that liens, security interests and other rights granted to other parties encumber assets owned by the Reorganized Debtors, those parties have or may exercise rights and remedies with respect to the property subject to their liens that could adversely affect the value of that collateral and the ability of the trustee (if any) under the New Notes Indenture, the collateral agent (if any) or the holders of the New Notes to realize or foreclose on that collateral.

Bankruptcy laws and other laws relating to foreclosure and sale also could substantially delay or prevent the ability of the trustee (if any) or any holder of the New Notes to obtain the benefit of any collateral securing the New Notes. Such delays could have a material adverse effect on the value of the collateral.

If the proceeds of any sale of collateral are not sufficient to repay all amounts due on the New Notes, the holders of the New Notes (to the extent not repaid from the proceeds of the sale of the collateral) would have only an unsecured claim against the Reorganized Debtors' remaining assets.

(g)     ***The Reorganized Debtors will in most cases have control over the collateral, and the sale of particular assets by the Reorganized Debtors could reduce the pool of assets securing the New Notes and the guarantees***

The collateral documents may allow the Reorganized Debtors to remain in possession of, retain exclusive control over, freely operate, and collect, invest and dispose of any income from, the collateral securing the New Notes and the guarantees, in each case subject to certain limitations. There are circumstances other than repayment or discharge of the New Notes under which the collateral securing the New Notes and guarantees may be released automatically, without the consent of the holders of the New Notes or the consent of the trustee (if any) or the collateral agent (if any) for the New Notes including:

- a sale, transfer or other disposal of such collateral in a transaction not prohibited under the New Notes Indenture;

- with respect to collateral held by a guarantor, upon the release of such guarantor from its guarantee; and

- with respect to collateral that is capital stock, upon the dissolution of the issuer of such capital stock in accordance with the New Notes Indenture.

Subject to the terms of the Exit Facility (if any) or another credit facility, holders of the New Notes may not be able to control actions with respect to the Credit Facility Priority Collateral, including the commencement and conduct of enforcement proceedings against the Credit Facility Priority Collateral, whether or not the holders of the New Notes agree or disagree with those actions and even if the rights of the holders of the New Notes are adversely affected.

The New Notes Indenture may also permit the Reorganized Debtors to designate any existing or future restricted subsidiary that is a guarantor or any future subsidiary, whether or not it is a guarantor, as an unrestricted subsidiary. If the Reorganized Debtors designate such a subsidiary guarantor as an unrestricted subsidiary for purposes of the New Notes Indenture, all of the liens on any collateral owned by such subsidiary or any of its subsidiaries and any guarantee by such subsidiary or any of its subsidiaries may be released under the New Notes Indenture. Designation of an unrestricted subsidiary may reduce the aggregate value of the collateral securing the New Notes to the extent that liens on the assets of the unrestricted subsidiary and its subsidiaries are released.

(h)     ***The rights of holders of New Notes to the collateral securing the New Notes may be adversely affected by the failure to perfect security interests in the collateral and other issues generally associated with the realization of security interests in collateral***

The rights of the holders of the New Notes in the collateral may be adversely affected by the failure to perfect security interests in certain collateral in the future. Applicable law requires that a security interest in certain tangible and intangible assets can only be properly perfected and its priority retained through certain actions undertaken by the secured party, and that certain property and rights acquired after the grant of a general security interest, such as equipment subject to a certificate and certain proceeds, can be perfected only at the time at which such property and rights are acquired and identified. The trustee (if any) or the collateral agent (if any) for the New Notes may not monitor, or they may not inform the trustee (if any) or the collateral agent (if any) of, the future acquisition of property and rights that constitute collateral, and necessary action may not be taken to properly perfect the security interest in such after-acquired collateral. The collateral agent (if any) for the New Notes has no obligation to monitor the acquisition of additional property or rights that constitute collateral or the perfection of any security interest in favor of the New Notes against third parties. A failure to do so may result in the loss of the security interest therein or the priority of the security interest in favor of the New Notes against third parties.

In addition, neither the trustee (if any) nor the collateral agent (if any) will have any obligation to ensure that (i) the collateral exists or is owned by the Reorganized Debtors, (ii) any guarantor is protected or insured, (iii) the collateral agent's liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority or (iv) any property or assets constituting collateral have been properly and completely listed or delivered (or to ensure the genuineness, validity, marketability or sufficiency thereof or title thereto).

The security interest of the collateral agent (if any) for the New Notes will also be subject to practical challenges generally associated with the realization of security interests in collateral. For example, the collateral agent (if any) may need to obtain the consent of third parties and make additional filings. If they are unable to obtain these consents or make these filings, the security interests may be invalid and the holders of the New Notes will not be entitled to the collateral or any recovery with respect to the collateral. The collateral agent (if any) may not be able to obtain any such consent. Further, the consents of any third parties may not be given when required to facilitate a foreclosure on such collateral. They are also not required to obtain third-party consents. Accordingly, the collateral agent (if any) may not have the ability to foreclose upon those assets, and the value of the collateral may significantly decrease.

(i)     *The collateral is subject to casualty risks*

The Reorganized Debtors intend to maintain insurance or otherwise insure against hazards in a manner appropriate and customary for the Reorganized Debtors' business. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. Insurance proceeds may not compensate the Reorganized Debtors fully for their losses. If there is a complete or partial loss of any of the collateral, the insurance proceeds may not be sufficient to satisfy all of the secured obligations, including the New Notes and the guarantees.

(j)     *Certain assets may be excluded from the collateral*

Certain assets may be excluded from the collateral securing the New Notes including, among other things, the following:

- common equity of any of the Reorganized Debtors' first-tier foreign subsidiaries (it is not anticipated that the Reorganized Debtors will have foreign subsidiaries) in excess of 65% of the common equity of such foreign subsidiary, equity of any of their indirect foreign subsidiaries and property and assets of their foreign subsidiaries;

- items as to which a security interest cannot be granted without violating contract rights or applicable law; and

- assets securing purchase money debt or capitalized lease obligations permitted to be incurred under the New Notes Indenture to the extent the documentation relating to such purchase money debt or capitalized lease obligations prohibits such assets from being collateral.

If an event of default occurs and the New Notes are accelerated, the New Notes may rank equally with the holders of the Reorganized Debtors' other unsubordinated and unsecured indebtedness and other liabilities with respect to such excluded assets. As a result, if the value of the collateral that secures the New Notes and the guarantees is less than the amount of the claims of the holders of the New Notes, no assurance can be provided that the holders of the New Notes would receive any substantial recovery from such excluded assets.

(k)     *The Reorganized Debtors' ability to repurchase the New Notes upon a change of control may be limited*

Upon the occurrence of certain change of control events, the Reorganized Debtors may be required to offer to repurchase all outstanding New Notes at 101% of the principal amount thereof plus accrued and unpaid interest to the date of repurchase. The Reorganized Debtors, however, may not have sufficient funds at the time of the change of control to make the required repurchase of New Notes or repayment of the Reorganized Debtors' other indebtedness. Any of their future debt agreements may contain similar restrictions.

If the Reorganized Debtors fail to repurchase any New Notes submitted in a change of control offer, it could constitute an event of default under the New Notes Indenture which could constitute an event of default under the Reorganized Debtors' other indebtedness, even if the change of control itself would not cause a default. Important corporate events, such as takeovers, recapitalizations or similar transactions, may not constitute a change of control under the New Notes Indenture and thus not permit the holders of the New Notes to require the Reorganized Debtors to repurchase or redeem the New Notes.

(l)     ***Holders of the New Notes may not be able to determine when a change of control giving rise to mandatory repurchase rights has occurred following a sale of "substantially all'' of the Reorganized Debtors' assets and their restricted subsidiaries' assets***

The definition of change of control in the New Notes Indenture may include a phrase relating to the direct or indirect sale, conveyance, transfer, lease or other disposition of "all or substantially all" of the Reorganized Debtors' assets and their restricted subsidiaries' assets. There is no precise established definition of the phrase "substantially all" under applicable law. Accordingly, your ability to require the Reorganized Debtors to repurchase New Notes as a result of a sale, conveyance, transfer, lease or other disposition of less than all of the Reorganized Debtors' assets and their restricted subsidiaries' assets to another individual, group or entity may be uncertain.

(m)     ***The Holders of the New Notes will not be entitled to any registration rights with respect to the New Notes under the Securities Act and any state securities laws, and there are restrictions on the ability of the holders of New Notes to transfer or resell the New Notes without registration under applicable securities laws***

The New Notes are being offered and sold pursuant to an exemption from registration under federal and applicable state securities laws. The New Notes and the guarantees of the New Notes have not been registered under the Securities Act or any state securities laws. Furthermore, holders of the New Notes will not have any registration rights under the Securities Act or any state securities laws. As a result, the New Notes may be transferred or resold in the United States only in a transaction exempt from the registration requirements of federal and applicable state securities laws or pursuant to an effective registration statement.

(n)     ***If the Reorganized Debtors do not have sufficient funds to pay cash interest on the New Notes (or otherwise elect not to), interest on the New Notes will be paid in PIK interest***

The Reorganized Debtors will have the option to pay Cash Interest or PIK Interest on the New Notes for the period commencing on the Effective Date and ending on the third anniversary

68

thereof. The Reorganized Debtors are not required to make cash interest payments on the New Notes, and holders of the New Notes could potentially receive no Cash Interest on the New Notes for the period commencing on the Effective Date and ending on the third anniversary thereof. The payment of interest through PIK Interest will increase the amount of the Reorganized Debtors' indebtedness and would exacerbate the risks associated with the Reorganized Debtors' level of indebtedness and may adversely affect the trading price of the New Notes (if a market is established).

(o) ***There is currently no public market for the New Notes, and an active trading market may not develop for the New Notes. The failure of a market to develop for the New Notes could affect the liquidity and value of the New Notes***

The New Notes will be a new issue of securities, and there is no existing market for the New Notes. An active market may not develop for the New Notes, and there can be no assurance as to the liquidity of any market that may develop for the New Notes. If an active market does not develop, the market price and liquidity of the New Notes may be adversely affected.

The liquidity of the trading market, if any, and future trading prices of the New Notes will depend on many factors, including, among other things, the number of holders thereof, the size of the New Notes offering, prevailing interest rates, the Reorganized Debtors' operating results, financial performance and prospects, the interest of securities dealers in making a market in the New Notes, the market for similar securities and the overall securities market, and may be adversely affected by unfavorable changes in these factors. Historically, the market for high-yield debt has been subject to disruptions that have caused substantial fluctuations in the prices of these securities. The market for the New Notes may be subject to similar disruptions. Any such disruptions may adversely affect the value of the New Notes. In addition to the foregoing, subsequent to their initial issuance, the New Notes may trade at a discount from their initial offering price, depending on other factors that include, without limitation, prevailing interest rates, the market for similar notes and the Reorganized Debtors' performance.

## 6.5    Risks Relating to New LTR Holdings Interests

(a) ***The Reorganized Debtors may not be able to achieve their projected financial results***

The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Reorganized Debtors have assumed in projecting their future business prospects.  If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after emergence.  The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  They do not, however, guarantee the Reorganized Debtors' future financial performance.

(b) ***The Plan exchanges senior securities for junior securities***

If the Plan is confirmed and consummated, certain holders of Claims and Interests will receive New LTR Holdings Interests.  Thus, in agreeing to the Plan, certain of such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a

stated interest rate, a maturity date, and a liquidation preference over equity securities, for New LTR Holdings Interests, which will be subordinate to all future creditor claims.

(c)     ***A liquid trading market for the New LTR Holdings Interests may not develop***

The Debtors make no assurance that liquid trading markets for the New LTR Holdings Interests will develop.  The liquidity of any market for the New LTR Holdings Interests will depend, among other things, upon the number of holders of New LTR Holdings Interests, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

(d)     ***The Reorganized Debtors may be controlled by a significant holder or significant holders***

Under the Plan, certain holders of Allowed Claims and Interests may receive New LTR Holdings Interests.  If a significant holder controls a substantial portion of the New LTR Holdings Interests, or holders of a significant portion of the New LTR Holdings Interests were to act as a group, such holder(s) might be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.  As a result, a significant holder may control important decisions affecting the Reorganized Debtors' governance and their operations.  Such holder's interests may differ from the interest of other holders of the post-Effective Date securities.  In addition, the New LTR Holdings Board shall include (i) two directors designated by the majority noteholder, (ii) one director designated by the noteholders other than the majority noteholder, (iii) LTR's chief executive officer, (iv) one director elected by the holders of a majority of the New LTR Holdings Interests, and (v) one board observer elected by the majority of the holders of the Investco Preferred Interests.  Further, if a significant holder controls a substantial portion of the New LTR Holdings Interests, certain regulatory review may be triggered, which might have the effect of delaying the Effective Date or result in the failure to satisfy the conditions precedent to consummation of the Plan and the occurrence of the Effective Date.

(e)     ***The Debtors' financial projections are subject to inherent uncertainty due to the numerous assumptions upon which they are based***

The Debtors' financial projections are based on numerous assumptions including:  timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Debtors and the Reorganized Debtors; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to indebtedness following Consummation.  Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will

occur. Except with respect to the projections and except as otherwise specifically and expressly stated, this Disclosure Statement does not reflect any events that may occur subsequent to the date of this Disclosure Statement. Such events may have a material impact on the information contained in this Disclosure Statement. The Debtors do not intend to update the projections and therefore the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

## 6.6    Risks Relating to the Debtors' Business

(a)    ***The Debtors' business depends on the oil and natural gas industry, and particularly on the level of exploration, development and production of oil and natural gas in the United States. Thus, it may be adversely affected by industry conditions that are beyond the Debtors' control***

Substantially all of the Debtors' revenues are derived from the rental and servicing of equipment used by oil and natural gas E&P companies. As a result, the Debtors' business depends indirectly on the level of oil and gas production activity, and directly on the level of actual and planned exploration and development activity in the oil and natural gas industry in the United States. The level of exploration, development and production activity in the United States depends upon the willingness of the Debtors' customers to make operating and capital expenditures to explore for, develop and produce oil and natural gas. Their willingness to do so, in turn, depends largely upon prevailing industry conditions that are influenced by numerous factors, over which the Debtors have no control, such as:

- the prices, and expectations about future prices, of oil and natural gas, including the ability of the members of OPEC to agree to and maintain oil price and production controls;

- the supply of oil and natural gas, including oil reserves and natural gas inventories of the United States;

- changes in the level of consumer demand for oil and natural gas, including as a result of technological advances affecting energy consumption and the price and availability of alternative fuels;

- technological advances, which affect the equipment used and time required to drill oil and gas wells;

- the cost of exploring for, developing, producing and delivering oil and natural gas;

- the nature and extent of federal, state and local government regulation of oil and natural gas drilling and related activities, including hydraulic fracturing activities, and expectations regarding such regulations;

- the expected rates of current oil and natural gas production;

- the discovery rates of new oil and natural gas reserves;

- available pipeline and other transportation capacity;

- the Debtors' ability to expand their products and services (including those they acquire) into new geographic markets;

- weather conditions, including hurricanes, that can affect oil and natural gas operations over a wide area;

- the level and effect of trading in commodity futures markets, including by commodity price speculators and others;

- domestic and worldwide economic and market conditions; and

- merger, acquisition and divestiture activity among oil and natural gas producers.

The level of activity in the oil and natural gas exploration, development and production industry in the United States is highly volatile. In 2015, the Debtors' industry experienced an unprecedented decline as active rig count in the United States dropped by approximately 78% from 2014 highs, according to data made available by Baker Hughes Weekly Rig Count. Correlating with this decline, the West Texas Intermediate ("WTI") spot price for oil decreased from $105.00 per barrel in June 2014 to $28 in January 2016, before rebounding slightly to $44 in August 2016. Crude oil prices are not forecast to improve significantly during 2016. The year has been, and the Debtors expect it will continue to be, challenging for them, as the Debtors' customers continue to make downward revisions to their operating budgets. Therefore, the Debtors expect continued lower relative levels of E&P activity coupled with pricing pressures, and continued lower levels of revenue and operating performance throughout 2016.

Continued depressed oil and natural gas prices is likely to continue to suppress drilling activity in the regions the Debtors serve, which could have a material adverse effect on the Debtors' business, financial condition, results of operations and cash flows. Should current market conditions worsen or persist for an extended period of time, the Debtors may be required to record additional asset impairments, including an impairment of the remaining carrying value of their intangible assets (if any), including customer lists and goodwill as well as the carrying value of their property and equipment. Such a potential impairment charge could have a material adverse impact on the Debtors' operating results. In addition, a decrease in the discovery rate of new oil and natural gas reserves, or in the development rate of oil and natural gas reserves in the regions the Debtors serve, may also have a material adverse impact on their business, financial condition and results of operations.

(b)     **The oil and natural gas industry is highly cyclical, and the Debtors' results of operations may be volatile**

The oil and natural gas industry is highly cyclical, with periods of high demand and high pricing followed by periods of low demand and low pricing. Periods of low demand intensify competition in the industry and may result in substantially lower revenue to the Debtors. As a result of the cyclicality of the Debtors' industry, their results of operations may be volatile in the future.

(c)     **The Debtors face the risk that cancellations or delays in oil and natural gas projects for reasons beyond their control could result in cancellations or delays in the completion of rental orders for their products, which could have a**

*material adverse effect on the Debtors' results of operations and financial condition*

The Debtors face the risk that oil and natural gas projects may be cancelled or delayed for reasons beyond their control, including due to inclement weather conditions, budget constraints, inadequate supplies of resources needed for drilling, mining and production or legislative and regulatory changes (particularly as such changes relate to hydraulic fracturing). The cancellation of, or delay in the completion of, such projects may result in the Debtors' customers cancelling or delaying rental orders for their equipment, which could have a material adverse effect on the Debtors' results of operations and financial condition. Adverse macroeconomic conditions may materially adversely affect the Debtors' results of operations.

Continued weak economic conditions in the United States and abroad may negatively impact the fundamentals of the Debtors' industry in various ways, including by reducing the level of activity in the oil and natural gas industry, making it difficult for the Debtors' customers to internally fund or externally finance their rental orders of the Debtors' products or by reducing the demand for oil and natural gas (resulting in lower oil and natural gas prices), all of which could result in reduced demand for the Debtors' equipment. The continuation or worsening of these macroeconomic conditions, whether in the geographic markets in which the Debtors' customers are located or in other regions, could materially adversely affect the Debtors' results of operations.

(d)     *The Debtors' customers' operating and capital expenditures in the oil and natural gas industry may be adversely impacted by a deterioration in the credit markets*

The Debtors' customers may finance their activities in the oil and natural gas industry through cash flow from operations, the incurrence of debt or the issuance of equity securities. The Debtors' customers may be negatively impacted by a significant decline in the availability of credit. The combined effect of a reduction of cash flow resulting from declines in commodity prices, a reduction in borrowing bases under reserve-based credit facilities and the lack of availability of debt or equity financing (or their availability on stringent terms) could result in a significant reduction in the Debtors' customers' operating and capital expenditures to explore, develop and produce oil and natural gas in the United States, which could have a material adverse effect on the Debtors' business, financial condition and results of operations.

(e)     *Improvements in, new discoveries of, or governmental regulations relating to energy technologies could have a material adverse effect on the Debtors' financial condition and results of operations*

The Debtors' business depends on the level of activity in the oil and natural gas industry, and any improvement in, new discoveries of, or governmental regulation that mandates, subsidizes, or otherwise promotes the use of alternative energy technologies (such as wind, solar, geothermal, fuel cells and biofuels) may increase the use of alternative forms of energy and reduce the demand for oil and natural gas. Additionally, since the Debtors' business involves power generation equipment rentals (diesel and natural gas generators), any improvement in or expansion of electrical grids, wind turbines or other power generation services could decrease

demand for the Debtors' products. Any of these improvements in, new discoveries of or governmental regulations relating to alternative energy technologies could have a material adverse effect on the Debtors' business, financial condition and results of operations.

(f)     ***The Reorganized Debtors may pursue growth opportunities through acquisitions, which could result in operating difficulties and other harmful consequences***

The Reorganized Debtors may pursue growth opportunities through acquisitions. There is substantial competition for attractive acquisitions and the Reorganized Debtors may not be successful in completing any such acquisitions in the future. If the Reorganized Debtors are successful in making any acquisition, it could nonetheless have a material adverse effect on their financial condition or results of operations. Among other things, acquisitions can involve a wide variety of risks depending upon, among other things, the specific business or assets being acquired or the specific terms of any transaction. These risks may include the following:

- difficulties in integrating the operations, products, employees, management information systems, human resources and other administrative systems of acquired or newly formed entities with the Reorganized Debtors' existing business and systems;

- unanticipated capital expenditures or investments in order to maintain, improve or sustain the operations of any business the Reorganized Debtors acquire;

- difficulties in managing larger or more complex operations and facilities, and if applicable, operations and employees in new geographic areas;

- diversion of management time and focus from operating the Reorganized Debtors' business due to challenges of integrating acquired businesses;

- cultural challenges associated with integrating employees from acquired businesses into the Reorganized Debtors' organization;

- the need to implement or improve internal controls, procedures and policies at acquired businesses;

- possible write-offs, impairment charges or amortization charges resulting from acquisitions; and

- unanticipated or unknown liabilities relating to acquired businesses.

Acquisitions are inherently risky, and any acquisitions or investments the Reorganized Debtors make may not perform in accordance with their expectations. Accordingly, any of these transactions, if completed, may not be successful and may adversely affect the Reorganized Debtors' business, results of operations or financial condition.

(g)     ***The Debtors face significant competitive pressures that may cause them to lose market share and harm their financial performance***

The Debtors' industry is highly fragmented and highly competitive. Within their core geographic markets, the Debtors compete with smaller local companies with a narrow product

focus, regional companies with similar products with a smaller branch structure and larger, national and well-capitalized companies with an extensive branch network. Many of their competitors may be more highly capitalized than the Debtors are or possess greater financial resources than the Debtors do. These competitors are better able to withstand industry downturns, compete on the basis of price and acquire new equipment and technologies, all of which could affect the Debtors' revenues and profitability. Their competitors may also have the ability to offer bundles of products and services to customers that the Debtors do not offer. In addition, the Debtors' customers may purchase and operate their own equipment in lieu of renting the Debtors' products. Reduced levels of activity in the oil and natural gas industry have intensified competition in the Debtors' markets, and the resultant pressure on pricing has resulted in lower revenues and margins to the Debtors. Any of these competitive pressures could have a material adverse effect on the Debtors' business, results of operations, financial condition and ability to service their indebtedness, including the New Notes.

(h)   *The Debtors are subject to the risk of technological obsolescence*

The Debtors anticipate that their ability to maintain their current customers and win new customers will depend upon maintaining technologically up-to-date and competitive equipment. There can be no assurance that the Debtors will be successful in their efforts in this regard or that they will have the resources available to ensure that their equipment is technologically up-to-date and competitive. Also, the energy service industry is subject to the introduction of new techniques and services using new technologies, some of which may be subject to patent or similar protection. As competitors and others use or develop new technologies, the Debtors may lose market share or be placed at a competitive disadvantage. Further, the Debtors may face competitive pressure to implement or acquire certain new technologies at a substantial cost. Additionally, the Debtors may be unable to implement new technologies or products at all, on a timely basis or at an acceptable cost. Limits on the Debtors' ability to use or implement new technologies, particularly if their competitors acquire technologically superior equipment, may have a material adverse effect on the Debtors' business, financial condition and results of operations.

(i)   *The Reorganized Debtors may not be able to fund capital expenditures that may be needed for the future growth of their business*

The amount and timing of any capital expenditures the Reorganized Debtors may need to grow their business may vary depending on a variety of factors, including the level of activity in the oil and natural gas exploration and production industry and any alternative uses for the Debtors' capital.

Historically, the Debtors have funded their capital expenditures through internally generated funds, borrowings under bank credit facilities and the sale of the Old Notes. Although the Debtors believe that cash flows from their operations, following the Restructuring Transactions, will generally be sufficient to fund the Reorganized Debtors' planned capital expenditures in the near future, the Debtors cannot give any assurance that such cash flow will be sufficient either in the near future or thereafter.

75

The Reorganized Debtors may require additional capital to fund any unanticipated capital expenditures, including any acquisitions, and to fund their growth, and necessary capital may not be available to them when they need it or on acceptable terms. The Reorganized Debtors' ability to raise additional capital will depend on the results of their operations, financial condition and the condition of the credit and capital markets and their industry at the time they seek such capital. Failure to generate sufficient cash flow and the absence of alternative sources of capital could have a material adverse effect on the Reorganized Debtors' business, financial condition and results of operations.

(j)     ***The Debtors are highly dependent on members of their executive management and the loss of any member of their executive management may have a material adverse effect on their financial condition, results of operations and future prospects***

The success of the Debtors' business depends, to a large extent, on the expertise and experience of their executive management. The Debtors' employment agreements with members of their executive management do not prevent them from seeking employment elsewhere. While the Debtors maintain "key person" life insurance policies on their founders, Mr. Hogan and Mr. Avary, the Debtors do not maintain "key person" life insurance policies on any other officers and directors. The loss of any member of their executive management could have a material adverse effect on the Debtors' financial condition, results of operations and future prospects, and the Debtors may not be able to secure the services of qualified individuals to replace them.

(k)     ***Failure to hire and retain skilled personnel could adversely affect the Debtors' business***

The Debtors may not be able to find enough skilled labor to meet their needs. As a result of volatility in oil and natural gas activity and the demanding nature of the work, workers may choose, particularly during periods of low demand, to pursue employment in fields that offer a more desirable work environment at wage rates that are competitive with the wages offered by the Debtors. In addition, shortages of qualified personnel in certain regions have previously occurred during periods of high demand. Increased demand has, in the past, led to wage rate increases which may or may not be reflected in the price of the Debtors' products or services. Other factors may also inhibit the Debtors' ability to find enough workers to meet their needs, such as the location of the Debtors' headquarters in Odessa, Texas and the low unemployment rates in the other markets in which the Debtors operate. The Debtors' specialized services require skilled workers who can perform physically demanding work. The Debtors believe that their success is dependent upon their ability to continue to employ and retain skilled personnel. The Debtors' inability to employ or retain skilled personnel could have a material adverse effect on their results of operations and financial condition.

(l)     ***The Debtors' equipment presents risks of loss that, if not insured against, could adversely affect their financial condition and results of operations***

The Debtors' products are provided to customers who are subject to hazards inherent in the oil and gas industry, such as blowouts, explosions, fires and spills. In particular, potential liability for oil spills and other releases into the air, soil, subsurface, surface waters or ground-

water, and other damage or impacts to the environment as a result of the use of the Debtors' products or defects in the Debtors' products can be substantial. The Debtors maintain liability insurance, including comprehensive general liability, automobile liability, workers' compensation, environmental liability and employers' liability with respect to their facilities. The Debtors do not maintain any product warranty insurance. Although the Debtors maintain insurance coverage at levels and against risks that they consider appropriate (based on their historical experience) and consistent with industry practice, the Debtors are not insured against all liabilities that could result from their operations due to coverage limits and exclusions, among other factors. In addition, as insurance rates have in the past been subject to wide fluctuation and could in the future increase substantially due to market conditions, the Debtors cannot give any assurance that all or a portion of their coverage will not be cancelled or that insurance coverage will continue to be available at rates considered reasonable or at all. Changes in coverage could result in less or no coverage for any particular liability, increases in cost or higher deductibles and retentions. As a result, it is possible that the Debtors' insurance may not cover a given risk or liability in full, or at all. Losses and liabilities from uninsured and underinsured events and delay in the payment of insurance proceeds could have a material adverse effect on the Debtors' financial condition and results of operations.

 (m) ***The Debtors' operations are subject to environmental and operational health and safety laws and regulations that may expose the Debtors to significant costs and liabilities***

  The Debtors' operations and their customers' operations are subject to numerous stringent and complex laws and regulations governing human health and safety and environmental protection. These laws and regulations may, among other things, regulate the management and disposal of hazardous and non-hazardous wastes; require acquisition of environmental permits related to the Debtors' operations; restrict the types, quantities and concentrations of various materials that can be released into the environment; limit or prohibit operational activities in certain ecologically sensitive and other protected areas; regulate specific health and safety criteria addressing worker protection; require compliance with operational and equipment standards; impose testing, reporting and record-keeping requirements; and require remedial or other corrective measures to mitigate or otherwise address pollution arising from former or ongoing operations, and contamination on, at, under or from current or former properties, nearby properties or sites to which the Debtors sent waste. Failure to comply with these laws and regulations or to obtain or comply with the permits required thereunder may result in the assessment of administrative, civil and criminal fines, penalties and damages, the imposition of remedial or corrective action requirements and the imposition of injunctions to prohibit certain activities or force future compliance.

  Laws and regulations protecting the environment have become more stringent in recent years and in certain circumstances may impose strict, joint and several liability on classes of persons who are considered to be responsible for the release of a hazardous substance into the environment, which could render the Debtors responsible for certain environmental liabilities, including natural resource damages, without regard to negligence or fault on the Debtors' part. These laws and regulations may expose the Debtors to liability for the conduct of, or conditions caused by, others or for acts that were in compliance with applicable laws and regulations at the time the acts were performed. Moreover, the modification of existing laws or regulations or the

adoption of new laws or regulations could result in materially increased costs, stricter standards and enforcement, larger fines and liability and increased capital expenditures for the Debtors and their customers and could materially limit the Debtors' future opportunities.

In addition, several of the Debtors' current and former properties are, or have been, used for industrial purposes for many years. Accordingly, the Debtors could become subject to material liabilities relating to the investigation, clean-up or monitoring of potentially contaminated properties, and to claims alleging personal injury or property damage, including natural resource damage, as the result of exposures to, or releases of, hazardous substances in the event that a release of such substances occurred on, under, at or from one of the Debtors' properties. Stricter enforcement of existing laws and regulations, new laws and regulations, the discovery of previously unknown contamination or the imposition of new or increased requirements could require the Debtors to incur costs or become the basis of new or increased liabilities that could reduce their earnings and their cash available for operations.

(n)     ***Delays in obtaining permits by the Debtors' customers for their operations could impair the Debtors' business***

In most states, the Debtors' customers are required to obtain permits from one or more governmental agencies in order to perform exploration, development and production activities. Such permits are typically required by state agencies but can also be required by federal and local governmental agencies. The requirements for such permits vary depending on the location where such activities will be conducted. As with governmental permitting processes, generally, there is a degree of uncertainty as to whether a permit will be granted, the time it will take for a permit to be issued and the conditions that may be imposed in connection with the granting of the permit. Moreover, in some cases, federal agencies have cancelled oil and natural gas leases on federal lands. New or continued state and local moratoria or bans on drilling or production activities could make it more difficult or costly for the Debtors' customers to operate in the regions we serve, which could result in a reduced demand for the Debtors' products and a loss of revenue that could have a materially adverse effect on the Debtors' financial condition, results of operation or business.

(o)     ***Climate change laws and regulations restricting emissions of greenhouse gases could result in increased operating costs and reduced demand for oil and natural gas, while the physical effects of climate change could disrupt oil and gas production and therefore reduce demand for the Debtors' products and services***

Studies indicate that emissions of certain gases, known as greenhouse gases, including methane and carbon dioxide, may be warming the Earth's atmosphere. Methane is a primary component of natural gas and carbon dioxide is a byproduct of the burning of oil, natural gas and refined petroleum products. In response to these studies, governments have been adopting domestic and international climate change laws. Internationally, the United Nations Framework Convention on Climate Change and the Copenhagen Accord, among others, address greenhouse gas emissions.

In the United States, Congress has considered comprehensive legislation to reduce emissions of greenhouse gases; however, no such legislation has been passed. It is uncertain at this time whether, or in what form, such federal climate change legislation will be adopted in the United States.

The Environmental Protection Agency ("EPA"), however, has been using its existing authority to address greenhouse gases. In 2009, the EPA published its findings that emissions of carbon dioxide, methane and other "greenhouse gases" present an endangerment to human health and the environment because emissions of such gases are, according to the EPA, contributing to warming of the Earth's atmosphere and other climatic changes. These findings by the EPA have allowed the agency to proceed with the adoption and implementation of regulations restricting emissions of greenhouse gases under existing provisions of the federal Clean Air Act. In 2012, EPA issued final rules to reduce air pollution from the oil and natural gas industry, which included the first federal air standards for natural gas wells that are hydraulically fractured. Among other things, EPA regulations now require specified large greenhouse gas emitters in the United States, including companies in the energy industry, to annually report those emissions. The EPA is continuing to assess other potential controls on greenhouse gas emissions from oil and natural gas operations, including limits on methane from oil wells. In May 2016, the EPA took steps under the President's *Climate Action Plan: Strategy to Reduce Methane Emissions* and the Clean Air Act to reduce methane emissions from the oil and natural gas sector by 40 to 45 percent from 2012 levels by 2025. EPA's final rules updated and expanded the New Source Performance Standards by reducing emissions limits for methane, which is the principal greenhouse gas emitted by equipment and processes in the oil and gas sector and by reducing volatile organic compound (VOC) emissions from sources, including hydraulically fractured oil wells that were not covered in the EPA's 2012 rules. EPA's final rule also requires owners/operators to find and repair fugitive emissions from new, reconstructed and modified oil and gas sources. The EPA has also adopted rules requiring the monitoring and reporting of greenhouse gas emissions from specified sources in the U.S., including, from certain onshore oil and natural gas production facilities, on an annual basis. In 2015, the U.S. participated in the United Nations Conference on Climate Change, which led to the creation of the Paris Agreement. The Paris Agreement, which was signed by the U.S. in April 2016 but is not yet in effect, will, among other things, require countries to review and regularly update their greenhouse gas emission reduction targets every five years, beginning in or about 2020. While the existing regulations have not to date materially affected the Debtors' company, such regulations may over time require the Debtors' customers to incur costs to reduce emissions of greenhouse gases associated with their operations or could adversely affect demand for the oil and natural gas they produce, and thereby reduce the Debtors' customers' demand for the Debtors' products and services.

Climate change is also being addressed by various courts throughout the United States, including the U.S. Supreme Court. Certain of the EPA's greenhouse gas rules are undergoing legal challenges and numerous other challenges are being filed by groups seeking additional regulation of a variety of additional sources of greenhouse gas emissions. Litigants in such cases may also challenge air emissions permits that greenhouse gas emitters apply for, seek to force emitters to reduce their emissions or seek damages for alleged climate change impacts to the environment, people and property. Although the Debtors are not currently a party to any climate

change litigation, they are monitoring these developments and may be subject to similar claims in the future.

In addition, numerous states, either individually or through multi-state regional initiatives, have begun to address greenhouse gas emissions, primarily through renewable energy standards or regional greenhouse gas cap and trade programs. Although most of the state-level initiatives have to date been focused on large sources of greenhouse gas emissions, such as electric power plants, it is possible that smaller sources could become subject to greenhouse gas-related regulation.

Depending on the particular program, the Debtors or their customers could be required to control emissions or to purchase and surrender allowances for greenhouse gas emissions resulting from the Debtors or their customers' operations. Any future laws or implementing regulations that may be adopted to address greenhouse gas emissions thus could require the Debtors and their customers to incur increased operating costs and could adversely affect demand for the oil and natural gas the Debtors' customers produce and thereby the Debtors' customers' demand for the Debtors' products and services.

Finally, it should be noted that many scientists have concluded that increasing concentrations of greenhouse gases in the Earth's atmosphere could produce climate changes that have significant physical effects, such as increased frequency and severity of storms, floods and other climatic events. Such effects could have an adverse effect on the Debtors' customers' exploration and production operations, and thereby their demand for the Debtors' products and services. Significant physical effects of climate change could also disrupt the transportation or process-related services the Debtors provide. The Debtors may not be able to recover through insurance some or any of the damages, losses, or costs that may result from potential physical effects of climate change.

(p)   ***Legislative and regulatory initiatives and litigation relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays***

Hydraulic fracturing is an essential and common practice in the oil and natural gas industry that stimulates production of natural gas and / or oil from dense subsurface rock formations. Hydraulic fracturing involves using water, sand and certain chemicals to fracture the hydrocarbon-bearing rock formation to facilitate flow of the hydrocarbons into the wellbore. The Debtors' customers expect to routinely apply hydraulic-fracturing techniques in many of their oil and natural-gas drilling and completion programs. The hydraulic fracturing process historically has been regulated by state oil and natural-gas commissions.

A number of states, including Texas and Louisiana, have adopted or are considering adopting more stringent permitting, public disclosure and well construction requirements for hydraulic-fracturing operations. In addition, local land use restrictions, such as city ordinances, may restrict or prohibit the performance of well drilling in general and / or hydraulic fracturing in particular. In the event state, local, or municipal legal restrictions are adopted in areas where the Debtors and their customers are currently conducting, or in the future plan to conduct operations, the Debtors and their customers may incur additional compliance costs that may be

significant in nature, and the Debtors' customers may experience delays or curtailment in the pursuit of exploration, development, or production activities, and perhaps even be precluded from the drilling of wells.

Federal agencies also are moving to regulate hydraulic fracturing. In 2012, for example, the EPA issued final rules under the Clean Air Act that require use of emission controls at newly drilled and fractured natural gas wells as well as existing natural gas wells that are refractured. Pursuant to the Safe Drinking Water Act, the EPA has asserted authority over certain hydraulic-fracturing activities using diesel fuel and has released final guidance documents explaining the permitting process for such activity. In early 2014, the EPA announced plans for developing proposed rules under Section 8(a) and 8(d) of the Toxic Substances Control Act related to the reporting of chemical substances and mixtures used in hydraulic fracturing. In April 2015, the EPA proposed pretreatment standards and effluent limitations for discharge of wastewater from onshore unconventional oil and gas extraction facilities to publicly owned treatment works. Additionally, in March 2015, the U.S. Department of the Interior's Bureau of Land Management (BLM) adopted a rule that, among other things, requires companies to publicly disclose the chemicals used in hydraulic fracturing operations after fracturing operations have been completed and includes provisions addressing well-bore integrity and flowback water management on federal and Indian lands.

Apart from these regulatory activities, the EPA has commenced a study of the potential environmental effects of hydraulic fracturing on drinking water and groundwater. The EPA released a progress report on this study in late 2012 and released a draft report in June 2015 with a final peer-reviewed report planned for a 2016 release. The final results of that study and any further studies contemplated to be undertaken by EPA may lead to further regulation at the federal, state and local levels.

Increased study, regulation and attention given to the hydraulic fracturing process could lead to greater opposition to its use, including litigation, seeking to prevent or limit oil and natural gas production activities using hydraulic fracturing techniques or seeking damages in connection with environmental impacts associated with hydraulic fracturing. Litigation and new legislation or regulation also could lead to operational delays or increased operating costs in the production of oil and natural gas, including from the developing shale plays, or could make it more difficult to perform hydraulic fracturing.

The adoption of any federal, state or local laws, the implementation of regulations regarding hydraulic fracturing and related litigation could potentially decrease or delay the completion of new oil and natural gas wells and increase compliance costs and thereby reduce demand for the Debtors' equipment and services, which could adversely affect the Debtors' financial position, results of operations and cash flows.

(q)     ***The Debtors may be adversely affected by potential litigation, including litigation arising out of the Chapter 11 Cases***

In the future, the Debtors may become a party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results.  It is also

possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**6.7    Certain Tax Implications of the Chapter 11 Cases**

Holders of Allowed Claims and Interests should carefully review Article IX herein, "Certain U.S. Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

**6.8    Disclosure Statement Disclaimer**

**(a)    Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances to the Plan and may not be relied upon for any other purpose.

**(b)    Disclosure Statement May Contain Forward-Looking Statements**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected dividends;

- projected price increases;

- effect of changes in accounting due to recently issued accounting standards;

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation;

- growth opportunities for existing products and services;

82

- results of litigation;

- disruption of operations;

- contractual obligations;

- projected general market conditions;

- plans and objectives of management for future operations;

- off-balance sheet arrangements; and

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(c)      **No Legal, Business, or Tax Advice Is Provided by This Disclosure Statement**

**THIS DISCLOSURE STATEMENT DOES NOT PROVIDE LEGAL, BUSINESS, OR TAX ADVICE**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(d)      **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

(e)      **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors, reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

(f)      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim or Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(g)     **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(h)     **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(i)     **No Representations Outside of this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE VII

## CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

**7.1**     **The Confirmation Hearing**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  On the Petition Date, the Debtors will file a motion requesting that the Bankruptcy Court set a date and time approximately 30 days after the Petition Date for the Confirmation Hearing.  In this case, the Debtors will also request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing.   The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.   The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.   The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections.  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections as set forth therein.

**7.2**     **Confirmation Standards**

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.  The Plan fully complies with the statutory requirements for Confirmation listed below:

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable;

- The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a

director, or officer, the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies;

- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained the Reorganized Debtors and the nature of any compensation for such Insider;

- With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date;

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below);

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code;

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider;

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

## 7.3   **Best Interests Test / Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Based on the Liquidation Analysis, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

**7.4**     **Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit B**.  Based on such projections, the Debtors believe that they will be able to make all payments required under the Plan.  Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**7.5**     **Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

(a)     **No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

(b)     **Fair and Equitable Test**

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class.  As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtor in such Class.  In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Secured Creditors:  Each holder of a secured claim:  (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors:  Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are

87

junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- <u>Equity Interests</u>:  Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 10 (the Investco Common Interests) is deemed to reject the Plan because, as to such Classes, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Classes will receive or retain any property on account of the Claims or Interests in such Class.

**7.6      Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, the Debtors may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate the Debtors under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis, attached hereto as **Exhibit C**.

**ARTICLE VIII**

**IMPORTANT SECURITIES LAW DISCLOSURE**

**8.1      Plan Securities**

The Plan provides for the Reorganized Debtors to distribute New LTR Holdings Interests and New Notes to certain holders of Allowed Claims in Class 4 (the "<u>Plan Securities</u>").

The Debtors believe that the Plan Securities may constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

**8.2      Issuance and Resale of Plan Securities Under the Plan**

(a)      **Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws**

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitation, section 4(a)(2) thereof, to exempt the offer of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on, or otherwise in connection with, the Plan.   Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act ("Reg. D") provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" as defined in section 501 of Reg. D (17 C.F.R. § 230.501).  The Ballots include certifications that the holders of Claims and Interests receiving Plan securities must make concerning their status as either an "accredited investor" or "qualified institutional buyer," (as such term is defined in Rule 144A of the Securities Act).

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if:  (x) the offer or sale occurs under a plan of reorganization; (y) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (z) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.   In reliance upon these exemptions and the exemptions set forth in the preceding paragraph, including the exemption provided by section 4(a)(2) of the Securities Act, the offer, issuance and distribution of the New LTR Holdings Interests and Equity Warrants to holders of Class 4 Noteholder Claims will not be registered under the Securities Act or any applicable state Blue Sky Laws.  In reliance upon the exemption provided by section 4(a)(2) of the Securities Act, the offer, issuance and distribution of the New Notes to holders of Class 4 Noteholder Claims will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The Debtors believe that the issuance of the New LTR Holdings Interests and Equity Warrants with respect to Allowed Claims is covered by section 1145 of the Bankruptcy Code. Accordingly, the Debtors believe that the New LTR Holdings Interests and Equity Warrants may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in 1145 of the Bankruptcy Code.   The Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.   In addition, Equity Warrants governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Recipients of the New LTR Holdings Interests are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to the Plan Securities and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

The Debtors intend that the New Notes will be issued without registration in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act rather than section 1145 of the Bankruptcy Code and the New Notes Indenture will not be qualified under the Trust Indenture Act of 1939. The New Notes will be "restricted securities" subject to resale restrictions

and may be resold, exchanged, assigned or otherwise transferred only pursuant to a registration statement or an applicable exemption from registration under the Securities Act, such as the exemptions provided by Rule 144, Rule 144A and Reg S under the Securities Act, and other under applicable law.

(b)     **Resales of New LTR Holdings Interests and Equity Warrants; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Under certain circumstances, holders of New LTR Holdings Interests or Equity Warrants who are deemed to be "underwriters" may be entitled to resell their Reorganized Holdco Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New LTR Holdings Interests or Equity Warrants would depend upon

various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New LTR Holdings Interests or Equity Warrants and, in turn, whether any Person may freely resell the New LTR Holdings Interests or Equity Warrants.  The Debtors recommend that potential recipients of Equity Warrants consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

(c)    <strong><u>Management Incentive Plan</u></strong>

The Plan contemplates the implementation of the Management Incentive Plan, which will provide for warrants, grants of options and/or restricted units/equity reserved for management, directors, and employees of the Reorganized Debtors in an amount of the New LTR Holdings Interests to be issued by the Reorganized Debtors sufficient to properly incentivize the senior management team of the Reorganized Debtors.

Such New LTR Holdings Interests will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act.

**ARTICLE IX**

**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

**9.1**    <u>**Introduction**</u>

The following discussion summarizes certain U.S. federal income tax consequences to U.S. Holders and Non-U.S. Holders (each term as defined below and in the aggregate, referred to as "<u>Holders</u>") and LTR relating to the exchange of Old Notes for each of the New Notes and New LTR Holdings Interests, as well as the exchange of Investco Convertible Preferred Interests for Equity Warrants, pursuant to the Plan, and the ownership and disposition of New Notes, New LTR Holdings Interests or Equity Warrants acquired in the Plan.  This summary does not address the U.S. federal income tax consequences to Holders who are not entitled to vote to accept or reject the Plan.  The effects of other U.S. federal tax laws, such as estate and gift tax laws, and any applicable state, local or foreign tax laws are not included in this discussion.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties and the following summary is not exhaustive.  For these reasons, the discussion is not a substitute for individualized advice, and thus Holders should consult their own tax advisors based upon the individual circumstances of each Holder.  This discussion is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), final, temporary and proposed United States Treasury regulations promulgated under the Code (the "<u>Regulations</u>"), and administrative rulings and judicial decisions of the Internal Revenue Service (the "<u>IRS</u>"), in each case as of the date hereof.  These authorities are subject to differing interpretations and may be changed, perhaps retroactively, resulting in U.S. federal income tax consequences materially different from those summarized below.  No ruling from the IRS has been obtained, or is intended to be obtained, with respect to the statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS will agree with such statements

91

and conclusions, or that if the IRS were to challenge such conclusions such challenge would not be sustained by a court.

This discussion is limited to Holders that hold the Old Notes, New Notes, New LTR Holdings Interests and Equity Warrants as "capital assets" within the meaning of Section 1221 of the Code (generally, property held for investment) and that acquire the New Notes, New LTR Holdings Interests and Equity Warrants pursuant to the Plan.  This discussion does not address all U.S. federal income tax consequences relevant to a Holder's particular circumstances, including the impact of the "net investment income" tax.  In addition, it does not address consequences relevant to Holders subject to special rules, including, without limitation:

- brokers, dealers or traders in securities;

- banks, insurance companies and other financial institutions;

- tax-exempt organizations or governmental organizations;

- real estate investment trusts or regulated investment companies;

- grantor trusts;

- corporations treated as personal holding companies;

- S corporations, partnerships or other entities or arrangements treated as partnerships or any other pass-through entity for U.S. federal income tax purposes;

- "controlled foreign corporations," "passive foreign investment companies" and corporations that accumulate earnings to avoid U.S. federal income tax;

- persons who hold or receive the New Notes, New LTR Holdings Interests or Equity Warrants pursuant to the exercise of any employee stock option or otherwise as compensation;

- tax-qualified retirement plans;

- persons that hold the Old Notes, New Notes, New LTR Holdings Interests or Equity Warrants as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment;

- persons that purchase or sell the Old Notes, New Notes, New LTR Holdings Interests or Equity Warrants as part of a wash sale for tax purposes;

- U.S. expatriates and certain former citizens or long-term residents of the United States;

- U.S. Holders whose functional currency for tax purposes is not the United States dollar; and

- persons subject to the alternative minimum tax.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of the Old Notes, New Notes, New LTR Holdings Interests or Equity Warrants as the case may be, the tax treatment of a partner in the partnership will depend on the status of the partner, the activities of the partnership and certain determinations made at the partner level.  Accordingly, partnerships holding the Old Notes, New Notes, New LTR Holdings Interests or Equity Warrants and the partners in such partnerships should consult their own tax advisors regarding the U.S. federal income tax consequences of

participating in the Plan and of the ownership of the New Notes, New LTR Holdings Interests and Equity Warrants.

**THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT INTENDED AS TAX ADVICE. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AS WELL AS ANY TAX CONSEQUENCES OF PARTICIPATING IN THE PLAN AND OF THE OWNERSHIP OF THE NEW NOTES, NEW LTR HOLDINGS INTERESTS AND EQUITY WARRANTS ARISING UNDER THE U.S. FEDERAL ESTATE OR GIFT TAX LAWS OR UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE INCOME TAX TREATY.**

**9.2    Certain U.S. Federal Income Tax Consequences to the Debtors**

    (a)    **Cancellation of Debt Income and Reduction of Tax Attributes**

LTR may realize cancellation of debt income ("COD income") as a result of the exchange of the Old Notes for each of the New Notes and New LTR Holdings Interests under the Plan. COD income generally is the amount by which the adjusted issue price of indebtedness discharged exceeds the fair market value of the consideration given in exchange therefor. However, COD income is not taxable to a debtor if the debt discharge occurs in a title 11 bankruptcy case. Because this bankruptcy exclusion will apply to the transactions consummated pursuant to the Plan, LTR will likely not be required to recognize any COD income realized as a result of the implementation of the Plan. Instead, under Section 108 of the Code, any such COD income would reduce certain of LTR's tax attributes, generally in the following order: (a) net operating losses; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of depreciable and nondepreciable assets (but not below the amount of their liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A debtor may elect pursuant to section 108(b)(5) of the Code to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries) and then to reduce net operating losses. LTR does not expect to make this election. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact, although in certain cases, excess loss accounts of the consolidated group of which LTR is a member could become includible in income if there is excess COD income over the amount of available tax attributes. Because the Plan provides that the Holders will receive the New Notes and New LTR Holdings Interests in exchange for the Old Notes, the amount of COD income, the amount of the reduction of COD income under the bankruptcy exclusion and the amount of tax attributes required to be reduced as a result of the application of the bankruptcy exclusion, will depend on, among other things, whether the Plan is consummated and the fair market values of the New Notes and New LTR Holdings Interests as of the exchange (which amounts cannot be known until after the Effective Date).

**9.3**     **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests**

The following discussion only applies to U.S. Holders of Claims and Interests. As used herein, the term "U.S. Holder" means a beneficial owner of the Old Notes, New Notes or New LTR Holdings Interests that is:

- an individual who is a citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States or any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust that (i) is subject to the primary supervision of a U.S. court and the control of one or more U.S. persons (within the meaning of Section 7701(a)(30) of the Code), or (ii) has made a valid election under applicable Regulations to continue to be treated as a domestic trust.

If you are not a U.S. Holder, this discussion does not apply to you and you should refer to "Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims and Interests" below.

    (a)     **Consequences to U.S. Holders of Noteholder Claims (Class 4)**

        (1)     **Exchange of Old Notes for New Notes and New LTR Holdings Interests**

LTR expects that Class 4 Holders will be treated as exchanging a portion of their Old Notes for New LTR Holdings Interests and the remaining portion of their Old Notes for New Notes, in distinct transactions for U.S. federal income tax purposes, and the remainder of this discussion assumes this will be the case. LTR expects that the exchange of the allocable portion of the Old Notes for the New LTR Holdings Interests will qualify as a contribution described in Section 351(a) of the Code. As a result, any gain or loss will not be recognized for U.S. federal income tax purposes under Section 351(a) upon the receipt of the New LTR Holdings Interests in exchange for the Old Notes. A U.S. Holder's holding period in the New LTR Holdings Interests will include such U.S. Holder's holding period in the allocable portion of the Old Notes that was exchanged for such New LTR Holdings Interests, and such U.S. Holder will have a basis in the New LTR Holdings Interests generally equal to such U.S. Holder's basis in the allocable portion of the Old Notes treated as exchanged therefor.

The exchange of Old Notes for New Notes will not be considered a taxable exchange (in respect of which gain or loss may be recognized) to the extent the exchange qualifies as a "recapitalization." An exchange should constitute a recapitalization for U.S. federal income tax purposes if the Old Notes and the New Notes are treated as "securities" for U.S. federal income tax purposes. Whether a debt instrument is a security is based on all of the facts and

circumstances, but most authorities have held that the term to maturity of the debt instrument is one of the most significant factors. In general, debt obligations with a term of ten years or more qualify as securities, whereas debt obligations with a term of less than five years do not qualify as securities. Whether a debt instrument of an original term to maturity of between five and ten years, such as the Old Notes and the New Notes, qualify as securities is less clear. In such cases, numerous other factors are taken into account, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. Holders should consult their own tax advisors regarding whether the Old Notes and New Notes are securities for U.S. federal income tax purposes.

*Consequences where the Exchange of the Old Notes for the New Notes Qualifies as a Recapitalization.* If the Old Notes and the New Notes are both treated as securities, then a U.S. Holder who exchanges Old Notes for New Notes should not recognize loss with respect to the exchange and should not recognize gain except to the extent of accrued interest on the Old Notes, which will generally be treated as interest income. The U.S. Holder's tax basis in the New Notes will be equal to the portion of the U.S. Holder's tax basis in the Old Notes allocable to the exchange for New Notes, and the U.S. Holder's holding period in the New Notes will include the holding period for the Old Notes exchanged therefor.

*Consequences where the Exchange of the Old Notes for the New Notes is a Taxable Exchange.* If either the Old Notes or the New Notes do not qualify as securities, then the exchange of Old Notes for New Notes will not qualify as a recapitalization and should instead be considered a taxable exchange under Section 1001 of the Code, then a U.S. Holder who tenders the Old Notes for the New Notes will recognize gain or loss in an amount equal to the "issue price" of the New Notes for U.S. federal income tax purposes (determined in the manner described below under "—Taxation of the New Notes—Issue Price of the New Notes") *less* the allocable portion of the U.S. Holder's adjusted tax basis in the Old Notes that were tendered therefor. A U.S. Holder will generally have an adjusted tax basis in an Old Note equal to the amount it paid for the Old Note *plus* any original issue discount ("OID," described below) and market discount previously included in income in respect of such Old Note and *minus* any payments on the Old Notes other than a payment of qualified stated interest (which is stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate) and any previously amortized bond premium on such Old Note.

The holding period for the New Notes will begin the day after the exchange. A U.S. Holder's tax basis in the New Notes received in the Plan will generally be equal to the issue price of the New Notes.

Any gain or loss that a U.S. Holder recognizes upon the exchange of the Old Notes for the New Notes will generally be capital gain or loss, except for any amounts attributable to accrued but unpaid interest on an Old Note, which will generally be treated as interest income, and except to the extent described below under "—Market Discount". Capital gain is generally taxable at preferential rates to non-corporate U.S. Holders whose holding period in the allocable

portion of the Old Notes exchanged for the New Notes is greater than one year and may under certain circumstances be reportable on the installment method. The deductibility of capital losses is subject to limitations.

*__Market Discount__*. If a U.S. Holder acquired the Old Notes for less than the adjusted issue price of the Old Notes and the difference between the U.S. Holder's cost and the adjusted issue price exceeded a de minimis threshold (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity), such difference will generally be treated as market discount. The "adjusted issue price" of the Old Notes at the beginning of an accrual period will equal its issue price (which was the principal amount of the Old Notes), increased by the aggregate amount of OID that has accrued on the Old Notes in all prior accrual periods, and decreased by all amounts that have been previously paid with respect to the Old Notes other than qualified stated interest. A U.S. Holder that recognizes gain on the tender of the Old Notes pursuant to the Plan must include in income as ordinary income any capital gain that would have otherwise been recognized to the extent of the accrued market discount on the Old Notes that are exchanged in a taxable transaction, unless the U.S. Holder previously elected to include the market discount in income as it accrued.

Holders should consult their own tax advisors regarding the tax treatment of the exchange of the Old Notes for the New Notes and New LTR Holdings Interests, respectively, in light of the overall transaction under the Plan.

### (2)   __Taxation of the New Notes__

*Classification of the New Notes.* In certain circumstances, LTR may be obligated to redeem or repurchase the New Notes for an amount that differs from the amount payable at maturity of the New Notes. In addition, LTR will be entitled to opt to pay some or all of the interest on the New Notes in the form of PIK interest. The existence of these contingent payments could cause the New Notes to be subject to the special rules that apply to contingent payment debt instruments. However, under applicable Regulations, the possibility of one or more contingent payments on the New Notes may be disregarded for the purposes of determining whether the New Notes are subject to the special rules of contingent payment debt instruments if, on the date the New Notes are issued, the possibility of such contingent payments occurring is remote and/or incidental or another exception applies, such as the alternative payment schedule exception (as described below under "—Treatment of Interest, Including OID and PIK Interest").

LTR intends to take the position that none of the contingencies would cause the New Notes to be contingent payment debt instruments and, as such, that the New Notes are not currently subject to the special rules of contingent payment debt instruments. The remainder of this discussion assumes that the New Notes will not be treated as contingent payment debt instruments. LTR's determination regarding these additional payments is binding on Holders unless a Holder discloses its contrary position in the manner required by applicable Regulations. LTR's determination is not, however, binding on the IRS, and if the IRS were to challenge this determination, a U.S. Holder may be required to accrue income on its notes in a different rate than described below under "—Treatment of Interest, Including OID and PIK Interest", and to treat as ordinary income rather than capital gain any income realized on the taxable disposition

of a New Note.  Holders are urged to consult their own tax advisors regarding the potential application of these rules to the New Notes and the consequences thereof.

*Issue Price of the New Notes.*  The "issue price" of the New Notes will depend upon whether the New Notes or the Old Notes are deemed to be "publicly traded" for U.S. federal income tax purposes.  If the New Notes are considered to be "publicly traded," as defined by the Regulations, the issue price of the New Notes will be equal to their fair market value on the date of the exchange.  If the New Notes are not considered to be publicly traded but the Old Notes are, the issue price of the New Notes will be equal to the fair market value of the Old Notes on the date of the exchange.  If neither the New Notes nor Old Notes are "publicly traded," then the issue price of the New Notes generally will be its stated principal amount.  A note will generally be considered to be "publicly traded" if, within the meaning of the Regulations, at any time during the 31-day period ending 15 days after the exchange, (i) there is a "sales price" for the note, (ii) there are one or more "firm quotes" for the note or (iii) there are one or more "indicative quotes" for the note.  There is also an exception from publicly traded status for an issue of notes of principal amount not in excess of $100 million.  Under this exception, LTR expects that the New Notes will not be considered as publicly traded.  Although no assurance can be provided, LTR expects to take the position that the Old Notes (and not the New Notes) will be considered "publicly traded" for these purposes, and the remainder of this disclosure assumes that this position is taken and is correct.  The rules regarding the determination of issue price are complex and highly detailed, and U.S. Holders should consult their own tax advisors regarding the determination of the issue price of the New Notes for U.S. federal income tax purposes.

*Treatment of Interest, Including OID and PIK Interest.*  Because the New Notes provide that LTR will be entitled to pay, in certain circumstances for three years commencing on the Effective Date, some or all of the interest on the notes in the form of paid-in-kind ("PIK") interest, no stated interest on the notes will be qualified stated interest for U.S. federal income tax purposes (even if paid in cash).

The New Notes will be issued with OID in an aggregate amount equal to the excess of the sum of all principal and stated interest payments provided by the New Note (initially taking into account the payment schedule as described below) over the "issue price" (determined in the manner described above under "—Issue Price of the New Notes") of the New Notes.  U.S. Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, must include the OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis), regardless of whether cash attributable to such OID is received at such time.  However, if the New Notes were received in a recapitalization, the New Notes may be subject to the acquisition premium or bond premium rules that mitigate the amount of OID includible in gross income.

The amount of OID includible in gross income by a U.S. Holder in any taxable year generally is the sum of the "daily portions" of OID with respect to the New Note for each day during such taxable year on which the U.S. Holder holds the New Note.  The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period.  The "accrual period" for a New Note may be of any length and may vary in length over the term of the New Note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the

final day of an accrual period. The amount of OID allocable to any accrual period, subject to the possible adjustments described below, will be an amount equal to the product of the New Note's "adjusted issue price" at the beginning of the accrual period and its yield to maturity (determined on a constant yield method, compounded at the close of each accrual period and properly adjusted for the length of the accrual period). OID allocable to the final accrual period is the difference between the amount payable at maturity and the adjusted issue price at the beginning of the final accrual period. The "adjusted issue price" of a New Note at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period and reduced by any payments made on the New Note during the accrual period. The "yield to maturity" of the New Notes is the discount rate that, when used in computing the present value (as of the issue date) of all principal and interest payments to be made on the New Notes, produces an amount equal to the issue price of the New Notes.

For purposes of computing the yield to maturity of the New Notes and the amount of OID attributable to each accrual period, LTR intends to use an alternative payment schedule, which payment schedule is believed to be significantly more likely than not to be the correct payment schedule and would preclude the contingent payment debt instrument rules discussed above from applying to the New Notes as a result of these payments of interest. This belief is stated solely for U.S. federal income tax purposes and does not constitute a representation by LTR regarding the likelihood of when any interest on the notes will be paid in cash. As described above under "—Classification of the New Notes," the remainder of this disclosure assumes that the New Notes will not be considered contingent payment debt instruments. If, contrary to the intended payment schedule, any PIK or cash interest (as applicable) is actually paid on the notes, then solely for the purposes of recomputing the OID accruals on the notes going forward, the New Notes will be treated as retired and reissued on the date of such change in circumstances for an amount equal to their then adjusted issue price and the yield to maturity on the New Notes will be redetermined taking into account such change in circumstances.

Any PIK interest will generally not be treated as a payment of interest on an original New Note for U.S. federal income tax purposes (though, as described above such interest is required to be accrued into income). Instead, any PIK interest together with the original New Note will be treated as a single debt instrument for U.S. federal income tax purposes.

Each payment of cash interest under a New Note will be treated first as a payment of any accrued OID on the New Note to the extent such accrued OID has not been allocated to prior cash payments and second as payments of principal on the New Note. U.S. Holders generally will not be required to separately include cash interest on the New Notes to the extent such cash payments constitute payments of previously accrued OID or payments of principal. The rules regarding OID are complex and the rules described above may not apply in all cases. If other rules apply instead, U.S. Holders of the New Notes could be treated differently than described above. Holders of the New Notes should consult their own tax advisors regarding the potential application of the OID and other rules to the New Notes and the consequences thereof.

*Sale, Exchange or Other Disposition of the New Notes.* U.S. Holders will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a New Note equal to the difference, if any, between (i) the amount realized upon such sale or other taxable disposition of the New Note (including cash and the fair market

value of any other property) and (ii) the adjusted tax basis of the New Note.  A U.S. Holder's adjusted tax basis in a New Note will generally equal (1) if the exchange of the allocable portion of the Old Notes for the New Notes is not treated as a recapitalization, the issue price of the New Note to the U.S. Holder or (2) if the exchange of the allocable portion of the Old Notes for the New Notes is treated as a recapitalization, such U.S. Holder's basis in the allocable portion of the Old Notes exchanged for such New Notes, in each case, increased by any OID previously accrued by the U.S. Holder, and decreased by the amount of any cash payments previously received on the New Note by the U.S. Holder.

Any gain or loss that a U.S. Holder recognizes upon the sale or such other taxable disposition of a New Note will generally constitute capital gain or loss and will be long-term capital gain or loss if such New Note was held for more than one year.  However, if the New Notes were received in a recapitalization, any market discount on the Old Notes will generally carry over to the New Notes and the market discount rules above will generally apply to any taxable sale, exchange or other disposition of the New Notes.  Capital gain of a non-corporate U.S. Holder is generally taxed at preferential rates where the property is held for more than one year. If the exchange of an allocable portion of the Old Notes for the New Notes is treated as a recapitalization, such U.S. Holder's holding period in the New Notes will include such U.S. Holder's holding period in the allocable portion of the Old Notes that was exchanged for such New Notes.  The deductibility of capital losses is subject to limitations.

(3)   <b>Taxation of the New LTR Holdings Interests</b>

*Distributions.*  In general, any distribution in respect of the New LTR Holdings Interests will constitute a dividend for U.S. federal income tax purposes to the extent of LTR's current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives a distribution on the New LTR Holdings Interests that would otherwise constitute a dividend for U.S. federal income tax purposes, but that exceeds LTR's current and accumulated earnings and profits, the distribution will generally be treated first as a non-taxable return of capital, which reduces the U.S. Holder's tax basis in the New LTR Holdings Interests, but not below zero.  Any distribution in excess of the U.S. Holder's tax basis in the New LTR Holdings Interests (determined on a share-by-share basis) will generally be treated as capital gain and as long-term capital gain if the U.S. Holder's holding period in the New LTR Holdings Interests exceeds one year.  Non-corporate U.S. Holders may be entitled to a preferential rate of tax on dividends if certain holding periods are met.  Corporate U.S. Holders may be entitled to a dividends received deduction if certain holding periods are met.  The length of time that a U.S. Holder has held its stock is reduced for any period during which the U.S. Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporate U.S. Holder incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

*Sale, Exchange or Other Disposition of the New LTR Holdings Interests.*  A U.S. Holder's initial tax basis in the New LTR Holdings Interests will generally equal such U.S Holder's basis in the Old Notes treated as exchanged therefor.  A U.S. Holder will generally recognize capital gain or loss on the sale, exchange or other taxable disposition of the New LTR

99

Holdings Interests equal to the difference between the amount realized and such U.S. Holder's adjusted tax basis in the New LTR Holdings Interests. Capital gain of a non-corporate U.S. Holder is generally taxed at preferential rates where the property is held for more than one year. A U.S. Holder's holding period in the New LTR Holdings Interests will include such U.S. Holder's holding period in the allocable portion of the Old Notes that was exchanged for such New LTR Holdings Interests. The deductibility of capital losses is subject to limitations.

(b)   **Consequences to U.S. Holders of Investco Convertible Preferred Interests (Class 8)**

*Exchange for the Penny Warrants.*   LTR expects that the exchange of Investco Convertible Preferred Interests for Pro Rata share of Equity Warrants that are penny warrants ("Penny Warrants") will qualify as a contribution described in Section 351(a) of the Code, and that the Penny Warrants will be treated as outstanding New LTR Holdings Interests for U.S. federal income tax purposes. As a result, gain or loss will not be recognized upon the exchange. A U.S. Holder's holding period in the Penny Warrants will include such U.S. Holder's holding period in its Investco Convertible Preferred Interests, and such U.S. Holder's basis in the Penny Warrants will generally equal, in the aggregate, such U.S. Holder's basis in the allocable portion of the Investco Convertible Preferred Interests treated as exchanged therefor. For a discussion of the tax consequences on the ownership and disposition of New LTR Holdings Interests, see "Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests—Consequences to U.S. Holders of Noteholder Claims—Taxation of the New LTR Holdings Interests".

*Exchange for the Non-Penny Warrants.*   The portion of the Equity Warrants that are warrants exercisable at a fixed (and non-nominal) strike price ("Non-Penny Warrants") as designated in Article IV.C of the Plan will be treated as stock warrants for U.S. federal income tax purposes. Though some uncertainty as to the exact result exists, the Regulations under Section 351 state that stock warrants are not treated as "stock" for the purposes of Section 351 of the Code, in which case the receipt of stock warrants in a transaction otherwise qualifying under Section 351(a) of the Code would be taxable. The remainder of this disclosure assumes that the Non-Penny Warrants will not be treated as "stock" for purposes of Section 351(a) of the Code and that, accordingly, the exchange of Investco Convertible Preferred Interests for the Non-Penny Warrants will be considered as the taxable receipt of "boot" under Section 351(b) of the Code. A U.S. Holder who tenders Investco Convertible Preferred Interests for the Non-Penny Warrants will recognize gain (if any) on such exchange, but not in excess of the fair market value of the Non-Penny Warrants received. Any loss on the exchange of Investco Convertible Preferred Interests for the Non-Penny Warrants will not be recognized. A U.S. Holder's tax basis in the Non-Penny Warrants will generally equal such U.S. Holder's basis in the allocable portion of the Investco Convertible Preferred Interests exchanged therefor *plus* the amount of gain recognized in respect of the Non-Penny Warrants in the exchange.

*Exercise or Lapse of the Non-Penny Warrants.*   A U.S. Holder generally will not recognize taxable gain or loss on the acquisition of New LTR Holdings Interests upon exercise of the Non-Penny Warrants. The U.S. Holder's aggregate tax basis in the New LTR Holdings Interests received upon exercise of a Non-Penny Warrant generally will be an amount equal to the sum of the U.S. Holder's tax basis in the Non-Penny Warrant prior to exercise and the Non-

100

Penny Warrant exercise price.  The U.S. Holder's holding period for the New LTR Holdings Interests received upon exercise of a Non-Penny Warrant generally will begin on the date following the date of exercise of the Non-Penny Warrant and will not include the period during which the U.S. Holder held the Non-Penny Warrant.  If a Non-Penny Warrant lapses unexercised, a U.S. Holder generally will recognize a capital loss equal to such Holder's tax basis in the Non-Penny Warrant, which will be long-term capital loss if the Non-Penny Warrant was held by the U.S. Holder for more than one year. The deductibility of capital losses is subject to limitations.

(c)  **Consequences to U.S. Holders of Investco Preferred Interests (Class 9)**

U.S. Holders of Investco Preferred Interests should consult with their tax advisors as to the consequences of any exchange of such Investco Preferred Interests pursuant to the Plan, including whether any income could be recognized on such exchange.

(d)  **Information Reporting and Backup Withholding**

Amounts received in the Plan will be reported to the IRS as and when required under applicable Regulations.  Further, information reporting requirements will generally apply to dividends received on the New LTR Holdings Interests, certain payments of principal, premium (if any), redemption price (if any), OID, interest and other amounts paid on the New Notes, and proceeds from sales or other dispositions of the New Notes, New LTR Holdings Interests or Equity Warrants.  Backup withholding, currently at a rate of 28%, will apply to reportable payments to a U.S. Holder that fails to certify its taxpayer identification number or otherwise fails to comply with applicable certification requirements.  Certain U.S. Holders (including, among others, certain tax-exempt organizations) are not subject to information reporting and backup withholding.  Any amounts withheld under the backup withholding rules generally will be allowed as a refund or a credit against the U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**9.4  Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims or Interests**

The following discussion applies to Non-U.S. Holders of Claims and Interests.  As used herein, the term "Non-U.S. Holder" means a beneficial owner of the Old Notes, New Notes or New LTR Holdings Interests  that is, for U.S. federal income tax purposes, neither a U.S. Holder (as defined under "Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests") nor a partnership or other pass-through entity.  This subsection does not apply to U.S. Holders.  For purposes of this discussion under "Non-U.S. Holders," references to "interest" generally also include OID.

(a)  **Consequences to Non-U.S. Holders of Noteholder Claims (Class 4)**

(1)  **Exchange of Old Notes for New Notes and New LTR Holdings Interests**

LTR expects that Class 4 Holders will be treated as exchanging a portion of their Old Notes for New LTR Holdings Interests and the remaining portion of their Old Notes for New

Notes, in distinct transactions for U.S. federal income tax purposes, and the remainder of this discussion assumes this will be the case. A Non-U.S. Holder will not be subject to U.S. federal income or withholding tax on any gain recognized on the exchange of Old Notes for New Notes or the exchange of Old Notes for New LTR Holdings Interests unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States, in which case the gain will be subject to U.S. federal income tax as described below under "—Taxation of the New Notes—United States Trade or Business Income"; or

- the Non-U.S. Holder is an individual and is present in the United States for 183 or more days during the taxable year in which the gain is realized and certain other conditions exist; in which case the gain will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate under an applicable income tax treaty), which may be offset by U.S.-source capital losses, provided such Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

Amounts received in the exchange that are allocable to accrued but unpaid interest will be treated as described below under "—Treatment of Interest, Including OID and PIK Interest".

(2)   <u>**Taxation of the New Notes**</u>

*Treatment of Interest, Including OID and PIK Interest.* Subject to the discussions below on backup withholding and the Foreign Account Tax Compliance Act, payments of interest (which, for these purposes includes OID) on a New Note to any Non- U.S. Holder generally will not be subject to U.S. federal income or withholding tax, provided that:

- the Non-U.S. Holder does not actually or constructively (under certain attribution rules) own 10% or more of the total combined voting power of all classes of LTR's stock entitled to vote;

- the Non-U.S. Holder is not a "controlled foreign corporation" related to LTR (within the meaning of section 864(d)(4) of the Code) and is not a bank that received such note on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of section 881(c)(3)(A) of the Code);

- such interest payments are not "effectively connected" with the conduct by the Non-U.S. Holder of a trade or business within the United States; and the Non-U.S. Holder appropriately certifies (as further described below) that it is not a "United States person" (within the meaning of the Code).

The certification requirement referred to above generally will be satisfied if the Non-U.S. Holder provides LTR or its paying agent with a statement on IRS Form W-8BEN or IRS Form W-8BEN-E (or suitable substitute or successor form), as applicable, signed under penalties of perjury, identifying the Non-U.S. Holder and stating, among other things, that the Non-U.S. Holder is not a United States person (within the meaning of the Code). If the Non-U.S. Holder holds the New Notes through a financial institution or other agent acting on the holder's behalf,

102

the Non-U.S. Holder will be required to provide appropriate documentation to that agent, and that agent will then be required to provide appropriate documentation to LTR or its paying agent (either directly or through other intermediaries).  Non-U.S. Holders should consult their own tax advisors regarding these certification requirements.

If any of the foregoing requirements is not satisfied, payments of accrued interest made to a Non-U.S. Holder generally will be subject to a 30% U.S. federal withholding tax unless such Non-U.S. Holder provides the applicable withholding agent with a properly executed (i) IRS Form W-8BEN or W-8BEN-E, as applicable, claiming an exemption from or reduction of the withholding tax under the benefit of a tax treaty between the United States and the Non-U.S. Holder's country of residence, or (ii) IRS Form W-8ECI stating that interest paid on a New Note is not subject to withholding tax because it is effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States (in which case, such interest will be taxed as described below under "—United States Trade or Business Income").

*Sale, Exchange or Other Disposition of the New Notes.*  Subject to the discussions below on backup withholding and the Foreign Account Tax Compliance Act, any gain realized by a Non-U.S. Holder on the sale, exchange or other taxable disposition (including retirements or redemptions) of a New Note generally will not be subject to U.S. federal income tax or withholding, unless: (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business within the United States (in which case, such gain will be taxed as described below under "—United States Trade or Business Income"); or (ii) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are satisfied.  If the second exception above applies, the Non-U.S. Holder generally will be subject to United States federal income tax at a rate of 30% (or at a reduced rate under an applicable income tax treaty) on the amount by which capital gains allocable to United States sources (including gains from such sale, exchange or other taxable disposition of the New Note) exceed capital losses allocable to United States sources.

*United States Trade or Business Income.*  If interest or gain from a disposition of the New Notes is effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an applicable income tax treaty so provides, the Non-U.S. Holder maintains a "permanent establishment" or "fixed base" in the United States to which such interest or gain is attributable), the Non-U.S. Holder generally will be subject to U.S. federal income tax on the interest or gain on a net basis in the same manner as if it were a U.S. Holder.  If interest received with respect to the New Notes is effectively connected income, the 30% withholding tax described above will not apply (assuming an appropriate certification is provided as discussed above under "—Treatment of Interest, Including OID and PIK Interest ").  In addition, a Non- U.S. Holder that is a non-U.S. corporation may also be subject to a branch profits tax on its effectively connected earnings and profits for the taxable year, subject to certain adjustments, at a rate of 30% (or at a reduced rate under an applicable income tax treaty).

(3)     **Taxation of the New LTR Holdings Interests**

*Distributions.*  In general, any distribution in respect of the New LTR Holdings Interests will constitute a dividend for U.S. federal income tax purposes to the extent of LTR's current or

103

accumulated earnings and profits, as determined under U.S. federal income tax principles. Subject to the discussions below on backup withholding and the Foreign Account Tax Compliance Act, dividends paid to a Non-U.S. Holder of the New LTR Holdings Interests that are not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the dividends (or at a reduced rate under an applicable income tax treaty).

To the extent that a Non-U.S. Holder receives a distribution on the New LTR Holdings Interests that would otherwise constitute a dividend for U.S. federal income tax purposes, but that exceeds LTR's current and accumulated earnings and profits, the distribution will generally be treated first as a non-taxable return of capital, which reduces the Non-U.S. Holder's tax basis in the New LTR Holdings Interests, but not below zero. Any distribution in excess of the U.S. Holder's tax basis in the New LTR Holdings Interests will generally be treated as capital gain and will be treated as described below under "—Sale, Exchange or Other Disposition of the New LTR Holdings Interests."

Non-U.S. Holders will be entitled to a reduction in or an exemption from withholding on dividends as a result of either (i) qualifying for the benefits of an applicable income tax treaty or (ii) the Non-U.S. Holder holding New LTR Holdings Interests in connection with the conduct of a trade or business within the United States and dividends being paid in connection with that trade or business. To claim such a reduction in or exemption from withholding, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed (i) IRS Form W-8BEN or W-8BEN-E (or applicable successor form) claiming an exemption from or reduction of the withholding tax under the benefit of an applicable income tax treaty, (ii) IRS Form W-8ECI (or applicable successor form) stating that the dividends are effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States, or (iii) a suitable substitute form, as may be applicable. These certifications must be provided to the applicable withholding agent prior to the payment of dividends and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

Subject to the discussions below on backup withholding and the Foreign Account Tax Compliance Act, if dividends paid to a Non-U.S. Holder are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and if an applicable income tax treaty so provides, the Non-U.S. Holder maintains a "permanent establishment" or "fixed base" in the United States to which such dividends are attributable) then, although exempt from U.S. federal withholding tax (provided the Non-U.S. Holder provides appropriate certification, as described above), the Non-U.S. Holder will be subject to U.S. federal income tax on such dividends on a net income basis at the regular graduated U.S. federal income tax rates. In addition, a Non-U.S. Holder that is or is treated as a corporation for U.S. federal income tax purposes may be subject to an additional branch profits tax at a rate of 30% (or at a reduced rate under an applicable income tax treaty) on its effectively connected earnings and profits for the taxable year that are attributable to such dividends, as adjusted for certain items. Non-U.S. Holders should consult their own tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

*Sale, Exchange or Other Disposition of the New LTR Holdings Interests.* Subject to the discussions below on backup withholding and the Foreign Account Tax Compliance Act, a Non-U.S. Holder will not be subject to U.S. federal income tax on any gain recognized upon the sale, exchange or other taxable disposition of the New LTR Holdings Interests unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States;

- the Non-U.S. Holder is an individual and is present in the United States for 183 or more days during the taxable year in which the gain is realized and certain other conditions exist; in which case the gain will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate under an applicable income tax treaty), which may be offset by U.S.-source capital losses, provided such Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses; or

- New LTR Holdings is classified as a U.S. real property holding corporation ("USRPHC") and no exceptions from the withholding tax imposed under the Foreign Investment in Real Property Tax Act ("FIRPTA") are available to such Non-U.S. Holder.

Gain described in the first bullet point above will generally be subject to U.S. federal income tax on a net income basis at the regular graduated U.S. federal income tax rates. A Non-U.S. Holder that is a foreign corporation also may be subject to an additional branch profits tax at a rate of 30% (or at a reduced rate under an applicable income tax treaty) on a portion of its effectively connected earnings and profits for the taxable year, as adjusted for certain items.

A Non-U.S. Holder described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate under an applicable income tax treaty) on any gain derived from the sale or other taxable disposition, which may be offset by certain U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States) provided the Non-U.S. Holder timely files U.S. federal income tax returns with respect to such losses.

With respect to the third bullet point above, at this time LTR has not conducted any analysis to determine whether it or any of its affiliates is currently a USRPHC for U.S. federal income tax purposes or whether New LTR Holdings is likely to become one. In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Code and applicable Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest. If New LTR Holdings is a USRPHC as to a Non-U.S. Holder at the time of disposition, such Non-U.S. Holder would be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New LTR Holdings Interests. Further, the buyer of the New LTR Holdings Interests would be required to withhold a tax equal to 15% of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund,

provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. No assurance can be given that New LTR Holdings or any of its affiliates is not now and will not become a USRPHC.

Taxable gain from the disposition of interest in a USRPHC (generally equal to the difference between the amount realized and such U.S. Holder's adjusted tax basis in such interest) will be treated as effectively connected income (against which the withholding mentioned in the prior paragraph can generally be credited, and which such gain will generally not be subject to an additional branch profits tax). Non-U.S. Holders should consult their own tax advisors regarding withholding tax imposed under FIRPTA and potentially applicable income tax treaties that may provide for different rules and other potential exceptions to these taxes.

(b)   **Consequences to Non-U.S. Holders of Investco Convertible Preferred Interests (Class 8)**

*Exchange for the Penny Warrants.*   LTR expects that the exchange of Investco Convertible Preferred Interests for Penny Warrants will qualify as a contribution described in Section 351(a) of the Code. The Penny Warrants will be treated as outstanding New LTR Holdings Interests for U.S. federal income tax purposes.

If Investco and New LTR Holdings are not USRPHCs as to a Non-U.S. Holder at the time of the exchange, LTR expects that the exchange will generally be nontaxable to such Non-U.S. Holder.  If New LTR Holdings is not a USRPHC but Investco is a USRPHC as to a Non-U.S. Holder at the time of the exchange, such Non-U.S. Holder would be subject to U.S. federal income tax as described above under "Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims or Interests—Consequences to Non-U.S. Holders of Noteholder Claims (Class 4)—Taxation of the New LTR Holdings Interests—Sale, Exchange or Other Disposition of the New LTR Holdings Interests".  If Investco and New LTR Holdings are USRPHCs as to a Non-U.S. Holder at the time of the exchange of the Investco Convertible Preferred Interests for the Penny Warrants, LTR expects that an exception to FIRPTA will generally be available to such Non-U.S. Holder on the receipt of the Penny Warrants, and that such Non-U.S. Holder would not recognize any gain or loss on the exchange, as long as such Non-U.S. Holder complies with certain filing requirements to avoid FIRPTA's withholding tax under the exception. FIRPTA tax and withholding could apply on a subsequent disposition of New LTR Holdings Interests, as described above.

Non-U.S. Holders should consult their own tax advisors with regard to FIRPTA's withholding tax and the requirements that such Non-U.S. Holder would need to meet to avoid FIRPTA's withholding tax under the exception available to such Non-U.S. Holder on the exchange of the Investco Convertible Preferred Interests for the Penny Warrants.

*Exchange for the Non-Penny Warrants.*   On the previously stated assumption that the Non-Penny Warrants are not stock for purposes of Section 351, the exchange of Investco Convertible Preferred Interests for the Non-Penny Warrants should be considered as potentially taxable receipt of "boot" under Section 351(b), as further described in the following paragraph.

If Investco is not a USRPHC as to a Non-U.S. Holder at the time of the exchange, the receipt of the Non-Penny Warrants will generally not be taxable unless: (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business within the United States (in which case, such gain will be taxed as described above under "—United States Trade or Business Income"); or (ii) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are satisfied. If Investco is a USRPHC as to a Non-U.S. Holder at the time of the exchange, such Non-U.S. Holder would be subject to U.S. federal income tax under FIRPTA on any gain recognized on the exchange of Investco Convertible Preferred Interests for Non-Penny Warrants. Any gain recognized would be treated as effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States. Investco expects that it would be required to withhold a tax equal to 15% of the amount realized on the exchange The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

*Exercise or Lapse of the Non-Penny Warrants.* For certain Non-U.S. Holders engaged in the conduct of a trade or business in the United States, the U.S. federal income tax treatment of the exercise of the Non-Penny Warrant, or the lapse of the Non-Penny Warrant, generally will correspond to the U.S. federal income tax treatment of the exercise or lapse of the Non-Penny Warrant by a U.S. Holder, as described above under "Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests—Consequences to U.S. Holders of Investco Convertible Preferred Interests— Exercise or Lapse of the Non-Penny Warrants". For all other Non-U.S. holders, the exercise or lapse of the Non-Penny Warrants generally will not be a U.S. taxable event.

Non-U.S. Holders should consult their own tax advisors with respect to FIRPTA's withholding tax on the exchange of the Investco Convertible Preferred Interests and the U.S. federal income tax consequences arising from the ownership, exercise, and disposition of the Penny Warrants and Non-Penny Warrants received in the Plan.

(c)     **Information Reporting and Backup Withholding**

For purposes of this discussion under "—Information Reporting and Backup Withholding," references to "interest" generally also include OID.

In general, with respect to payments to a Non-U.S. Holder, LTR and other payors are required to report payments attributable to accrued interest on the Old Notes and payments of interest, if any, on the New Notes, dividends with respect to the New LTR Holdings Interests, and the amount of tax, if any, withheld with respect to those payments on IRS Form 1042-S. Payments of principal or interest made by us and other payors or payments of dividends to a Non-U.S. Holder would otherwise not be subject to information reporting and backup withholding, provided the applicable withholding agent does not have actual knowledge or reason to know such Holder is a U.S. person and the Holder certifies its non-U.S. status by providing a valid IRS Form W-8BEN, W-8BEN-E or W-8ECI, or other applicable certification (or applicable successor form), or otherwise establishes an exception. Copies of these information returns may also be made available under the provisions of a specific treaty or

agreement to the tax authorities of the country in which the Non-U.S. Holder resides or is established.

In addition, payment of the proceeds from the sale of the Old Notes, New Notes, New LTR Holdings Interests or Equity Warrants effected at a U.S. office of a broker will not be subject to backup withholding and information reporting if the beneficial owner certifies under penalty of perjury that it is a non-U.S. person on IRS Form W-8BEN, W-8BEN-E or W-8ECI, or other applicable form or successor form (and the payor does not have actual knowledge or reason to know that the beneficial owner is a U.S. person), or otherwise establishes an exemption.

With respect to payments to a Non-U.S. Holder, payment of the proceeds from the sale of the Old Notes, New Notes, New LTR Holdings Interests or Equity Warrants effected at a foreign office of a broker will generally not be subject to information reporting or backup withholding. However, a sale effected at a foreign office of a broker could be subject to information reporting in the same manner as a sale within the United States (and, in certain cases may be subject to backup withholding as well) if (i) the broker has certain connections to the United States, (ii) the proceeds or confirmation are sent to the United States or (iii) the sale has certain other specified connections with the United States.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

(d)    **Withholdable Payments to Foreign Financial Entities and Other Foreign Entities**

Withholding taxes may be imposed under the provisions of the law generally known as the Foreign Account Tax Compliance Act, or FATCA, on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities.  Specifically, a 30% withholding tax may be imposed on dividends on stock, payments of interest (including OID), or gross proceeds from the sale or other disposition of stock, debt securities or certain other instruments that can produce U.S.-source passive income paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code), unless (i) the foreign financial institution undertakes certain diligence and reporting obligations, (ii) the non-financial foreign entity either certifies it does not have any "substantial U.S. owners" (as defined in the Code) or furnishes identifying information regarding each substantial U.S. owner or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from FATCA.  If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (i) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified U.S. persons" or "U.S.-owned foreign entities" (each as defined in the Code), annually report certain information about such accounts and withhold 30% on payments to non-compliant foreign financial institutions and certain other account Holders.  An intergovernmental agreement between the United States and an applicable foreign country, or future Regulations or other guidance, may modify these requirements.

Under the applicable Regulations and guidance from the IRS, withholding under FATCA generally applies to payments of interest and dividends on the Old Notes, New Notes, and New LTR Holdings Interests, and will apply to payments of gross proceeds from the sale or other disposition of the Old Notes, New Notes and New LTR Holdings Interests on or after January 1, 2019, and to certain "pass-thru" payments made on or after the later of January 1, 2019 and the date final Regulations are issued defining such pass-thru payments. The FATCA withholding tax will apply to all withholdable payments without regard to whether the beneficial owner of the payment would otherwise be entitled to an exemption from imposition of withholding tax pursuant to an applicable tax treaty with the United States or U.S. domestic law. Amounts that a Holder receives on the Old Notes, New Notes or New LTR Holdings Interests could be affected by this withholding if such Holder is subject to the information reporting requirements and fails to comply with them or if such Holder holds the Old Notes, New Notes or New LTR Holdings Interests through another person (e.g., a foreign bank or broker) that is subject to withholding because it fails to comply with these requirements (even if such Holder would not otherwise have been subject to withholding). However, withholding will not apply to payments of gross proceeds from a sale or other disposition of the Old Notes, New Notes or New LTR Holdings Interests before January 1, 2019. Accordingly, FATCA withholding will not apply to amounts that are paid to a Holder upon a disposition of the Old Notes pursuant to the Plan, except that FATCA withholding could apply to the portion of such payment that is attributable to accrued but unpaid interest on the Old Notes.

Holders should consult their own tax advisors regarding the potential application of withholding under FATCA to their investment in the Old Notes, New Notes, and New LTR Holdings Interests.

## ARTICLE X

## CONCLUSION AND RECOMMENDATION

Overall, the Plan provides for a substantial deleveraging of the Debtors' balance sheet, augments the Debtors' liquidity, continues the Debtors' business operations with minimal disruption, preserves the going-concern value of the Debtors' businesses, maximizes recoveries for stakeholders, and protects the jobs of the Debtors' employees. The Debtors urge all holders of Claims and Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than 4:00 p.m. prevailing Central Time on September 20, 2016.

[*Remainder of Page Intentionally Left Blank*]

Respectfully submitted,

LIGHT TOWER RENTALS, INC., *et al.*
on behalf of itself and all other Debtors

By: _____
Name:    Keith Muncy
Title:    Chief Financial Officer

Prepared by:

Patricia B. Tomasco (State Bar No. 01797600)
Matthew D. Cavenaugh (State Bar No. 24062656)
Jennifer F. Wertz (State Bar No. 24072822)
**JACKSON WALKER LLP**
1401 McKinney Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4242
Email: ptomasco@jw.com
        mcavenaugh@jw.com
        jwertz@jw.com

-and-

Philip M. Abelson
Ehud Barak
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: pabelson@proskauer.com
        ebarak@proskauer.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Debtors' Joint Prepackaged Chapter 11 Plan**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS – HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHT TOWER RENTALS, INC., *et al.*,[1] | ) | Case No. 16-34284 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

---

THIS CHAPTER 11 PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS CHAPTER 11 PLAN SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE OF THIS PLAN ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

---

Patricia B. Tomasco (State Bar No. 01797600)
Matthew D. Cavenaugh (State Bar No. 24062656)
Jennifer F. Wertz (State Bar No. 24072822)
**JACKSON WALKER LLP**
1401 McKinney Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4242
Email: ptomasco@jw.com
      mcavenaugh@jw.com
      jwertz@jw.com

-and-

Philip M. Abelson
Ehud Barak
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Light Tower Rentals, Inc. (4893); LTR Holdco, Inc. (8813); LTR Shelters, Inc. (5396); and LTR Investco, Inc. (3819).  The location of the Debtors' service address is 2330 E. I-20 S. Service Rd., Odessa, TX 79766.

Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: pabelson@proskauer.com
        ebarak@proskauer.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  August 22, 2016

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................6

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, GOVERNING LAW, AND OTHER REFERENCES.....................................6
    A.    Defined Terms .........................................................................................6
    B.    Rules of Interpretation ...........................................................................16
    C.    Computation of Time .............................................................................17
    D.    Governing Law .......................................................................................17
    E.    Reference to Monetary Figures..............................................................17
    F.    Reference to the Debtors or the Reorganized Debtors...........................17
    G.    Controlling Document ...........................................................................17

ARTICLE II ADMINISTRATIVE, PROFESSIONAL AND PRIORITY TAX CLAIMS .........18
    A.    Administrative Claims ...........................................................................18
    B.    [Reserved] .............................................................................................18
    C.    Professional Claims ...............................................................................18
    D.    Priority Tax Claims................................................................................19

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
INTERESTS ........................................................................................................19
    A.    Classification of Claims and Interests....................................................19
    B.    Treatment of Classes of Claims and Interests........................................20
    C.    Special Provision Governing Unimpaired Claims..................................24
    D.    Elimination of Vacant Classes ...............................................................25
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes............25
    F.    Intercompany Interests...........................................................................25
    G.    Subordinated Claims ..............................................................................25
    H.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code....................25

ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN .................................26
    A.    General Settlement of Claims and Interests............................................26
    B.    Sources of Consideration for Plan Distributions ...................................26
    C.    The Equity Warrants ..............................................................................28
    D.    Management Incentive Plan....................................................................29
    E.    Exit Facility...........................................................................................30
    F.    Professional Fees and Expenses.............................................................30
    G.    Exemption from Registration Requirements ..........................................31
    H.    Corporate Existence ...............................................................................31

iii

| | | | |
|---|---|---|---|
| I. | Vesting of Assets in the Reorganized Debtors | ........................................ | 32 |
| J. | Cancellation of Notes, Instruments, Certificates, and Other Documents | ............ | 32 |
| K. | New Organizational Documents | ................................................... | 33 |
| L. | Effectuating Documents; Further Transactions | ...................................... | 33 |
| M. | Section 1146(a) Exemption | ....................................................... | 33 |
| N. | Directors and Officers | ............................................................ | 34 |
| O. | [Reserved] | ...................................................................... | 35 |
| P. | Incentive Plans and Employee and Retiree Benefits | .............................. | 35 |
| Q. | Preservation of Rights of Action | .................................................. | 35 |
| R. | Restructuring Transactions | ...................................................... | 36 |

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................. 37

| | | | |
|---|---|---|---|
| A. | Assumption of Executory Contracts and Unexpired Leases | ...................... | 37 |
| B. | Indemnification | ................................................................. | 37 |
| C. | Cure of Defaults and Objections to Cure and Assumption | ....................... | 38 |
| D. | Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date | ..................................................................... | 39 |
| E. | Insurance Policies | ............................................................... | 39 |
| F. | Compensation and Benefits | ...................................................... | 39 |
| G. | Rejection | ....................................................................... | 39 |
| H. | Nonoccurrence of Effective Date | ................................................ | 39 |
| I. | Reservation of Rights | ........................................................... | 40 |

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ............................. 40

| | | | |
|---|---|---|---|
| A. | Distributions on Account of Claims and Interests Allowed as of the Effective Date | ................................................................... | 40 |
| B. | Rights and Powers of Distribution Agent | ........................................ | 40 |
| C. | Special Rules for Distributions to Holders of Disputed Claims and Interests | .................................................................... | 41 |
| D. | Delivery of Distributions | ........................................................ | 41 |
| E. | Claims Paid or Payable by Third Parties | ........................................ | 44 |
| F. | Setoffs | ......................................................................... | 44 |
| G. | Allocation Between Principal and Accrued Interest | .............................. | 45 |

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
INTERESTS ........................................................................ 45

| | | | |
|---|---|---|---|
| A. | Disputed Claims Process | ........................................................ | 45 |
| B. | Claims Administration Responsibilities | .......................................... | 45 |
| C. | Adjustment to Claims Without Objection | ........................................ | 46 |
| D. | No Interest | ..................................................................... | 46 |

E.        Disallowance of Claims and Interests ...................................................................46

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN ...............................................46
A.        Discharge of Claims and Termination of Interests ..............................................46
B.        Releases by the Debtors ......................................................................................47
C.        Releases by Holders of Claims and Interests.......................................................47
D.        Exculpation .........................................................................................................48
E.        Injunction ...........................................................................................................48
F.        Protection Against Discriminatory Treatment .....................................................49
G.        Recoupment ........................................................................................................49
H.        Document Retention ...........................................................................................49
I.        Reimbursement or Contribution .........................................................................49
J.        Release of Liens .................................................................................................50

ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..............................50
A.        Conditions Precedent to the Effective Date ........................................................50
B.        Waiver of Conditions Precedent .........................................................................52
C.        Effect of Non-Occurrence of Conditions to Consummation ................................52

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN..........52
A.        Modification of Plan ...........................................................................................52
B.        Effect of Confirmation on Modifications ............................................................53
C.        Withdrawal of Plan .............................................................................................53

ARTICLE XI RETENTION OF JURISDICTION.........................................................................53

ARTICLE XII MISCELLANEOUS PROVISIONS .....................................................................55
A.        Immediate Binding Effect...................................................................................55
B.        Additional Documents ........................................................................................55
C.        Payment of Statutory Fees ..................................................................................55
D.        Reservation of Rights..........................................................................................55
E.        Successors and Assigns........................................................................................55
F.        Service of Documents .........................................................................................56
G.        Term of Injunctions or Stays...............................................................................56
H.        Entire Agreement ...............................................................................................56
I.        Plan Supplement Exhibits ...................................................................................57
J.        Non-Severability .................................................................................................57
K.        Votes Solicited in Good Faith.............................................................................57
L.        Closing of Chapter 11 Cases ...............................................................................57
M.        Waiver or Estoppel .............................................................................................57

## INTRODUCTION

Light Tower Rentals, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases jointly propose this Plan. Capitalized terms used in the Plan shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions on the Effective Date of the Plan or as soon as practicable thereafter. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A.    Defined Terms

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

3.    "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

4.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

5.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas – Houston Division or such other court having jurisdiction over the Chapter 11 Cases.

6.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United

States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

7.     "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

8.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

9.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.   Causes of Action also include:   (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

10.    "*Certificate*" means any instrument evidencing a Claim or an Interest.

11.    "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

12.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

13.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent.

14.    "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

15.    "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

16.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

17.    "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

18.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

19.     "*Consenting Noteholders*" means the Noteholders that are party to the RSA.

20.     "*Consummation*" means the occurrence of the Effective Date.

21.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

22.     "*Debtor Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

23.     "*Debtors*" means, collectively, (i) LTR, (ii) Holdings, (iii) Shelters, and (iv) Investco.

24.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

25.     "*Disputed*" means, with respect to any Claim or Interest, a Claim or Interest that is not yet Allowed, including (a) any Proof of Claim that, on its face, is contingent or unliquidated; (b) any Proof of Claim or request for payment of an Administrative Claim filed after the Effective Date or the deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, and (c) any Claim that is subject to an objection or a motion to estimate, in each case that has not been withdrawn, resolved, or ruled on by a Final Order of the Bankruptcy Court.

26.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

27.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims and/or Interests entitled to receive distributions under the Plan.

28.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in <u>Article IX.A</u> of the Plan have been satisfied or waived in accordance with <u>Article IX.B</u> of the Plan.

29.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

30.     "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code and includes, for the avoidance of doubt, the Investco Interests.

31.     "*Equity Warrants*" means the warrants issued to holders of Investco Convertible Preferred Interests, as more fully described in <u>Article IV.C</u> of the Plan.

32.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

33.     "*Exchange Act*" means the Securities Exchange Act of 1934, as now in effect or hereafter amended.

34.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases (if any) and each of their respective members; (c) the Consenting Noteholders; (d) the Exit Facility Lenders; (e) the Exit Facility Agent; (f) the LTR Indenture Trustee; and (g) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

35.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

36.     "*Existing Equityholders*" means the holders of Investco Interests.

37.     "*Exit Facility*" means either a new asset-based lending facility or a revolving facility potentially to be entered into by the Reorganized Debtors on the terms set forth in a document contained in the Plan Supplement.

38.     "*Exit Facility Agent*" means the administrative agent and collateral agent under the Exit Facility, if applicable, or any successor thereto, solely in its capacity as such.

39.     "*Exit Facility Documents*" means the Exit Facility credit agreement, if applicable, and any guarantee, security agreement, deed of trust, mortgage, and relevant documentation potentially entered into with respect to the Exit Facility.

40.     "*Exit Facility Lenders*" means each of the lenders and their Affiliates under the Exit Facility, if applicable, solely in their capacity as such.

41.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

42.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek *certiorari* has expired and no appeal or petition for *certiorari* has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which *certiorari* could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

9

43.    "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Professional Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Noteholder Claim, a Revolving Facility Claim, a Debtor Intercompany Claim, or a Section 510(b) Claim.

44.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

45.    "*Holdings*" means LTR Holdco, Inc., a Texas corporation and a guarantor under the LTR Indenture and LTR Credit Agreement.

46.    "*Impaired*" is used to describe a Claim or an Interest that is not Unimpaired.

47.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

48.    "*Intercompany Contract*" means a contract between or among two or more Debtors or a contract between or among one or more Debtors and one or more of its Affiliates.

49.    "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate of a Debtor.

50.    "*Interest*" means any Equity Security in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

51.    "*Investco*" means LTR Investco, Inc., a Texas corporation and the Debtors' ultimate parent.

52.    "*Investco Common Interests*" means the issued and outstanding common stock of Investco, and any options, warrants, rights and other instruments evidencing such interests (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

53.    "*Investco Convertible Preferred Interests*" means the issued and outstanding Series A Convertible Preferred Stock of Investco, and any options, warrants, rights and other instruments evidencing such interest (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

54.    "*Investco Interests*" means the Investco Common Interests, the Investco Convertible Preferred Interests, and the Investco Preferred Interests.

55.    "*Investco Preferred Interests*" means the issued and outstanding Series A Senior Preferred Stock of Investco, and any options, warrants, rights and other instruments evidencing such interests (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

56.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

57.    "*LTR*" means Light Tower Rentals, Inc., a Texas corporation.

58.    "*LTR Credit Agreement*" means that certain credit agreement dated as of July 21, 2014, by and among, *inter alia*, LTR, Holdings, Shelters, and each lender from time to time party thereto.

59.    "*LTR Indenture*" means that certain indenture dated as of July 21, 2014, by and among LTR, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent.

60.    "*LTR Indenture Trustee*" means The Bank of New York Mellon Trust Company, N.A. and any successor thereto.

61.    "*Management Incentive Plan*" means that certain management incentive plan, the terms of which shall be determined by the New LTR Holdings Board after the Effective Date, as more fully described in Article IV.D of the Plan.

62.    "*New LTR Holdings*" means the newly formed Delaware limited liability company, treated as a corporation for tax purposes, that will be, as of the Effective Date, the ultimate parent company of the Reorganized Debtors.

63.    "*New LTR Holdings Board*" means New LTR Holdings' initial board of directors.

64.    "*New LTR Holdings Interests*" means the limited liability company interests in New LTR Holdings.  For the avoidance of doubt, New LTR Holdings Interests does not include the Equity Warrants, Management Warrants, or Management Options prior to their respective exercise dates.

65.    "*New LTR Holdings Interests Documents*" means the New LTR Holdings LLC Agreement, the New LTR Holdings Securityholders Agreement, and the New LTR Holdings Registration Rights Agreement.  The New LTR Holdings Interests Documents will, among other things, set forth the relative rights and obligations of the holders of New LTR Holdings Interests (including as to voting, transferability, and other matters) with respect to New LTR Holdings Interests and equity-linked interests and related governance matters.  The New LTR Holdings Interests Documents will contain customary unitholder protections with respect to tag-along rights, preemptive rights, drag-along obligations, and protection against self-dealing.  The New LTR Holdings Interests Documents will also contain customary structural anti-dilution protections for stock splits or other subdivisions, stock dividends, and stock combinations.

66.     *"New LTR Holdings LLC Agreement"* means the limited liability company agreement of New LTR Holdings, the form of which shall be included in the Plan Supplement.

67.     *"New LTR Holdings Organizational Documents"* means the New LTR Holdings Interests Documents and the certificate of formation and/or other organizational documents of New LTR Holdings.

68.     "*New LTR Holdings Registration Rights Agreement*" means that certain registration rights agreement of New LTR Holdings, the form of which shall be included in the Plan Supplement.

69.     "*New LTR Holdings Securityholders Agreement*" means that certain securityholders agreement, dated as of the Effective Date, by and among the holders of New LTR Holdings Interests, the form of which shall be included in the Plan Supplement, and that will supersede and cancel any analogous prepetition shareholders' agreement or investor rights agreement.

70.     *"New Notes"* means the new secured notes or loans issued to holders of Allowed Noteholder Claims, as more fully described in <u>Article IV.B.2</u> of the Plan.

71.     *"New Notes Indenture"* means that certain indenture, loan, or similar document, dated as of the Effective Date, by and among Reorganized LTR, as issuer (or borrower), each of its subsidiaries as subsidiary guarantors, and Reorganized Holdings, as parent guarantor, and the trustee (if any) and collateral agent (if any) thereunder, which is expected to contain substantially the same collateral package and terms as the LTR Indenture.

72.     *"New Notes Debt Documents"* means, collectively, the New Notes Indenture, and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any collateral agreement, guarantee agreement, and intercreditor agreement (if any)).

73.     *"New Organizational Documents"* means the New LTR Holdings Organizational Documents and, as applicable, the certificates of incorporation, certificates of formation, bylaws, shareholders' agreement, limited liability company agreement, or functional equivalent thereof with respect to each Reorganized Debtor, in each case the forms of which shall be contained in the Plan Supplement and subject to the RSA.

74.     "*Noteholder*" means each Holder, as defined in the LTR Indenture.

75.     "*Noteholder Claim*" means any Claim arising under, derived from, or based upon the LTR Indenture.

76.     "*Noteholder Equity Recovery*" means 100% of the New LTR Holdings Interests issued on the Effective Date, subject to Pro Rata dilution on account of the Management Incentive Plan, the Equity Warrants, and the distribution to holders of Investco Preferred Interests.

77. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

78. "*Other Secured Claim*" means any Secured Claim other than (a) a Revolving Facility Claim or (b) a Noteholder Claim.

79. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

80. "*Petition Date*" means the date on which the Chapter 11 Cases were commenced.

81. "*Plan*" means this chapter 11 plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

82. "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors no later than 7 days before the voting deadline to accept or reject the Plan or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth on the exhibits attached hereto, where applicable.

83. "*Plan Transaction Documents*" means all definitive documents and agreements to which the Debtors will be a party as contemplated by the RSA and the Plan, including (a) the Plan and any documentation or agreements related thereto; (b) the Confirmation Order and pleadings in support of entry thereof; (c) the New Organizational Documents; (d) the New Notes Debt Documents; (e) the Exit Facility Documents (if applicable); and (f) each other document that will comprise the Plan Supplement. The form and substance of each document comprising the Plan Transaction Documents shall be acceptable to the Debtors and the Required Consenting Noteholders.

84. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

85. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

86. "*Professional Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

87. "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C of the Plan.

13

88.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

89.     "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

90.     "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

91.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

92.     "*Released Party*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Noteholders; (c) the Existing Equityholders; (d) the Revolving Lenders; (e) the Exit Facility Lenders; (f) the Exit Facility Agent; (g) the LTR Indenture Trustee; (h) the Noteholders; and (i) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (b) through (h), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their (including, for the avoidance of doubt, the Entities identified in clauses (a) through (h)) respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

93.     "*Releasing Parties*" means, collectively, (a) the Debtors and the Reorganized Debtors; (b) the Consenting Noteholders; (c) the Existing Equityholders; (d) the Revolving Lenders; (e) the Exit Facility Lenders; (f) the Exit Facility Agent; (g) the LTR Indenture Trustee; (h) the Noteholders; (i) all holders of Claims or Interests that are deemed to accept the Plan; and (j) with respect to the foregoing clauses (a) through (i), each such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

94.     "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

95.     "*Reorganized Holdings*" means Holdings, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

14

96.     *"Reorganized LTR"* means LTR, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

97.     *"Required Consenting Noteholders"* means the Consenting Noteholders who hold, in the aggregate, at least 55% of the outstanding principal amount of the total outstanding notes under the LTR Indenture held by all Consenting Noteholders as of such date the Required Consenting Noteholders make a determination in accordance with the RSA or the Plan.

98.     *"Restructuring Transactions"* means the Debtors' restructuring, inclusive of the transactions described in <u>Article IV.R</u> of the Plan.

99.     *"Revolving Facility"* means the Revolving Credit Facility, as defined in the LTR Credit Agreement.

100.    *"Revolving Facility Claim"* means any Claim arising under, derived from, or based upon the Revolving Facility, together with all existing letters of credit thereunder.

101.    *"Revolving Facility Documents"* means the LTR Credit Agreement, together with all related agreements and documents executed by any of the Debtors in connection with the LTR Credit Agreement.

102.    *"Revolving Lenders"* means each Lender, as defined in the LTR Credit Agreement.

103.    *"RSA"* means that certain Restructuring Support Agreement, dated as of August 8, 2016, by and among the Debtors, the Consenting Noteholders, and the Existing Equityholders, including all exhibits and attachments thereto.

104.    *"Schedule of Rejected Contracts and Leases"* means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, filed as part of the Plan Supplement, as may be amended by the Debtors from time to time prior to the Confirmation Date.

105.    *"Section 510(b) Claim"* means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

106.    *"Secured Claim"* means a Claim:  (a) secured by a valid Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

107.    *"Securities Act"* means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

108.    *"Security"* has the meaning set forth in section 2(a)(1) of the Securities Act.

15

109.    "*Servicer*" means an agent or other authorized representative of holders of Claims or Interests and, with respect to the Noteholders, the LTR Indenture Trustee.

110.    "*Shelters*" means LTR Shelters, Inc., a Texas corporation and a guarantor under the LTR Indenture and LTR Credit Agreement

111.    "*Solicitation Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

112.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

113.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

114.    "*Unimpaired*" is used to describe a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

## B.    Rules of Interpretation

For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (k) references to "shareholders," "directors," and/or "officers" shall also include

"members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (l) the Reorganized Debtors shall include New LTR Holdings as and where appropriate; (m) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" and (n) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## C.   Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

## E.   Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F.   Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## G.   Controlling Document

In the event of an inconsistency between the Plan, the RSA, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

# ARTICLE II

## ADMINISTRATIVE, PROFESSIONAL AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

## A.   Administrative Claims

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (in consultation with the Required Consenting Noteholders) or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

## B.   [Reserved]

## C.   Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.   The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.  Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than five Business Days prior to the anticipated Effective Date.   For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  No funds in the

Professional Fee Escrow Account shall be property of the Estates. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## D.    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

## A.    Classification of Claims and Interests

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

| Class | Claim or Interest | Status | Voting Rights |
|:---:|---|:---:|:---:|
| 3 | Revolving Facility Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Noteholder Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 7 | Interests in Debtors other than Investco | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Investco Convertible Preferred Interests | Impaired | Entitled to Vote |
| 9 | Investco Preferred Interests | Impaired | Entitled to Vote |
| 10 | Investco Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**     **Treatment of Classes of Claims and Interests**

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by:  (a) the Debtors; (b) the holder of such Allowed Claim or Allowed Interest, as applicable; and (c) the Required Consenting Noteholders.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.     **Class 1 — Other Secured Claims**

(a)     *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

(b)     *Treatment*:  Each holder of an Allowed Class 1 Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders:

(i)        payment in full in Cash of its Allowed Class 1 Claim;

(ii)       the collateral securing its Allowed Class 1 Claim;

(iii)     Reinstatement of its Allowed Class 1 Claim; or

(iv)     such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:   Class 1 is Unimpaired under the Plan.   Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.   Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

2.     **Class 2 — Other Priority Claims**

(a)     *Classification*:   Class 2 consists of any Other Priority Claims against any Debtor.

(b)     *Treatment*:   Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim.

(c)     *Voting*:   Class 2 is Unimpaired under the Plan.   Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.   Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

3.     **Class 3 — Revolving Facility Claims**

(a)     *Classification*:   Class 3 consists of any Revolving Facility Claims.

(b)     *Allowance*: On the Effective Date, Class 3 Revolving Facility Claims shall be Allowed in the aggregate principal amount of $0, plus any liquidated amounts for reasonable and documented costs and expenses, as of the Petition Date, that are reimbursable under the Revolving Facility Documents.

(c)     *Treatment*:   Each holder of an Allowed Class 3 Claim shall receive Cash in an amount equal to such Allowed Class 3 Claim.

(d)     *Voting*:   Class 3 is Unimpaired under the Plan.   Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.   Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

4.     **Class 4 — Noteholder Claims**

(a)     *Classification*:  Class 4 consists of all Noteholder Claims.

(b)     *Allowance*:  On the Effective Date, Class 4 Claims shall be Allowed in the aggregate principal amount of $330,000,000, plus any accrued but unpaid interest thereon as of the Petition Date, in each case in accordance with the terms and conditions under the LTR Indenture.

(c)     *Treatment*:  Each holder of an Allowed Class 4 Claim shall receive (i) its Pro Rata share of the Noteholder Equity Recovery and (ii) its Pro Rata share of the New Notes.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5.     **Class 5 — General Unsecured Claims**

(a)     *Classification*:  Class 5 consists of any General Unsecured Claims against any Debtor.

(b)     *Treatment*:  Each holder of an Allowed Class 5 Claim shall receive Cash in an amount equal to such Allowed Class 5 Claim on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 5 Claim.

(c)     *Voting*:   Class 5 is Unimpaired under the Plan.  Holders of Allowed Class 5 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan.

6.     **Class 6 — Debtor Intercompany Claims**

(a)     *Classification*:  Class 6 consists of any Debtor Intercompany Claims.

(b)     *Treatment*:  Each Allowed Class 6 Claim shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders, either:

(i)     Reinstated; or

(ii)    canceled and released without any distribution on account of such Claims.

(c)     *Voting*:  Holders of Allowed Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

7.      **Class 7 — Interests in Debtors other than Investco**

(a)     *Classification*:  Class 7 consists of Interests in Debtors other than Investco.

(b)     *Treatment*:  Class 7 Interests shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Required Consenting Noteholders, either:

(i)     Reinstated; or

(ii)    canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 7 Interests will not receive any distribution on account of such Class 7 Interests.

(c)     *Voting*:  Holders of Class 7 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of Class 7 Interests are not entitled to vote to accept or reject the Plan.

8.      **Class 8 — Investco Convertible Preferred Interests**

(a)     *Classification*:  Class 8 consists of the Investco Convertible Preferred Interests.

(b)     *Treatment*:  Class 8 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each holder of an Allowed Class 8 Interest shall receive its Pro Rata share of Equity Warrants, as more fully described in Article IV.C of this Plan.

(c)     *Voting*:  Class 8 is Impaired under the Plan.  Holders of Allowed Class 8 Interests are entitled to vote to accept or reject the Plan.

9.      **Class 9 — Investco Preferred Interests**

(a)     *Classification*:  Class 9 consists of the Investco Preferred Interests.

(b)     *Treatment*:  Class 9 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.  Each holder of an Allowed Class 9 Interest shall receive its Pro Rata share of Management Warrants, issued on the same terms as the Management Incentive Plan, representing New LTR Holdings Interests constituting 1.0% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances).  Except as expressly set forth in Article IV.D of the Plan, the other terms (including vesting) of the Management Warrants will be

negotiated in good faith, acceptable to the Required Consenting Noteholders, and documented in the Plan Supplement.

(c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Allowed Class 9 are entitled to vote to accept or reject the Plan.

10.     **Class 10 – Investco Common Interests**

(a)     *Classification*: Class 10 consists of the Investco Common Interests.

(b)     *Treatment*: Class 10 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Class 10 Interests will not receive any distribution on account of such Class 10 Interests.

(c)     *Voting*: Class 10 is Impaired under the Plan.  Holders of Class 10 Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 10 Interests are not entitled to vote to accept or reject the Plan.

11.     **Class 11 – Section 510(b) Claims**

(a)     *Classification*: Class 11 consists of any Section 510(b) Claims against any Debtor.

(b)     *Allowance*: Notwithstanding anything to the contrary herein, a Class 11 Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Class 11 Claim and believe that no such Class 11 Claim exists.

(c)     *Treatment*: Class 11 Claims, if any, will be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)     *Voting*: Class 11 is Impaired under the Plan.  Holders (if any) of Allowed Class 11 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders (if any) of Allowed Class 11 Claims are not entitled to vote to accept or reject the Plan.

C.     **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**D.**     **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.**     **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the holders of such Claims or Interests in such Class; *provided*, *however*, that such Class will not be used as an impaired accepting class pursuant to Bankruptcy Code section 1129(a)(10).

**F.**     **Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of New LTR Holdings Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor that owns such subsidiary.

**G.**     **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**H.**     **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors, with the consent of the Required Consenting Noteholders, reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE IV

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

### B.    Sources of Consideration for Plan Distributions

#### 1.    Cash on Hand

The Reorganized Debtors shall use Cash on hand to fund distributions to certain holders of Claims entitled to receive Cash.

#### 2.    New Notes

On the Effective Date, Reorganized LTR shall issue new secured notes, guaranteed by each of its subsidiaries (except for any immaterial subsidiaries, consistent with the LTR Indenture) and its parent company (which shall be a subsidiary of New LTR Holdings), in the aggregate principal amount of $30 million, (i) bearing interest at 10% per annum, payable in cash or in kind at the option of the Reorganized LTR for the period commencing on the Effective Date and ending on the third anniversary thereof, and payable solely in cash thereafter, (ii) maturing on the fifth anniversary of the Effective Date, (iii) being callable (a) prior to the second anniversary of the Effective Date at a price equal to 101% of the aggregate principal amount outstanding, (b) during the period commencing on the second anniversary of the Effective Date through the day prior to the third anniversary of the Effective Date at a price equal to 106.75% of the aggregate principal amount outstanding, (c) during the period commencing on the third anniversary of the Effective Date through the day prior to the fourth anniversary of the Effective Date at a price equal to 104.50% of the aggregate principal amount outstanding, and (d) at a price equal to 100% of the aggregate outstanding amount from the fourth anniversary of the Effective Date and thereafter, and (iv) containing terms and covenants substantially similar to those under the LTR Indenture, with such modifications acceptable to the Required Consenting Noteholders.  A form of the New Notes Indenture shall be filed with the Plan Supplement.  For the avoidance of doubt, the Noteholders will not be required to purchase the New Notes from the Reorganized Debtors with new money and shall receive New Notes on account of their prepetition Claims and as part of their distribution pursuant to Article III of the Plan.

On the Effective Date, the applicable Reorganized Debtors may enter into the New Notes Debt Documents. Confirmation of the Plan shall be deemed approval of the New Notes and the New Notes Debt Documents, if applicable, and all transactions contemplated thereby, including, without limitation, any actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the New Notes Debt Documents and such other documents as may be required to effectuate the treatment afforded thereunder, if applicable. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Notes Debt Documents, if applicable, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Debt Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Notes Debt Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. The collateral agent (if any) of the New Notes and the agent for the lenders under the Exit Facility (if any) may enter into a customary intercreditor agreement setting forth the respective rights of Creditors to the collateral, including that the obligations under the New Notes may be secured by (a) a first priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Notes Priority Collateral (which is expected to be defined substantially similarly to the LTR Indenture) and (b) a second priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Credit Facility Priority Collateral (which is expected to be defined substantially similarly to the LTR Indenture), in each case subject to certain exceptions and permitted liens, and the terms of the intercreditor agreement (if any).

3. **Issuance and Distribution of the New LTR Holdings Interests**

All existing Interests in Investco shall be cancelled as of the Effective Date, and Reorganized Investco shall issue 100% of its Interests to New LTR Holdings. New LTR Holdings shall issue the New LTR Holdings Interests pursuant to the Plan. The issuance of the New LTR Holdings Interests (including Interests reserved under the Management Incentive Plan and the Equity Warrants), shall be authorized without the need for any further corporate or limited liability company action and without any further action by the holders of Claims or Interests or the Debtors or the Reorganized Debtors, as applicable. The New LTR Holdings Organizational Documents shall authorize the issuance and distribution on the Effective Date of the New LTR Holdings Interests to the Distribution Agent for the benefit of Entities entitled to receive the New LTR Holdings Interests on the Effective Date pursuant to the Plan. All of the

New LTR Holdings Interests issued under the Plan shall be duly authorized and validly issued, and the holders of Allowed Noteholder Claims that will receive New LTR Holdings Interests shall not be required to execute any of the New LTR Holdings Interests Documents before receiving their respective distributions of New LTR Holdings Interests under the Plan. Any such Noteholder who does not execute one or all of the New LTR Holdings Interests Documents shall be automatically deemed to have executed and accepted the terms of each such unexecuted New LTR Holdings Interests Document (in such Person's capacity as a unitholder of New LTR Holdings) and to be party thereto without further action. Each of the New LTR Holdings Interests Documents shall be adopted on the Effective Date and shall be deemed to be valid, binding and enforceable in accordance with its terms, and each holder of New LTR Holdings Interests shall be bound thereby. Each distribution and issuance of the New LTR Holdings Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, none of the New LTR Holdings Interests will be registered under the Securities Act or listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Exchange Act, except in connection with a public offering, the New Organizational Documents may impose certain trading restrictions, and the New LTR Holdings Interests may be subject to certain transfer and/or other restrictions pursuant to the New Organizational Documents designed to maintain the Reorganized Debtors as private, non-reporting companies.

## C.     The Equity Warrants

The terms of the Equity Warrants shall be substantially similar in all respects with those provided in the RSA. For the avoidance of doubt, the Equity Warrants shall consist of (i) penny warrants exercisable into New LTR Holdings Interests constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the Management Incentive Plan and future equity issuances), (ii) warrants exercisable into New LTR Holdings Interests constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the Management Incentive Plan and future equity issuances), at an initial strike price implying a total equity value of the Reorganized Debtors of $300 million, and (iii) warrants exercisable into New LTR Holdings Interests constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the Management Incentive Plan and future equity issuances), at an initial strike price implying a total equity value of the Reorganized Debtors of $457 million. The strike price on each of the Equity Warrants shall be increased or decreased to reflect appropriate adjustments on account of any capital contributions made to (whether in Cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in Cash, cash equivalents, promissory obligations, or the fair market

value of other property which is distributed or deemed to have been distributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date. Each class of the Equity Warrants shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of such Equity Warrants shall be entitled only to participation in the portion of the proceeds in excess of the applicable strike price. For the avoidance of doubt, holders entitled to receive the Equity Warrants hereunder shall, in their capacity as such, neither execute, nor be deemed to have executed and accepted the terms of, the New LTR Holdings Interests Documents as of the Effective Date. For the further avoidance of doubt, such holders shall, upon exercise of the Equity Warrants, execute or be deemed to have executed and accepted, and be bound by, the New LTR Holdings Interests Documents.

## D.   **Management Incentive Plan**

After the Effective Date, the Reorganized Debtors, including New LTR Holdings, shall implement the Management Incentive Plan on terms approved by the directors of New LTR Holdings Board, but which shall provide for: (i) penny warrants or options (the "Management Warrants") exercisable into, or, alternatively, restricted units representing, New LTR Holdings Interests constituting 1.5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), separate from and in addition to the Management Warrants constituting 1.0% of the total equity of New LTR Holdings in respect of the Class 9 Interests; and (ii) options (the "Management Options" and, together with the Management Warrants, the "Management Securities") (A) to purchase New LTR Holdings Interests constituting 2.5% of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), at an initial strike price implying a total equity value of the Reorganized Debtors of $157 million; and (B) to purchase New LTR Holdings Interests constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), (xx) one third (1/3) of which are exercisable at an initial strike price implying a total equity value of the Reorganized Debtors of $232 million, (yy) one third (1/3) of which are exercisable at an initial strike price implying a total equity value of the Reorganized Debtors of $300 million, and (zz) one third (1/3) of which are exercisable at an initial strike price implying a total equity value of the Reorganized Debtors of $457 million. The strike price on each of the Management Securities shall be increased or decreased to reflect appropriate adjustment on account of any capital contributions made to (whether in Cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in Cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date. The Management Securities shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of Management Securities shall be entitled only to participation in the portion of the proceeds in excess of the applicable strike price. The Management Options shall vest over a five (5) year period from grant with 20% of such Management Options vesting each year, subject in each case to continued employment with the Reorganized Debtors through each such vesting date, and subject to customary repurchase and forfeiture provisions. The other terms (including vesting) of the Management Warrants will be negotiated in good faith,

acceptable to the Required Consenting Noteholders, and documented in the Plan Supplement. For the avoidance of doubt, (1) allocation of the Management Warrants and Management Options shall be made at the discretion of the New LTR Holdings Board, and (2) eligible parties under the Management Incentive Plan shall, in their capacity as such, neither execute, nor be deemed to have executed and accepted the terms of, the New LTR Holdings Interests Documents as of the Effective Date. For the further avoidance of doubt, such eligible parties shall, upon exercise of the Management Securities, execute or be deemed to have executed and accepted, and be bound by, the New LTR Holdings Interests Documents.

E.     **Exit Facility**

On the Effective Date, the Reorganized Debtors may enter into the Exit Facility, the terms of which will be set forth in the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, if applicable, and all transactions contemplated thereby, including, without limitation, any supplemental or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facility, if applicable. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents, if applicable, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. The collateral agent (if any) of the New Notes and the agent for the lenders under the Exit Facility (if any) may enter into a customary intercreditor agreement setting forth the respective rights of Creditors to the collateral, including that the obligations under the Exit Facility (if any) may be secured by (a) a first priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Credit Facility Priority Collateral and (b) a second priority lien on all of the existing and future property and assets of LTR and the guarantors constituting Notes Priority Collateral, in each case subject to certain exceptions and permitted liens, and the terms of the intercreditor agreement (if any).

F.     **Professional Fees and Expenses**

On the Effective Date, the Debtors or the Reorganized Debtors shall pay in Cash all accrued and unpaid reasonable and documented fees and expenses of the Consenting Noteholders' professionals (which shall be limited to Kirkland & Ellis LLP, a financial advisor, a due diligence consultant, and any other professionals agreed to by the Debtors or the Reorganized Debtors, as applicable (with such agreement not to be unreasonably withheld)) and the LTR Indenture Trustee.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors shall pay in Cash all accrued and unpaid fees and expenses owed to Credit Suisse Securities (USA) LLC under its letter, dated April 12, 2016, with LTR, including, without limitation, the "Transaction Fee" referred to therein, and such payment shall be deemed reasonable.

## G.   Exemption from Registration Requirements

The offering, issuance, and distribution of any Securities, including the New Notes, New LTR Holdings Interests, any of the Equity Warrants, and the equity and equity-linked interests associated with the Management Incentive Plan, pursuant to the Plan will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code or any other available exemption from registration under the Securities Act, as applicable, as further described below.  Pursuant to section 1145 of the Bankruptcy Code, the New LTR Holdings Interests and Equity Warrants issued under the Plan will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any other applicable regulatory approval.

At the request of the Required Consenting Noteholders, the New Notes will be issued without registration in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act rather than section 1145 of the Bankruptcy Code and the New Notes Indenture will not be qualified under the Trust Indenture Act of 1939.  The New Notes will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to a registration statement or an applicable exemption from registration under the Securities Act, such as the exemptions provided by Rule 144, Rule 144A and Reg S under the Securities Act, and under other applicable law.

Equity and equity-linked interests associated with the Management Incentive Plan will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act.

## H.   Corporate Existence

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may

be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

## I.      Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## J.      Cancellation of Notes, Instruments, Certificates, and Other Documents

On the Effective Date, except with respect to assumed Executory Contracts and Unexpired Leases and to the extent otherwise provided herein, all notes, instruments, Certificates, plans (including the 2012 Stock Option Plan of Debtor LTR Investco, Inc.), agreements and other documents (including that certain Clairvest Management Fee Agreement and any prepetition shareholders' agreement or investor rights agreement) evidencing Claims or Interests, shall be cancelled and the obligations thereunder (or in any way related thereto) of the Debtors, the Reorganized Debtors, or any other counterpart shall be discharged and canceled; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims to receive distributions under the Plan and (b) allowing the beneficiaries of any Indemnification Provisions to be indemnified.

Any Claims (the following, collectively, "Old Equity Claims") arising from the cancellation or rejection of any prepetition organizational documents, shareholders' agreement or investor rights agreement, and any related-party consulting or management services agreements, including that certain Clairvest Management Fee Agreement, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Old Equity Claims have agreed to waive, not pursue, and not receive any distribution on account of such Claims.

The LTR Indenture shall continue in effect to: (i) allow the LTR Indenture Trustee to make all distributions to Noteholders; (ii) permit the LTR Indenture Trustee to assert its charging lien in accordance with the terms of the LTR Indenture; (iii) permit the LTR Indenture Trustee to

appear before the Bankruptcy Court or any other court of competent jurisdiction after the Effective Date; and (iv) permit the LTR Indenture Trustee to perform any functions that are necessary to effectuate the foregoing.

## K.    New Organizational Documents

On the Effective Date, the Debtors shall enter into new formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) as may be necessary to effectuate the transactions contemplated by the Plan and shall be in form and substance acceptable to the Debtors and the Required Consenting Noteholders.   The Debtors' respective formation, organizational, and constituent documents (including those formation, organizational, and constituent documents relating to limited partnerships and limited liability companies) shall be amended, cancelled, or otherwise modified as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code.  The New Organizational Documents shall be included as exhibits to the Plan Supplement and shall, among other things:  (a) be in form and substance acceptable to the Debtors and Required Consenting Noteholders; and (b) authorize the issuance of the New LTR Holdings Interests.  After the Effective Date, each of New LTR Holdings and each of the Reorganized Debtors may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

## L.    Effectuating Documents; Further Transactions

On and after the Effective Date, New LTR Holdings and the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit Facility Documents, if applicable, the New Notes Debt Documents, the New Organizational Documents, the Equity Warrants, any equity or equity-linked interests issued pursuant to the Management Incentive Plan and/or to the holders of New LTR Holdings Interests, and any other Securities issued pursuant to the Plan in the name of and on behalf of New LTR Holdings and/or the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## M.    Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for any or all of the Exit Facility, if applicable, and the New Notes; or (f) the making, delivery, or recording of any deed or other instrument of

transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## N. <u>Directors and Officers</u>

The Debtors' senior officers as of the Petition Date shall continue to occupy such roles until and upon the Effective Date. The members of the New LTR Holdings Board and the officers, directors, and/or managers of each of New LTR Holdings and the Reorganized Debtors will be identified in the Plan Supplement or before the Confirmation Hearing. On the Effective Date, the New LTR Holdings Board will consist of five members. The members of the New LTR Holdings Board shall be determined in accordance with the terms of the RSA and designated as follows: (i) Clearlake Capital Group, L.P. or its affiliates ("Clearlake") is entitled to designate two (2) directors; (ii) the Consenting Noteholders other than Clearlake is entitled to designate one (1) director; (iii) the chief executive officer of LTR shall be a director; (iv) holders of the majority of the New LTR Holdings Interests shall designate one (1) director; and (v) for so long as such holders continue to hold at least 50% of each series of Equity Warrants (and units issuable upon exercise thereof), the holders of Investco Convertible Preferred Interests in possession of the majority of the Equity Warrants (and units issuable upon exercise thereof) shall designate one (1) board observer. The members of the board of directors of any Reorganized Debtor subsidiary of New LTR Holdings shall be acceptable to the Required Consenting Noteholders. On the Effective Date, the existing officers of the Debtors shall serve in their current capacities for the Reorganized Debtors. From and after the Effective Date, each director, officer, or manager of New LTR Holdings and the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and applicable laws of New LTR Holdings' and/or the respective Reorganized Debtor's jurisdiction of formation. In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities of the members of the New LTR Holdings Board and any Person proposed to serve as an officer of New LTR Holdings shall be disclosed at or before the Confirmation Hearing.

The Debtors shall purchase, on or before the Effective Date, and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.

O.      [Reserved]

P.      **Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New LTR Holdings Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall: (a) amend, adopt, assume, and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans (other than any equity incentive plan (if any) or other prepetition senior management incentive plan, which in each case shall be replaced by the Management Incentive Plan), health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Q.      **Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following: (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date, except for Causes of Action brought as counterclaims or defenses to claims asserted against the Reorganized Debtors and their Affiliates; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim

preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

R.   **Restructuring Transactions**

On or after the Confirmation Date, or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, consistent with and pursuant to the terms and conditions of the RSA, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, including such transactions as are acceptable to the Required Consenting Noteholders to cause New LTR Holdings to become the ultimate parent company of the Reorganized Debtors and to effect (i) the issuance and distribution of the New LTR Holdings Interests, Equity Warrants, and any equity or equity-linked interests associated with the Management Incentive Plan, (ii) the issuance by Reorganized LTR of the New Notes and execution and delivery of the New Notes Debt Documents, and (iii) the guaranty of the New Notes by Reorganized Holdings; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the Exit Facility Documents, if applicable; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

Each of the matters provided for by the Plan involving the corporate structure of New LTR Holdings and/or the Debtors or corporate or related actions to be taken by or required of New LTR Holdings and/or the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further action and without any further action by New LTR Holdings, the Debtors or the Reorganized Debtors, as applicable. Such actions may include, among others, the following: (a) the adoption and filing of the New Organizational Documents; (b) the selection of the directors, managers, and officers for New LTR Holdings and the Reorganized Debtors, including the appointment of

the New LTR Holdings Board; (c) the authorization, issuance, and distribution of New LTR Holdings Interests, New Notes, Equity Warrants, and any equity or equity-linked interests associated with the Management Incentive Plan; (d) the assumption of Executory Contracts or Unexpired Leases; (e) the entry into the Exit Facility, if applicable, and the execution and delivery of the Exit Facility Documents, if applicable and the New Notes Debt Documents; and (f) the adoption of the Management Incentive Plan, at the discretion of (and on terms and conditions determined by) the New LTR Holdings Board and in accordance with the RSA.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease that has otherwise not been rejected shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors, the Required Consenting Noteholders, and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### B.      Indemnification

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

**C.**     **Cure of Defaults and Objections to Cure and Assumption**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed and served on the Reorganized Debtors on or before 30 days after the Effective Date.  If such Cure dispute is not resolved within 7 days of the Reorganized Debtors' receiving such Cure dispute, the counterparty to the applicable assumed Executory Contract or Unexpired Lease shall timely file an objection with the Bankruptcy Court within 7 days.  **Any such request and/or objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim (but, for the avoidance of doubt, not including Cures) based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

**D.**    **Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date**

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**E.**    **Insurance Policies**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

**F.**    **Compensation and Benefits**

As of the Effective Date, unless specifically rejected by a Final Order of the Bankruptcy Court or otherwise specifically provided for herein, all employment and severance policies, workers' compensation programs, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its present and former employees, officers, and directors, including, without limitation, all health care plans, disability plans, severance benefit plans, and incentive plans, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are deemed assumed under the Plan, and the Debtors' obligations under such plans, policies, and programs, shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, survive Confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code. Any defaults existing under any of such plans, policies, and programs shall be Cured promptly after they become known by the Reorganized Debtors.

**G.**    **Rejection**

In the event that the rejection of an Executory Contract or Unexpired Lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective Estate, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the applicable Debtor no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the Effective Date of the rejection of such Executory Contract or Unexpired Lease, as set forth on the Schedule of Rejected Contracts and Leases or order of the Bankruptcy Court. The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts and Leases.

**H.**    **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting

Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**I.      Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on the Effective Date or as soon as practicable thereafter, subject to the Reorganized Debtors' right to object to Claims and Interests; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no less frequently than once in every 30 day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

**B.      Rights and Powers of Distribution Agent**

**1.      Powers of the Distribution Agent**

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

**2.      Expenses Incurred On or After the Effective Date**

40

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

**C.**      <u>**Special Rules for Distributions to Holders of Disputed Claims and Interests**</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged. Any dividends or other distributions arising from property distributed to holders of Allowed Claims or Interests, as applicable, in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Interests in such Class.

**D.**      <u>**Delivery of Distributions**</u>

     1.      **Record Date for Distributions to Holders of Non-Publicly Traded Securities**

On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Effective Date. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate, is transferred and the Debtors have been notified in writing of such transfer less than 10 days before the Effective Date, the Distribution Agent shall make distributions to the transferee (rather than the transferor) only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. Notwithstanding the foregoing, publicly held securities shall not be subject to the distribution record date.

     2.      **Distribution Process**

The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims or Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (1) to the address of such holder as set forth in the books and records of the

applicable Debtor (or if the Debtors have been notified in writing, on or before the date that is 10 days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors' books and records, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 days before the Effective Date; or (3) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### 3.  Accrual of Dividends and Other Rights

For purposes of determining the accrual of distributions or other rights after the Effective Date, the New LTR Holdings Interests shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; *provided*, *however*, neither New LTR Holdings nor the Reorganized Debtors shall pay any such distributions or distribute such other rights, if any, until after distributions of the New LTR Holdings Interests actually take place.

### 4.  Compliance Matters

In connection with the Plan, to the extent applicable, New LTR Holdings and the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, New LTR Holdings and the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  New LTR Holdings and the Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### 5.  Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

### 6.  Fractional, Undeliverable, and Unclaimed Distributions

(a)  *Fractional Distributions*.  Whenever any distribution of fractional shares or units of the New LTR Holdings Interests would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest share (up or down), with half shares or less being

rounded down.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

LTR will not accept any tender from Noteholders that would result in the issuance of less than $2,000 principal amount of New Notes to the participating Noteholder.  The aggregate principal amount of New Notes issued to each participating Noteholder will be rounded down, if necessary, to $2,000 or the nearest whole multiple of $1,000 in excess thereof.  This rounded amount will be the principal amount of New Notes the Noteholder will receive, and no New Notes or Cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding.

(b)    *Undeliverable Distributions*.  If any distribution to a holder of an Allowed Claim or Interest is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until the Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date.   Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VI.D.6.(c) of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(c)    *Reversion*.   Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is New LTR Holdings Interests, shall be deemed cancelled.  Upon such revesting, the Claim or Interest of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

7.    **Surrender of Cancelled Instruments or Securities**

On the Effective Date, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.

Notwithstanding the foregoing paragraph, this Article VI.D.7 shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

**E.    Claims Paid or Payable by Third Parties**

1.    **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.    **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    **Applicability of Insurance Policies**

Except as otherwise provided herein, distributions to holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Except as otherwise expressly provided herein, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**F.    Setoffs**

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of

Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**G.      Allocation Between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Effective Date.

## ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**A.      Disputed Claims Process**

Except as otherwise provided herein, if a party files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan.  For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan.  **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

**B.      Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the

Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.Q of the Plan.

## C.      Adjustment to Claims Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

## D.      No Interest

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## E.      Disallowance of Claims and Interests

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII

## EFFECT OF CONFIRMATION OF THE PLAN

## A.      Discharge of Claims and Termination of Interests

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained**

46

pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

**B.    Releases by the Debtors**

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Exit Facility, if applicable, or any Restructuring Transaction, contract, instrument, release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**C.    Releases by Holders of Claims and Interests**

Notwithstanding anything contained in this Plan to the contrary, as of the Effective Date, for good and valuable consideration, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on

behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Exit Facility, if applicable, or any Restructuring Transaction, contract, instrument, release, or other Plan Transaction Document, agreement, or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

D.    **Exculpation**

        Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facility, if applicable, or any Restructuring Transaction, contract, instrument, release or other Plan Transaction Document, agreement, or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.    **Injunction**

        Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are

48

subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

## F.     Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## G.     Recoupment

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

## H.     Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## I.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is

contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.      Release of Liens**

Except (a) with respect to the Liens securing the Exit Facility, if applicable, the New Notes, and Other Secured Claims (depending on the treatment of such Claims), or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Plan and Plan Transaction Documents shall be in a form and substance consistent in all material respects with the RSA;

2.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors and the Required Consenting Noteholders, and shall:

   (a)      authorize the Debtors or the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   (b)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

   (c)      authorize the Debtors, as applicable or necessary, to:  (1) implement the Restructuring Transactions; (2) distribute the New Notes, the New LTR Holdings Interests, and the Equity Warrants pursuant to the exemption from registration under the Securities Act provided by section 1145 of the

Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (3) make all distributions and issuances as required under the Plan, including Cash, the New Notes, the New LTR Holdings Interests, and the Equity Warrants; and (4) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan;

(d)   authorize the implementation of the Plan in accordance with its terms; and

(e)   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the Exit Facility, if applicable, and the New Notes);

3.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.   the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors and the Required Consenting Noteholders;

5.   the New Organizational Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation, limited liability company, or alternative comparable laws, as applicable;

6.   all Professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

7.   all fees and expenses of the Consenting Noteholders, including the fees and expenses of counsel and financial advisor to the Consenting Noteholders, shall have been paid in full in Cash;

8.   the RSA shall not have terminated and shall be in full force and effect and shall not be (a) identified on the Schedule of Rejected Contracts and Leases or (b) subject of a pending motion to reject Executory Contracts, and the Debtors shall be in compliance therewith;

9.      the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Plan and, without limiting any definition contained in <u>Article I.A</u> of the Plan or other provision of the Plan, according to documentation acceptable to the Debtors and the Required Consenting Noteholders; and

10.     if applicable, the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility, if applicable, shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility, if applicable, shall be deemed to occur concurrently with the occurrence of the Effective Date.

## B.      **Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld), may waive any of the conditions to the Effective Date set forth in <u>Article IX.A</u> of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C.      **Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.      **Modification of Plan**

Effective as of the date hereof, (a) the Debtors, with the consent of the Required Consenting Noteholders (not to be unreasonably withheld), reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Required Consenting Noteholders or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.    **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    **Withdrawal of Plan**

The Debtors, subject to and in accordance with the RSA, reserve the right to withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI

# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.     enforce all orders previously entered by the Bankruptcy Court; and

16.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**A.     Immediate Binding Effect**

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**B.     Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.     Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.     Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**E.     Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## F.   Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **Light Tower Rentals, Inc.**<br>2330 E. I-20 S. Service Rd.<br>Odessa, TX 79766<br>Attn.:  Keith Muncy, Chief Financial Officer |
| **Proposed Counsel to Debtors** | **Jackson Walker LLP**<br>1401 McKinney Suite 1900<br>Houston, Texas 77010<br>Attn:   Patricia Tomasco<br><br>**Proskauer Rose LLP**<br>Eleven Times Square<br>New York, New York 10019<br>Attn.:   Philip M. Abelson<br>          Ehud Barak |
| **Consenting Noteholders** | **Kirkland & Ellis LLP**<br>300 N. LaSalle<br>Chicago, Illinois 60654<br>Attn:   Anup Sathy, P.C.<br>         Ross M. Kwasteniet |
| **United States Trustee** | **Office of the United States Trustee<br>for the District of Southern<br>District of Texas – Houston Division**<br>[Address]<br>Attn.:   [Name] |

## G.   Term of Injunctions or Stays

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## H.   Entire Agreement

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants,

56

agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**I.**     **Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://cases.primeclerk.com/LTR or the Bankruptcy Court's website, available via PACER. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**J.**     **Non-Severability**

The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Required Consenting Noteholders, consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

**K.**     **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**L.**     **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**M.**     **Waiver or Estoppel**

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made

with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the RSA, or papers filed with the Bankruptcy Court prior to the Confirmation Date.


Respectfully submitted,

LIGHT TOWER RENTALS, INC., *et al.*
on behalf of itself and all other Debtors

By: _____
Name:   Keith Muncy
Title:   Chief Financial Officer

58

Respectfully submitted,

LIGHT TOWER RENTALS, INC., *et al.*
on behalf of itself and all other Debtors

By: _____
Name:   Keith Muncy
Title:    Chief Financial Officer

## Exhibit B

**Financial Projections**

## FINANCIAL PROJECTIONS

### A.      Projected Financial Information

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.   In connection with the development of the Plan and for the purposes of determining whether such Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.   The Debtors are projected to have sufficient cash on hand to meet their obligations, but the potential Exit Facility would provide them with additional flexibility and cushion.   As set forth below, the Debtors prepared financial projections (the "Projections") for the years ending 2016 through 2021 (the "Projection Period").

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.   Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or other parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory body pursuant to the provisions of the Plan.

The Projections assume that the Plan will be implemented in accordance with its stated terms.   The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors: a deterioration in economic conditions; the level of exploration, development, and production of oil and natural gas in the United States; cyclicality in the oil and natural gas industry; cancellations or delays in oil and natural gas projects; customers' operating and capital expenditures; improvements in, new discoveries of, or governmental regulations relating to energy technologies; financial constraints that lead to an inability to purchase replacement equipment and competitive pressures.   Consequently, the estimates, and assumptions underlying the Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.   Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.   The Projections included herein were prepared in August 2016.

The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS.   THE DEBTORS DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.   THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, AND THE

CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information as submitted to court in the Debtors' Monthly Operating Reports filed with the Bankruptcy Court.

B.       Assumptions to the Projections

| REVENUE DRIVERS | |
|---|---|
| Usage days | 2016 – 2017: Flat for equipment categories, excluding Natural Gas Generators<br>2018 – 2021:<br>• Diesel Generators, Light Towers, and Tanks: Constant growth from Q4 '17 – Q4 '21 to reach 85% of Q4'15 usage days, however growth is constrained by supply of equipment and maximum utilization rates<br>• Natural Gas Generators: Constant growth from Q1 '17 – Q4 '21 to reach 100% Q2 2015 usage days, however growth is constrained by supply of equipment and maximum utilization rates<br><br>*Usage day growth assumptions limited by cash available to purchase replacement capex at time of disposal and maximum utilization thresholds* |
| Day Rate Pricing | • 2H 2016 – 2017: Based on 2Q 2016 day rates<br>• 2018 – 2021: Constant growth to reach 85% of Q4 2014 day rates[1] |
| Ancillary Revenue / Non-Core Rental | Based on historical performance (% of revenue) |
| MARGIN ASSUMPTIONS | |
| COGS % of Revenue | Q3 2016: Held constant based on June 2016 performance (~52% of revenue)<br>Q4 2016: 50%<br>2017 –2018: Decline by 100 bps per quarter<br>2019 – 2021: Held constant thereafter at 41% of revenue |
| Selling & Marketing[2]<br>(QoQ growth) | Q3 2016: 0%<br>2017: 5%<br>2018: 10%<br>2019: 15%<br>2020: 20%<br>2021: 10% |
| G&A Expense[3]<br>(QoQ growth) | Q3 2016: (2%)<br>2017: (5%)<br>2018: 5%<br>2019: 15%<br>2020: 15%<br>2021: 10% |
| Taxes | • NOLs and the tax basis of its assets subject to a floor of $30mm (set equal to the debt at the Reorganized Company)<br>• Assumed quarterly straight line depreciation over 5 years for the tax depreciation of the existing tax basis<br>• Cancellation of debt (including accrued interest) of ~$170 million (assumes $175 million EV)<br>• Cancellation of debt income in excess of eliminated tax basis and NOLs is permanently eliminated |
| EQUIPMENT ASSUMPTIONS | |
| Useful Life of Equipment (Disposals) | • Assumes equipment purchased pre-2011 is disposed of in 2H 2016/2017<br>• Equipment has a useful life of 7 years thereafter (i.e., equipment bought in 2011 is disposed of in 2018)<br>• Tanks assume 2% of the outstanding fleet is retired per year (20-year useful life) |

[1] Natural Gas Generators (100-199kVA) day rate growth based off of Q2'15 day rates.
[2] Effected in Q1 of each year.
[3] Effected in Q1 of each year.

| FINANCING ASSUMPTIONS | |
|---|---|
| **Emergence from bankruptcy** | Assumes October 31, 2016 for emergence from bankruptcy |
| **Transaction** | • Assumes October 31, 2016 close for $30 million of New 10.0% Senior Secured PIK Notes. Assumes new notes are refinanced at maturity |
| **PIK interest** | Assumes the new notes PIK semiannually for 3 years |

C.      **<u>Financial Projections</u>**

**PROJECTED INCOME STATEMENT**

| | | FYE December 31, | | | | |
|---|---|---|---|---|---|---|
| (US $ in thousands) | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
| Revenue | $66,944 | $65,227 | $83,145 | $109,828 | $147,202 | $184,739 |
| COGS | 32,157 | 30,973 | 36,131 | 45,030 | 60,353 | 75,743 |
| Gross Profit | $34,788 | $34,254 | $47,014 | $64,799 | $86,849 | $108,996 |
| *Gross margin* | 52% | 53% | 57% | 59% | 59% | 59% |
| | | | | | | |
| Selling & Marketing Expense | 5,905 | 5,887 | 6,476 | 7,447 | 8,936 | 9,830 |
| G&A Expense | 20,307 | 18,506 | 19,432 | 22,346 | 25,698 | 28,268 |
| Management Fee | 125 | – | – | – | – | – |
| Depreciation & Amortization | 36,797 | 21,532 | 14,873 | 13,082 | 14,010 | 19,044 |
| EBIT | (28,346) | (11,671) | 6,233 | 21,924 | 38,204 | 51,854 |
| Interest | 19,330 | 3,152 | 3,475 | 3,831 | 4,020 | 4,020 |
| Other | 827 | – | – | – | – | – |
| Income (Loss) Before Tax Provision | (48,503) | (14,823) | 2,758 | 18,092 | 34,184 | 47,834 |
| Cash tax expense (receipt) | (10,200) | 426 | 3,755 | 6,605 | 10,823 | 16,102 |
| Net income (loss) | ($38,303) | ($15,249) | ($996) | $11,488 | $23,361 | $31,732 |
| | | | | | | |
| RECONCILIION OF NET INCOME TO ADJUSTED EBITDA | | | | | | |
| Net income (loss) | ($38,303) | ($15,249) | ($996) | $11,488 | $23,361 | $31,732 |
| Depreciation & Amortization | 36,797 | 21,532 | 14,873 | 13,082 | 14,010 | 19,044 |
| Management Fee | 125 | – | – | – | – | – |
| Interest Expense | 19,330 | 3,152 | 3,475 | 3,831 | 4,020 | 4,020 |
| Other (Income) Expense | 827 | – | – | – | – | – |
| Tax expense (receipt) | (10,200) | 426 | 3,755 | 6,605 | 10,823 | 16,102 |
| Adjusted EBITDA | $8,576 | $9,861 | $21,107 | $35,005 | $52,215 | $70,898 |

**PROJECTED BALANCE SHEET**

| | | FYE December 31, | | | | |
|---|---|---|---|---|---|---|
| (US $ in thousands) | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
| ASSETS | | | | | | |
| Cash and cash equivalents | $16,561 | $35,342 | $44,190 | $18,156 | $3,279 | $3,002 |
| Accounts Receivable | 16,874 | 16,441 | 20,957 | 27,683 | 37,103 | 46,564 |
| Prepaid Expenses & Other | 8,620 | 3,399 | 5,706 | 9,142 | 13,955 | 18,788 |
| Deferred Tax Asset-Short Term | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 |
| Total Current Assets | $43,655 | $56,781 | $72,454 | $56,581 | $55,937 | $69,955 |
| | | | | | | |
| Fixed Assets - Net | $163,142 | $137,980 | $125,606 | $158,211 | $184,651 | $204,811 |
| Non-compete/Goodwill - Net | – | – | – | – | – | – |
| Deferred Finance Charges-Net | – | – | – | – | – | – |
| Total Assets | $206,797 | $194,762 | $198,060 | $214,793 | $240,588 | $274,766 |
| | | | | | | |
| LIABILITIES AND SHAREHOLDERS EQUITY | | | | | | |
| Accounts Payable & Accrued Liabilities | $5,110 | $4,922 | $5,741 | $7,155 | $9,590 | $12,036 |
| Accrued Interest | 500 | 827 | 912 | 1,005 | 1,005 | 1,005 |
| Total Current Liabilities | $5,610 | $5,749 | $6,653 | $8,160 | $10,595 | $13,041 |
| | | | | | | |
| Notes Payable | $30,000 | $33,075 | $36,465 | $40,203 | $40,203 | $40,203 |
| Contingency Payments-Acquisition | – | – | – | – | – | – |
| Deferred Taxes - Net | 27,076 | 27,076 | 27,076 | 27,076 | 27,076 | 27,076 |
| LTIP | 720 | 720 | 720 | 720 | 720 | 720 |
| Total Equity | 143,391 | 128,142 | 127,146 | 138,633 | 161,994 | 193,726 |
| Total Liabilities and Shareholders Equity | $206,797 | $194,762 | $198,060 | $214,793 | $240,588 | $274,766 |

**PROJECTED CASH FLOW STATEMENT**

| (US $ in thousands) | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|
| | | | FYE December 31, | | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net Earnings | ($38,303) | ($15,249) | ($996) | $11,488 | $23,361 | $31,732 |
| Depreciation & Amortization | 36,797 | 21,532 | 14,873 | 13,082 | 14,010 | 19,044 |
| Change in Interest Payable | 4,969 | 327 | 85 | 93 | – | – |
| Change in NWC | 4,345 | 5,466 | (6,004) | (8,748) | (11,798) | (11,849) |
| Other | (2,091) | – | – | – | – | – |
| **Total Operating Activities** | $5,717 | $12,075 | $7,958 | $15,915 | $25,573 | $38,927 |
| | | | | | | |
| **INVESTING ACTIVITIES** | | | | | | |
| Capex | (2,618) | (905) | (5,256) | (49,648) | (45,335) | (45,228) |
| Sale of Assets | 3,607 | 4,535 | 2,757 | 3,961 | 4,884 | 6,024 |
| **Total Investing Activities** | $989 | $3,630 | ($2,499) | ($45,687) | ($40,450) | ($39,203) |
| | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | |
| Change in debt | – | 3,075 | 3,390 | 3,738 | – | – |
| Other | (11,500) | – | – | – | – | – |
| **Total Financing Activities** | ($11,500) | $3,075 | $3,390 | $3,738 | – | – |
| | | | | | | |
| **Total Change in Cash** | ($4,794) | $18,781 | $8,849 | ($26,034) | ($14,877) | ($277) |

**<u>Exhibit C</u>**

**Unaudited Liquidation Analysis**

## LIQUIDATION ANALYSIS OF THE DEBTORS

## INTRODUCTION

The Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each impaired Class either: (a) has accepted the Plan of Reorganization; or (b) will receive or retain property of a value, as of the Effective Date (defined below), that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, a requirement commonly referred to as the "best interests test". To make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds that a chapter 7 trustee would generate if the chapter 11 cases were converted to a chapter 7 case on the Effective Date and the Debtors' assets were liquidated in a forced sale scenario; (2) determine the distribution that each impaired class would receive from the liquidation proceeds under the priority scheme dictated in chapter 7; and (3) compare the projected liquidation distribution to the distribution to such holder of a Claim or Interest under the Plan.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors' management, together with Zolfo Cooper, LLC prepared this Liquidation Analysis.

The Liquidation Analysis presents both "Low" and "High" estimates of the proceeds of liquidation representing a range of management's assumptions relating to the costs incurred during the liquidation and the proceeds realized. It is assumed that the Debtors would cease operations immediately, or shortly after the appointment of a chapter 7 trustee, and the proceeds represent value to be obtained in a forced sale of the assets. The projected date of conversion to a hypothetical chapter 7 liquidation (the "Effective Date") is October 31, 2016. Recoveries to creditors and interest holders are presented on an undiscounted basis.

For purposes of the analysis, recent balance sheet data and certain proforma adjustments were used to estimate balances as the Effective Date. There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under Section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of the parties-in-interest.

The Debtors' cost of liquidation under Chapter 7 would include fees payable to a Chapter 7 trustee, as well as those which might be payable to attorneys and other professionals that such a trustee may engage. Further, costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors until conclusion of the Chapter 7 case. It is possible that in a Chapter 7 case, the wind-down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on the length of time of the liquidation.

Under the absolute priority rule, no junior creditor or interest holder would receive any distribution until all senior stakeholders are paid in full. The Debtors believe that in the Chapter 7 case, general unsecured creditors of the Debtors will likely receive no recovery.

The Debtors' estimate of allowed claims contained in the Liquidation Analysis may differ from allowed claims estimates pursuant to the Plan. Therefore, the Debtors' estimate of allowed claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of allowed claims and equity interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. The Liquidation Analysis is based on numerous estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors and their management and advisors. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a chapter 7 liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated under chapter 7. Accordingly, while the information contained in the Liquidation Analysis is necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized or the Claims levels assumed would not change if the liquidating Debtors were in fact liquidated, nor can assurance be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

## DETAILED LIQUIDATION ANALYSIS

The following table provides detailed calculations of recoveries under a chapter 7 liquidation and should be read in conjunction with the accompanying notes.

Summary Consolidated Liquidation Analysis ($mm)

| Liquidation Proceeds | Note | Estimated Balance | RECOVERY LOW | RECOVERY HIGH | RECOVERY % LOW | RECOVERY % HIGH |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | 1 | 17.0 | 17.0 | 17.0 | 100.0% | 100.0% |
| Accounts Receivable | 2 | 15.3 | 8.6 | 11.2 | 56.2% | 73.1% |
| Prepaid Expenses | 3 | 13.4 | 4.0 | 6.1 | 29.8% | 45.8% |
| Other Current Assets | 4 | 0.1 | 0.0 | 0.0 | 0.0% | 0.0% |
| Property, Plant and Equipment | 5 | 246.6 | 57.6 | 108.1 | 23.4% | 43.8% |
| Deferred Assets | 6 | 7.5 | 0.0 | 0.0 | 0.0% | 0.0% |
| Gross Liquidation Proceeds | | 300.0 | 87.2 | 142.4 | 29.1% | 47.5% |

| Less Cost of Wind-Down | | | | |
|---|---|---|---|---|
| Wind-Down Costs | 7 | | (2.0) | (2.0) |
| Chapter 7 Trustee Fees | 8 | | (2.6) | (4.3) |
| Chapter 7 Professional Expenses | 9 | | (1.4) | (1.4) |
| Net Proceeds Available for Creditors | | | 81.2 | 134.8 |

| Estimated Recoveries | | Estimated Claim | RECOVERY LOW | RECOVERY HIGH | RECOVERY % LOW | RECOVERY % HIGH |
|---|---|---|---|---|---|---|
| *Priority Claims* | | | | | | |
| Priority Tax Claims | | 2.0 | 2.0 | 2.0 | 100.0% | 100.0% |
| Other Priority Claims | | 1.1 | 1.1 | 1.1 | 100.0% | 100.0% |
| *Secured Claims* | | | | | | |
| Revolving Facility Claims | | 0.0 | 0.0 | 0.0 | 100.0% | 100.0% |
| Noteholder Claims | | 345.8 | 78.1 | 131.6 | 22.6% | 38.1% |
| Other Secured Claims | | 0.0 | 0.0 | 0.0 | n.a. | n.a. |
| *Administrative Costs* | | | | | | |
| Administrative Claims | | 4.2 | 0.0 | 0.0 | 0.0% | 0.0% |
| Professional Fee Claims | | 2.2 | 0.0 | 0.0 | 0.0% | 0.0% |
| *Unsecured Claims* | | | | | | |
| General Unsecured Claims | 10 | 2.2 | 0.0 | 0.0 | 0.0% | 0.0% |
| Debtor Intercompany Claims | | n.a. | n.a. | n.a. | 0.0% | 0.0% |
| *Equity Claims* | | | | | | |
| Interests in Debtors other than Investco | | n.a. | n.a. | n.a. | 0.0% | 0.0% |
| Investco Convertible Preferred Interests | | 97.6 | 0.0 | 0.0 | 0.0% | 0.0% |
| Investco Preferred Interests | | n.a. | n.a. | n.a. | 0.0% | 0.0% |
| Investco Common Interests | | n.a. | n.a. | n.a. | 0.0% | 0.0% |

## NOTES TO DETAILED LIQUIDATION ANALYSIS

1.  *Cash and cash equivalents*

    The estimated cash balance as of October 31, 2016 is $17.0 million.  Cash consists of all cash in banks or operating accounts of the Debtors. Cash is assumed to be fully recoverable.

2.  *Accounts Receivable*

    The majority of the accounts receivable relate to trade receivables ($11.1 million net of allowances). Trade receivable recoveries have been reduced to $7.2 to $8.9 million based on the Debtors' estimates to reflect the increased difficulty of collecting receivables following a liquidation.

    The Debtors hold a note, secured by wellhead compression equipment, from an unrelated oilfield equipment rental provider in the amount of $4.6 million. The Debtors believe that, in the event of a liquidation, they could realize $1.4 to $2.3 million of value.

3.  *Prepaid Expenses*

    Prepaid expenses consist primarily of income tax receivables, prepaid insurance, software licenses and retainers prepaid to professionals relating to the restructuring. With the exception of the income tax receivable, prepaid expenses are assumed to have no recovery.

    The company has two income tax receivables in the amount of $9.6 million total, with an anticipated recovery of $4.0 to $5.8 million. The company has applied for, and expects to receive, a refund in the amount of $4.0 million for tax installments rolled from 2014 to 2015. The company also has an income tax receivable of $5.6 million for a loss carryback from 2015 to 2013 and 2014 that the company believes it is less likely to collect.

4.  *Other Current Assets*

    Other current assets consist primarily of unsecured advances made to non-executive employees of the Debtors. No recovery is anticipated on those advances in a liquidation.

5.  *Property, Plant and Equipment*

    The Debtors' rental fleet consists of diesel- and natural gas-powered generators, light towers, tanks and other equipment that supports oil and gas drilling and production. In the normal course of business, the Debtors are active in the secondary market for the equipment they provide. Based on the Debtors' best estimates of realizable value and transactions over the past year, they have determined that a range of 10% to 21% of original cost would be reasonable in a liquidation. Higher recoveries are expected on the company's fleet of natural gas-powered generators, while light towers and tanks would realize lower valuations relative to cost.

The Debtors also own a large fleet of light trucks, heavy-duty trucks and trailers to deliver rental equipment to customers in the field. Based on the Debtors' knowledge of the secondary market and transactions during the past year, they have determined that a range of 20% to 35% of original cost would be reasonable in a liquidation process.

Recoveries on land and improvements on owned land are expected to generate 55% to 74% of historical costs due to sales commissions, transfer taxes and valuation pressure related to the overall oil and gas market. No recoveries are assumed for leasehold improvements.

| Rental Equipment ($mm) | Original Cost | RECOVERY % LOW | RECOVERY % HIGH | RECOVERY $ LOW | RECOVERY $ HIGH | Net Book Value | RECOVERY as % of NBV LOW | RECOVERY as % of NBV HIGH |
|---|---|---|---|---|---|---|---|---|
| Diesel Generators | 93.7 | 10% | 25% | 9.4 | 23.4 | 42.4 | 22% | 55% |
| Natural Gas Generators | 87.9 | 20% | 35% | 17.6 | 30.8 | 57.5 | 31% | 54% |
| Light Tower | 15.4 | 5% | 15% | 0.8 | 2.3 | 6.5 | 12% | 35% |
| Tanks | 98.3 | 5% | 10% | 4.9 | 9.8 | 76.5 | 6% | 13% |
| Pipe/Tools/Ponds/Water | 29.3 | 2% | 10% | 0.6 | 2.9 | 9.8 | 6% | 30% |
| All Other | 33.9 | 10% | 20% | 3.4 | 6.8 | 16.5 | 21% | 41% |
| Subtotal Rental Equipment | 358.6 | 10% | 21% | 36.6 | 76.1 | 209.2 | 18% | 36% |
| | | | | | | | | |
| Vehicles and Trailers | 35.9 | 20% | 35% | 7.2 | 12.6 | 14.2 | 51% | 88% |
| Land and Buildings | 24.4 | 55% | 74% | 13.3 | 18.1 | 21.7 | 61% | 84% |
| Other | 5.3 | 10% | 25% | 0.5 | 1.3 | 1.6 | 34% | 85% |
| Total Property, Plant & Equipment | 424.1 | 14% | 25% | 57.6 | 108.1 | 246.6 | 23% | 44% |

6.  *Deferred Assets*

Deferred Assets are primarily comprised of deferred income tax assets ($1.6 million) and capitalized financing fees ($5.9 million). No realizable value is assumed for deferred assets on liquidation.

7.  *Wind-Down Costs*

To maximize recoveries on remaining assets, minimize the amount of Claims, and generally ensure an orderly liquidation, the chapter 7 trustee will need to manage the reclamation of rental equipment in the field and the closure of operating locations in several states.

The trustee will need to retain a number of individuals currently employed by the Debtors during the chapter 7 liquidation process. These individuals will primarily be responsible for maintaining the Debtors' assets, providing historical knowledge and insight to the chapter 7 trustee regarding the Debtors' businesses, and concluding the administrative wind-down of the business.

Wind-down costs also include other expenses required to manage the liquidation including ongoing operating expenses consisting of corporate overhead and occupancy costs to be incurred during the Chapter 7 liquidation period. The Debtors assume that the liquidation would occur over a four-month period and that such expenses, costs and overhead would decrease over time.

8.  *Chapter 7 Trustee Fees*

It is assumed that the chapter 7 trustee fees are paid in accordance with limits established by section 326 of the Bankruptcy Code. Fees are estimated to be 3% of the proceeds to be distributed to creditors.

9.  *Chapter 7 Professional Fees*

Professional fees include the cost of attorneys, accountants and other professionals retained by the chapter 7 trustee.  Professional fees are stepped down over the course of the liquidation as operations are wound down and distributions are made.

10. *General Unsecured Claims*

For purposes of the Liquidation Analysis, assumes that pre-petition general unsecured payables are paid in the ordinary course post-filing.

## **Exhibit D**

**Unaudited Valuation Analysis**

# VALUATION ANALYSIS[1]

Solely for the purposes of the Joint Chapter 11 Plan of Reorganization (the "Plan") of Light Tower Rentals, Inc. ("LTR") and its subsidiaries (together with LTR the "Company"), GuideCap Partners LLC ("GuideCap") has estimated a hypothetical range of total enterprise value (the "Enterprise Value") of the Company, and its successors (the "Reorganization Value"), after the Plan becomes effective (the "Reorganized Company") on a going concern and pro forma basis for the transaction contemplated by the Plan. For purposes of this valuation, it has been assumed that no material changes that would affect estimated value occur between the date of the Disclosure Statement, and the assumed Effective Date.

In estimating the Enterprise Value of the Company, GuideCap consulted with the senior management team to discuss the operations and future prospects, reviewed the historical financial information, reviewed the financial projections, and reviewed publicly-available third-party information.

For purposes of the Plan, the Enterprise Value is estimated to be approximately $170 million to $213 million (with a midpoint estimate of approximately $191 million) as of the Effective Date. The valuation analysis herein is based on information as of the date of the Disclosure Statement and is based on financial information provided by the Company's management, as well as the Financial Projections attached to the Disclosure Statement as Exhibit B (collectively, the "Projections"). The Enterprise Value estimates set forth herein represent a valuation of the Reorganized Company based on the application of standard valuation techniques, including public comparable company analysis, precedent transaction analysis, and discounted cash flow analysis. GuideCap's estimated range of Reorganization

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Disclosure Statement for the Company's Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code to which this Valuation Analysis is attached.

Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED RANGE OF THE REORGANIZATION VALUE, AS OF THE EFFECTIVE DATE, REFLECTS WORK PERFORMED BY GUIDECAP ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE COMPANY AVAILABLE TO GUIDECAP AS OF THE DISCLOSURE DATE. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT GUIDECAP'S CONCLUSIONS, GUIDECAP DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

GUIDECAP DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS PROVIDED BY THE COMPANY IN CONNECTION WITH GUIDECAP'S ESTIMATES OF THE REORGANIZATION VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE COMPANY WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. OUR ESTIMATE OF THE REORGANIZATION VALUE DOED NOT PURPORT TO BE AN APPRAISAL OR NECESSARILY REFLECT THE VALUE THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED COMPANY, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY GUIDECAP REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED COMPANY. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED

REORGANIZATION VALUE OF THE REORGANIZED COMPANY THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN. THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF ENTERPRISE VALUE OF THE REORGANIZED COMPANY SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE COMPANY, NEITHER GUIDECAP, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.

THE ESTIMATES OF THE REORGANIZATION VALUE DETERMINED BY GUIDECAP REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. GUIDECAP IS NOT RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

The estimated ranges of Enterprise Value do not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act

with respect to the Plan. GuideCap did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income (if any) on the Reorganized Company's projections. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Company's projections could materially impact GuideCap's valuation analysis.

GuideCap assumed and relied on, without independent verification, the accuracy and completeness of all: (a) financial and other information furnished to it by or on behalf of the Company, including, but not limited to, the Financial Projections; and (b) publicly available information. GuideCap assumed that the Financial Projections were prepared reasonably and in good faith on a basis reflecting the Company's best estimates and judgment as to future operating and financial performance. GuideCap did not conduct an independent evaluation or appraisal of the Company's assets, and no independent evaluations or appraisals of the Company's assets were sought or were obtained in connection with the preparation of the Valuation.

**Valuation Methodology**

In performing its analysis, GuideCap used various valuation techniques, including:

(a) **a comparable company analysis**, in which GuideCap analyzed the enterprise values of public companies that GuideCap deemed generally comparable to all or parts of the Company's operating businesses as a multiple of certain financial measures, including earnings before interest, taxes, depreciation and amortization ("EBITDA"), GuideCap made certain adjustments, then applied selected multiples derived from such analysis to the actual and projected financials of the Company;

(b) **a precedent transactions analysis**, in which GuideCap analyzed the financial terms of certain acquisitions of companies that GuideCap believed were generally

comparable to the Company, and then applied certain financial performance and other metrics provided by such analysis to the relevant metrics of the Company; and

(c) **a discounted cash flow analysis** ("DCF") was performed by GuideCap. The DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. GuideCap's DCF analysis used the debt-free, after-tax cash flows in the Financial Projections. These cash flows were then discounted at a range of estimated weighted average costs of capital, which was based on the projected capital structure and the estimated cost of equity of selected publicly traded companies that are similar to the Company. The terminal value was determined by evaluating the enterprise values of public companies that GuideCap deemed generally comparable and making certain adjustments for differences.

The Company has experienced a significant decline in financial performance due to the decline in the oil & gas industry and a near-term recovery is not projected. Both the recent and the near-term projected performance does not properly capture the long-term Enterprise Value that is expected to accrue to the Company upon recovery of the oil & gas industry. A limitation of the comparable company analysis and the precedent transactions analysis is that these methods derive valuations based on recent performance or near-term expected performance. The discounted cash flow method was determined to be the most reliable method since it captures the future expected economic benefits produced by the Company over a longer time horizon. Based on the long-term nature of the method, and the potential to capture value upon the market recovery, and the projected holding period in the financial plan, the discounted cash flow method was determined to be the most relevant method.

The summary set forth above does not purport to be a complete description of the analyses performed by GuideCap. An estimate of total enterprise value is not entirely mathematical, but rather it involves complex considerations and judgment concerning various factors that could affect the value of an operating business. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description.

**<u>Exhibit E</u>**

**Debtors' Financial Report, dated June 30, 2016**

# LTR HOLDCO, INC. AND ITS SUBSIDIARIES

**FINANCIAL REPORT**

**JUNE 30, 2016**

# C O N T E N T S

Page

UNAUDITED INTERIM CONSOLIDATED FINANCIAL STATEMENTS

Consolidated Balance Sheets ............................................................................................... 21

Consolidated Statements of Income .................................................................................... 23

Consolidated Statements of Stockholders' Deficit ............................................................. 24

Consolidated Statements of Cash Flows ............................................................................. 25

Notes to Consolidated Financial Statements ...................................................................... 26

**LTR HOLDCO, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEET**
**JUNE 30, 2016 AND DECEMBER 31, 2015**
(In thousands, unaudited)

| | June 30, 2016 | December 31, 2015 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 22,871 | $ 20,858 |
| Account receivable, net | 10,765 | 21,609 |
| Prepaid expenses and other current assets | 2,586 | 1,771 |
| Notes receivable | 4,562 | 3,636 |
| Prepaid income taxes | 9,611 | 4,162 |
| Deferred tax asset | 1,600 | 1,600 |
| **Total current assets** | 51,995 | 53,636 |
| **PROPERTY AND EQUIPMENT, NET** | 247,975 | 269,627 |
| **OTHER ASSETS** | | |
| Intangibles, net | - | 20,356 |
| Goodwill | - | 8,657 |
| **Total other assets** | - | 29,013 |
| **TOTAL ASSETS** | $ 299,970 | $ 352,276 |

The Notes to Unaudited Consolidated Financial Statements are an integral part of these statements.

**LTR HOLDCO, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEET**
**JUNE 30, 2016 AND DECEMBER 31, 2015**
(In thousands, unaudited)

|  | June 30, 2016 | December 31, 2015 |
|---|---|---|
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued liabilities | $       17,095 | $       16,995 |
| Current income tax payable | - | 350 |
| **Total current liabilities** | 17,095 | 17,345 |
| **LONG-TERM LIABILITIES** | | |
| Notes payable, less debt issuance costs | 323,906 | 322,901 |
| Long-term incentive plan | 720 | 840 |
| Deferred tax liability, net | 29,176 | 42,776 |
| **Total long-term liabilities** | 353,802 | 366,517 |
| **Total liabilities** | 370,897 | 383,862 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **STOCKHOLDERS' DEFICIT** | | |
| Common stock | 75,664 | 75,664 |
| Additional paid-in capital | 15,214 | 14,494 |
| Retained deficit | (161,805) | (121,744) |
| **Total stockholders' deficit** | (70,927) | (31,586) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT** | $       299,970 | $       352,276 |

The Notes to Unaudited Consolidated Financial Statements are an integral part of these statements.

**LTR HOLDCO, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**PERIODS ENDED MARCH 31, 2016 AND 2015**
(In thousands, unaudited)

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| REVENUE | $ 14,109 | $ 43,064 | $ 36,434 | $ 107,956 |
| COST OF REVENUE | 6,831 | 17,068 | 16,526 | 41,946 |
| Gross Profit | 7,278 | 25,996 | 19,908 | 66,010 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 6,794 | 10,395 | 14,514 | 23,459 |
| DEPRECIATION AND AMORTIZATION EXPENSE | 19,738 | 14,034 | 30,987 | 27,747 |
| Income (loss) from operations | (19,254) | 1,567 | (25,593) | 14,804 |
| OTHER EXPENSE | | | | |
| Interest expense | 7,171 | 7,056 | 14,361 | 14,335 |
| Loss (gain) on sale of assets | (171) | 46 | 107 | 124 |
| Impairment loss | 19,400 | - | 19,400 | - |
| Total other expense | 26,400 | 7,102 | 33,868 | 14,459 |
| INCOME (LOSS) BEFORE INCOME TAXES | (45,654) | (5,535) | (59,461) | 345 |
| PROVISION FOR INCOME TAXES | | | | |
| Total income tax expense (benefit) | (15,000) | (1,510) | (19,400) | 642 |
| NET INCOME | $ (30,654) | $ (4,025) | $ (40,061) | $ (297) |

The Notes to Unaudited Consolidated Financial Statements are an integral part of these statements.

**LTR HOLDCO, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDER'S DEFICIT**
**PERIODS ENDED MARCH 31, 2016 AND 2015**
(in thousands, except share data, unaudited)

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance at December 31, 2014** | 1,000 | $ 75,664 | $ 12,748 | $ (110,554) | $ (22,142) |
| Stock based compensation | - | - | 750 | - | 750 |
| Issuance of shares by LTR Investco, Inc. | - | - | 546 | - | 546 |
| Net income | - | - | - | (297) | (297) |
| **Balance at June 30, 2015** | 1,000 | $ 75,664 | $ 14,044 | $ (110,851) | $ (21,143) |
| **Balance at December 31, 2015** | 1,000 | $ 75,664 | $ 14,494 | $ (121,744) | $ (31,586) |
| Stock based compensation | | | 720 | - | 720 |
| Net income | - | - | - | (40,061) | (40,061) |
| **Balance at June 30, 2016** | 1,000 | $ 75,664 | $ 15,214 | $ (161,805) | $ (70,927) |

The Notes to Unaudited Consolidated Financial Statements are an integral part of these statements.

**LTR HOLDCO, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**PERIOD ENDED JUNE 30, 2016 AND 2015**
(in thousands, unaudited)

| | SIX MONTHS ENDED JUNE 30, | |
| --- | --- | --- |
| | __2016__ | __2015__ |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net (loss) income | $ (40,061) | $ (297) |
| Adjustments to reconcile net (loss) income to net cash provided by operating expenses | | |
| Depreciation and amortization expense | 30,987 | 27,747 |
| Stock based compensation expense | 720 | 750 |
| Amortization of debt issuance costs | 1,005 | 996 |
| Bad debt expense | - | 754 |
| Impairment loss | 19,400 | - |
| Deferred taxes | (13,600) | (478) |
| Loss on sale of assets | 107 | 124 |
| Long-term incentive plan | (120) | (40) |
| Changes in working capital | 3,404 | 21,816 |
| **Net cash provided by (used in) operating activities** | 1,842 | 51,372 |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from sale of assets | 1,839 | 1,092 |
| Purchase of property and equipment | (1,668) | (37,668) |
| **Net cash provided by (used in) investing activities** | 171 | (36,596) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from notes payable | - | 17,500 |
| Repayments of notes payable | - | (19,346) |
| Contribution by LTR Investco, Inc. | - | 546 |
| **Net cash provided by (used in) financing Activities** | - | (1,300) |
| | | |
| **Net increase (decrease) in cash and cash equivalents** | 2,013 | 13,476 |
| | | |
| **CASH AND CASH EQUIVALENTS, beginning of period** | 20,858 | 2,910 |
| | | |
| **CASH AND CASH EQUIVALENTS, end of period** | $ 22,871 | $ 16,386 |
| | | |
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION** | | |
| Interest paid | $ 14,520 | $ 14,355 |
| Taxes paid | $ - | $ 975 |

The Notes to Unaudited Consolidated Financial Statements are an integral part of these statements.

# NOTE 1.   ORGANIZATION AND NATURE OF OPERATIONS

The unaudited interim consolidated financial statements included herein are comprised of the individual financial statements of LTR Holdco, Inc. (Holdco) (a Texas corporation), and its wholly-owned subsidiaries Light Tower Rentals, Inc. (LTR) (a Texas corporation), and LTR Shelters, Inc. (Shelters) (a Texas corporation), collectively referred to herein as (the "Company").  All outstanding shares of common stock of the Company are held by its parent company, LTR Investco, Inc.

The Company is a regional provider of rental equipment to the oil and gas industry in Texas, New Mexico, Arkansas, Louisiana, Oklahoma, North Dakota, Pennsylvania, West Virginia, Kansas, Ohio, Montana, Mississippi and Colorado.  The Company maintains an extensive inventory of light towers, generators, tanks, downhole tools, pumps, trailers and downhole pipe for lease or sublease to customers in Texas, Utah, Colorado, Oklahoma, North Dakota, New Mexico, Arkansas, Louisiana, Pennsylvania, West Virginia, New York, Michigan, Kansas, New Jersey, Ohio, Montana and Mississippi.  Offices are located in the following locations at June 30, 2016: Odessa, Texas; Pecos, Texas; Canadian, Texas; Charlotte, Texas; Gonzales, Texas; Athens, Texas; Norman, Oklahoma; Artesia, New Mexico; Quitman, Arkansas; McDonald, Pennsylvania; Dickinson, North Dakota; Stanley, North Dakota and Fort Collins, Colorado.

# NOTE 2.   BASES OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

## Basis of Consolidation

The accompanying unaudited interim consolidated financial statements include the accounts of the above named businesses. The Company maintains its books and prepares its interim consolidated financial statements on the accrual basis of accounting in accordance with generally accepted accounting principles. All intercompany transactions and balances have been eliminated in consolidation. The accompanying unaudited interim consolidated financial statements include all adjustments, consisting of only normal recurring adjustments, which are necessary to make the financial position as of June 30, 2016 not misleading. The accompanying unaudited interim consolidated financial statements do not include all disclosures normally required by generally accepted accounting principles in the United States of America ("GAAP"). These statements should be read in conjunction with the audited consolidated financial statements for the years ended December 31, 2015. In the opinion of the Company's management, the unaudited interim consolidated financial statements are a fair presentation of the financial position, results of operations and cash flows for the periods presented.  The results of operations for the three months ended June 30, 2016 are not necessarily indicative of the results of operations to be expected for the full fiscal year ended December 31, 2016.

## Note Receivable

On September 25, 2015, the Company entered into a short-term loan receivable with a third party limited liability company (the Borrower). Under the agreement, the Borrower may request up to $4,400,000 with interest accruing at 6% per year on the balance outstanding and payable upon maturity.  The loan is collateralized by the Borrower's assets and matures the earlier of (i) thirty days after written demand for payment is given by the Company to the Borrower, and (ii) December 31, 2016.  The loan principal and interest receivable as of June 30, 2016 are included in notes receivable in the consolidated balance sheet.

**Property and Equipment**

Property and equipment are stated at cost less accumulated depreciation and any accumulated impairment losses.  Depreciation expense is computed using the straight-line method over the estimated useful lives of the assets.

The estimated useful lives of the major classes of property and equipment are as follows:

| | |
|---|---|
| Buildings and improvements | 20–40 years |
| Furniture and fixtures | 5–7 years |
| Equipment, vehicles and trailers | 3–20 years |

If there is an indication that there has been a significant change in depreciation rate, useful life or residual value of an asset, the depreciation of that asset is revised prospectively to reflect the new expectations.

Maintenance and repairs of property and equipment are charged to operations as incurred.  When property and equipment is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the accounts, and any resulting gain or loss is included in the statements of income.

**Long-lived Assets**

In accordance with Final Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 360 *Property, Plant, and Equipment*, long-lived assets, excluding goodwill, to be held and used by the Company are reviewed to determine whether any events or changes in circumstances indicate that the carrying amount of the asset may not be recoverable.  For long-lived assets to be held and used, the Company bases its evaluation on impairment indicators such as the nature of the assets, the future economic benefit of the assets, any historical or future profitability measurements and other external market conditions or factors that may be present.  If such impairment indicators are present or other factors exist that indicate that the carrying amount of the asset may not be recoverable, the Company determines whether an impairment has occurred through the use of a discounted cash flow analysis of the asset at the lowest level for which identifiable cash flows exist.  If an impairment has occurred, the Company recognizes a loss in operations for the difference between the carrying amount and the fair value of the asset.

**Debt Issuance Costs**

The costs related to the issuance of debt are capitalized and amortized to expense using the straight-line method, which approximates the interest method, over the maturity periods of the related debt. Amortization expense related to debt issuance costs totaled $503,000 and $498,000 for the three months ended June 30, 2016 and 2015. Accumulated amortization totaled $3,829,000 and $2,824,000 at June 30, 2016 and December 31 2015, respectively.

**Goodwill and Intangible Assets**

In accordance with ASC Topic 350 *Intangibles-Goodwill and Other*, the Company tests for the impairment of goodwill on at least an annual basis.  The Company's annual test of impairment of goodwill is performed as of the end of the fiscal year or if a triggered event has occurred.  The

27

Company's goodwill impairment test involves a comparison of the fair value of the Company with its carrying amount. The fair value is determined using market-related valuation models, including earnings multiples, discounted cash flows, and comparable asset market values.  If the fair value is less than the carrying value, the asset is considered impaired. The amount of the impairment, if any, is then determined based on an allocation of the reporting unit fair values.

Based on annual testing process in fiscal 2015, the Company determined that goodwill related to a previously acquired water transfer service business, purchased in 2012, was permanently impaired at December 31, 2015 and was fully written off. Based on the testing process completed as at June 30, 2016 and the Company's more recent financial performance, the Company determined that the goodwill associated with prior acquisitions was permanently impaired and fully written off.

Other intangibles are amortized over their estimated useful lives. Amortizable intangible assets are reviewed at least annually to determine whether events or circumstances warrant a revision to the remaining period of amortization. During fiscal 2015, the Company recorded an impairment loss on the non-compete and customer list related to the acquired water transfer business. As at June 30, 2016, the Company recorded an impairment loss on the remaining carrying value of the non-compete and customer lists associated with prior acquisitions.

## Revenue Recognition

Revenue for product rentals and the sale of the related services are recognized when all of the following criteria have been met:  (1) evidence of an agreement or delivery ticket exists, (2) rental products are delivered or services rendered to the customer and all significant risks and rewards of ownership have passed to the customer (3) the price to the customer is fixed and determinable and (4) collectability is reasonably assured. Accounts receivable are recorded at that time, net of any discounts.  Earnings are charged with a provision for doubtful accounts based on a current review of collectability of the accounts receivable. Accounts receivable deemed ultimately uncollectible are applied against the allowance for doubtful accounts.

## Management Estimates

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting periods.  Actual results could differ from those estimates.

## Stock-based Compensation

The Company has a stock option plan where it may grant options to its employees and independent board members.  The exercise price of each option is equal to the estimated fair value of the Company's stock at the dates of the grants.  The maximum term for any option is 10 years and will vest over a 5 year time period. See Note 13 for additional disclosures.

## Subsequent Events

The Company evaluated all events and transactions that occurred after June 30, 2016 and through August 8, 2016, which is the date the unaudited interim consolidated financial statements were available to be issued, and determined no events, except as disclosed in Note 15, have occurred

subsequent to June 30, 2016 that require recognition in the unaudited interim consolidated financial statements or disclosure in the notes to the unaudited interim consolidated financial statements.

## NOTE 3.   ACCOUNTS RECEIVABLE – TRADE

Accounts receivable at June 30, 2016 and December 31, 2015 consists of the following:

|  | June 30, 2016 | December, 31, 2015 |
| --- | --- | --- |
| Trade receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,251 | 26,195 |
| Less: Allowance for doubtful accounts . . . . . . . . . . . . . . . . . . . . . . . . | (4,586) | (4,586) |
|  | 10,765 | 21,609 |

**(In thousands)**

## NOTE 4.   PROPERTY AND EQUIPMENT

Property and equipment at June 30, 2016 and December 31, 2015 consists of the following:

|  | June 30, 2016 | December 31, 2015 |
| --- | --- | --- |
| Shop Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,809 | $2,809 |
| Rental Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 358,592 | 360,974 |
| Office Furniture and fixtures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,165 | 1,274 |
| Vehicles and trailers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35,966 | 38,226 |
| Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,019 | 6,019 |
| Building and leasehold improvements . . . . . . . . . . . . . . . . . . . . . . . . . | 18,339 | 18,296 |
|  | 422,890 | 427,598 |
| Equipment under construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,357 | 1,251 |
|  | 424,247 | 428,849 |
| Less: Accumulated depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (176,272) | (159,222) |
| Net Property and equipment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 247,975 | $269,627 |

**(In thousands)**

## NOTE 5.   INTANGIBLE ASSETS

As a result of prior acquisitions in 2012 and 2014, the following intangible assets were acquired in those transactions:

|  | June 30, 2016 | December 31, 2015 |
| --- | --- | --- |
| Non-compete agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $        - | $1,743 |
| Customer lists  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - | 23,279 |
| Accumulated amortization  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - | (4,666) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $        - | $20,356 |

**(In thousands)**

Amortization expense recognized on all amortizable intangibles totaled $478,000 for both of the three months ended June 30, 2016 and 2015.  As at June 30, 2016, the Company recorded an impairment loss on the remaining carrying value of the non-compete agreements and customer lists associated with past acquisitions.

29

## NOTE 6.   GOODWILL

The Company's goodwill is derived from the acquisitions of assets or businesses that qualify for acquisition accounting treatment under the requirements of ASC Topic 805.  Any excess of the purchase price over the fair value assigned to assets acquired and liabilities assumed is recorded as goodwill.

Changes in the carrying amount of goodwill for the three months ended June 30, 2016 and the year ended December 31, 2015 are as follows:

|  | June 30, 2016 | December 31, 2015 |
|---|---|---|
| Balance, beginning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,657 | $8,933 |
| Impaired during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (8,657) | (276) |
|  | $    - | $8,657 |

(In thousands)

As a result of the Company's review of goodwill associated with prior acquisitions in 2012 and 2014, an impairment was recorded as at June 30, 2016. The remaining carrying value was written off and included in depreciation and amortization expense on the consolidated statements of income.

## NOTE 7.   OPERATING LEASE OBLIGATIONS

The Company leases certain equipment and warehouse and office space under noncancelable agreements classified as operating leases, expiring at various dates through 2021.  Rental expense totaled $251,000 and $343,000 for the quarters ended June 30, 2016 and 2015. Minimum annual rental commitments under noncancelable agreements for years ended June 30 is as follows:

| | |
|---|---|
| 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $591 |
| 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 356 |
| 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 274 |
| 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140 |
| 2021 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81 |
| Total | $1,443 |

(In thousands)

## NOTE 8.   NOTES PAYABLE

**Senior Secured Notes:**

As of July 21, 2014, the Company restructured all outstanding bank debt.  On that date, the Company completed the placement of $330 million principal amount of its 8.125% Senior Secured Notes (Senior Debt), due in 2019, in a private offering to qualified institutional investors in accordance with Rule 144A of the Securities Act of 1933.

The Senior Debt is fully and unconditionally guaranteed, jointly and severally, on a senior secured basis by Holdco and any material existing and future domestic restricted subsidiaries.  The Senior Debt and the guarantees are secured by a first lien charge on all the existing and future property and assets of the Company, except for a second lien charge over specific assets pledged as first lien security for the ABL facility.  The Senior Debt is not subject to loan covenants

**ABL Facility:**

On July 21, 2014, LTR entered into a new ABL Facility for borrowings up to the lesser of *(a)* $30 million and *(b)* a borrowing base of 85% of eligible receivable of the Company less reserves.  The ABL Facility will also provide for an uncommitted incremental facility of up to $12 million.

The ABL Facility will be secured by a first lien charge over a specific existing and future assets of the Company consisting namely of accounts receivables and deposit and collection accounts; and a second lien charge over all other existing and future property assets of the Company. Interest rates on any amounts drawn under the ABL Facility will equal either (a) prime rate plus an applicable margin of .75% to 1.25% or (b) the Eurodollar rate for the selected interest period plus an applicable margin of 1.75% to 2.25%.  The Company will also pay a commitment fee equal to .375% to .50% per annum on the unused portion of the ABL Facility.

Long-term debt as of June 30, 2016 and December 31, 2015 is as follows:

|  | June 30, 2016 | December 31, 2015 |
|---|---|---|
| Senior Secured Notes, matures August 1, 2019, principal due at maturity, interest payable semi-annually, in arrears on February 1 and August 1 each year, beginning February 1, 2015...................................................... | 330,000 | 330,000 |
| Less unamortized debt issuance costs ........................................................... | (6,094) | (7,099) |
| ABL Facility, matures January 21, 2019, interest payable quarterly on prime rate based draws, and at end of applicable interest period for Eurodollar based draws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – | – |
|  | 323,906 | 322,901 |
| Less current maturities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – | – |
| Notes payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $323,906 | $322,901 |

**(In thousands)**

Maturities of long-term debt at June 30, 2016 are as follows:

|  | Senior Secured Notes |
| --- | --- |
| 2017 .................................................................. | – |
| 2018 .................................................................. | – |
| 2019 .................................................................. | – |
| 2020 .................................................................. | 330,000 |
|  | $330,000 |

(In thousands)

## NOTE 9.   EMPLOYEE BENEFIT PLAN

LTR established the Light Tower Rentals, Ltd. 401(K) Profit Sharing Plan January 1, 1998.  The plan covers all employees who meet the eligibility requirements.  Participants become fully vested in employer profit sharing contributions and any earnings thereon after six years of service.  Employer contributions were $251,000 and $407,000 for the three months ended June 30, 2016 and 2015, respectively.

## NOTE 10.   COMMITMENTS AND CONTINGENCIES

The Company is party to various legal proceedings arising in the ordinary course of business.  In the opinion of the Company's management, upon advice of legal counsel, the Company has adequate legal defense and/or insurance coverage and does not believe that any of these matters, individually or in the aggregate, will have a material effect on the Company's financial condition, results of operations or cash flows.

The Company is subject to various federal, state and local environmental and occupational safety and health laws, regulations and ordinances, including water discharge, waste management and environmental cleanup.  The Company believes it is in compliance with all laws, regulations and ordinances.

## NOTE 11.   INCOME TAXES

The provision for federal income taxes consists of current and deferred taxes and differs from amounts that would be calculated by applying federal statutory rates to income before taxes, due to the effect of progressive tax rates and nondeductible items such as entertainment limitations, as well as the effect of the provision for state income taxes.

Deferred tax assets have resulted primarily from the Company's future deductible temporary differences.  In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or the entire deferred tax asset will be realized. The Company's ability to realize its deferred tax assets depends upon the generation of sufficient future taxable income to allow the utilization of its deductible temporary differences and tax planning strategies. Management evaluates the reliability of the deferred tax assets and the need for a valuation allowance annually.  No valuation allowance was recorded at June 30, 2016 or December 31, 2015.

## NOTE 12.   SHARE CAPITAL

Shares authorized, and issued and outstanding by The Company at June 30, 2016 and December 31, 2015 are as follows:

|  | Shares Authorized | Shares Issued and Outstanding |
|---|---|---|
| Common Stock – No Par Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,000 | 1,000 |

## NOTE 13.   STOCK OPTIONS

The following table reflects the summary of stock options outstanding at June 30, 2016:

|  | Number of Options Granted | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at December 31, 2015, beginning of period . . . . . . . . . . . . . . | 3,914,240 | $3.42 |
| Options expired during the period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (251,577) | $3.46 |
| Outstanding at June 30, 2016, ending of period . . . . . . . . . . . . . . . . . . . . . | 3,662,663 | $3.41 |
| Exercisable and vested or expected to vest, as of June 30, 2016  . . . . . . . | 1,469,778 | $3.10 |

The following table reflects the summary of stock options outstanding at June 30, 2015:

|  | Number of Options Granted | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at December 31, 2014, beginning of period . . . . . . . . . . . . . . | 3,827,774 | $3.29 |
| Options issued during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 664,000 | $4.04 |
| Options expired during the period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (249,906) | $3.14 |
| Outstanding at June 30, 2015, ending of period . . . . . . . . . . . . . . . . . . . . . | 4,241,868 | $2.92 |
| Exercisable and vested or expected to vest, as of June 30, 2015  . . . . . . . | 898,132 | $2.71 |

The Company estimated the fair value of each stock option on the date of grant using the Black-Scholes Merton option pricing model.  The expected volatility is based on historical volatility over the expected vesting terms ranging from 24-months to 60-months using the industry sector indices that most closely represent the industry sector in which the Company operates.  Stock compensation cost was recorded in the amount of $360,000 and $375,000 for the three months ended June 30, 2016 and 2015, respectively.  These option awards were granted with an exercise price equal to the fair value price of the Company's stock at the dates of grant.

33

**NOTE 14.   SUBSEQUENT EVENTS**

On August 8, 2016, the Company    entered into a restructuring support agreement with certain holders of our senior secured notes, to restructure the Company's $330 million of senior secured notes.

The restructuring support agreement outlines an expected restructuring through a prepackaged plan of reorganization including:

— The exchange of $330 million of the Company's senior secured notes into 100% of the equity of the reorganized Company and $30 million of new senior secured notes.

— The existing holders of the convertible preferred stock of LTR Investco, Inc.to receive warrants exercisable for new common equity of the Company.

— Implementation of a new management incentive plan.

**Exhibit F**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE OF THIS AGREEMENT ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "***Agreement***"), dated as of August 8, 2016, is entered into by and among (i) LTR Holdco, Inc. ("***Parent***"), (ii) Light Tower Rentals, Inc. (the "***Issuer***"), (iii) LTR Investco, Inc. ("***Holdings***"), (iv) the subsidiary guarantors signatory hereto (the "***Subsidiary Guarantors***" and together with Parent, Holdings, the Issuer and their direct and indirect subsidiaries, the "***Company***"), (v) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "***Noteholders***" and together with their respective successors and permitted assigns and any subsequent Noteholder that becomes party hereto in accordance with the terms hereof, the "***Consenting Noteholders***") of the 8.125% Senior Secured Notes due 2019 (the "***Senior Notes***") issued by the Company, (vi) Clairvest Equity Partners III Limited Partnership, CEP III Co-investment Limited Partnership, Mojopa, Ltd. and Avary Family Limited Partnership (collectively, the "***Common Equity Stockholders***"), as current holders of approximately 90.1% of the Company's common stock, (vii) Keith Muncy, Pat Bond, Mark Beckstrom and Nina Valles (collectively, the "***Senior Preferred Stockholders***"), and (viii) Stepstone Capital Partners III, L.P. and its affiliated entities listed on the signature pages hereto (collectively, "***Stepstone***"), Allstate Insurance Company and its affiliated entities listed on the signature pages hereto (collectively, "***Allstate***") and USS-Constitution Co-Investment Fund II, LP and its affiliated entities listed on the signature pages hereto (collectively, "***Constitution***"), as holders of 100% of the Company's convertible preferred stock (Stepstone, Allstate and Constitution, collectively, the "***Preferred Stockholders***"). The Company, each Consenting Noteholder, the Common Equity Stockholders, the Senior Preferred Stockholders, the Preferred Stockholders and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "***Parties***" and individually as a "***Party***".

**WHEREAS**, the Parties have agreed to a restructuring of the Company (the "***Restructuring***") that will be implemented through a prepackaged plan of reorganization (the "***Plan***") of the Company under chapter 11 of title 11 of the United States Code that would be filed by the Company in its capacity as a debtor and debtor in possession in connection with the commencement of cases in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Chapter 11 Cases***"). The Restructuring will be consummated in accordance with the terms and conditions reflected in the term sheet attached hereto on Exhibit A (the "***Term Sheet***," including any schedules and exhibits attached thereto, and as may be modified in accordance with Section 10 hereof). The Term Sheet is the product of arm's length good faith discussions between the Parties hereto and their respective professionals. Notwithstanding anything in this Agreement, and for the avoidance of doubt, the board of

directors has not yet authorized the Company's filing for bankruptcy and any such filing by the Company will require approval of the board of directors;

**WHEREAS**, as of the date hereof, the Consenting Noteholders hold, in the aggregate, more than 80% of the aggregate outstanding principal amount of the Senior Notes issued by the Company under that certain Indenture, dated as of July 21, 2014 (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "***Indenture***"), by and among the Company, each of the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. as trustee and collateral agent (the "***Trustee***");

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.     Certain Definitions.

As used in this Agreement, the following terms have the following meanings:

(a)     "Closing" means the consummation of the Plan.

(b)     "Definitive Documents" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and the Plan and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring, including, the Plan (and the documents to be filed in supplement to the Plan (the "***Plan Supplement***")), the Warrant Agreement, the Indenture and this Agreement (together with any voting and solicitation related materials), and any motion seeking the approval thereof, the order of the Bankruptcy Court confirming the Plan, and definitive documentation relating to the Company's debtor-in-possession financing (if any), use of cash collateral, any exit financing, organizational documents, investor related agreements or other related documents, which shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet and shall otherwise be acceptable in all respects to the Company and the Requisite Noteholders, in accordance with Section 7 hereof.

(c)     "Material Adverse Effect" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, financial condition, assets or liabilities of the Company, taken as a whole.

(d)     "Noteholder Claims" means any and all claims arising under the Indenture or the Senior Notes.

(e)     "Plan Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) the Senior Preferred Stockholders, (iii) the Preferred Stockholders, (iv) the Common Equity Stockholders holding at least 90.1% of the Company's common stock, and (v) Consenting Noteholders holding at least 66⅔% in aggregate principal amount outstanding of the Senior Notes.

(f)     "Plan Support Period" means the period commencing on the Plan Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 6 hereof and (ii) the effective date of the Plan (the "Effective Date").

(g)     "Requisite Noteholders" means, as of the date of determination, Consenting Noteholders holding at least 55% of the outstanding principal amount of the Senior Notes held by the Consenting Noteholders in the aggregate as of such date.

## 2.     Term Sheet.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Term Sheet sets forth the material terms and conditions for the Plan; provided, however, the Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistency between the Term Sheet and this Agreement, this Agreement shall control.

## 3.     Agreements of the Consenting Noteholders.

(a)     Agreement to Support.  Each of the Consenting Noteholders agrees, for the duration of the Plan Support Period, to support the Restructuring and the Plan and to act in good faith and take all reasonable actions necessary or reasonably requested by the Company to consummate the Restructuring and the Plan, as applicable, in a timely manner.  Subject to the terms and conditions hereof, for the duration of the Plan Support Period, each Consenting Noteholder irrevocably agrees to, at the request of the Company, support the Company's motions in bankruptcy implementing this Agreement, including the use of cash collateral and other first day motions.

(b)     Voting.  Each Consenting Noteholder agrees that, for the duration of the Plan Support Period, such Consenting Noteholder, so long as it is entitled to vote on the Plan and its vote has been properly solicited pursuant to Sections 1125(g) and 1126 of the Bankruptcy Code, shall:

(i)     (A) timely vote or cause to be voted each of its Noteholder Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with Sections 1125(g) and 1126 of the Bankruptcy Code, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Noteholder at any time following termination of this

3

Agreement, (C) timely vote (or cause to be voted) its Noteholder Claims against, and shall not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the solicitation of votes on the Plan, approval of the Disclosure Statement, and the confirmation and consummation of the Plan, and (D) not opt-out of the releases under Article VIII of the Plan; and

(ii)     support and take all reasonable actions necessary or reasonably requested by the Company to facilitate the solicitation of votes on the Plan, approval of the Disclosure Statement, and confirmation and consummation of the Plan (it being understood that the Consenting Noteholders shall not be required to incur any material costs, expense or liability in connection therewith).

(c)     Transfers.  Each Consenting Noteholder agrees that, for the duration of the Plan Support Period, such Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of the Noteholder Claims or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any Senior Notes or any other claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such Senior Notes or such other claims against or interests in the Company), unless the transferee thereof either (i) is a Consenting Noteholder or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to Consenting Noteholders (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as Exhibit B (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (i) Proskauer Rose LLP ("*Proskauer*"), as counsel to the Company, and (ii) Kirkland & Ellis LLP ("*Kirkland*"), as counsel to certain of the Consenting Noteholders, in which event (a) the transferee (including the Consenting Noteholder transferee, if applicable) shall be deemed to be a Consenting Noteholder hereunder to the extent of such transferred rights and obligations and (b) the transferor, solely with respect to the Senior Notes that were transferred, shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Each Consenting Noteholder agrees that any Transfer of any Noteholder Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Noteholder shall have the right to enforce the voiding of such Transfer.

(d)     Additional Noteholder Claims.  To the extent any Consenting Noteholder acquires additional Noteholder Claims or equity interests (preferred and/or common), then, in each case, each such Consenting Noteholder shall promptly notify Proskauer and

Kirkland, and each such Consenting Noteholder agrees that such Noteholder Claims or other claims or equity interests shall be subject to this Agreement, and that, for the duration of the Plan Support Period, it shall vote (or cause to be voted) such Noteholder Claims or equity interests (preferred and/or common) (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with Sections 3(a) and 3(b) hereof.

(e)      No-Action by Consenting Noteholders.  Each of the Consenting Noteholders agrees, for the duration of the Plan Support Period, not to take any action (or encourage or instruct any other party, including any agent or indenture trustee, to take any action) in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the Indenture that would be triggered as a result of the execution of this Agreement, the commencement of the Chapter 11 Cases, or the undertaking by the Company to implement the Restructuring through the Chapter 11 Cases.

4.      **Agreements of the Company.**

(a)      Affirmative Covenants.  The Company agrees that, for the duration of the Plan Support Period, the Company shall, and shall cause each of its direct and indirect subsidiaries to, (and the Common Equity Stockholders and Preferred Stockholders shall cause the Company to) directly or indirectly, do the following:

(i)      do all things necessary and appropriate in furtherance of the Restructuring, including, without limitation, (A) commencing solicitation on the Plan within the time frames contemplated herein, (B) commencing the Chapter 11 Cases on or before August 31, 2016 (the "***Outside Petition Date***," and the actual commencement date, the "***Petition Date***") and completing and filing, within the timeframes contemplated herein, the Plan, Disclosure Statement and the other Definitive Documents, which documents shall contain terms and conditions consistent in all material respects with the Term Sheet and shall otherwise be acceptable to the Requisite Noteholders, and distributing such documents to the legal and financial advisors for the Consenting Noteholders and affording reasonable opportunity to comment and review in advance of any filing thereof, and use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan within the timeframes contemplated by this Agreement; (ii) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any; and (iii) not take any action that is inconsistent with, or is intended or is likely to interfere with, consummation of the Restructuring;

(ii)      subject to Section 4(b), continue to operate its businesses in the ordinary course of business consistent with past practice, and confer with the Requisite Noteholders and their representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations.  Notwithstanding the generality of the foregoing, the Company shall, except as expressly contemplated by this Agreement or with the prior written consent of the Requisite Noteholders and, subject to applicable bankruptcy law, use commercially reasonable efforts consistent with the Restructuring to,

(a) continue to operate its businesses in compliance with all applicable laws, rules and regulations in all material respects, (b) preserve the relationships with the current customers, distributors, suppliers, vendors and others having business dealings with the Company, (c) maintain its physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (d) not take any action, or omit to take any action, the intent of which is to cause the termination of its current officers other than a termination for cause (in accordance with the definition of "Cause" in any applicable contract or agreement) or if the failure to do so would be inconsistent with the exercise of applicable fiduciary duties, (e) perform all obligations required to be performed by the Company under any assumed executory contracts, (f) maintain its books and records on a basis consistent in all material respects with prior practice, (g) bill for products sold or services rendered and pay accounts payable in a manner consistent in all material respects with past practice, (h) maintain all insurance policies required, or suitable replacements therefor, in full force and effect through the close of business on the Effective Date, (i) provide the Consenting Noteholders with updated monthly financial information concerning the Company (subject to customary confidentiality restrictions), (j) not encumber nor enter into any material new leases (other than the leases listed on Annex A), licenses or other use or occupancy agreements for real property or any part thereof, (k) timely pay any and all required fees and taxes with respect to patents (if any), patent applications (if any), any trademark applications and any registered trademarks, and (l) not enter into any agreement with any labor union or labor organization, including but not limited to any collective bargaining agreement, except as required by applicable law;

(iii)    (A) support and take all reasonable actions necessary or reasonably requested by the Consenting Noteholders to facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated thereby, (B) not take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan, and (C) support the mutual release and exculpation provisions contained in the Term Sheet and the Plan;

(iv)    (A) commence solicitation of the Plan in accordance with Section 1126(b) of the Bankruptcy Code on or before August 22, 2016;

(B) file on the Petition Date such first day motions and pleadings that are reasonably acceptable, in form and substance, to the Requisite Noteholders;

(C) (i) file a motion with the Bankruptcy Court on the Petition Date seeking approval of an order permitting use of cash collateral, (ii) obtain the cash collateral order (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is three (3) calendar days after the Petition Date, and (iii) obtain approval on a final basis of the cash collateral order (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is twenty-eight (28) calendar days after the Petition Date;

6

(D) (i) file the Plan and the Disclosure Statement with the Bankruptcy Court on the Petition Date and (ii) obtain confirmation of the Plan (including the Disclosure Statement) by entry of an order of the Bankruptcy Court (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is fifty-five (55) calendar days after the Petition Date (such date that the Disclosure Statement and Plan are approved and the confirmation order is entered, the "***Confirmation Date***");

(E) satisfy all conditions to the effectiveness of the Plan and consummate the Plan as soon as reasonably practicable and in no event later than the date that is seventy-five (75) calendar days after the Petition Date;

(v)    provide, for each month, beginning July 2016 until the Effective Date, (a) upon written request of any of the Consenting Noteholders, to such Consenting Noteholders, an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for the month then ended within thirty (30) days of the end of such month (the "***Monthly Financial Statements***"), which Monthly Financial Statements, except as indicated therein and, except for the absence of footnotes, shall be prepared in accordance with GAAP and shall present fairly in all material respects the financial position, results of operations and cash flows of the Company as of the dates indicated and for the periods specified, subject to year-end audit adjustments;

(vi)    provide draft copies of all "first day" motions or applications and other documents the Company intends to file with the Bankruptcy Court to Kirkland as soon as reasonably practicable and in no event later than the date that is three (3) business days prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.  The Company will use reasonable efforts to provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to Kirkland within a reasonable time prior to filing such pleading to the extent practicable and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading;

(vii)    maintain their good standing under the laws of the state in which they are incorporated or organized;

(viii)    timely file with the Bankruptcy Court a formal written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases or (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(ix)    provide to Kirkland, no later than five (5) calendar days prior to the Petition Date, a schedule of executory contracts and unexpired leases the Company

7

intends to reject, which schedule shall be in form and substance acceptable to the Requisite Noteholders;

(x)       provide to the Consenting Noteholders and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's business plans and participating in the planning process with respect to the consummation of the transactions contemplated by the Plan, (C) timely and specific responses to all reasonable diligence requests, and (D) information with respect to all material executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(xi)      convene a call on the second and fourth Tuesday of each month with the Consenting Noteholders and their respective advisors, which calls will include the Company's management and financial and legal advisors; provided, however, to the extent such call is missed or needs to be rescheduled by the Company, the Company shall have until the immediate Tuesday thereafter to convene the call;

(xii)     in the event that the Company (including all subsidiaries and representatives) receives a written proposal or offer (binding or nonbinding) with respect to any transaction proposed as an alternative to the Restructuring, provide written notice thereof and a copy of such proposal or offer to the Consenting Noteholders (subject to an appropriate confidentiality agreement) and the Preferred Stockholders within five (5) business days following receipt of such offer;

(xiii)    provide prompt written notice to the Consenting Noteholders between the date hereof and the Effective Date (unless notice is already provided to the Consenting Noteholders) of (A) the occurrence, or failure to occur, of any event that, to the Company's knowledge, would be likely to cause (1) any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate in any material respect, (2) any covenant of any of the Company contained in this Agreement not to be satisfied in any material respect or (3) any condition precedent contained in the Plan, the Term Sheet or this Agreement not to occur or become impossible to satisfy, (B) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any written notice from any governmental body in connection with this Agreement or the transactions contemplated by the Restructuring, (D) receipt of any written notice of any proceeding commenced, or, to the knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (E) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

8

(xiv)   unless otherwise agreed by the Company and the applicable firm, on the date that is at least one (1) calendar day prior to the Petition Date, pay in cash to (A) Kirkland and (B) the financial advisor and due diligence consultant to the Consenting Noteholders, in each case, all costs and out-of-pocket expenses then due, outstanding and payable in connection with this matter, in accordance with that certain letter agreement, dated July 22, 2016, between the Issuer and the undersigned Consenting Noteholders; and

(xv)   promptly notify the other Parties in writing following the receipt in writing of any notice of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which would reasonably be anticipated to have a Material Adverse Effect.

(b)   Negative Covenants.  The Company agrees that, for the duration of the Plan Support Period, the Company shall not, without prior written consent of the Requisite Noteholders, do or permit to occur any of the following:

(i)   directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan, or take any other action that would reasonably be expected to prevent, interfere with, delay or impede in any way, the solicitation of votes on the Plan, the approval of the Disclosure Statement, or the implementation or consummation of the Plan;

(ii)   amend or modify (other than technical, non-substantive modifications, which changes shall not in any event be adverse to the Consenting Noteholders) the Term Sheet or the Plan;

(iii)   withdraw or revoke the Term Sheet or the Plan or publicly announce its intention not to pursue the Term Sheet or the Plan;

(iv)   file any motion or pleading or other Definitive Document with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any material respect with this Agreement, the Term Sheet or the Plan;

(v)   move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract (including, without limitation, any employment agreement or employee benefit plan) or unexpired lease other than in accordance with the Term Sheet or the Plan;

(vi)   issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(vii)    amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

(viii)    except as contemplated by the Plan, split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(ix)    redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(x)    acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Company, other than in the ordinary course of business consistent with past practices and in no event in excess of $500,000, individually or in aggregate; provided, however, that the Requisite Noteholders shall be deemed to have provided their advance written consent for the sale of the assets listed on Annex B;

(xi)    incur any capital expenditures other than in the ordinary course of business and in amounts consistent with historical business practices;

(xii)    incur or suffer to exist any indebtedness, except indebtedness (1) existing and outstanding immediately prior to the date hereof, (2) authorized by "first day orders" entered by the Bankruptcy Court (which orders shall be reasonably acceptable to the Consenting Noteholders), or (3) trade payables and liabilities arising and incurred in the ordinary course of business and not overdue by more than 90 days;

(xiii)    incur or suffer to exist any liens or security interests;

(xiv)    enter into any commitment or agreement with respect to debtor-in-possession financing or the use of cash collateral;

(xv)    enter into any employment agreements, collective bargaining agreements or employee benefit plans, or materially modify any existing employment agreements, collective bargaining agreements or benefit plans;

(xvi)    hire any executive or employee whose total annual compensation is greater than $100,000 or increase the compensation for any executive or employee whose total annual compensation is greater than $100,000 without the express consent of the Requisite Noteholders; or

(xvii)    allow or settle claims or any pending litigation not otherwise insured under the Company's insurance policies and paid for by the Company's applicable insurance carrier for more than $50,000 per claim individually, or $200,000 in the aggregate.

10

(c)    Automatic Stay.   The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

**5.    Agreements of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders.**

(i)    Each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders agrees, for the duration of the Plan Support Period, (A) to support and take all reasonable actions necessary or reasonably requested by the Consenting Noteholders to facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated thereby, (B) not to take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan, and (C) support the mutual release and exculpation provisions contained in the Term Sheet and the Plan. Without limiting the generality of the foregoing, each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders agrees, for the duration of the Plan Support Period, (x) to timely vote (or cause to be voted) its equity interests (and any equity interests as to which it holds a proxy) in favor of all transactions required to consummate the Plan, and (y) not to Transfer, directly or indirectly, in whole or in part, any of its equity interest of the Company or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any equity interests or any claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such equity interests or any other claims against or interests in the Company).

(ii)    Each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders agrees to timely vote (or cause to be voted) its equity interests against, and shall not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the solicitation of votes on the Plan, approval of the Disclosure Statement, and the confirmation and consummation of the Plan.

**6.    Termination of Agreement.**

(a)    This Agreement shall terminate upon the receipt of written notice, delivered in accordance with Section 20 hereof, from the Requisite Noteholders to the other Parties hereto at any time after the occurrence of any Requisite Noteholder Termination Event (defined below).  In addition, this Agreement shall terminate upon the

11

receipt of written notice, delivered in accordance with <u>Section 20</u> hereof, from the Company to the other Parties hereto at any time after the occurrence of any Company Termination Event (defined below).

(b)    A "<u>Requisite Noteholder Termination Event</u>" shall mean any of the following:

(i)    the material breach by the Company of (a) any affirmative or negative covenant contained in this Agreement (without giving effect to any "materiality" qualifiers set forth herein) or (b) any other material obligations of the Company set forth in this Agreement (without giving effect to any "materiality" qualifiers set forth herein), and, in either respect, such breach remains uncured for a period of ten (10) business days following the Company's receipt of notice pursuant to <u>Section 6(a)</u> of this Agreement;

(ii)    any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of ten (10) business days following the Company's receipt of notice pursuant to <u>Section 6(a)</u> of this Agreement;

(iii)    at any time on or before August 15, 2016 at 9:00 a.m. Eastern Time, the Requisite Noteholders shall not be satisfied in their sole discretion with the results of their legal, business and tax due diligence;

(iv)    any material term or condition of any of the restructuring documents that are filed with the Bankruptcy Court shall be (whether due to an order of the Bankruptcy Court or otherwise) different and adverse to the Consenting Noteholders than as contemplated by the Term Sheet and the Plan, and such event remains unremedied for a period of ten (10) business days following the Company's receipt of notice pursuant to <u>Section 6(a)</u> of this Agreement;

(v)    except as explicitly permitted under this Agreement, the Company shall have (A) incurred any indebtedness, (B) leased, mortgaged, pledged, granted a lien on or disposed of any of its properties or assets or (C) declared, set aside or paid any dividends on, or made any other distributions in respect of, any of the capital stock of the Company;

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(vii)    the Company shall have failed to provide to Noteholders, the Trustee and the Permitted Parties (as defined in the Indenture), as promptly as practicable (and in any event within two (2) business days), a Current Report setting forth the information that would be required on Form 8-K to which this Agreement (including all

exhibits) (with such redactions as may be reasonably requested by counsel to the Consenting Noteholders) and the Term Sheet are attached; provided, however, that the principal amount of Senior Notes listed on each Consenting Noteholders' signature page shall be redacted and shall not be made available to any person other than such Consenting Noteholder, Kirkland (to be held by Proskauer and Kirkland on a professionals' eyes only basis) and the Company, except as required by law;

(viii)   the Company shall not have commenced solicitation of the Plan on or before August 22, 2016;

(ix)   as of 11:59 p.m. Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Noteholders, if the Chapter 11 Cases shall have not been filed;

(x)   the Company shall not have obtained approval of the Disclosure Statement and confirmation of the Plan by entry of an order of the Bankruptcy Court (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is fifty-five (55) calendar days after the Petition Date;

(xi)   the Company shall not have satisfied all conditions to the effectiveness of the Plan and consummated the Plan as soon as reasonably practicable and in no event later than the date that is seventy-five (75) calendar days after the Petition Date;

(xii)   the occurrence of any event, change, effect, occurrence, development, circumstance or change of fact that has or would reasonably be expected to have a Material Adverse Effect;

(xiii)   the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(xiv)   the Bankruptcy Court grants relief terminating, annulling or modifying the automatic stay (as set forth in Section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $10 million in the aggregate;

(xv)   the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease other than in accordance with the Term Sheet or the Plan;

(xvi)   the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(xvii) priority claims under Section 507(a) of the Bankruptcy Code, expected cure costs for assumed executory contracts and Section 503(b)(9) claims are expected to exceed $3.5 million on the Effective Date; or

(xviii) authorization is granted to the Company to pay claims in excess of $2.0 million under critical vendor and other orders.

(c)　A "Company Termination Event" shall mean any of the following:

(i)　the breach by any of the Consenting Noteholders that are initial signatories hereto, other than Clairvest Group Inc. and Mojopa Ltd., of any of the representations, warranties or covenants of such Consenting Noteholders set forth in this Agreement to the extent such breach would have a material adverse impact on the consummation of the transactions contemplated by the Plan, and which breach remains uncured for a period of ten (10) business days after the receipt by the applicable Consenting Noteholder from the Company of written notice of such breach;

(ii)　the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(iii)　the board of directors of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

(d)　Mutual Termination.  This Agreement may be terminated by mutual agreement of the Company and the Requisite Noteholders upon the receipt of written notice delivered in accordance with Section 20 hereof.

(e)　Effect of Termination.  Subject to the proviso contained in Section 6(a) hereof, upon the termination of this Agreement in accordance with this Section 6, and except as provided in Section 13 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Senior Notes, the Indenture and any ancillary documents or agreements thereto; provided, however, that in no event shall any such termination relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, each Consenting Noteholder may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Consenting Noteholder prior to such termination, whereupon any such vote or

14

consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with this Agreement. If this Agreement has been terminated in accordance with this Agreement at a time when permission of the Bankruptcy Court shall be required for a Consenting Noteholder to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Noteholder to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 13</u> of this Agreement. The Consenting Noteholders shall have no liability to the Company or to any other Consenting Noteholder in respect of any termination of this Agreement in accordance with the terms of <u>Section 6(b)</u>.

(f)     This Agreement and the Term Sheet are part of a proposed settlement of a dispute among the Parties. If the transactions contemplated herein are not consummated following the occurrence of the Termination Date, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 7.     <u>Definitive Documents; Good Faith Cooperation; Further Assurances.</u>

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the Parties hereto to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring (<u>provided</u>, <u>however</u>, that no Consenting Noteholder shall be required to incur any material cost, expense or liability in connection therewith unless, in the case of any such cost or expense, funds are advanced by the Company, subject to Bankruptcy Court approval (if necessary)), and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

## 8.     <u>Representations and Warranties.</u>

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the

15

performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Noteholder severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the beneficial owner of the aggregate principal amount of Senior Notes set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof) and owns such Senior Notes free and clear of any and all liens, claims, security interests and similar restrictions and any other restrictions that could adversely affect the ability of such Consenting Noteholder to perform its obligations hereunder, and/or (ii) has, with respect to the beneficial owners of such Senior Notes, (A) sole investment or voting discretion with respect to such Senior Notes, (B) full power and authority to vote on and consent to matters concerning such Senior Notes or to exchange, assign and transfer such Senior Notes, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders severally (and not jointly) represents and warrants that, as of the date hereof, it (i) is the record or beneficial owner, and has good and marketable title to, the equity interests of Holdings set forth opposite such person's name on Exhibit C hereto free and clear of any and all liens, claims, security interests, proxies, voting trusts or agreements, options, rights, understandings or arrangements or any other encumbrances whatsoever on title, transfer, or exercise of any rights of the Stockholders in respect of such shares, other than the Holdings' Amended and Restated Stockholders Agreement, dated August 28, 2014 and, in the case of the Senior Preferred Stockholders, their respective restricted stock agreements; (ii) does not own, of record or beneficially,

16

any shares of capital stock of the Company (or rights to acquire any such shares) or any Senior Notes (or rights to acquire Senior Notes) other than as set forth on Exhibit C hereto; and (iii) has the sole right to vote, sole power of disposition, sole power to issue instructions with respect to the matters set forth herein, sole power to demand appraisal rights and sole power to agree to all of the matters set forth in this Agreement, in each case with respect to all of such shares, with no material limitations, qualifications or restrictions on such rights, subject to the terms of this Agreement.

9. **Disclosure; Publicity.**

(a)   Upon execution of this Agreement, subject to the provisions set forth in Section 9(b) hereof, the Company shall disseminate a press release or furnish to Noteholders, the Trustee and the Permitted Parties a Current Report disclosing the existence of this Agreement and the terms hereof and of the Term Sheet (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Petition Date) with such redactions as may be reasonably requested by any Consenting Noteholder's counsel to maintain the confidentiality of the items identified in Section 9(b) hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Noteholder may publicly disclose, after providing the Company with a reasonable opportunity to review before its release, the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by Section 9 hereof), and the Company hereby waives any claims against the Consenting Noteholders arising as a result of such disclosure by a Consenting Noteholder in compliance with this Agreement.

(b)   The Company shall submit drafts to Kirkland of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Noteholder, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Noteholder), other than advisors to the Company, the principal amount or percentage of any Senior Notes or any other securities of the Company held by any Consenting Noteholder, in each case, without such Consenting Noteholder's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Senior Notes held by all the Consenting Noteholders collectively.  Notwithstanding the provisions in this Section 9, any Party may disclose, to the extent consented to in writing by a Consenting Noteholder, such Consenting Noteholder's individual holdings.

10.     **Amendments and Waivers.**

(a)     This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except in a writing signed by the Company and the Requisite Noteholders; provided, however, that any waiver, modification, amendment or supplement to this Section 10(a) shall require the written consent of all of the Parties; provided, further, that any modification, amendment or change to the definition of Requisite Noteholders shall require the written consent of each Consenting Noteholder; provided, further, that any change, modification or amendment to this Agreement, the Term Sheet or the Plan that materially adversely affects the economic recoveries of any Consenting Noteholder or Preferred Stockholder, as compared to the recoveries expected from the Term Sheet attached hereto as of the date hereof, may not be made without the written consent of each such adversely affected Consenting Noteholder or Preferred Stockholder, as applicable.

(b)     Any amendment or waiver of the conditions set forth in Section 6(b)(iii) or this Section 10(b) shall require the consent of each of the Consenting Noteholders that are initial signatories hereto, other than Clairvest Group Inc. and Mojopa Ltd., for so long as each such person (together with its affiliates) holds in the aggregate at least 10% of the Senior Notes.

11.     **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Plan Support Effective Date, and not before such date; provided, however, that signature pages executed by Consenting Noteholders shall be delivered to (a) other Consenting Noteholders in a redacted form that removes such Consenting Noteholders' holdings of the Senior Notes and (b) the Company and Kirkland in an unredacted form (to be held by Proskauer and Kirkland on a professionals' eyes only basis).

12.     **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  EACH PARTY

HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

## 13. <u>Specific Performance/Remedies.</u>

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorneys fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything that may be expressed or implied in this Agreement, each of the Parties hereto covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, officer, employee, general or limited partner or equity holder of any Consenting Noteholder or of any affiliate or assignee thereof, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future officer, agent or employee of any Consenting Noteholder or any current or future member of any Consenting Noteholder or any current or future director, officer, employee, partner or member of any Consenting Noteholder or of any affiliate or assignee thereof, as such for any obligation of any Consenting Noteholder under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

## 14. <u>Survival.</u>

Notwithstanding the termination of this Agreement pursuant to <u>Section 6</u> hereof, the agreements and obligations of the Parties in this <u>Section 14</u>, the proviso set forth in <u>Section 3(b)(i)(B)</u> hereof, and <u>Sections 6(e)</u>, <u>6(f)</u>, <u>9</u>, <u>11</u>, <u>12</u>, <u>13</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u> and <u>23</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Noteholders in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 15. <u>Headings.</u>

The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

## 16.    Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit Transfers of the Senior Notes or claims arising under the Senior Notes other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

## 17.    No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

## 18.    Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto (and including the Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Noteholder shall continue in full force and effect.

## 19.    Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

## 20.    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by email, courier or by registered or certified mail (return receipt requested) to the following addresses and emails:

(1)    If to the Company, to:

Light Tower Rentals, Inc.
2330 E. I-20 South Service Road

20

Odessa, Texas 79766
Attention:  Keith Muncy
            Chief Financial Officer
            (kmuncy@ltr.com)

With a copy to:

Proskauer Rose LLP
11 Times Square
New York, New York 10036
Attention:  Frank Lopez
            (flopez@proskauer.com)
            Philip M. Abelson
            (pabelson@proskauer.com)
            Max Kirchner
            (mkirchner@proskauer.com)
            -and-
            Ehud Barak
            (ebarak@proskauer.com)
and
Miller, Egan, Molter & Nelson LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Attention:  Michael S. Colvin
            (michael.colvin@milleregan.com)

(2)    If to a Consenting Noteholder, or a transferee thereof, to the addresses or emails set forth following the Consenting Noteholder's signature (or as directed by any transferee thereof), with copies to:

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
Attention:  Anup Sathy, P.C.
            (anup.sathy@kirkland.com)
            -and-

            Ross M. Kwasteniet
            (ross.kwasteniet@kirkland.com)

(3)    If to a Common Equity Stockholder, Senior Preferred Stockholder or Preferred Stockholder to the addresses or emails set forth following such Common Equity Stockholder's, Senior Preferred Stockholder's or Preferred Stockholder's signature.

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

21

### 21.    Reservation of Rights; No Admission.

Nothing contained herein shall (i) limit (A) the ability of any Consenting Noteholder to consult with other Consenting Noteholders or the Company, subject to the terms of any nondisclosure agreement entered into with the Company or (B) the rights of any Consenting Noteholder under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Consenting Noteholder's obligations hereunder or under the terms of the Plan and are not for the purpose of hindering, delaying or preventing the confirmation or consummation of the Plan; (ii) limit the ability of any Consenting Noteholder to sell or enter into any transactions in connection with the Senior Notes or any other claims against or interests in the Company, subject to the terms of Section 3(d) hereof or any nondisclosure agreement entered into with the Company; or (iii) limit the rights of any Consenting Noteholder under the Indenture, or any agreements executed in connection with the Indenture or constitute a waiver or amendment of any provision of the Indenture, or any agreements executed in connection with the Indenture, subject to the terms of Section 3(a) or (e) hereof.

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  This Agreement and the Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 22.    Relationship Among Parties.

It is understood and agreed that no Consenting Noteholder has any duty of trust or confidence in any kind or form with any other Consenting Noteholder, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Noteholder may trade in the Senior Notes, subject to the limitations in Section 3, or other debt or equity securities of the Company without the consent of the Company or any other Consenting Noteholder, subject to applicable securities laws, the terms of this Agreement and any nondisclosure agreement entered into with the Company; provided, however, that no Consenting Noteholder shall have any responsibility for any such trading to any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Consenting Noteholders shall in any way affect or negate the foregoing understanding and agreement.

22

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Consenting Noteholder or representative of a Consenting Noteholder that becomes a member of a statutory committee that may be established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member; provided, however, that nothing in this Agreement shall be construed as requiring any Consenting Noteholder to serve on any statutory committee in the Chapter 11 Cases.

### 23.    No Solicitation; Representation by Counsel; Adequate Information.

This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases.  The acceptances of the Consenting Noteholders with respect to the Plan will not be solicited until such Consenting Noteholder has received the Disclosure Statement and related ballots and solicitation materials, each as subsequently approved by the Bankruptcy Court.

Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Noteholder acknowledges and agrees and represents to the Company that it is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933 or a registered investment advisor under the Investment Advisors Act of 1940. Any offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

### 24.    Independent Due Diligence and Decision Making.

Each Party hereby confirms that it is (a) a sophisticated party with respect to the matters that are the subject of this Agreement, (b) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, (c) has adequate information concerning the matters that are the subject of this Agreement, and (d) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Agreement, which it enters, or as to which it acknowledges and agrees voluntarily and of its own choice and not under coercion or duress.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

23

**[Signature Pages Removed]**

## EXHIBIT A

**TERM SHEET**

**LIGHT TOWER RENTALS, INC., et al.**

**RESTRUCTURING TERM SHEET**

**AUGUST 8, 2016**

**THIS TERM SHEET (THIS "*TERM SHEET*") DESCRIBES THE MATERIAL TERMS OF A PROPOSED RESTRUCTURING TRANSACTION (THE "*RESTRUCTURING*") PURSUANT TO WHICH LIGHT TOWER RENTALS, INC. ("*LIGHT TOWER*"), LTR HOLDCO, INC., AND LTR INVESTCO, INC., (TOGETHER WITH THEIR RESPECTIVE AFFILIATES AND SUBSIDIARIES, THE "*DEBTORS*")[1] PROPOSE TO RESTRUCTURE THEIR CAPITAL STRUCTURE THROUGH A JOINT PREPACKAGED PLAN OF REORGANIZATION (THE "*PLAN*") FILED IN CONNECTION WITH VOLUNTARY CASES (THE "*CHAPTER 11 CASES*") COMMENCED UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "*BANKRUPTCY CODE*") IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION (THE "*BANKRUPTCY COURT*").**

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY, NOR IS IT A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS NOT A COMMITMENT TO LEND OR TO AGREE TO THE TERMS OF ANY RESTRUCTURING. THIS TERM SHEET IS SUBJECT TO DEFINITIVE DOCUMENTATION ACCEPTABLE TO THE REQUISITE NOTEHOLDERS (AS DEFINED BELOW) IN THEIR SOLE DISCRETION. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.**

**THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW AND APPROVAL BY ALL PARTIES AND IS NOT BINDING, IS SUBJECT TO MATERIAL CHANGE, AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.**

---

[1] For the avoidance of doubt, the Debtors are LTR Holdco, Inc., Light Tower Rentals, Inc., LTR Investco, Inc., and LTR Shelters, Inc.

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | Prior to the date of the commencement of the Chapter 11 Cases (the "***Petition Date***"), each of the Company, the Consenting Noteholders,[2] the Common Equity Holders, the Senior Preferred Stockholders, and the Preferred Stockholders shall have executed the RSA pursuant to which the Debtors will pursue and implement the Restructuring consistent with this Term Sheet in order to consummate the Plan.<br><br>This Term Sheet outlines the terms of a balance-sheet restructuring of the Company (each of the Debtors as reorganized, a "***Reorganized Debtor***" and, collectively, the "***Reorganized Debtors***").<br><br>This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the Definitive Documents, each of which shall be in form and substance acceptable to the Requisite Noteholders.  The Definitive Documents, all motions, and related orders and the plan solicitation documents shall satisfy the requirements of the Bankruptcy Code and be consistent with the RSA and this Term Sheet. |
| **Debt to Be Restructured** | Indebtedness that will be restructured under the Plan includes, among other things, the following indebtedness and obligations:<br><br>a.  up to $30.0 million of obligations outstanding under that certain Credit Agreement, dated as of July 21, 2014, by and among Light Tower Rentals, Inc., as borrower, the guarantors party thereto, Jefferies Finance LLC, as administrative and collateral agent, and the other lenders party thereto (the "***ABL Facility***," the "***ABL Credit Agreement***" and, together with all related agreements and documents executed by any of the Debtors in connection with the ABL Credit Agreement, the "***ABL Facility Documents***"), and such obligations thereunder (the "***ABL Facility Claims***"); and<br><br>b.  approximately $330.0 million of obligations outstanding under that certain Indenture, dated as of July 21, 2014, by and among Light Tower Rentals, Inc., as issuers, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, providing for the issuance of 8.125% Senior Secured Notes due 2019 (such notes, the "***Senior Notes***," such indenture, the "***Indenture***," |

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the restructuring support agreement (the "***RSA***") to which this Term Sheet is attached.

| | |
|---|---|
| | and, together with all related agreements and documents executed the Company in connection with the Indenture, the "***Senior Notes Documents***") and such obligations thereunder, the "***Senior Notes Claims***"). |
| **Exit Financing** | The decision to seek approval of, and the terms and conditions related to, any exit financing arrangement effective upon the effective date of the Plan (the "***Effective Date***") related to the Chapter 11 Cases (together with related loan, security, collateral, and other documents, an "***Exit Facility***"), in each case shall be acceptable to the Requisite Noteholders. |

| **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** |
|---|

| | |
|---|---|
| **Administrative Claims**<br><br>**Priority Tax Claims**<br><br>**Other Priority Claims**<br><br>**Other Secured Claims** | **Treatment**. Customary treatment provisions for each of these classes in order to render the holders of such claims unimpaired.<br><br>**Voting**. Not classified or unimpaired, as applicable; not voting. |
| **General Comment Regarding Treatment** | Each holder of an allowed claim or allowed interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed claim or allowed interest, except to the extent different treatment is agreed to by: (a) the Debtors; (b) the holder of such allowed claim or allowed interest, as applicable; and (c) the Requisite Noteholders. Unless otherwise indicated, the holder of an allowed claim or allowed interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter. |
| **ABL Facility Claims** | **Allowance**. On the Effective Date, ABL Facility Claims shall be allowed in the aggregate principal amount of $0, plus any liquidated amounts for reasonable and documented costs and expenses, as of the Petition Date, that are reimbursable under the ABL Facility Documents.<br><br>**Treatment**. Each holder of an allowed ABL Facility Claim shall receive cash in an amount equal to such ABL Facility Claim. |

3

| | |
|---|---|
| | **Voting**.  Holders of ABL Facility Claims are unimpaired under the Plan. Holders of allowed ABL Facility Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of allowed ABL Facility Claims are not entitled to vote to accept or reject the Plan. |
| **Senior Notes Claims** | **Allowance**.  On the Effective Date, Senior Notes Claims shall be allowed in the aggregate principal amount of $330,000,000, plus any accrued but unpaid interest thereon as of the Petition Date, in each case in accordance with the terms and conditions under the Indenture.<br><br>**Treatment**.  Each holder of an allowed Senior Notes Claim shall receive (i) its pro rata share of the New Equity (subject to dilution on account of the Warrants, the MIP, and distribution (if any) to holders of Investco Preferred Interests), and (ii) its pro rata share of the New Notes.<br><br>• "***New Equity***" means the equity of the Reorganized Debtors' ultimate parent, which shall be a newly formed Delaware limited liability company treated as a corporation for tax purposes ("***New LTR Holdings***") authorized and issued pursuant to the Plan.<br><br>• "***New Notes***" means the secured notes issued by Reorganized Light Tower Rentals, Inc., and guaranteed by each of its subsidiaries and its parent company (which shall be a subsidiary of New LTR Holdings), in the aggregate principal amount of  $30 million, (i) bearing interest at 10% per annum, payable in cash or in kind at the option of the Reorganized Debtors for the period commencing on the Effective Date and ending on the third anniversary thereof, and payable solely in cash thereafter, (ii) maturing on the fifth anniversary of the Effective Date, (iii) being callable (a) prior to the second anniversary of the Effective Date at a price equal to 101% of the aggregate outstanding amount, (b) during the period commencing on the second anniversary of the Effective Date through the day prior to the third anniversary of the Effective Date at a price equal to 106.75% of the aggregate outstanding amount, (c) during the period commencing on the third anniversary of the Effective Date through the day prior to the fourth anniversary of the Effective Date at a price equal to 104.50% of the aggregate outstanding amount, and (d) at a |

4

| | |
|---|---|
| | price equal to 100% of the aggregate outstanding amount from the fourth anniversary of the Effective Date and thereafter, and (iv) containing covenants substantially similar to those under the Indenture.<br><br>**Voting**.  Holders of Senior Notes are impaired under the Plan. Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan. |
| **General Unsecured Claims** | **Treatment**.  Each holder of an allowed general unsecured claim shall receive cash in an amount equal to such allowed general unsecured claim on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such allowed general unsecured claim.<br><br>**Voting**.  Holders of allowed general unsecured claims are unimpaired under the Plan. Holders of allowed general unsecured claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of allowed general unsecured claims are not entitled to vote to accept or reject the Plan. |
| **Intercompany Claims** | **Treatment**.  Each allowed claim held by one Debtor against another Debtor (each, an "***Intercompany Claim***") shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Requisite Noteholders, either:<br><br>&bull; reinstated; or<br><br>&bull; canceled and released without any distribution on account of such claims.<br><br>**Voting**.  Holders of Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of allowed Intercompany Claims are not entitled to vote to accept or reject the Plan. |
| **Intercompany Interests** | **Treatment**.  Interests in a Debtor held by another Debtor (each, an "***Intercompany Interest***") shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Requisite Noteholders, either: |

|  | <ul><li>reinstated; or</li><li>canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.</li></ul>**Voting**.  Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of allowed Intercompany Interests are not entitled to vote to accept or reject the Plan. |
|---|---|
| **Investco Convertible Preferred Interests** | **Treatment**.  On the Effective Date, Investco Convertible Preferred Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and each holder of an allowed Investco Convertible Preferred Interests shall receive its pro rata share of the Preferred Equity Distribution.<br><br><ul><li>"*Investco Convertible Preferred Interests*" means the issued and outstanding Series A Convertible Preferred Stock of LTR Investco, Inc., and any options, warrants, rights and other instruments evidencing such interest (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.</li><li>"*Preferred Equity Distribution*" means the distribution of (i) penny warrants exercisable into New Equity constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the MIP and future equity issuances), (ii) warrants exercisable into New Equity constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the MIP and future equity issuances), at an initial strike price implied by a post-Restructuring equity value of $300 million, and (iii) warrants exercisable into New Equity constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the MIP and future equity issuances), at an initial strike price implied by a post-Restructuring equity value of $457 million (subparts (i) - (iii), collectively, the "*Warrants*").  The strike price on each of the Warrants shall |

<table>
<tr><td></td><td>be increased or decreased to reflect appropriate adjustment on account of any capital contributions made to (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is distributed or deemed to have been distributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date. Each class of the Warrants shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of such Warrants shall be entitled only to participation in the portion of the proceeds in excess of the applicable strike price.<br><br>**Voting**. Holders of Investco Convertible Preferred Interests are impaired under the Plan. Each holder of an Investco Convertible Preferred Interests will be entitled to vote to accept or reject the Plan.</td></tr>
<tr><td>**Investco Preferred Interests**</td><td>**Treatment**. On the Effective Date, Investco Preferred Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and at the option of the Debtors, with the consent of the Requisite Noteholders, there shall be either (i) no distribution to holders of Investco Preferred Interests on account of such Investco Preferred Interests; or (ii) a pro rata distribution to holders of Investco Preferred Interests on account of such Investco Preferred Interests in the form of penny warrants or options exercisable into, or alternatively, restricted units representing, New Equity constituting 1.0% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances).<br><br>    • "***Investco Preferred Interests***" means the issued and outstanding Series A Senior Preferred Stock of LTR Investco, Inc., and any options, warrants, rights and other instruments evidencing such interest (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.<br><br>**Voting**. Holders of Investco Preferred Interests are impaired under the Plan. Each holder of an Investco Preferred Interest will, if there is no distribution to the holders of Investco Preferred Interests, be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and each holder of an Investco Preferred Interest will not be entitled to vote to accept or</td></tr>
</table>

| | |
|---|---|
| | reject the Plan. If there is a distribution to the holders of Investco Preferred Interests, then each holder of an Investco Preferred Interest will be entitled to vote to accept or reject the Plan. |
| **Investco Common Interests** | **Treatment**. On the Effective Date, Investco Common Interests will be canceled, released, and extinguished, and will be of no further force or effect, and holders of Investco Common Interests will not receive any distribution on account of such Investco Common Interests.<br><br>• "***Investco Common Interests***" means the issued and outstanding common stock of LTR Investco, Inc., and any options, warrants, rights and other instruments evidencing such interest (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.<br><br>**Voting**. Holders of Investco Common Interests are impaired under the Plan. Holders of Investco Common Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Investco Common Interests are not entitled to vote to accept or reject the Plan. |
| **Section 510(b) Claims** | **Allowance**. A section 510(b) claim, if any such claim exists, may only become allowed by final order of the Bankruptcy Court. The Debtors are not aware of any valid section 510(b) claim and believe that no such claim exists.<br><br>**Treatment**. On the Effective Date, allowed section 510(b) claims, if any, will be discharged, canceled, released, and extinguished, and will be of no further force or effect, and holders of allowed section 510(b) claims will not receive any distribution on account of such allowed claim.<br><br>**Voting**. Holders of section 510(b) claims are impaired under the Plan. Holders (if any) of allowed section 510(b) claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders (if any) of allowed section 510(b) claims are not entitled to vote to accept or reject the Plan. |
| | **OTHER GENERAL PROVISIONS** |
| **Corporate Governance, Structure** | The documentation evidencing the corporate governance for the Reorganized Debtors and New LTR Holdings, including charters, |

| | |
|---|---|
| | bylaws, limited liability company agreements, operating agreements, shareholder agreements, and/or other organizational documents ("***Organizational Documents***"), in each case shall be acceptable to the Requisite Noteholders.  In addition, the Reorganized Debtors' corporate structure shall be acceptable to the Requisite Noteholders.<br><br>Without limiting the foregoing, the Organizational Documents shall be amended and restated for the Reorganized Debtors in a manner consistent with section 1123(a)(6) of the Bankruptcy Code.  In addition, the Plan shall provide that holders of New Equity (including warrants and options exercisable into New Equity) shall, as a condition to receiving the New Equity, be deemed to be a party to, and bound by (regardless of whether such holder executes a signature page thereto), the limited liability company agreement of New LTR Holdings as well as one or more securityholders' agreements (collectively, the "***Securityholders Agreement***"), in each case in form and substance acceptable to the Consenting Noteholders, setting forth such holders' relative rights and obligations (including as to voting, transferability, and other matters) with respect to the New Equity and equity-linked interests and related governance matters.  The Plan shall provide that any prepetition shareholders' agreement or investor rights agreement, and any related-party management services agreements, including the Clairvest Management Fee Agreement, will be canceled and superseded by the Securityholders Agreement. The Securityholders Agreement shall contain customary shareholder protections with respect to tag-along rights, preemptive rights, drag-along obligations, and protection against self-dealing.   The Securityholders Agreement shall also contain customary structural anti-dilution protections for stock splits or other subdivisions, stock dividends, and stock combinations.<br><br>Any claims arising from the cancellation or rejection of any prepetition organizational documents, shareholders' agreement or investor rights agreement, and any related-party management services agreements, including the Clairvest Management Fee Agreement, will be waived and will not be pursued. |
| **Management Incentive Plan** | After the Effective Date, the Reorganized Debtors, including New LTR Holdings, shall implement a management incentive plan on terms approved by the initial board of directors of New LTR Holdings (the "***MIP***").<br><br>The MIP shall include, in the aggregate, the following consideration: (i) subject to reduction by the distribution to the Investco Preferred |

| | |
|---|---|
| | Interests, if any, penny warrants or options exercisable into, or alternatively, restricted units representing, New Equity constituting 2.5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances) (the "***Management Warrants***"); (ii) options (the "***Management Options***") (A) to purchase New Equity constituting 2.5% of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), at an initial strike price implied by a post-Restructuring equity value of $157 million; and (B) to purchase New Equity constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), (xx) one third (1/3) of which are exercisable at an initial strike price implied by a post-Restructuring equity value of $232 million, (yy) one third (1/3) of which are exercisable at an initial strike price implied by a post-Restructuring equity value of $300 million, and (zz) one third (1/3) of which are exercisable at an initial strike price implied by a post-Restructuring equity value of $457 million.  The Management Warrants shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of Management Warrants and Management Options shall be entitled only to participation in the portion of the proceeds in excess of the applicable strike price.  The strike price on each of the Management Warrants and Management Options shall be increased or decreased to reflect appropriate adjustment on account of any capital contributions made to (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is distributed or deemed to have been distributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date.  The Management Options shall vest over a five (5) year period from grant with 20% of such Management Options vesting each year, subject in each case to continued employment with the Reorganized Debtors through each such vesting date, and subject to customary repurchase and forfeiture provisions.  For the avoidance of doubt, allocation of the Management Warrants and Management Options shall be made at the discretion of the board of directors of New LTR Holdings. |
| **Employment Agreements, Other Compensation, and** | The Definitive Documents shall include, no later than the filing of a customary plan supplement, details regarding key executive employment agreements and system-wide benefits plans to the extent different from existing compensation and benefit plans.  The terms of |

| | |
|---|---|
| **Benefit Plans** | such agreements and plans shall be acceptable to the Requisite Noteholders. |
| **Reorganized Debtors' Initial Board of Directors** | The Plan shall designate the chief officers and the number of members of the initial board of directors of the Reorganized Debtors and New LTR Holdings, as determined by the Requisite Noteholders.<br><br>The initial board of directors of New LTR Holdings shall consist of five (5) members, designated as follows:  (a) Clearlake Capital Group, L.P. or its affiliates ("***Clearlake***") is entitled to designate two (2) directors, (b) the Consenting Noteholders other than Clearlake are entitled to designate one (1) director, (c) the Chief Executive Officer of the Reorganized Company shall be a director, and (d) the holders of a majority of New Equity shall be entitled to appoint one (1) director.  One (1) board observer shall be elected by the existing holders of Investco Convertible Preferred Interests that hold a majority of the warrants (and shares issuable upon exercise thereof) issued in connection with the Restructuring, for so long as such holders continue to hold at least 50% of each series of such warrants (and shares issuable upon exercise thereof).<br><br>The Company's senior officers as of the Petition Date shall continue to occupy such roles until and upon the Effective Date. |
| **Cancellation of Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided herein, all instruments, certificates, plans (including the 2012 Stock Option Plan of Debtor LTR Investco, Inc.), agreements and other documents evidencing debt of the Debtors or equity interests in Debtor LTR Investco, Inc. shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| **Issuance of New Equity** | The issuance of the New Equity under the Plan will be exempt from SEC registration under section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act of 1933, as applicable. |
| **Executory Contracts and Unexpired Leases** | The treatment (e.g., assumption, assumption and assignment, and/or rejection) of all executory contracts and unexpired leases to which the Debtors are party shall be acceptable to the Requisite Noteholders.<br><br>The Plan shall provide for a "deemed assume" structure in respect of the Debtors' executory contracts and unexpired leases. |

11

| | |
|---|---|
| **Avoidance Actions, Commercial Tort Claims** | To the extent not subject to the releases or exculpation under the Plan, avoidance actions arising under Chapter 5 of the Bankruptcy Code and commercial tort claims against any and all vendors with which the Debtors will have an ongoing relationship following the Effective Date shall vest in the applicable Reorganized Debtor. |
| **Releases, Exculpations, and Injunctions** | The Plan shall provide for customary release, exculpation, and injunction provisions, which shall be acceptable to the Requisite Noteholders and shall include, among others, the Reorganized Debtors, the Noteholders, the holders of Investco Convertible Preferred Interests, Investco Preferred Interests and the holders of Investco Common Interests. |
| **Fees and Expenses** | The Company shall be responsible, and the Plan shall provide, for the payment in cash on the Effective Date, of all documented fees and expenses incurred by the Consenting Noteholders in connection with the evaluation, negotiation and implementation of the Restructuring, including legal counsel, financial advisors and other expenses, as set forth in that certain letter agreement, dated July 22, 2016, between the Company and the Consenting Noteholders. |
| **Tax Matters** | The Restructuring and the Plan shall be structured to achieve favorable tax attributes and treatment to the extent practicable, which structure shall be acceptable to the Requisite Noteholders. |
| **Other Plan Terms** | The Plan shall contain all other customary terms otherwise reasonably acceptable to the Requisite Noteholders. |

<u>**EXHIBIT B**</u>

**FORM OF JOINDER AGREEMENT FOR CONSENTING NOTEHOLDERS**

This Joinder Agreement to the Restructuring Support Agreement, dated as of August [●], 2016 (as amended, supplemented or otherwise modified from time to time, the "<u>Agreement</u>"), by and among (i) LTR Holdco, Inc. ("***Parent***"), (ii) Light Tower Rentals, Inc. (the "***Issuer***"), (iii) LTR Investco, Inc. ("***Holdings***"), (iv) the subsidiary guarantors signatory thereto (the "***Subsidiary Guarantors***" and together with Parent, Holdings, the Issuer and their direct and indirect subsidiaries, the "***Company***"), is executed and delivered by [_____] (the "<u>Joining Party</u>") as of [_____], 2016.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.      <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Noteholder" and a "Party" for all purposes under the Agreement.

2.      <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Senior Notes set forth below its name on the signature page hereof, the Joining Party hereby makes the representations and warranties of the Consenting Noteholders set forth in <u>Section 8</u> of the Agreement to each other Party to the Agreement.

3.  <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

**[The Remainder Of This Page Is Intentionally Left Blank]**

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING NOTEHOLDER]**

By: _____
Name:
Title:

Principal Amount of Senior Notes: $_____

<u>Notice Address</u>:

_____
_____
_____
Fax:
Attention:
Email:

                                        Acknowledged:

                                        **LIGHT TOWER RENTALS, INC.**

                                        By: _____
                                        Name:
                                        Title:

                                        **LTR HOLDCO, INC.**

                                        By: _____
                                        Name:
                                        Title:

                                        **LTR INVESTCO, INC.**

                                        By: _____
                                        Name:
                                        Title:

## **EXHIBIT C**

## EQUITY CAPITALIZATION

| Name | Class | Number of Shares |
|------|-------|------------------|
| Clairvest Equity Partners III Limited Partnership | Common | ■■■■■ |
| CEP III Co-Investment Limited Partnership | Common | ■■■■ |
| Mojopa, Ltd. | Common | ■■■■ |
| Avary Family Limited Partnership | Common | ■■■■ |
| Pat Bond[1] | Series A Senior Preferred | ■■■ |
| Keith Muncy[2] | Series A Senior Preferred | ■■■ |
| Nina Valles | Series A Senior Preferred | ■■■ |
| Mark Beckstrom | Series A Senior Preferred | ■■■ |
| StepStone Capital Partners III, L.P. | Series A Preferred | ■■■■ |
| StepStone Capital Partners III Offshore Holdings, L.P. | Series A Preferred | ■■■ |
| SCP III Holdings SCS | Series A Preferred | ■■■ |
| StepStone Atlantic Fund, L.P. | Series A Preferred | ■■■■ |
| StepStone K Strategic Opportunities Fund, L.P. | Series A Preferred | ■■■■ |
| StepStone Ferro Opportunities Fund, L.P. | Series A Preferred | ■■■ |
| Allstate Insurance Company | Series A Preferred | ■■■■ |
| Allstate Life Insurance Company | Series A Preferred | ■■■■ |
| Allstate Life Insurance Company of New York | Series A Preferred | ■■■ |
| Allstate Retirement Plan Trust | Series A Preferred | ■■■ |
| USS-Constitution Co-Investment Fund II, LP | Series A Preferred | ■■■■ |
| Ironsides Co-Investment Fund III, LP | Series A Preferred | ■■■■ |
| Ironsides Co-Investment Fund III-QC, LP | Series A Preferred | ■■ |

---

[1] Pat Bond owns ■■■■ shares of common stock.

[2] Keith Muncy owns ■■■■ shares of common stock.

## <u>ANNEX A</u>

## EXCLUDED LEASES

1.  Potential Lease Agreement between Light Tower Rentals, Inc., as tenant, and Imperial Industrial Park LLC (which, for the avoidance of doubt, is not an affiliate of the Company), as landlord, for lease of 100 Imperial Industrial Park, Oakdale, PA 15071, commencing on September 1, 2016.

## ANNEX B

## EXCLUDED SALES OF ASSETS

1. Approximately 20 miles of 10 inch lay-flat hose and associated reels. (Approximate value: $600,000 - $700,000)