**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHT TOWER RENTALS, INC, *et al.*,[1] | ) | Case No. 16-34284 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF KEITH MUNCY IN SUPPORT OF
THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Keith Muncy, hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer of each of the above-captioned debtors and debtors in possession (together, the "Debtors").  I have served as Chief Financial Officer since January 2008.  Prior to working at Light Tower Rentals, Inc., I served as Chief Financial Officer of VOXCOM Security Systems, a Toronto Stock Exchange-listed company, for over seven years.  I also worked as a Senior Manager at PricewaterhouseCoopers, where I oversaw issues relating to financial reporting, taxation, and corporate structuring.  I am a Chartered Accountant and a CPA.

2.     As the Debtors' CFO, my duties include, among other things: (i) participating in key decisions as a member of the executive management team; (ii) managing the accounting, tax, and treasury departments; (iii) developing financial and tax strategies; (iv) monitoring and directing the implementation of strategic business plans; (v) monitoring cash balances and forecasts; and (vi) overseeing the production and issuance of financial information.  Accordingly,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Light Tower Rentals, Inc. (4893); LTR Holdco, Inc. (8813); LTR Shelters, Inc. (5396); and LTR Investco, Inc. (3819). The location of the Debtors' service address is: 2330 E. Interstate 20 S. Service Road, Odessa, Texas 79766.

I am intimately familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including the Debtors' employees working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

I.      **Introduction**[2]

    A.      **Brief Background**

4.      The Debtors and their non-Debtor affiliates (collectively, "LTR") are a diversified specialty equipment rental and services company focused on the oil and gas sector.  LTR offers a diverse portfolio of surface rental equipment that can provide customers with a specific product, or when combined with other products, a comprehensive wellsite rental solution.  LTR's equipment rental fleet includes power generation units, fluid handling equipment, light towers,

---

[2] Capitalized terms not otherwise defined herein shall have the same meaning given to them in the *Debtors' Joint Prepackaged Chapter 11 Plan* (the "Plan").

heaters, trailers and other equipment. LTR's current service operations include equipment delivery and set-up, fuel and trucking.

**B.    A Comprehensive, Consensual Restructuring**

5.     In the fall of 2014, oil prices plummeted due principally to global oversupply and have yet to recover—falling from over $100 Bbl[3] to below $27 per Bbl in February 2016 and currently trading at approximately $47 per Bbl. This came on the heels of a decline in natural gas prices, which, in response to continued growth in domestic production and unseasonably mild weather, fell below $1.70 per MMBtu[4] in December 2015 and are currently trading at approximately $2.86 per MMBtu.

6.     This unanticipated and prolonged decline in oil and natural gas commodity prices triggered a deep transformation in the oil and gas industry, and led to reduced drilling and completion activity. The recent wave of large E&P company chapter 11 filings, many of which have devolved into protracted and heavily litigated proceedings, has only compounded the distress in the industry. And while it took some time for this economic turmoil to reach the Debtors (as service providers to the producers), the impact has been swift and dramatic.

7.     Against this backdrop, the Debtors and their advisors have been working diligently with primary stakeholders to achieve a consensual balance-sheet restructuring that right-sizes their capital structure, provides unsecured creditors and other classes with full recoveries, preserves jobs, and facilitates a prompt emergence from chapter 11. Upon emergence, the Reorganized Debtors will be well-positioned to capitalize on their attractive asset base, key relationships, and strong national presence.

---

[3] "Bbl," or "barrel," is a unit of volume for crude oil and petroleum products. One bbl equals approximately 42 U.S. gallons.

[4] "MMBtu" is a unit of measurement meaning one million British thermal units.

8.      The terms of this comprehensive restructuring are embodied in a restructuring support agreement, dated as of August 8, 2016 (the "Restructuring Support Agreement" or "RSA"), a copy of which is attached as **Exhibit B**.  The Debtors entered into the Restructuring Support Agreement with[5] (i) holders of more than 80% of the aggregate outstanding principal amount of the $330 million 8.125% senior secured notes issued by Light Tower Rentals, Inc. (comprising the "Noteholder Claims" under the Plan) (ii) all of the holders of issued and outstanding Investco preferred stock (defined as "Investco Preferred Interests" under the Plan), (iii) all of the holders of convertible Investco preferred stock (defined as "Investco Convertible Preferred Interests" under the Plan), and (iv) approximately 90.1% of the holders of the issued and outstanding Investco common stock (defined as "Investco Common Interests" under the Plan) (collectively, the "Restructuring Support Parties").  Setting aside classes of claims that are set to be paid in full under the Plan, nearly the Debtors' entire capital structure was involved in the negotiations of, and eventually signed, the RSA.

9.      To implement the terms of the RSA, the Debtors commenced solicitation of a prepackaged chapter 11 plan (the "Plan") on August 22, 2016.  The voting deadline on the Plan is currently set for September 20, 2016.  The parties entitled to vote in such solicitation are the holders of the Noteholder Claims, the holders of the Investco Preferred Interests, and the holders of the Investco Convertible Preferred Interests.

10.      The Plan contemplates a swift restructuring by which the Debtors will eliminate substantially all of their funded debt by exchanging the approximately $345.8 million in Noteholder Claims for 100% of the reorganized common equity (subject to dilution by warrants provided to the holders of the Investco Preferred Interests and the Investco Convertible Preferred

---

[5] The Debtors' capital structure is described in more detail below in Section I.D.

Interests, and the management incentive plan) and $30 million in new notes.  The key elements

and benefits of the Plan include, without limitation, the following:

- Each holder of an allowed Noteholder Claim shall receive (i) its pro rata share of 100% of the Reorganized Debtors' equity (subject to dilution by the management incentive plan and certain equity warrants) and (ii) its pro rata share of new senior secured notes issued by the Reorganized Debtors in the aggregate principal amount of $30 million and bearing an annual interest rate of 10% per annum, payable in kind or in cash (as more fully described in Article III.B of the Plan);

- Holders of allowed General Unsecured Claims, including trade vendors, suppliers, and customers, will not be affected by the filing of the Chapter 11 cases and, subject to Court approval, are anticipated to be paid in full in the ordinary course of business during the pendency of the Chapter 11 cases or reinstated and left unimpaired under the Plan according to their terms;

- All allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims will be paid in full in cash or otherwise satisfied in accordance with the Bankruptcy Code;

- Existing Investco Convertible Preferred Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each holder of Investco Convertible Preferred Interests shall receive its pro rata share of certain equity warrants (as more fully described in Article IV.C of the Plan);

- Existing Investco Preferred Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each holder of Investco Preferred Interests shall receive its pro rata share of management warrants, issued on the same terms (including vesting) as the management incentive plan, representing New LTR Holdings Interests constituting 1.0% of the total equity of New LTR Holdings (as more fully described in Article IV.D of the Plan);

- Existing Investco Common Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Investco Common Interests will not receive any distribution on account of such interests;

- The Debtors plan to assume all unexpired executory contracts and leases, with the possible exception of certain leases that may be rejected; and

- Prompt emergence from chapter 11.

11.     As part of the compromises that resulted from these hard-fought negotiations, the

Plan provides for a "Debtor Release" and a "Non-Debtor Release," as well as certain

exculpation, discharge, and injunction provisions that the Debtors believe are appropriate under

the circumstances.[6]  These release and exculpation provisions were an integral component of the nearly-universal consensus and compromise achieved by the RSA and embodied in the Plan. Litigation with any of the Released Parties (as defined under the Plan) could greatly increase the time and expense associated with the chapter 11 cases—and the efforts of the Released Parties are essential to the Debtors' ability to efficiently proceed to confirmation of the Plan on what is expected to be a largely uncontested basis.

12.     Consummation of this restructuring will preserve the Debtors' value as a going concern, deleverage the Debtors' balance sheet by approximately 90 percent, leave general unsecured creditors unimpaired, and otherwise has support from nearly all of the Debtors' stakeholders.  This result represents a significant achievement against a challenging market backdrop and will, if all goes as planned, facilitate the Debtors emergence from chapter 11 in less than two months.

13.     The Debtors believe that the restructuring embodied in the RSA and Plan gives them the best opportunity to withstand current adverse market conditions, maintain adequate liquidity for their operations going forward, avoid an enterprise-wide, piecemeal liquidation, and maximize value for the benefit of their stakeholders.  As described below, given the Debtors' core strengths, including the experience of their team, the strategic location of their assets, and their ability to pursue growth opportunities, the Debtors are confident that they can implement the terms of their proposed restructuring and ensure their long-term viability.

### C.     The Debtors' Operational and Corporate History

14.     Since its formation in 1994, LTR has expanded its product and service offerings and positioned itself as a nationally recognized brand operating a well-maintained fleet of rental

---

[6] *See generally* Plan Art. VIII.

equipment in key U.S. oil and gas producing regions.  LTR has a national network of facilities with a highly trained support staff.  Each major branch location is staffed with mechanics, technicians, service staff, and field-level salespeople equipped to respond to customer requests in a timely manner.  In total, LTR currently has 258 employees.

15.     LTR's major operating areas (basins) include the Permian, Eagle Ford, Bakken, Marcellus, Eaglebine / Eagle Ford East, Barnett, Fayetteville, Haynesville, Granite Wash and Woodford basins.  The Permian basin, one of the highest-producing oil and gas regions in the United States, is LTR's largest revenue generating operating area with a favorable mix of equipment rental and service revenue from well drilling, completion, and production.

16.     Coinciding with the energy market recovery following the overall industry downturn in 2009, the Company embarked on an aggressive growth program (including both organic growth and acquisitions).  Organic growth included geographic expansion into new basins, the addition of new locations in the basins which the Company already had a presence and the growth of existing locations in which the company was already operating.  In addition to the demand for new rental equipment for those expansion locations, the Company was also experiencing increased demand for its equipment in those basins that it already had an established presence.  To meet that demand, the Company recommenced the reinvestment of all its free cash flow into rental equipment and supporting operations.  Combined spending on property, plant and equipment in the fiscal years of 2012 to 2015 inclusive amounted to $282 million.  During that time, the Company also increased its borrowings to provide additional cash resources to fund additional property plant and equipment purchases that were unable to be funded by the Company's own free cash flows.

17.     On December 27, 2012, LTR purchased 100% of the outstanding stock of Wellsite Leasing, Inc., ("Wellsite") an oilfield equipment rental company, and 100% of the outstanding membership interests of On Site Water, LLC, ("On Site") an oilfield water transfer company.  Both companies were headquartered in Dickinson, North Dakota and had additional locations in Watford City, North Dakota, Stanley, North Dakota and Minot, North Dakota. These acquisitions were made for the purpose of increasing LTR's rental base in the North Dakota area with an expanded rental fleet, additional customer relationships and experienced regional management.   As a result, their assets and operations were rolled into LTR's existing North Dakota branch operations.  The Debtors recently dissolved the legal entities of Wellsite and On Site as those legal entities have been dormant since the acquisition.

18.     On January 10, 2014, LTR signed a purchase agreement to acquire certain assets of Riverside Rentals, LLP ("River Rentals"), a rental equipment company in the oil and gas industry, with operations in Williston, Northern Dakota for $3.6 million.  This acquisition was made to broaden LTR's presence in the North Dakota and the Montana area with additional customer relationships and a new satellite branch location in Williston, North Dakota.  Those acquired assets were incorporated into LTR's existing fleet and the Williston, North Dakota operations was added as a satellite branch to LTR's existing North Dakota branch operations.

19.     On September 25, 2015, LTR entered into a short-term loan receivable with Total Operations and Production Services of Midland, LLC. ("TOPS Midland") in which TOPS Midland borrowed $4,400,000 from LTR with interest accruing at 6% per year on the balance outstanding and payable upon maturity.  The loan is collateralized by TOPS Midland's assets and matures the earlier of (i) thirty days after written demand for payment is given by LTR to

TOPS Midland and (ii) December 31, 2016.  As of June 30, 2016, the loan principal and interest owed to LTR was approximately $4.56 million.

D.  **The Debtors' Corporate and Capital Structure**

20.  The chart below depicts a condensed summary of the Debtors' rather straightforward organizational structure:



21.  There are four Debtor entities: (i) LTR Investco, Inc. ("Investco"); (ii) LTR Holdco, Inc. ("Holdco"); (iii) Light Tower Rentals, Inc. ("Light Tower Rentals"); and (iv) LTR Shelters, Inc. ("Shelters").  Investco is the top-level holding company, and it directly owns 100% of Holdco.  Holdco directly owns 100% of Light Tower Rentals, and Light Tower Rentals directly owns 100% of Shelters.

22.  The Debtors' only current operating company is Light Tower Rentals.  Shelters was active until late 2014, but has not had any operations since then.  Light Tower Rentals is also the primary obligor of the $330 million in aggregate principal amount of the 8.125% senior secured notes (the "Old Notes"), which constitutes all of the Debtors' outstanding funded debt

obligations.  Holdco and Shelters (but not Investco) are guarantors of Light Tower Rentals'
obligations under the 8.125% senior secured notes.

23.     The Debtors also have two non-Debtor affiliates, LTR Holdco 2, Inc. and
Compressco, Inc., which are shell corporations without any assets or liabilities and are not
depicted in the chart above.  These corporations were formed in anticipation of certain operations
and/or potential acquisitions, but they were ultimately never utilized and their stock was never
issued and are in the process of being dissolved under state law.  Further, the Debtors recently
dissolved Wellsite and On Site, so these entities are also not depicted in the chart above.

24.     As with the corporate structure, LTR's capital structure is relatively simple: (i) a
now-terminated revolving credit facility that was completely undrawn; (ii) $330 million of senior
secured notes; (iii) two issuances of preferred stock; and (iv) common equity.

        a.      **The ABL Facility**

25.     On July 21, 2014, LTR entered into an ABL Facility for borrowings up to the
lesser of (a) $30 million and (b) a borrowing base of 85% of eligible receivables of LTR less
reserves.  The ABL Facility also provided for an uncommitted incremental facility of up to $12
million.  The ABL Facility was secured by a first lien charge over specific existing and future
assets of LTR, consisting namely of accounts receivables and deposit and collection accounts;
and a second lien charge over all other existing and future property assets of LTR.  Interest rates
on any amounts drawn under the ABL Facility equaled either (a) prime rate plus an applicable
margin of 0.75% to 1.25% or (b) the Eurodollar rate for the selected interest period plus an
applicable margin of 1.75% to 2.25%.  LTR also paid a commitment fee equal to 0.375% to
0.50% per annum on the unused portion of the ABL Facility.  The Debtors terminated the ABL
Facility on August 26, 2016, just prior to the Petition Date.

b.      **The Old Notes**

26.      The remaining funded debt is $330 million of 8.125% senior secured notes due 2019 (as used herein, the "Old Notes") under that certain Indenture (the "Old Notes Indenture"), dated July 21, 2014, by and among Light Tower Rentals, Inc., as issuer, LTR Holdco, Inc. and LTR Shelters, Inc. as guarantors party thereto (the "Old Notes Guarantors"), and The Bank of New York Mellon Trust Company, N.A. as trustee and collateral agent.  The Old Notes bear an annual coupon of 8.125%, which is payable on February 1 and August 1 of each year.  The Old Notes mature on August 1, 2019 with all principal paid at maturity.

27.      The proceeds of the Old Notes were used to (i) fund a distribution to LTR's equity holders, (ii) to permanently repay the approximately $107 million in borrowings under an existing credit facility, (iii) to pay related transaction fees and expenses, and (iv) for general corporate purposes.  At the time the Old Notes were issued, oil prices were expected to remain strong and, as a result, were expected to lead to continued North American shale development. Further, shale opportunities had driven the return of majors, including Exxon Mobil, Shell, BP, Chevron, and Conoco, back to the U.S. onshore market, contributing to robust capital spending in the E&P sphere.

28.      LTR had an interest payment of approximately $13.4 million due under the Old Notes Indenture on August 1, 2016, which it did not pay.  The Old Notes Indenture provides a 30-day grace period for LTR to make this interest payment.  That grace period expires on August 31, 2016.

c.      **Preferred and Common Stock**

29.      In addition to its funded debt, LTR Investco, Inc. has two types of preferred stock issued and outstanding, including (a) 24,175,941 shares of Series A Convertible Preferred Stock

(the "Investco Preferred Convertible Interests" under the Plan) and (b) 300,000 shares of Series A Senior Preferred Stock (the "Investco Preferred Interests" under the Plan). The authorized capital of LTR Investco, Inc. also consists of 150 million shares of common stock, of which 31,251,958 shares of common stock are issued and outstanding (the "Investco Common Interests" under the Plan).  Information regarding the preferred and common stock voting rights, dividends, liquidation rights, and conversion rights can be seen in the table below.

| | Voting Rights | Dividends | Liquidation Rights | Conversion Rights |
|---|---|---|---|---|
| **Common Stock** | One vote for each share. | May be declared and paid from funds available and when determined by the Investco Board of Directors. | Holders will be entitled to receive all assets available for distribution to its shareholders, subject to outstanding Investco Preferred Stock. | N/A |
| **Series A Senior Preferred** | None. | Equal to the product of (x) five percent (5.00%) multiplied by (y) a fraction, the numerator of which is the total number of shares of Senior A Preferred Stock shares outstanding and the denominator of which is the total authorized number of shares of Series A Preferred Stock, multiplied by (z) the aggregate of all dividends to be paid on the Common Stock and all series of Preferred Stock entitled to dividends as and when declared by the Board of Directors. | Holders will be entitled to be paid out of all assets available for distribution prior to any payment to holders of Series A Convertible Preferred Stock and Common Stock in an amount equal to the product of (x) five percent (5.00%) multiplied by (y) a fraction, the numerator of which is the total number of shares of Senior A Preferred Stock shares outstanding and the denominator of which is the total authorized number of shares of Series A Preferred Stock, multiplied by (z) all assets of the Corporation available for distribution plus any declared but unpaid dividends on shares of Series A Senior Preferred Stock. | N/A |
| **Series A Convertible Preferred** | Votes equal to the number of whole shares of Common Stock into which the shares of Series A Convertible Preferred Stock could be converted. | Holders of Series A Preferred Stock are entitled to receive dividends equal to those paid on the Common Stock. | Following payment to the Series A Senior Preferred holders, holders shall be entitled to an amount equal to the greater of (i) $4.036 per share (minus Indemnification Claims) plus declared but unpaid dividends and (ii) such amount per share as would have been payable had all the shares been converted into Common Stock. | Each share of Series A Preferred Stock shall be convertible into one share of Common Stock. |

                d.      **Debtors' Liquidity Position**

30.     The Debtors' cash on hand as of the Petition Date is $19.2 million. The Debtors have requested authority to use cash collateral subject to certain specified conditions. If such relief is granted, the Debtors believe that the cash available to them during the reorganization will provide sufficient liquidity to support their business operations during the restructuring process. The primary uses of cash have been to finance the operating business, service indebtedness, and fund capital expenditures. During these cases, cash will only be needed to finance operations and restructuring costs. The primary operating cash requirements are personnel costs, facility costs, insurance, equipment repairs, re-rentals, and taxes.

## II.    The Circumstances Leading to these Chapter 11 Cases

### A.    Market Decline

31.     As noted above, the Debtors' businesses have been under significant pressure from macroeconomic forces beyond their control. Rig counts, a common indicator of new upstream drilling activity, are down nearly 60% over the past year. As demonstrated in the chart below,[7] the price of crude oil per barrel has declined from $105.54 in June 2014 to $40.19 as of August 2016. Oil sank to a low of $28.50 in January 2016, the lowest recorded price in almost 15 years.

---

[7] The chart represents the historical monthly West Texas Intermediate (WTI or NYMEX) crude oil price per barrel. Prices are adjusted for inflation.



32.     As a result of this decline in commodity prices, production became uneconomical and numerous upstream producers suspended drilling activities entirely.  Indeed, several E&P companies have been forced to file for chapter 11 protection since the downturn in commodities prices.  A growing number of other similarly situated companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.

33.     As a wellsite service solution and rental equipment provider to E&P companies, LTR's fate is intertwined with the fate of the E&P companies it services as well as the oil and gas industry as a whole.  Utilization rates, which measure the number of days that the rental equipment is on rent (the numerator) divided by the number of days that the rental equipment is available for rent (the denominator) during any period, have sharply declined since the beginning of 2016.  For example, diesel generators—one of the most popular products in LTR's fleet—saw

utilization rates decline from 56.4% in the twelve month period ending December 31, 2014 to 32.8% in the twelve month period ending December 31, 2015 to 19.9% in the twelve-month period ending June 30, 2016.  The average day rate that LTR was able to charge for diesel generator rentals slipped from $152 to $131.  Parallel trends can be seen across LTR's other rental product categories in the chart below.

| PRODUCT CATEGORY[5] | FLEET SIZE (UNITS) | | | | FOR THE TWELVE MONTHS ENDED | | | | | |
| | AVERAGE OF THE PERIOD[1] | | AS OF[2] | | AVERAGE UTILIZATION | | AVERAGE DAY RATE[3] | | REVENUE[4] | |
| | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 | DEC. 31, 2015 | JUN. 30, 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Diesel Generators.................. | 1,799 | 1,773 | 1,722 | 1,735 | 32.8% | 19.9% | $ 152 | $ 131 | $ 32.9 | $ 16.9 |
| Natural Gas Generators........ | 644 | 717 | 722 | 735 | 49.7% | 41.9% | 388 | 308 | 45.3 | 33.8 |
| Light Towers........................ | 1,416 | 1,387 | 1,403 | 1,323 | 31.6% | 19.9% | 54 | 44 | 8.9 | 4.4 |
| Tanks ................................... | 2,705 | 2,711 | 2,711 | 2,707 | 44.5% | 29.6% | 44 | 35 | 19.2 | 10.3 |
| Heaters ................................ | 381 | 381 | 382 | 378 | 26.0% | 19.0% | 191 | 106 | 6.9 | 31.2 |
| Other Rental Equipment & Service Revenue ................. | | | | | | | | | 57.8 | 31.2 |
| **Total Revenue ....................** | | | | | | | | | **$170.9** | **$99.4** |
| Gross Profit ......................... | | | | | | | | | 103.9 | 57.8 |
| Gross Margin ....................... | | | | | | | | | 60.8% | 58.1% |
| Adjusted SG&A [6]............... | | | | | | | | | 40.1 | 31.1 |
| **Adjusted EBITDA .............** | | | | | | | | | **$ 63.8** | **$26.7** |
| Adjusted EBITDA Margin... | | | | | | | | | 37.3% | 26.9% |

[1] Average fleet size for the twelve months ended for each period shown

[2] Fleet size as at date shown

[3] Average day rate is influenced by product mix changes (for example, size and quantity of generators) within each category

[4] Revenue by product category for the twelve months ended for each period shown ($ in millions)

[5] Consists of various product sizes of generators, light towers and/or various equipment subcategories
[6] Adjusted SG&A includes SG&A costs and other adjustments in the net income to Adjusted EBITDA reconciliation as detailed in the Disclosure Statement

34.     As a result of the ongoing reductions in both equipment utilization rates and average daily rental rates, the Debtors' total revenue decreased $29.0 million, or 67.3%, to $14.1 million for the three months ended June 30, 2016, as compared to the corresponding quarter in 2015.  The equipment rental division accounted for $11.0 million, or 78.0%, of revenue for the three months ended June 30, 2016, as compared to $31.4 million, or 72.9%, of revenue for the

corresponding quarter in 2015. The service division accounted for $3.1 million, or 22.0%, of revenue for the three months ended June 30, 2016, as compared to $11.7 million, or 27.1% of revenue for the corresponding quarter in 2015.

| | JUN 30 2016 | MAR 31 2016 | DEC 31 2015 | SEPT 30 2015 | JUN 30 2015 | MAR 31 2015 | DEC 31 2014 | SEP 30 2014 |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Equipment Rental Revenue | $11.0 | $17.2 | $22.0 | $25.4 | $31.4 | $46.2 | $56.7 | $46.5 |
| Service Revenue | $3.1 | $5.1 | $6.8 | $8.7 | $11.7 | $18.7 | $22.6 | $24.0 |
| Total Revenue | $14.1 | $22.3 | $28.8 | $34.1 | $43.1 | $64.9 | $79.3 | $70.5 |



### B.  Proactive Approach to Addressing Liquidity Constraints

35.  In response to deteriorating market conditions, the Debtors commenced various cost-saving initiatives and other strategic restructuring efforts in 2015 and year-to-date 2016. The Debtors have reduced employee headcount by approximately 360 employees (58%) from year-end 2014 levels. In addition to employee headcount reductions, the Debtors instituted a number of cost-saving and restructuring measures, including:

- reducing wages company-wide by 10%;

- suspending payments under incentive programs;

- reducing entitlements under its 401(k) program;

- increasing employee contribution rates for medical benefit program;

- eliminating a number of mid-level management positions in both branch offices and headquarters;

- closing unprofitable branches;

- consolidating satellite locations into regional branches;

- discontinuing its unprofitable water transfer business;

- renegotiating certain supplier arrangements to reduce operating costs;

- consolidating supplier purchases for better pricing; and

- suspending interest payments with respect to the Old Notes beginning August 1, 2016.

36.     Recognizing that a near-term solution to their liquidity constraints may not be achievable without a more comprehensive restructuring of their liabilities, the Debtors sought external strategic advice and assistance.  In the months leading up to the filing of the Plan, LTR engaged Credit Suisse as investment banker, and Proskauer Rose LLP, its long-time transactional counsel, to analyse its financial condition and assist LTR in pursuing restructuring options to address its liquidity challenges.  In May 2016, Credit Suisse presented a number of restructuring alternatives to LTR's board, which included (i) a comprehensive recapitalization, (ii) a new money plan, which would include a partial equitization, an exchange of Old Notes for new notes and a new equity contribution from the existing stockholders, and (iii) an out-of-court exchange offer that would replace the Old Notes with new PIK notes.  The paths presented to LTR were all highly dependent on the willingness of the holders of the Old Notes to engage in discussions on the potential transactions.

37.     Ultimately, such holders were willing to engage in those discussions, and the Debtors and the Restructuring Support Parties began a series of good-faith, arms-length

negotiations over the terms of a restructuring that could be accomplished by an out-of-court exchange offer (or combined with a possible pre-pack (otherwise known as a stapled pre-pack)). Unfortunately, time interceded, and the length of these negotiations meant that the exchange offer could not be fully solicited and closed before the expiration of the grace period on the pending interest payment on the Old Notes.  At this point, in late-July 2016, LTR pivoted to pursue only a prepackaged chapter 11 plan of reorganization largely incorporating the same terms as the exchange offer.

38.     The rationale behind both the exchange offer and the proposed prepackaged chapter 11 plan is to complete a financial restructuring that minimizes disruption to LTR's operations.   In crafting the Plan, the Debtors and the Restructuring Support Parties made a deliberate effort to ensure that trade creditors, employees, and other key constituencies would not be impacted and LTR would continue to do business in the ordinary course.  The First Day Motions will prevent the Debtors from having to change their accounting procedures and cease payments to creditors in the ordinary course.  The First Day Motions are therefore consistent with the underlying rationale of the Plan and are crucial to ensuring that there will not be any unnecessary disruption in the Debtors' operations.

### C.     The Restructuring Support Agreement

39.     On August 8, 2016, the Debtors entered into the Restructuring Support Agreement with (i) certain beneficial holders, or investment advisors or managers for the account of beneficial holders, of more than 80% of the amount of the Old Notes, (ii) Clairvest Equity Partners III Limited Partnership, CEP III Co-investment Limited Partnership, Mojopa, Ltd. and Avary Family Limited Partnership, as holders of approximately 90.1% of the Investco Common Interests, (iii) Keith Muncy, Pat Bond, Mark Beckstrom and Nina Valles, as holders of 100% of

the Investco Preferred Interests, and (iv) Stepstone Capital Partners III, L.P. and its affiliated entities listed on the signature pages thereto, Allstate Insurance Company and its affiliated entities listed on the signature pages thereto, and USS-Constitution Co-Investment Fund II, LP and its affiliated entities listed on the signature pages thereto, as holders of 100% of the Investco Convertible Preferred Interests.

40.     Under the terms of the RSA, the holders of the Old Notes have agreed, among others things, (a) to support and take all reasonable actions necessary to consummate the restructuring and the Plan in a timely manner, (b) to timely vote all of its claims to accept the Plan, and (c) to support and take all reasonable actions necessary to facilitate the solicitation of votes on the Plan, approval of this Disclosure Statement, and confirmation and consummation of the Plan.  The Restructuring Support Agreement may be terminated, among other reasons, based upon the failure to satisfy certain requirements and milestones generally related to progress (or lack thereof) toward confirmation and consummation of the Plan.

### D.     Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

41.     The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A prolonged period of operating under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity, including, among other things:

- Senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations;

- It may become more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses;

- It may become more likely that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships; and

- The Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

42.     Significantly, as noted above, the Debtors have not sought new postpetition financing based on their assessment that the $19.2 million cash on hand is sufficient to provide for their liquidity needs under a streamlined chapter 11 prepackaged proceeding.  If the Debtors are forced to seek DIP financing, and the Debtors are unable to obtain final approval of such financing on favorable terms or at all, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.  Therefore, a prolonged stay in chapter 11 would be harmful to the Debtors' reorganization and operational prospects.

**III.     Relief Sought in the Debtors' First Day Motions**

43.     Contemporaneously herewith, the Debtors filed numerous First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to provide stability and facilitate the Debtors' continued operations and the efficient administration of these chapter 11 cases, as well as ensuring the swift consummation of its prepackaged chapter 11 plan. The First Day Motions include:

    **A.     Administrative Motions:**

- "<u>Joint Administration Motion</u>": *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases and Granting Related Relief.*

- "<u>Scheduling Motion</u>": *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the*

*Confirmation Hearing Notice, (V) Directing that a Meeting of Creditors not be Convened, and (VI) Shortening the Notice Requirements Related Thereto.*

- "<u>Schedules Waiver and Creditor Matrix Motion</u>": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (II) Extending the Time and, Upon Plan Confirmation, Waiving the Requirement to File Schedules and Statements of Financial Affairs and Granting Related Relief.*

- "<u>Noticing and Solicitation Agent Application</u>": *Debtors' Application for Appointment of Prime Clerk, LLC as Claims, Noticing and Solicitation Agent.*

**B.    Financing Motions:**

- "<u>Cash Collateral Motion</u>": *Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to the Secured Notes Parties; and (III) Scheduling a Final Hearing.*

**C.    Operational Motions:**

- "<u>Cash Management Motion</u>": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (II) Granting Related Relief.*

- "<u>Vendors Motion</u>": *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing to Pay Prepetition Claims of Trade and Service Providers in the Ordinary Course of Business and Granting Related Relief.*

- "<u>Wages and Employee Benefits Motion</u>": *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (II) Maintain Employee Benefit*

> *Programs and Pay Related Administrative Obligations,
> and (III) Pay Independent Contractor Obligations, and
> (B) Directing Financial Institutions to Receive, Process,
> Honor, and Pay All Checks Presented for Payment and
> to Honor All Fund Transfer Requests Related to Such
> Obligations.*

- *"Insurance Motion": Debtors' Emergency Motion for
  Entry of Interim and Final Orders Authorizing the
  Debtors to Pay Prepetition Amounts Arising under
  Insurance Policies and Granting Related Relief.*

- *"Taxes Motion": Debtors' Emergency Motion for Entry
  of Interim and Final Orders Authorizing, but not
  Directing, the Payment of Certain Prepetition Taxes and
  Fees and Granting Related Relief.*

- *"Utilities Motion": Debtors' Emergency Motion for
  Entry of Interim and Final Orders (I) Approving
  Proposed Adequate Assurance of Payment for Future
  Utility Services, (II) Prohibiting Utility Companies from
  Altering, Refusing, or Discontinuing Services, and (III)
  Approving Proposed Procedures for Resolving
  Additional Assurance Requests.*

44.     I have read and understand each of the First Day Motions and the relief requested

therein.  Based on my review, and to the best of my knowledge and belief, the factual statements

contained in each of the First Day Motions are true and accurate and each such factual statement

is incorporated herein by reference.  I believe that the relief requested in the First Day Motions is

necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in

interest, and will allow the Debtors to operate with minimal disruption during the pendency

of these chapter 11 cases. Failure to grant the relief requested in any of the First Day Motions

may result in immediate and irreparable harm to the Debtors, their businesses, and their estates.

A description of the relief requested and the facts supporting each of the First Day Motions is

detailed in **Exhibit A**. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated:  August 30, 2016

Keith Muncy
Light Tower Rentals, Inc.
Chief Financial Officer

## Exhibit A

**Evidentiary Support for First Day Motions**

<u>EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS</u>[1]

I.      Administrative Motions

      **A.**      Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases and Granting Related Relief (the "<u>Joint Administration Motion</u>").

      1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order:  (a) directing joint administration of these chapter 11 cases for procedural purposes only, and (b) granting related relief.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the jointly-administered cases under the case of Light Tower Rentals, Inc., and that the cases be administered under a consolidated caption.

      2.      Joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of four independent chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

      **B.**      Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Confirmation Hearing Notice, (V) Directing that a Meeting of Creditors not be Convened, and (VI) Shortening the Notice Requirements Related Thereto (the "<u>Scheduling Motion</u>").

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

3.      Pursuant to the Scheduling Motion, the Debtors request entry of an order that: (a) schedules a combined hearing (the "Confirmation Hearing") on the adequacy of the Disclosure Statement and confirmation of the Plan; (b) establishes a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline") and approves related procedures; (c) establishes a deadline to file a brief in support of confirmation of the Plan and reply to any objections (the "Reply Deadline"); (d) approves the solicitation procedures with respect to the Plan; (e) approves the form and manner of notice of the Confirmation Hearing (the "Notice"); (f) directs the United States Trustee for the Southern District of Texas (the "U.S. Trustee") not to convene a meeting of creditors (the "Creditors' Meeting") under Bankruptcy Code section 341(e) if the Plan is confirmed within 75 days of the Petition Date; (g) shortens the notice period for the Confirmation Hearing and the Objection Deadline; and (h) authorizes the notice period for the Disclosure Statement and Confirmation Hearing to run simultaneously.

4.      In connection with the foregoing, the Debtors request that the Court approve the following schedule of proposed dates (the "Confirmation Schedule"):

| Event | Date[2] |
|---|---|
| Voting Record Date | August 18, 2016 |
| Start of Solicitation | August 22, 2016 |
| Petition Date | August 30, 2016 |
| Notice Date[3] | September 1, 2016 |
| Voting Deadline | September 20, 2016 |
| Objection Deadline | September 22, 2016 |
| Reply Deadline | September 27, 2016 |
| Confirmation Hearing | September 29, 2016 |

---

[2] Certain of the proposed dates are subject to the Court's docket availability.

[3] The "Notice Date" is the date by which the Notice will be served upon the Debtors' creditor matrix and all interest holders of record.

5.      The Debtors began soliciting votes on the Plan prior to the Petition Date in accordance with the Solicitation Procedures and the Bankruptcy Code.  On August 22, 2016, the Debtors caused their solicitation agent, Prime Clerk LLC (the "Solicitation Agent"), to distribute packages containing the disclosure statement (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), the joint prepackaged chapter 11 plan (as amended, supplemented, or otherwise modified from time to time, the "Plan"), the Debtors' cover letter, and ballots (collectively, the "Solicitation Package") to holders of claims and interests entitled to vote to accept or reject the Plan as of the Voting Record Date.[4]  Holders of claims or interests that received the Solicitation Package were directed to follow the instructions contained in the ballots (and described in the Disclosure Statement) to complete and submit their respective ballots to cast a vote to accept or reject the Plan.  The Disclosure Statement and applicable ballot expressly provide that such holder needs to submit its ballot so that it is actually received by the Solicitation Agent on or before the Voting Deadline[5] to be counted.  Certain holders of claims and interests were not provided a Solicitation Package because such holders are either:  (a) unimpaired under, and conclusively presumed to accept, the Plan under section 1126(f) of the Bankruptcy Code; or (b) impaired and entitled to receive no distribution on account of such claims or interests under the Plan, and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

6.      The Debtors submit that the schedule proposed in the Scheduling Motion is in the best interests of the Debtors, their estates, and all stakeholders, as it will assist the Debtors in their efforts to efficiently an expeditiously exit chapter 11.  Indeed, the transaction proposed in

---

[4] The "Voting Record Date" is the date as of which a holder of record of a claim or interest entitled to vote on the Plan must have held such claim or interest to cast a vote to accept or reject the Plan.

[5] The "Voting Deadline" is the date and time by which a holder of a claim or interest entitled to vote to accept or reject the Plan must have submitted its ballot casting its vote.

the Plan is the product of lengthy negotiations among the Debtors, certain Noteholders holding more than 80% of the Noteholder Claims in amount and certain Existing Equityholders holding approximately 100% of the Investco Convertible Preferred Interests, 100% of the Investco Preferred Interests, and 90.1% of the Investco Common Interests in amount.   Prior to the commencement of solicitation, the Plan and the Disclosure Statement was subject to extensive review and comment by the Noteholders that are party to the RSA.   In other words, many of the holders of claims and interests who were entitled to vote on the Plan participated in the plan negotiation process.   Thus, I believe the solicitation period is sufficient and appropriate for holders of claims and interests entitled to vote on the Plan to make an informed decision to accept or reject the Plan, and respectfully submit that the Scheduling Motion should be approved.

C.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (II) Extending the Time and, Upon Plan Confirmation, Waiving the Requirement to File Schedules and Statements of Financial Affairs and Granting Related Relief (the "Schedules Waiver and Creditor Matrix Motion").

7.      Pursuant to the Schedules Waiver and Creditor Matrix Motion, the Debtors seek entry of an order:  (a) authorizing the Debtors to file a consolidated list of creditors in lieu of separate mailing matrices for each Debtor; (b) extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") by 31 days, to October 14, 2016, for a total of 45 days from the Petition Date (the "Deadline"), without prejudice to the Debtors' right to request additional extensions should it become necessary; (c) waiving the requirement that the Debtors file the Schedules and Statements if confirmation occurs on or before the Deadline with such waiver effective as of the date the order confirming the proposed chapter 11 plan is entered; and (d) granting related relief.

8.     Requiring the Debtors to segregate and convert their computerized records to a debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.   Further, the Debtors have many potential creditors, and the ordinary operation of the Debtors' businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems.   Thus, substantial time would be required for the Debtors to complete the Schedules and Statements.   Accordingly, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor and extending the time, and upon Plan confirmation waiving the requirement, to file the Schedules and Statements will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.

**D.**     Debtors' Application for Appointment of Prime Clerk, LLC as Claims, Noticing and Solicitation Agent (the "Noticing and Solicitation Agent Application")

9.     Pursuant to the Noticing and Solicitation Agent Application, the Debtors seek entry of an order appointing Prime Clerk as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, to, among other tasks: (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the Engagement Agreement (attached as Exhibit C to the Noticing and Solicitation Agent Application).   The Debtors submit that Prime Clerk's rates are competitive and reasonable.

10.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in these cases.   I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors of the administrative burden of,

noticing and soliciting and tabulating votes and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Noticing and Solicitation Agent Application should be approved.

## II.  Financing Motions

**A.** Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to the Secured Notes Parties; and (III) Scheduling a Final Hearing (the "Cash Collateral Motion").

11.    Pursuant to the Cash Collateral Motion, the Debtors seek entry of an interim order that authorizes the Debtors to use "cash collateral," as such term is defined in Bankruptcy Code section 363 and provide adequate protection to the Secured Notes Parties on the terms set forth in the Interim Order. Certain notable terms in the Interim Order are more particularly set forth in the Cash Collateral Motion, and include the following: (a) modifying the automatic stay to implement certain provisions in the Interim Order and to deliver any notices of termination of the RSA, (b) authorizing the Debtors to grant adequate protection liens (including liens on the proceeds of avoidance actions, but not the actions themselves) and superpriority claims to the Secured Notes Parties, as well as professional fees for the professionals retained by the Ad Hoc Committee of Secured Notes Parties; (c) waiving surcharge rights under Bankruptcy Code sections 506(c) or 552(b) or any other applicable principle of equity or law; (d) waiving any right to assert an "equities of the case" claim against the Secured Notes Parties under Bankruptcy Code section 552; (e) scheduling an Interim Hearing to consider entry of the Interim Order; (f) scheduling a Final Hearing to consider entry of the Final Order; and (g) waiving any applicable stay period as to the effectiveness and enforceability of the Interim Order or the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

12.     The relief requested in the Motion is critical to the Debtors' business and the efficient administration of these cases.  As noted above, the Debtors have not sought new postpetition financing based on their assessment that its $19.2 million of cash on hand is sufficient to provide for their liquidity needs in and what are anticipated to be streamlined chapter 11 prepackaged cases.  As a result, the Debtors have an immediate need to obtain use of the Cash Collateral because it is the only source of funding during these cases.  Given that the Debtors have already garnered support for their restructuring from nearly all stakeholders in the RSA, it is the Debtors' anticipation and hope that these cases move expeditiously toward confirmation and emergence.  The 13-week cash-flow budget, attached as <u>Exhibit 1</u> to the Interim Order, as well as the other relief sought by the Debtors in their first-day motions, reflects this desire.

13.     The Cash Collateral will be used to, among other things, fund working capital, provide for general corporate purposes and permit the satisfaction of the costs and expenses of administering the Cases.  Absent entry of this Interim Order, the Debtors' estates and reorganization efforts will be immediately and irreparably harmed.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

**III.**   Operational Motions

    **A.**   Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").

14.     Pursuant to the Cash Management Motion, the Debtors seek entry of the Order: (a) authorizing the Debtors to maintain the Bank Accounts and Cash Management System; (b) authorizing the Debtors to continue using their existing Business Forms; and (c) waiving the

requirement to comply with section 345 of the Bankruptcy Code, to the extent the Debtors' bank accounts do not strictly comply therewith.

15.     In the ordinary course of business, the Debtors maintain the Cash Management System.  The Cash Management System is comprised of a total of six (6) Bank Accounts.  All of the Debtors' Bank Accounts reside at Frost Bank.  As of the Petition Date, the Debtors have approximately $19.2 million in cash on hand available.  The Debtors' Bank Accounts are described in the following tables:

| | Debtor | Bank Name | Account Name | Account Number | Account Type |
|---|---|---|---|---|---|
| 1 | Light Tower Rentals, Inc. | Frost Bank | Light Tower Payroll | XXXXX0671 | Deposit |
| 2 | Light Tower Rentals, Inc. | Frost Bank | Light Tower Checking | XXXXX1627 | Deposit |
| 3 | Light Tower Rentals, Inc. | Frost Bank | Light Tower Deposits | XXXXX 5262 | Deposit |
| 4 | Light Tower Rentals, Inc. | Frost Bank | ASO Medical Plan | XXXXX 2154 | Deposit |
| 5 | Light Tower Rentals, Inc. | Frost Bank | Light Tower Utility Deposit | XXXXX3881 | Deposit |
| 6 | LTR Shelters, Inc. | Frost Bank | LTR Shelters Checking | XXXXX 2909 | Deposit |

| Account | Account Description |
|---|---|
| Light Tower Rentals, Inc. Checking – 1627 (the "Main Operating Account") | The Main Operating Account is the primary concentration account for the Debtors' operational and financing activities. The Main Operating Account receives customer receipts via incoming wires, ACH, and ACH transfers from the Light Tower Rentals, Inc. Deposits account (the "Light Tower Deposits Account") and is utilized to pay vendors and ordinary course payrolls to Debtor's employees. |
| Light Tower Rentals, Inc. Payroll – 0671 (the "The Light Tower Payroll Account") | The Light Tower Payroll Account is used to cut physical payroll checks to the Debtors' employees. The account is utilized for the quick turnaround of any smaller denomination manual checks related to payroll matters. The company utilizes the services of ADP for the processing of its bi-weekly payrolls and the funding for the bi-weekly payrolls is drawn directly from the Main Operating Account. |
| Light Tower Rentals, Inc. Deposits – 5262 | The Light Tower Deposits Account is a zero balance depositary account which receives certain customer receipts via ACH and checks. Positive balances are transferred to the Main Operating |

| | Account on a daily basis. |
|---|---|
| Light Tower Rentals, Inc. ASO Medical Plan – 2154 (the "<u>Medical Plan Account</u>") | The Medical Plan Account is funded from the Main Operating Account on notification from plan providers. |
| Light Tower Rentals, Inc. Utility Deposit – 3881 (the "<u>Utility Deposit Account</u>") | Contemporaneously with this Motion, the Debtors filed a motion seeking to approve proposed adequate assurance of payment to certain utility providers (the "<u>Utilities Motion</u>"). This segregated account will hold the deposit proposed as adequate assurance for the benefit of the utility providers, in the event this Court approves the Utilities Motion. |
| LTR Shelters, Inc. Checking – 2909 (the "<u>LTR Shelters Checking Account</u>") | The LTR Shelters Checking Account is a dormant checking account. |

16.     The Debtors use the Cash Management System to efficiently collect, transfer, and disburse funds generated from their operations.  The Debtors' treasury department maintains accounting controls with respect to each of the Bank Accounts and is able to accurately trace the funds through their Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Accordingly, the Debtors will be able to accurately document, record, and trace the transactions occurring within the Cash Management System for the benefit of all parties in interest.  The diagram below illustrates the Debtors' cash management system.



17.     As part of the Cash Management System, the Debtors utilize numerous preprinted business forms in the ordinary course of their business, including, without limitation, letterhead, purchase orders, invoices, as well as preprinted and future checks (the "Business Forms").  To minimize expenses to their estates and avoid confusion on the part of employees, customers, and vendors during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all correspondence and Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather

than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.  Further, to the extent the Debtors exhaust their existing supply of Business Forms during these chapter 11 cases, the Debtors will transition to using checks and other business forms with the designation "Debtors in Possession" and the corresponding bankruptcy case number on all such forms.

18.    I believe that the relief requested in the Cash Management Motion is essential to the Debtors' business and denial of such relief would severely disrupt the Debtors' business.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

     **B.**    Debtors' Emergency Motion For Entry Of Interim And Final Orders Authorizing To Pay Certain Prepetition Claims of Trade and Service Providers In The Ordinary Course Of Business and Granting Related Relief (the "<u>Vendors Motion</u>)

19.    Pursuant to the Vendors Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business allowed prepetition claims (collectively, the "<u>Accounts Payable Claims</u>") of all trade and service providers (the "<u>Trade and Service Providers</u>")[6] in an amount up to approximately $1.24 million on an interim basis and an additional approximately $180,000 upon entry of the Final Order, which is comprised of (i) certain vendors that are critical to the Debtors' business operations (as listed on <u>Exhibit C</u>, the "<u>Critical Vendors</u>"), (ii) the Mineral Contractors, (iii) the Mechanic Contractors; (iv) the Shippers, (v) the 503(b)(9) Claimants, and (vi) all remaining general

---

[6] Contemporaneously with the filing of the Vendors Motion, the Debtors have filed certain other "first day" motions seeking authority to satisfy certain prepetition claims. The Vendors Motion is not duplicative of any such motion. As used herein, the term "Accounts Payable Claims" includes no obligation the Debtors seek to pay under separate motion. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any asserted claim.

unsecured Trade and Service Providers; (b) in the Debtors' discretion, either (i) authorizing one of the Debtors' credit fuel suppliers to convert the Debtors' existing prepetition deposit with such supplier into a postpetition deposit, or (ii) authorizing the Debtors to provide the credit fuel supplier with a new deposit that will replace the Debtors' existing prepetition deposit (with the prepetition deposit to be returned to the Debtors); and (c) granting related relief.  Notably, the Debtors are seeking relief to pay the prepetition claims of the preceding six categories of claimants under (a) above in the alternative; in other words, the Debtors request that a denial of the relief sought with respect to five or less of the preceding six categories of claimants will not affect or prejudice the relief sought with respect to the remaining categories of claimants.

20.     The Debtors have relationships with approximately 1,000 Creditors that provide the Debtors goods and services necessary to run the Debtors' businesses.  The Creditors provide the Debtors with goods and services in the ordinary course of business, including, among other things, fuel, parts and repairs for rental equipment, as well as information technology services, financial services, leases of property and equipment, maintenance and repair services of vehicle fleets, equipment tracking and performance monitoring services, environmental services, legal services, human resources services, and other basic business necessities for the operation of the Debtors' businesses.  Correspondingly, the Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Creditors in the ordinary course of business.

21.     In many cases, including where a Creditor may itself be facing financial hardship in the severely distressed oil and gas sector or where a Creditor may be able to contract with competitors of the Debtors, the Debtors' failure to pay Accounts Payable Claims may result in Creditors stopping work for or deliveries to the Debtors, which may severely disrupt the Debtors' businesses.  That disruption may occur before the Debtors would be able to

successfully bring an action in the Court to compel performance or otherwise enforce the automatic stay. The Debtors' businesses rely heavily on sustained relationships with its Trade and Service Providers, which magnifies the impact of any disruption. Also, the Debtors interact with the Creditors pursuant to a variety of arrangements, including arrangements that are not executory in nature. The counterparty of such an arrangement may not agree to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors and would be under no obligation to do so. A description of the types of Trade and Service Providers and the amounts to be paid under the Vendors motion can be seen in the table below:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| Critical Vendors | Represents Trade and Service Providers that, *inter alia*, are critical, cannot be readily and efficiently replaced by the Debtors, and the loss of whose services will cause damage disproportionate to the claims to be paid. | $420,000 | $420,000 |
| Mineral Contractors/Mechanics/Shippers | Represents Trade and Service Providers whose Accounts Payable Claims may give rise to liens under certain state and federal laws, and that are not Debtors or "affiliates" of the Debtors. | $140,000 | $140,000 |
| 503(b)(9) Claimants | Represents Trade and Service Providers holding claims relating to goods delivered to the Debtors within twenty (20) days of the Petition Date. | $520,000 | $520,000 |
| Other Trade and Service Providers | Represents all other general unsecured not covered by the above categories, but not including creditors covered by relief sought in other "first day" motions. | $340,000 | $160,000 |
| **Total** | | **$1.42 million** | **$1.24 million** |

22.     Although the total amount of accrued Accounts Payable Claims as of the Petition Date is approximately $1.42 million, the Debtors seek authority to pay an amount up to $1.24 million on an interim basis and the remaining $180,000 upon entry of a Final Order.

23.     The Debtors, in consultation with their professional advisors, meticulously reviewed a list of approximately 1,000 vendors to determine which vendors were absolutely critical to their business operations.  Among other criteria, the Debtors considered a vendor to be critical only if the goods and services provided by such vendor cannot be readily and efficiently replaced, which is often the case in remote locations where the pool of available vendors is limited or when a highly-skilled work force is involved, or where alternatives are typically limited and even a short-term interruption of services or supplies would cause damage disproportionate to the amount of the claims.  Additionally, the Debtors considered the importance of the vendor to the Debtors' business operations, the likelihood that the vendor would discontinue service if not timely paid, the ability of the vendor to assert liens (as discussed in more detail below), and whether the vendor was a party to a contract with the Debtors and any terms thereof *(i.e.,* short-term termination rights).

24.     Each of the Critical Vendors listed on Exhibit C to the Vendors Motion provides goods and services that are critical to the Debtors' operations, including*, inter alia*, fuel and parts for rental equipment and vehicle fleets, communications, equipment tracking and performance monitoring services, and environmental services (collectively, the "Critical Goods and Services").  The Debtors submit that (a) each of the Critical Vendors are of great necessity on a go-forward basis and cannot be readily and efficiently replaced and (b) the failure to pay the Critical Vendors for the Critical Goods and Services would likely result in a severe disruption or

cessation of certain of the Debtors' operations, and thus, would undermine the Debtors' ongoing operations and the revenues derived therefrom.

25.    In the ordinary course of business, the Debtors engage certain subcontractors to perform labor or supply materials and machinery essential to the Debtors' operations. The Debtors obtain such materials and services from various independent contractors and service providers (the "Mineral Contractors"), often on a project basis without long-term contracts.

26.    I understand that, if the Debtors do not pay the amounts owed to the Mineral Contractors on a timely basis, the Mineral Contractors may assert liens on the materials, machinery, and supplies provided to the Debtors or refuse to deliver or release such materials and machinery until their invoices are paid. Even more significantly, the Mineral Contractors may assert liens on the leaseholds, oil or gas wells, or oil and gas leases of the Debtors' customers for whom they performed subcontracting services. The assertion of liens against the Debtors' customers as a result of not being paid would severely disrupt the Debtors' operations (if not shut them down entirely). This could potentially cost the Debtors a substantial amount of revenue and future business.

27.    In the ordinary course of business, the Debtors have various equipment repaired by third party repair shops (electrical, mechanical, auto, etc.). Such third parties (the "Mechanic Contractors") may be in possession of the Debtors' property that they have already performed services on as of the Petition Date. I understand that, if the Debtors do not pay the amounts owed to the Mechanic Contractors on a timely basis, the Mechanic Contractors may assert liens on the Debtors' property in their possession or refuse to deliver or release such equipment until their invoices are paid. The assertion of liens against the Debtors' equipment as a result of not

being paid would severely disrupt the Debtors' operations.  This could potentially cost the Debtors a substantial amount of revenue and future business.

28.     In the ordinary course of business, the Debtors engage certain third-party shippers (the "Shippers") to store and transport the Debtors' inventory or materials ("Materials").  The Shippers regularly possess Materials belonging to the Debtors as well as the Debtors' customers. I understand that, if the Debtors were to default on any obligation to the Shippers, they may assert a lien, attempt to take possession of the Debtors' property, and/or bar the Debtors' access to Materials necessary to the operations of the Debtors' businesses.

29.     The Debtors may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the 20 days before the Petition Date.  Certain of the Debtors' relationships with the 503(b)(9) Claimants are not governed by enforceable long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis. Certain of these suppliers may be necessary for the Debtors' business operations.

30.     One of the Debtors' credit fuel suppliers has notified the Debtors that it will stop providing the Debtors credit for fuel if neither of the following conditions are carried out: (i) the Debtors' existing prepetition deposit with such supplier is converted to a postpetition deposit (in an amount of $50,000); or (ii) Debtors' existing prepetition deposit is replaced with a new postpetition deposit (again in an amount of $50,000) with the prepetition deposit to be returned to the Debtors.  If the credit fuel supplier were to stop providing the Debtors with credit for fuel, it will cause delay and interruption to the Debtors' business.  On the other hand, complying with either of the credit fuel supplier's requests would have a limited effect on the Debtors' cash flow or financials

31.     The requested relief in the Vendors Motion is warranted as it provides the Debtors with immediate benefits while not prejudicing any non-consenting class of creditors.   The Debtors' businesses rely heavily on sustained relationships with its Trade and Service Providers. Failure to make timely payments would not only strain these relationships, it would compound the financial distress many of the Trade and Service Providers are already experiencing as participants in the oil and gas industry.   Further, without the requested relief, the Debtors would have to endure the burden of overhauling their accounting system and could face other significant disruptions to their operations.   Lastly, I attest and affirm to the veracity of Exhibit C to the Vendors Motion, which explains why the named Trade and Service Providers are critical to the Debtors' operations.   Accordingly, on behalf of the Debtors, I respectfully submit that the Vendors Motion should be approved.

      **C.**     Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (III) Pay Independent Contractor Obligations, and (B) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations (the "Wages and Employee Benefits Motion").

32.     Pursuant to the Wages and Employees Benefits Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to honor or pay (i) all prepetition obligations of the Debtors owing to or on behalf of Employees and Independent Contractors, whether accrued or currently due and payable, (ii) all prepetition amounts owed with respect to the Employee Benefits, whether accrued or currently due and payable, including payment of all applicable plan administrators and other service providers, and (iii) all prepetition amounts owed to (A) ADP for payroll processing services and (B) American Express in connection with, among other things, charges to the AmEx Cards; (b) authorizing the Debtors to continue certain

Employee Benefits programs; and (c) directing all financial institutions to honor prepetition checks for payment (i) of the Employee Claims and the Independent Contractor Claims, (ii) on account of the Employee Benefits, and (iii) to ADP and American Express (collectively, the "Obligations") and prohibiting such financial institutions from placing any holds on, or attempting to reverse, any transfers made to satisfy the Obligations.

33.     In the ordinary course of business, the Debtors rely on the services of approximately 258 full-time Employees, 165 of which are hourly Employees and 93 of which are salaried Employees.  The Employees provide a variety of management, administrative, operational, sales and other support services for the Debtors, including, but not limited to, mechanical repairs, equipment maintenance, sales, truck driving, accounting, logistics, marketing, and information technology.  The Employees' skills and knowledge of the Debtors' infrastructure and operations are essential to the continued preservation of the Debtors' business, and their ongoing, uninterrupted services are vital to the Debtors' reorganization efforts.

34.     The Debtors pay Employees' wages, salaries, and other compensation on a biweekly basis.  The Debtors' aggregate biweekly payroll is approximately $790,000.  As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $365,000 on account of accrued and unpaid wages earned prior to the Petition Date, all of which will become due in the first 21 days after the Petition Date. The Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue their Employee Compensation practices on a postpetition basis in the ordinary course of the Debtors' business.

35.     47. The Debtors pay approximately $92,000 per year to ADP for the payroll services it provides to the Debtors (the "Payroll Fees").  As of the Petition Date, the Debtors owe

approximately $1,750 on account of Payroll Fees.  It is critically important that the Debtors be able to continue to compensate employees on the historical payroll schedule, and to do so requires the services of ADP.  Accordingly, the Debtors seek authority to pay any unpaid prepetition Payroll Fees, and to continue paying Payroll Fees in the ordinary course, on a postpetition basis.

36.     Further, it is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue to make payments for business expenses and the charges incurred through use of the AmEx Cards.   Additionally, Employees have incurred Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse them.   Accordingly, to avoid harming Employees who incurred Reimbursable Expenses, and who may become personally liable for such expenses reasonably incurred at the Debtors' direction, the Debtors request authority to (a) satisfy any prepetition amounts due and owing to American Express and honor any prepetition obligations related to Reimbursable Expenses, (b) pay Employees or applicable credit card companies on account of Reimbursable Expenses that have accrued prepetition or accrue postpetition but relate to the prepetition period, (c) continue use of the AmEx Cards program in place as of the Petition Date, and (d) continue to pay all amounts due and owing to American Express and reimburse Employees for Reimbursable Expenses in accordance with past practice and in the ordinary course of business.

37.     In the ordinary course of business, the Debtors make various benefit plans available to their Employees.  These benefit plans fall within the following categories:  (a) paid time off, including vacation days, sick days, short-term disability pay,  family medical leave, bereavement leave, jury duty leave, voting leave, and military leave; (b) medical, dental, vision,

and prescription drug benefits, life insurance, accidental death and dismemberment insurance, long-term disability, and workers' compensation; (c) 401(k) plan pension and savings benefits; (d) severance benefits; and (e) miscellaneous benefits.  Although the Debtors maintain certain Employee Benefits plans themselves, other Employee Benefits plans, such as the Health and Welfare Benefits plans, are maintained by third parties.  Through this Motion, the Debtors seek authority to pay any prepetition amounts owed on account of the Employee Benefits and to continue the Employee Benefits postpetition in accordance with prepetition practices.

38.     In the ordinary course of business, in addition to the Employees, the Debtors rely on the services of approximately four cleaning contractors, who perform cleaning work for the Debtors as independent contractors (collectively, the "Independent Contractors").  The Debtors incur obligations to or on account of such work (the "Independent Contractor Obligations").  The Independent Contractors provide valuable cleaning services for both premises and certain rental products and are therefore an integral component to the Debtors' business.  The Independent Contractors submit either weekly or monthly invoices to the Debtors and are paid in arrears.

39.     The aggregate monthly payroll for the Independent Contractors is approximately $5,000.  The Debtors estimate that, as of the Petition Date, they owe approximately $1,200 on account of the Independent Contractors Obligations.  The Debtors seek authority to pay such prepetition Independent Contractors Obligations through this Motion.  The Independent Contractors typically submit invoices in arrears, and thus, as of the Petition Date, the Debtors have not paid certain Independent Contractors for prepetition services.

40.     Payment of the Obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.  Without this relief, otherwise loyal Employees and Independent Contractors may seek

other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise and which may cause irreparable harm.  Payment of the Obligations will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption.  The total amount sought to be paid by this Motion is modest compared to the magnitude of the Debtors' overall business. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

> **D.**      Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Amounts Arising under Insurance Policies and Granting Related Relief (the "Insurance Motion").

41.      Pursuant to the Insurance Motion, the Debtors seek entry of interim and final, orders, subject to any Court-approved budget and any order authorizing the use of the Debtors' cash collateral: (a) authorizing the Debtors to pay any premiums, administrative fees, deductibles, and other obligations related to the Insurance Policies and related programs that accrued but remain unpaid as of the Petition Date; and (b) granting related relief.

42.      In the ordinary course of business, the Debtors maintain certain insurance policies covering, *inter alia*, general liability, automobile liability, commercial property and contractors' equipment liability, workers compensation, director and officer liability, employment practices liability and pollution legal liability.  The Insurance Policies are essential to the Debtors' ongoing operations.

43.      Over the past nine months, the Debtors have paid an aggregate amount of approximately $1.89 million in premiums, including financing charges, on account of the Insurance Policies.  The Debtors paid a significant portion of the premiums associated with the Insurance Policies at inception and make additional premium payments in monthly installments. As of August 1, 2016, the Debtors make monthly payments on the Insurance Policies in an amount of approximately $100,000.  The Debtors renew their Insurance Policies annually on

November 1ˢᵗ of each year, with help of their insurance consultant (McGriff, Seibels & Williams of Texas, Inc.).  I believe that the renewal of the Insurance Policies is in the ordinary course and the Debtors do not seek any further relief with respect to the renewal, which may occur during the pendency of these cases.  As of the Petition Date, the Debtors believe that within the first 25 days after the Petition Date, $101,275.40 in prepetition amounts is due and payable on account of the Insurance Policies.

44.      The success of the Debtors' efforts to operate effectively and efficiently in chapter 11 will depend on the maintenance of the Insurance Policies on an uninterrupted basis.  I understand that the Debtors' failure to pay the Insurance Claims, as and when they become due, could affect their ability to renew and maintain the Insurance Policies, which could have a material adverse effect on the Debtors' operations.  If the Insurance Policies are allowed to lapse or are terminated, or if the Debtors default under the Insurance Policies based on their non-payment of Insurance Claims, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others.  This exposure would negatively impact the Debtors' ability to operate in chapter 11.  Additionally, to ensure the retention of qualified and dedicated senior management, the Debtors must continue the directors' and officers' liability policies.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

      **E.**      **Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Payment of Certain Prepetition Taxes and Fees and Granting Related Relief (the "<u>Taxes Motion</u>").**

45.      Pursuant to the Taxes Motion, the Debtors seek entry of the Interim Order and Final Order: (a) authorizing, but not directing, the Debtors to remit and pay the Taxes and Fees to the Authorities, in an amount up to $1.62 million; (b) authorizing, but not directing, the

Debtors to pay the Taxes and Fees that arise or accrue in the ordinary course of business on a postpetition basis; and (c) granting related relief.[7]

46.     In the ordinary course of business, the Debtors collect, withhold, and incur Taxes and Fees.  The Debtors' failure to pay prepetition Taxes and Fees may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts. Further, claims for certain of the Taxes and Fees are or may be priority claims entitled to payment before general unsecured claims.

47.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**F.**     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving Proposed Procedures for Resolving Additional Assurance Requests (the "Utilities Motion").

48.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) approving the Debtors' proposed adequate assurance of payment for future utility

---

[7] The Debtors anticipate that they will emerge from chapter 11 before certain annual tax payments are due.  Given the consequence of a failure to make a tax payment, and out of an abundance of caution, the Debtors are seeking the relief requested in the Taxes Motion should circumstances arise that would cause the case to be prolonged. Furthermore, concurrently with the Taxes Motion, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (III) Pay Independent Contractor Obligations, and (B) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations*, seeking authority from the court to remit approximately $47,500 in prepetition Payroll Taxes and to continue remitting Payroll Taxes on a postpetition basis.

services; (b) prohibiting the Utilities from altering, refusing, or discontinuing services to the Debtors; (c) approving the Debtors' proposed procedures for resolving additional assurance requests; and (d) granting related relief.

49.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services from a number of utility companies or brokers.  On average, the Debtors pay approximately $150,000 each month for Utility Services, calculated as a historical average for the twelve (12) month period that ended July 31, 2016.  Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $150,000.  To provide additional assurance of payment, the Debtors propose to deposit into a segregated account the $75,000 Adequate Assurance Deposit, which represents an amount equal to approximately one half of the Debtors' average monthly cost of Utility Services (calculated based on the Debtor's average utility expenses over the twelve months ended July 31, 2016), for the benefit of the Utility Companies and for the duration of these chapter 11 cases and which may be applied to any postpetition defaults in payment to the Utility Companies.

50.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue its branch operations, which are necessary in the providing of the rental equipment and related services to the Debtor's customers.  I believe this disruption would adversely impact customer relationships and result in a decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor

recoveries.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved as it is critical that Utility Services continue uninterrupted during these chapter 11 cases.

**<u>Exhibit B</u>**

**The Restructuring Support Agreement**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE OF THIS AGREEMENT ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "***Agreement***"), dated as of August 8, 2016, is entered into by and among (i) LTR Holdco, Inc. ("***Parent***"), (ii) Light Tower Rentals, Inc. (the "***Issuer***"), (iii) LTR Investco, Inc. ("***Holdings***"), (iv) the subsidiary guarantors signatory hereto (the "***Subsidiary Guarantors***" and together with Parent, Holdings, the Issuer and their direct and indirect subsidiaries, the "***Company***"), (v) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "***Noteholders***" and together with their respective successors and permitted assigns and any subsequent Noteholder that becomes party hereto in accordance with the terms hereof, the "***Consenting Noteholders***") of the 8.125% Senior Secured Notes due 2019 (the "***Senior Notes***") issued by the Company, (vi) Clairvest Equity Partners III Limited Partnership, CEP III Co-investment Limited Partnership, Mojopa, Ltd. and Avary Family Limited Partnership (collectively, the "***Common Equity Stockholders***"), as current holders of approximately 90.1% of the Company's common stock, (vii) Keith Muncy, Pat Bond, Mark Beckstrom and Nina Valles (collectively, the "***Senior Preferred Stockholders***"), and (viii) Stepstone Capital Partners III, L.P. and its affiliated entities listed on the signature pages hereto (collectively, "***Stepstone***"), Allstate Insurance Company and its affiliated entities listed on the signature pages hereto (collectively, "***Allstate***") and USS-Constitution Co-Investment Fund II, LP and its affiliated entities listed on the signature pages hereto (collectively, "***Constitution***"), as holders of 100% of the Company's convertible preferred stock (Stepstone, Allstate and Constitution, collectively, the "***Preferred Stockholders***"). The Company, each Consenting Noteholder, the Common Equity Stockholders, the Senior Preferred Stockholders, the Preferred Stockholders and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "***Parties***" and individually as a "***Party***".

**WHEREAS**, the Parties have agreed to a restructuring of the Company (the "***Restructuring***") that will be implemented through a prepackaged plan of reorganization (the "***Plan***") of the Company under chapter 11 of title 11 of the United States Code that would be filed by the Company in its capacity as a debtor and debtor in possession in connection with the commencement of cases in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Chapter 11 Cases***"). The Restructuring will be consummated in accordance with the terms and conditions reflected in the term sheet attached hereto on Exhibit A (the "***Term Sheet***," including any schedules and exhibits attached thereto, and as may be modified in accordance with Section 10 hereof). The Term Sheet is the product of arm's length good faith discussions between the Parties hereto and their respective professionals. Notwithstanding anything in this Agreement, and for the avoidance of doubt, the board of

directors has not yet authorized the Company's filing for bankruptcy and any such filing by the Company will require approval of the board of directors;

**WHEREAS**, as of the date hereof, the Consenting Noteholders hold, in the aggregate, more than 80% of the aggregate outstanding principal amount of the Senior Notes issued by the Company under that certain Indenture, dated as of July 21, 2014 (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "***Indenture***"), by and among the Company, each of the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. as trustee and collateral agent (the "***Trustee***");

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.      Certain Definitions.

As used in this Agreement, the following terms have the following meanings:

(a)      "Closing" means the consummation of the Plan.

(b)      "Definitive Documents" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and the Plan and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring, including, the Plan (and the documents to be filed in supplement to the Plan (the "***Plan Supplement***")), the Warrant Agreement, the Indenture and this Agreement (together with any voting and solicitation related materials), and any motion seeking the approval thereof, the order of the Bankruptcy Court confirming the Plan, and definitive documentation relating to the Company's debtor-in-possession financing (if any), use of cash collateral, any exit financing, organizational documents, investor related agreements or other related documents, which shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet and shall otherwise be acceptable in all respects to the Company and the Requisite Noteholders, in accordance with Section 7 hereof.

(c)      "Material Adverse Effect" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, financial condition, assets or liabilities of the Company, taken as a whole.

(d)      "Noteholder Claims" means any and all claims arising under the Indenture or the Senior Notes.

(e)     "Plan Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) the Senior Preferred Stockholders, (iii) the Preferred Stockholders, (iv) the Common Equity Stockholders holding at least 90.1% of the Company's common stock, and (v) Consenting Noteholders holding at least 66⅔% in aggregate principal amount outstanding of the Senior Notes.

(f)     "Plan Support Period" means the period commencing on the Plan Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 6 hereof and (ii) the effective date of the Plan (the "Effective Date").

(g)     "Requisite Noteholders" means, as of the date of determination, Consenting Noteholders holding at least 55% of the outstanding principal amount of the Senior Notes held by the Consenting Noteholders in the aggregate as of such date.

## 2.     Term Sheet.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Term Sheet sets forth the material terms and conditions for the Plan; provided, however, the Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistency between the Term Sheet and this Agreement, this Agreement shall control.

## 3.     Agreements of the Consenting Noteholders.

(a)     Agreement to Support.  Each of the Consenting Noteholders agrees, for the duration of the Plan Support Period, to support the Restructuring and the Plan and to act in good faith and take all reasonable actions necessary or reasonably requested by the Company to consummate the Restructuring and the Plan, as applicable, in a timely manner.  Subject to the terms and conditions hereof, for the duration of the Plan Support Period, each Consenting Noteholder irrevocably agrees to, at the request of the Company, support the Company's motions in bankruptcy implementing this Agreement, including the use of cash collateral and other first day motions.

(b)     Voting.  Each Consenting Noteholder agrees that, for the duration of the Plan Support Period, such Consenting Noteholder, so long as it is entitled to vote on the Plan and its vote has been properly solicited pursuant to Sections 1125(g) and 1126 of the Bankruptcy Code, shall:

(i)     (A) timely vote or cause to be voted each of its Noteholder Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with Sections 1125(g) and 1126 of the Bankruptcy Code, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void ab initio) by any Consenting Noteholder at any time following termination of this

3

Agreement, (C) timely vote (or cause to be voted) its Noteholder Claims against, and shall not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the solicitation of votes on the Plan, approval of the Disclosure Statement, and the confirmation and consummation of the Plan, and (D) not opt-out of the releases under Article VIII of the Plan; and

(ii)  support and take all reasonable actions necessary or reasonably requested by the Company to facilitate the solicitation of votes on the Plan, approval of the Disclosure Statement, and confirmation and consummation of the Plan (it being understood that the Consenting Noteholders shall not be required to incur any material costs, expense or liability in connection therewith).

(c)  Transfers.  Each Consenting Noteholder agrees that, for the duration of the Plan Support Period, such Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of the Noteholder Claims or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any Senior Notes or any other claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such Senior Notes or such other claims against or interests in the Company), unless the transferee thereof either (i) is a Consenting Noteholder or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to Consenting Noteholders (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as Exhibit B (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (i) Proskauer Rose LLP ("*Proskauer*"), as counsel to the Company, and (ii) Kirkland & Ellis LLP ("*Kirkland*"), as counsel to certain of the Consenting Noteholders, in which event (a) the transferee (including the Consenting Noteholder transferee, if applicable) shall be deemed to be a Consenting Noteholder hereunder to the extent of such transferred rights and obligations and (b) the transferor, solely with respect to the Senior Notes that were transferred, shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Each Consenting Noteholder agrees that any Transfer of any Noteholder Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Noteholder shall have the right to enforce the voiding of such Transfer.

(d)  Additional Noteholder Claims.  To the extent any Consenting Noteholder acquires additional Noteholder Claims or equity interests (preferred and/or common), then, in each case, each such Consenting Noteholder shall promptly notify Proskauer and

Kirkland, and each such Consenting Noteholder agrees that such Noteholder Claims or other claims or equity interests shall be subject to this Agreement, and that, for the duration of the Plan Support Period, it shall vote (or cause to be voted) such Noteholder Claims or equity interests (preferred and/or common) (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with Sections 3(a) and 3(b) hereof.

(e)     No-Action by Consenting Noteholders. Each of the Consenting Noteholders agrees, for the duration of the Plan Support Period, not to take any action (or encourage or instruct any other party, including any agent or indenture trustee, to take any action) in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the Indenture that would be triggered as a result of the execution of this Agreement, the commencement of the Chapter 11 Cases, or the undertaking by the Company to implement the Restructuring through the Chapter 11 Cases.

4.     **Agreements of the Company.**

(a)     Affirmative Covenants. The Company agrees that, for the duration of the Plan Support Period, the Company shall, and shall cause each of its direct and indirect subsidiaries to, (and the Common Equity Stockholders and Preferred Stockholders shall cause the Company to) directly or indirectly, do the following:

(i)     do all things necessary and appropriate in furtherance of the Restructuring, including, without limitation, (A) commencing solicitation on the Plan within the time frames contemplated herein, (B) commencing the Chapter 11 Cases on or before August 31, 2016 (the "*Outside Petition Date*," and the actual commencement date, the "*Petition Date*") and completing and filing, within the timeframes contemplated herein, the Plan, Disclosure Statement and the other Definitive Documents, which documents shall contain terms and conditions consistent in all material respects with the Term Sheet and shall otherwise be acceptable to the Requisite Noteholders, and distributing such documents to the legal and financial advisors for the Consenting Noteholders and affording reasonable opportunity to comment and review in advance of any filing thereof, and use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan within the timeframes contemplated by this Agreement; (ii) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any; and (iii) not take any action that is inconsistent with, or is intended or is likely to interfere with, consummation of the Restructuring;

(ii)     subject to Section 4(b), continue to operate its businesses in the ordinary course of business consistent with past practice, and confer with the Requisite Noteholders and their representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations. Notwithstanding the generality of the foregoing, the Company shall, except as expressly contemplated by this Agreement or with the prior written consent of the Requisite Noteholders and, subject to applicable bankruptcy law, use commercially reasonable efforts consistent with the Restructuring to,

5

(a) continue to operate its businesses in compliance with all applicable laws, rules and regulations in all material respects, (b) preserve the relationships with the current customers, distributors, suppliers, vendors and others having business dealings with the Company, (c) maintain its physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (d) not take any action, or omit to take any action, the intent of which is to cause the termination of its current officers other than a termination for cause (in accordance with the definition of "Cause" in any applicable contract or agreement) or if the failure to do so would be inconsistent with the exercise of applicable fiduciary duties, (e) perform all obligations required to be performed by the Company under any assumed executory contracts, (f) maintain its books and records on a basis consistent in all material respects with prior practice, (g) bill for products sold or services rendered and pay accounts payable in a manner consistent in all material respects with past practice, (h) maintain all insurance policies required, or suitable replacements therefor, in full force and effect through the close of business on the Effective Date, (i) provide the Consenting Noteholders with updated monthly financial information concerning the Company (subject to customary confidentiality restrictions), (j) not encumber nor enter into any material new leases (other than the leases listed on Annex A), licenses or other use or occupancy agreements for real property or any part thereof, (k) timely pay any and all required fees and taxes with respect to patents (if any), patent applications (if any), any trademark applications and any registered trademarks, and (l) not enter into any agreement with any labor union or labor organization, including but not limited to any collective bargaining agreement, except as required by applicable law;

(iii)     (A) support and take all reasonable actions necessary or reasonably requested by the Consenting Noteholders to facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated thereby, (B) not take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan, and (C) support the mutual release and exculpation provisions contained in the Term Sheet and the Plan;

(iv)     (A) commence solicitation of the Plan in accordance with Section 1126(b) of the Bankruptcy Code on or before August 22, 2016;

(B) file on the Petition Date such first day motions and pleadings that are reasonably acceptable, in form and substance, to the Requisite Noteholders;

(C) (i) file a motion with the Bankruptcy Court on the Petition Date seeking approval of an order permitting use of cash collateral, (ii) obtain the cash collateral order (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is three (3) calendar days after the Petition Date, and (iii) obtain approval on a final basis of the cash collateral order (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is twenty-eight (28) calendar days after the Petition Date;

6

(D) (i) file the Plan and the Disclosure Statement with the Bankruptcy Court on the Petition Date and (ii) obtain confirmation of the Plan (including the Disclosure Statement) by entry of an order of the Bankruptcy Court (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is fifty-five (55) calendar days after the Petition Date (such date that the Disclosure Statement and Plan are approved and the confirmation order is entered, the "***Confirmation Date***");

(E) satisfy all conditions to the effectiveness of the Plan and consummate the Plan as soon as reasonably practicable and in no event later than the date that is seventy-five (75) calendar days after the Petition Date;

(v)     provide, for each month, beginning July 2016 until the Effective Date, (a) upon written request of any of the Consenting Noteholders, to such Consenting Noteholders, an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for the month then ended within thirty (30) days of the end of such month (the "***Monthly Financial Statements***"), which Monthly Financial Statements, except as indicated therein and, except for the absence of footnotes, shall be prepared in accordance with GAAP and shall present fairly in all material respects the financial position, results of operations and cash flows of the Company as of the dates indicated and for the periods specified, subject to year-end audit adjustments;

(vi)     provide draft copies of all "first day" motions or applications and other documents the Company intends to file with the Bankruptcy Court to Kirkland as soon as reasonably practicable and in no event later than the date that is three (3) business days prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.  The Company will use reasonable efforts to provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to Kirkland within a reasonable time prior to filing such pleading to the extent practicable and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading;

(vii)     maintain their good standing under the laws of the state in which they are incorporated or organized;

(viii)     timely file with the Bankruptcy Court a formal written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases or (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(ix)     provide to Kirkland, no later than five (5) calendar days prior to the Petition Date, a schedule of executory contracts and unexpired leases the Company

7

intends to reject, which schedule shall be in form and substance acceptable to the Requisite Noteholders;

(x)     provide to the Consenting Noteholders and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's business plans and participating in the planning process with respect to the consummation of the transactions contemplated by the Plan, (C) timely and specific responses to all reasonable diligence requests, and (D) information with respect to all material executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(xi)     convene a call on the second and fourth Tuesday of each month with the Consenting Noteholders and their respective advisors, which calls will include the Company's management and financial and legal advisors; provided, however, to the extent such call is missed or needs to be rescheduled by the Company, the Company shall have until the immediate Tuesday thereafter to convene the call;

(xii)     in the event that the Company (including all subsidiaries and representatives) receives a written proposal or offer (binding or nonbinding) with respect to any transaction proposed as an alternative to the Restructuring, provide written notice thereof and a copy of such proposal or offer to the Consenting Noteholders (subject to an appropriate confidentiality agreement) and the Preferred Stockholders within five (5) business days following receipt of such offer;

(xiii)     provide prompt written notice to the Consenting Noteholders between the date hereof and the Effective Date (unless notice is already provided to the Consenting Noteholders) of (A) the occurrence, or failure to occur, of any event that, to the Company' s knowledge, would be likely to cause (1) any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate in any material respect, (2) any covenant of any of the Company contained in this Agreement not to be satisfied in any material respect or (3) any condition precedent contained in the Plan, the Term Sheet or this Agreement not to occur or become impossible to satisfy, (B) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any written notice from any governmental body in connection with this Agreement or the transactions contemplated by the Restructuring, (D) receipt of any written notice of any proceeding commenced, or, to the knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (E) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

8

(xiv)   unless otherwise agreed by the Company and the applicable firm, on the date that is at least one (1) calendar day prior to the Petition Date, pay in cash to (A) Kirkland and (B) the financial advisor and due diligence consultant to the Consenting Noteholders, in each case, all costs and out-of-pocket expenses then due, outstanding and payable in connection with this matter, in accordance with that certain letter agreement, dated July 22, 2016, between the Issuer and the undersigned Consenting Noteholders; and

(xv)   promptly notify the other Parties in writing following the receipt in writing of any notice of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which would reasonably be anticipated to have a Material Adverse Effect.

(b)   <u>Negative Covenants</u>.   The Company agrees that, for the duration of the Plan Support Period, the Company shall not, without prior written consent of the Requisite Noteholders, do or permit to occur any of the following:

(i)   directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan, or take any other action that would reasonably be expected to prevent, interfere with, delay or impede in any way, the solicitation of votes on the Plan, the approval of the Disclosure Statement, or the implementation or consummation of the Plan;

(ii)   amend or modify (other than technical, non-substantive modifications, which changes shall not in any event be adverse to the Consenting Noteholders) the Term Sheet or the Plan;

(iii)   withdraw or revoke the Term Sheet or the Plan or publicly announce its intention not to pursue the Term Sheet or the Plan;

(iv)   file any motion or pleading or other Definitive Document with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any material respect with this Agreement, the Term Sheet or the Plan;

(v)   move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract (including, without limitation, any employment agreement or employee benefit plan) or unexpired lease other than in accordance with the Term Sheet or the Plan;

(vi)   issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(vii)    amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

(viii)    except as contemplated by the Plan, split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(ix)    redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(x)    acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Company, other than in the ordinary course of business consistent with past practices and in no event in excess of $500,000, individually or in aggregate; provided, however, that the Requisite Noteholders shall be deemed to have provided their advance written consent for the sale of the assets listed on Annex B;

(xi)    incur any capital expenditures other than in the ordinary course of business and in amounts consistent with historical business practices;

(xii)    incur or suffer to exist any indebtedness, except indebtedness (1) existing and outstanding immediately prior to the date hereof, (2) authorized by "first day orders" entered by the Bankruptcy Court (which orders shall be reasonably acceptable to the Consenting Noteholders), or (3) trade payables and liabilities arising and incurred in the ordinary course of business and not overdue by more than 90 days;

(xiii)    incur or suffer to exist any liens or security interests;

(xiv)    enter into any commitment or agreement with respect to debtor-in-possession financing or the use of cash collateral;

(xv)    enter into any employment agreements, collective bargaining agreements or employee benefit plans, or materially modify any existing employment agreements, collective bargaining agreements or benefit plans;

(xvi)    hire any executive or employee whose total annual compensation is greater than $100,000 or increase the compensation for any executive or employee whose total annual compensation is greater than $100,000 without the express consent of the Requisite Noteholders; or

(xvii)    allow or settle claims or any pending litigation not otherwise insured under the Company's insurance policies and paid for by the Company's applicable insurance carrier for more than $50,000 per claim individually, or $200,000 in the aggregate.

10

(c)     <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

**5.**     **<u>Agreements of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders.</u>**

(i)     Each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders agrees, for the duration of the Plan Support Period, (A) to support and take all reasonable actions necessary or reasonably requested by the Consenting Noteholders to facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated thereby, (B) not to take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan, and (C) support the mutual release and exculpation provisions contained in the Term Sheet and the Plan. Without limiting the generality of the foregoing, each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders agrees, for the duration of the Plan Support Period, (x) to timely vote (or cause to be voted) its equity interests (and any equity interests as to which it holds a proxy) in favor of all transactions required to consummate the Plan, and (y) not to Transfer, directly or indirectly, in whole or in part, any of its equity interest of the Company or any option thereon or any right or interest therein or any other claims against or interests in the Company (including grant any proxies, deposit any equity interests or any claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such equity interests or any other claims against or interests in the Company).

(ii)     Each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders agrees to timely vote (or cause to be voted) its equity interests against, and shall not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the solicitation of votes on the Plan, approval of the Disclosure Statement, and the confirmation and consummation of the Plan.

**6.**     **<u>Termination of Agreement.</u>**

(a)     This Agreement shall terminate upon the receipt of written notice, delivered in accordance with <u>Section 20</u> hereof, from the Requisite Noteholders to the other Parties hereto at any time after the occurrence of any Requisite Noteholder Termination Event (defined below).  In addition, this Agreement shall terminate upon the

11

receipt of written notice, delivered in accordance with <u>Section 20</u> hereof, from the Company to the other Parties hereto at any time after the occurrence of any Company Termination Event (defined below).

(b) A "<u>Requisite Noteholder Termination Event</u>" shall mean any of the following:

(i) the material breach by the Company of (a) any affirmative or negative covenant contained in this Agreement (without giving effect to any "materiality" qualifiers set forth herein) or (b) any other material obligations of the Company set forth in this Agreement (without giving effect to any "materiality" qualifiers set forth herein), and, in either respect, such breach remains uncured for a period of ten (10) business days following the Company's receipt of notice pursuant to <u>Section 6(a)</u> of this Agreement;

(ii) any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of ten (10) business days following the Company's receipt of notice pursuant to <u>Section 6(a)</u> of this Agreement;

(iii) at any time on or before August 15, 2016 at 9:00 a.m. Eastern Time, the Requisite Noteholders shall not be satisfied in their sole discretion with the results of their legal, business and tax due diligence;

(iv) any material term or condition of any of the restructuring documents that are filed with the Bankruptcy Court shall be (whether due to an order of the Bankruptcy Court or otherwise) different and adverse to the Consenting Noteholders than as contemplated by the Term Sheet and the Plan, and such event remains unremedied for a period of ten (10) business days following the Company's receipt of notice pursuant to <u>Section 6(a)</u> of this Agreement;

(v) except as explicitly permitted under this Agreement, the Company shall have (A) incurred any indebtedness, (B) leased, mortgaged, pledged, granted a lien on or disposed of any of its properties or assets or (C) declared, set aside or paid any dividends on, or made any other distributions in respect of, any of the capital stock of the Company;

(vi) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(vii) the Company shall have failed to provide to Noteholders, the Trustee and the Permitted Parties (as defined in the Indenture), as promptly as practicable (and in any event within two (2) business days), a Current Report setting forth the information that would be required on Form 8-K to which this Agreement (including all

12

exhibits) (with such redactions as may be reasonably requested by counsel to the Consenting Noteholders) and the Term Sheet are attached; provided, however, that the principal amount of Senior Notes listed on each Consenting Noteholders' signature page shall be redacted and shall not be made available to any person other than such Consenting Noteholder, Kirkland (to be held by Proskauer and Kirkland on a professionals' eyes only basis) and the Company, except as required by law;

(viii)    the Company shall not have commenced solicitation of the Plan on or before August 22, 2016;

(ix)    as of 11:59 p.m. Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Noteholders, if the Chapter 11 Cases shall have not been filed;

(x)    the Company shall not have obtained approval of the Disclosure Statement and confirmation of the Plan by entry of an order of the Bankruptcy Court (which order shall be in form and substance acceptable to the Requisite Noteholders) as soon as reasonably practicable and in no event later than the date that is fifty-five (55) calendar days after the Petition Date;

(xi)    the Company shall not have satisfied all conditions to the effectiveness of the Plan and consummated the Plan as soon as reasonably practicable and in no event later than the date that is seventy-five (75) calendar days after the Petition Date;

(xii)    the occurrence of any event, change, effect, occurrence, development, circumstance or change of fact that has or would reasonably be expected to have a Material Adverse Effect;

(xiii)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(xiv)    the Bankruptcy Court grants relief terminating, annulling or modifying the automatic stay (as set forth in Section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $10 million in the aggregate;

(xv)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease other than in accordance with the Term Sheet or the Plan;

(xvi)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(xvii)  priority claims under Section 507(a) of the Bankruptcy Code, expected cure costs for assumed executory contracts and Section 503(b)(9) claims are expected to exceed $3.5 million on the Effective Date; or

(xviii)  authorization is granted to the Company to pay claims in excess of $2.0 million under critical vendor and other orders.

(c)  A "Company Termination Event" shall mean any of the following:

(i)  the breach by any of the Consenting Noteholders that are initial signatories hereto, other than Clairvest Group Inc. and Mojopa Ltd., of any of the representations, warranties or covenants of such Consenting Noteholders set forth in this Agreement to the extent such breach would have a material adverse impact on the consummation of the transactions contemplated by the Plan, and which breach remains uncured for a period of ten (10) business days after the receipt by the applicable Consenting Noteholder from the Company of written notice of such breach;

(ii)  the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(iii)  the board of directors of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

(d)  Mutual Termination.  This Agreement may be terminated by mutual agreement of the Company and the Requisite Noteholders upon the receipt of written notice delivered in accordance with Section 20 hereof.

(e)  Effect of Termination.  Subject to the proviso contained in Section 6(a) hereof, upon the termination of this Agreement in accordance with this Section 6, and except as provided in Section 13 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Senior Notes, the Indenture and any ancillary documents or agreements thereto; provided, however, that in no event shall any such termination relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, each Consenting Noteholder may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Consenting Noteholder prior to such termination, whereupon any such vote or

14

consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with this Agreement.  If this Agreement has been terminated in accordance with this Agreement at a time when permission of the Bankruptcy Court shall be required for a Consenting Noteholder to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Noteholder to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 13</u> of this Agreement.  The Consenting Noteholders shall have no liability to the Company or to any other Consenting Noteholder in respect of any termination of this Agreement in accordance with the terms of <u>Section 6(b)</u>.

(f)     This Agreement and the Term Sheet are part of a proposed settlement of a dispute among the Parties.  If the transactions contemplated herein are not consummated following the occurrence of the Termination Date, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 7.     <u>Definitive Documents; Good Faith Cooperation; Further Assurances.</u>

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the Parties hereto to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring (<u>provided</u>, <u>however</u>, that no Consenting Noteholder shall be required to incur any material cost, expense or liability in connection therewith unless, in the case of any such cost or expense, funds are advanced by the Company, subject to Bankruptcy Court approval (if necessary)), and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

## 8.     <u>Representations and Warranties.</u>

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the

15

performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Noteholder severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the beneficial owner of the aggregate principal amount of Senior Notes set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof) and owns such Senior Notes free and clear of any and all liens, claims, security interests and similar restrictions and any other restrictions that could adversely affect the ability of such Consenting Noteholder to perform its obligations hereunder, and/or (ii) has, with respect to the beneficial owners of such Senior Notes, (A) sole investment or voting discretion with respect to such Senior Notes, (B) full power and authority to vote on and consent to matters concerning such Senior Notes or to exchange, assign and transfer such Senior Notes, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each of the Common Equity Stockholders, Senior Preferred Stockholders and Preferred Stockholders severally (and not jointly) represents and warrants that, as of the date hereof, it (i) is the record or beneficial owner, and has good and marketable title to, the equity interests of Holdings set forth opposite such person's name on Exhibit C hereto free and clear of any and all liens, claims, security interests, proxies, voting trusts or agreements, options, rights, understandings or arrangements or any other encumbrances whatsoever on title, transfer, or exercise of any rights of the Stockholders in respect of such shares, other than the Holdings' Amended and Restated Stockholders Agreement, dated August 28, 2014 and, in the case of the Senior Preferred Stockholders, their respective restricted stock agreements; (ii) does not own, of record or beneficially,

16

any shares of capital stock of the Company (or rights to acquire any such shares) or any Senior Notes (or rights to acquire Senior Notes) other than as set forth on <u>Exhibit C</u> hereto; and (iii) has the sole right to vote, sole power of disposition, sole power to issue instructions with respect to the matters set forth herein, sole power to demand appraisal rights and sole power to agree to all of the matters set forth in this Agreement, in each case with respect to all of such shares, with no material limitations, qualifications or restrictions on such rights, subject to the terms of this Agreement.

9.   **<u>Disclosure; Publicity.</u>**

(a)   Upon execution of this Agreement, subject to the provisions set forth in <u>Section 9(b)</u> hereof, the Company shall disseminate a press release or furnish to Noteholders, the Trustee and the Permitted Parties a Current Report disclosing the existence of this Agreement and the terms hereof and of the Term Sheet (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Petition Date) with such redactions as may be reasonably requested by any Consenting Noteholder's counsel to maintain the confidentiality of the items identified in <u>Section 9(b)</u> hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Noteholder may publicly disclose, after providing the Company with a reasonable opportunity to review before its release, the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by <u>Section 9</u> hereof), and the Company hereby waives any claims against the Consenting Noteholders arising as a result of such disclosure by a Consenting Noteholder in compliance with this Agreement.

(b)   The Company shall submit drafts to Kirkland of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Noteholder, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Noteholder), other than advisors to the Company, the principal amount or percentage of any Senior Notes or any other securities of the Company held by any Consenting Noteholder, in each case, without such Consenting Noteholder's prior written consent; <u>provided</u>, <u>however</u>, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Senior Notes held by all the Consenting Noteholders collectively.  Notwithstanding the provisions in this <u>Section 9</u>, any Party may disclose, to the extent consented to in writing by a Consenting Noteholder, such Consenting Noteholder's individual holdings.

17

10.     **Amendments and Waivers.**

(a)     This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except in a writing signed by the Company and the Requisite Noteholders; provided, however, that any waiver, modification, amendment or supplement to this Section 10(a) shall require the written consent of all of the Parties; provided, further, that any modification, amendment or change to the definition of Requisite Noteholders shall require the written consent of each Consenting Noteholder; provided, further, that any change, modification or amendment to this Agreement, the Term Sheet or the Plan that materially adversely affects the economic recoveries of any Consenting Noteholder or Preferred Stockholder, as compared to the recoveries expected from the Term Sheet attached hereto as of the date hereof, may not be made without the written consent of each such adversely affected Consenting Noteholder or Preferred Stockholder, as applicable.

(b)     Any amendment or waiver of the conditions set forth in Section 6(b)(iii) or this Section 10(b) shall require the consent of each of the Consenting Noteholders that are initial signatories hereto, other than Clairvest Group Inc. and Mojopa Ltd., for so long as each such person (together with its affiliates) holds in the aggregate at least 10% of the Senior Notes.

11.     **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Plan Support Effective Date, and not before such date; provided, however, that signature pages executed by Consenting Noteholders shall be delivered to (a) other Consenting Noteholders in a redacted form that removes such Consenting Noteholders' holdings of the Senior Notes and (b) the Company and Kirkland in an unredacted form (to be held by Proskauer and Kirkland on a professionals' eyes only basis).

12.     **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  EACH PARTY

18

HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.   NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

## 13.   **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorneys fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything that may be expressed or implied in this Agreement, each of the Parties hereto covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, officer, employee, general or limited partner or equity holder of any Consenting Noteholder or of any affiliate or assignee thereof, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future officer, agent or employee of any Consenting Noteholder or any current or future member of any Consenting Noteholder or any current or future director, officer, employee, partner or member of any Consenting Noteholder or of any affiliate or assignee thereof, as such for any obligation of any Consenting Noteholder under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

## 14.   **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties in this Section 14, the proviso set forth in Section 3(b)(i)(B) hereof, and Sections 6(e), 6(f), 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22 and 23 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Noteholders in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 15.   **Headings.**

The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit Transfers of the Senior Notes or claims arising under the Senior Notes other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

17.     **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

18.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (and including the Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Noteholder shall continue in full force and effect.

19.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20.     **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by email, courier or by registered or certified mail (return receipt requested) to the following addresses and emails:

(1)     If to the Company, to:

Light Tower Rentals, Inc.
2330 E. I-20 South Service Road

20

Odessa, Texas 79766
Attention:  Keith Muncy
                   Chief Financial Officer
                   (kmuncy@ltr.com)

With a copy to:

Proskauer Rose LLP
11 Times Square
New York, New York 10036
Attention:  Frank Lopez
                   (flopez@proskauer.com)
                   Philip M. Abelson
                   (pabelson@proskauer.com)
                   Max Kirchner
                   (mkirchner@proskauer.com)
                   -and-
                   Ehud Barak
                   (ebarak@proskauer.com)
and
Miller, Egan, Molter & Nelson LLP
2911 Turtle Creek Blvd., Suite 1100
Dallas, Texas 75219
Attention:  Michael S. Colvin
                   (michael.colvin@milleregan.com)

(2)     If to a Consenting Noteholder, or a transferee thereof, to the addresses or emails set forth following the Consenting Noteholder's signature (or as directed by any transferee thereof), with copies to:

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
Attention:  Anup Sathy, P.C.
                   (anup.sathy@kirkland.com)
                   -and-

                   Ross M. Kwasteniet
                   (ross.kwasteniet@kirkland.com)

(3)     If to a Common Equity Stockholder, Senior Preferred Stockholder or Preferred Stockholder to the addresses or emails set forth following such Common Equity Stockholder's, Senior Preferred Stockholder's or Preferred Stockholder's signature.

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

21

### 21. Reservation of Rights; No Admission.

Nothing contained herein shall (i) limit (A) the ability of any Consenting Noteholder to consult with other Consenting Noteholders or the Company, subject to the terms of any nondisclosure agreement entered into with the Company or (B) the rights of any Consenting Noteholder under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Consenting Noteholder's obligations hereunder or under the terms of the Plan and are not for the purpose of hindering, delaying or preventing the confirmation or consummation of the Plan; (ii) limit the ability of any Consenting Noteholder to sell or enter into any transactions in connection with the Senior Notes or any other claims against or interests in the Company, subject to the terms of Section 3(d) hereof or any nondisclosure agreement entered into with the Company; or (iii) limit the rights of any Consenting Noteholder under the Indenture, or any agreements executed in connection with the Indenture or constitute a waiver or amendment of any provision of the Indenture, or any agreements executed in connection with the Indenture, subject to the terms of Section 3(a) or (e) hereof.

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries. This Agreement and the Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 22. Relationship Among Parties.

It is understood and agreed that no Consenting Noteholder has any duty of trust or confidence in any kind or form with any other Consenting Noteholder, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Noteholder may trade in the Senior Notes, subject to the limitations in Section 3, or other debt or equity securities of the Company without the consent of the Company or any other Consenting Noteholder, subject to applicable securities laws, the terms of this Agreement and any nondisclosure agreement entered into with the Company; provided, however, that no Consenting Noteholder shall have any responsibility for any such trading to any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Consenting Noteholders shall in any way affect or negate the foregoing understanding and agreement.

22

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Consenting Noteholder or representative of a Consenting Noteholder that becomes a member of a statutory committee that may be established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member; provided, however, that nothing in this Agreement shall be construed as requiring any Consenting Noteholder to serve on any statutory committee in the Chapter 11 Cases.

### 23.    No Solicitation; Representation by Counsel; Adequate Information.

This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases.  The acceptances of the Consenting Noteholders with respect to the Plan will not be solicited until such Consenting Noteholder has received the Disclosure Statement and related ballots and solicitation materials, each as subsequently approved by the Bankruptcy Court.

Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Noteholder acknowledges and agrees and represents to the Company that it is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933 or a registered investment advisor under the Investment Advisors Act of 1940. Any offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

### 24.    Independent Due Diligence and Decision Making.

Each Party hereby confirms that it is (a) a sophisticated party with respect to the matters that are the subject of this Agreement, (b) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, (c) has adequate information concerning the matters that are the subject of this Agreement, and (d) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Agreement, which it enters, or as to which it acknowledges and agrees voluntarily and of its own choice and not under coercion or duress.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

23

**[Signature Pages Removed]**

## EXHIBIT A

**TERM SHEET**

## LIGHT TOWER RENTALS, INC., et al.

## RESTRUCTURING TERM SHEET

## AUGUST 8, 2016

THIS TERM SHEET (THIS "*TERM SHEET*") DESCRIBES THE MATERIAL TERMS OF A PROPOSED RESTRUCTURING TRANSACTION (THE "*RESTRUCTURING*") PURSUANT TO WHICH LIGHT TOWER RENTALS, INC. ("*LIGHT TOWER*"), LTR HOLDCO, INC., AND LTR INVESTCO, INC., (TOGETHER WITH THEIR RESPECTIVE AFFILIATES AND SUBSIDIARIES, THE "*DEBTORS*")[1] PROPOSE TO RESTRUCTURE THEIR CAPITAL STRUCTURE THROUGH A JOINT PREPACKAGED PLAN OF REORGANIZATION (THE "*PLAN*") FILED IN CONNECTION WITH VOLUNTARY CASES (THE "*CHAPTER 11 CASES*") COMMENCED UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "*BANKRUPTCY CODE*") IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION (THE "*BANKRUPTCY COURT*").

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY, NOR IS IT A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS.  THIS TERM SHEET IS NOT A COMMITMENT TO LEND OR TO AGREE TO THE TERMS OF ANY RESTRUCTURING.  THIS TERM SHEET IS SUBJECT TO DEFINITIVE DOCUMENTATION ACCEPTABLE TO THE REQUISITE NOTEHOLDERS (AS DEFINED BELOW) IN THEIR SOLE DISCRETION.  ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.  THIS TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.

THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW AND APPROVAL BY ALL PARTIES AND IS NOT BINDING, IS SUBJECT TO MATERIAL CHANGE, AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.

---

[1]  For the avoidance of doubt, the Debtors are LTR Holdco, Inc., Light Tower Rentals, Inc., LTR Investco, Inc., and LTR Shelters, Inc.

| **OVERVIEW** | |
|---|---|
| **Restructuring Summary** | Prior to the date of the commencement of the Chapter 11 Cases (the "***Petition Date***"), each of the Company, the Consenting Noteholders,[2] the Common Equity Holders, the Senior Preferred Stockholders, and the Preferred Stockholders shall have executed the RSA pursuant to which the Debtors will pursue and implement the Restructuring consistent with this Term Sheet in order to consummate the Plan. |
| | This Term Sheet outlines the terms of a balance-sheet restructuring of the Company (each of the Debtors as reorganized, a "***Reorganized Debtor***" and, collectively, the "***Reorganized Debtors***"). |
| | This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the Definitive Documents, each of which shall be in form and substance acceptable to the Requisite Noteholders.  The Definitive Documents, all motions, and related orders and the plan solicitation documents shall satisfy the requirements of the Bankruptcy Code and be consistent with the RSA and this Term Sheet. |
| **Debt to Be Restructured** | Indebtedness that will be restructured under the Plan includes, among other things, the following indebtedness and obligations: |
| |     a.  up to $30.0 million of obligations outstanding under that certain Credit Agreement, dated as of July 21, 2014, by and among Light Tower Rentals, Inc., as borrower, the guarantors party thereto, Jefferies Finance LLC, as administrative and collateral agent, and the other lenders party thereto (the "***ABL Facility***," the "***ABL Credit Agreement***" and, together with all related agreements and documents executed by any of the Debtors in connection with the ABL Credit Agreement, the "***ABL Facility Documents***"), and such obligations thereunder (the "***ABL Facility Claims***"); and |
| |     b.  approximately $330.0 million of obligations outstanding under that certain Indenture, dated as of July 21, 2014, by and among Light Tower Rentals, Inc., as issuers, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, providing for the issuance of 8.125% Senior Secured Notes due 2019 (such notes, the "***Senior Notes***," such indenture, the "***Indenture***," |

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the restructuring support agreement (the "***RSA***") to which this Term Sheet is attached.

| | and, together with all related agreements and documents executed the Company in connection with the Indenture, the "***Senior Notes Documents***") and such obligations thereunder, the "***Senior Notes Claims***"). |
|---|---|
| **Exit Financing** | The decision to seek approval of, and the terms and conditions related to, any exit financing arrangement effective upon the effective date of the Plan (the "***Effective Date***") related to the Chapter 11 Cases (together with related loan, security, collateral, and other documents, an "***Exit Facility***"), in each case shall be acceptable to the Requisite Noteholders. |
| **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** | |
| **Administrative Claims**<br><br>**Priority Tax Claims**<br><br>**Other Priority Claims**<br><br>**Other Secured Claims** | **Treatment**.  Customary treatment provisions for each of these classes in order to render the holders of such claims unimpaired.<br><br>**Voting**.  Not classified or unimpaired, as applicable; not voting. |
| **General Comment Regarding Treatment** | Each holder of an allowed claim or allowed interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed claim or allowed interest, except to the extent different treatment is agreed to by:  (a) the Debtors; (b) the holder of such allowed claim or allowed interest, as applicable; and (c) the Requisite Noteholders.  Unless otherwise indicated, the holder of an allowed claim or allowed interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter. |
| **ABL Facility Claims** | **Allowance**.  On the Effective Date, ABL Facility Claims shall be allowed in the aggregate principal amount of $0, plus any liquidated amounts for reasonable and documented costs and expenses, as of the Petition Date, that are reimbursable under the ABL Facility Documents.<br><br>**Treatment**.  Each holder of an allowed ABL Facility Claim shall receive cash in an amount equal to such ABL Facility Claim. |

| | |
|---|---|
| | **Voting**.  Holders of ABL Facility Claims are unimpaired under the Plan. Holders of allowed ABL Facility Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of allowed ABL Facility Claims are not entitled to vote to accept or reject the Plan. |
| **Senior Notes Claims** | **Allowance**.  On the Effective Date, Senior Notes Claims shall be allowed in the aggregate principal amount of $330,000,000, plus any accrued but unpaid interest thereon as of the Petition Date, in each case in accordance with the terms and conditions under the Indenture.<br><br>**Treatment**.  Each holder of an allowed Senior Notes Claim shall receive (i) its pro rata share of the New Equity (subject to dilution on account of the Warrants, the MIP, and distribution (if any) to holders of Investco Preferred Interests), and (ii) its pro rata share of the New Notes.<br><br>• "***New Equity***" means the equity of the Reorganized Debtors' ultimate parent, which shall be a newly formed Delaware limited liability company treated as a corporation for tax purposes ("***New LTR Holdings***") authorized and issued pursuant to the Plan.<br><br>• "***New Notes***" means the secured notes issued by Reorganized Light Tower Rentals, Inc., and guaranteed by each of its subsidiaries and its parent company (which shall be a subsidiary of New LTR Holdings), in the aggregate principal amount of  $30 million, (i) bearing interest at 10% per annum, payable in cash or in kind at the option of the Reorganized Debtors for the period commencing on the Effective Date and ending on the third anniversary thereof, and payable solely in cash thereafter, (ii) maturing on the fifth anniversary of the Effective Date, (iii) being callable (a) prior to the second anniversary of the Effective Date at a price equal to 101% of the aggregate outstanding amount, (b) during the period commencing on the second anniversary of the Effective Date through the day prior to the third anniversary of the Effective Date at a price equal to 106.75% of the aggregate outstanding amount, (c) during the period commencing on the third anniversary of the Effective Date through the day prior to the fourth anniversary of the Effective Date at a price equal to 104.50% of the aggregate outstanding amount, and (d) at a |

| | |
|---|---|
| | price equal to 100% of the aggregate outstanding amount from the fourth anniversary of the Effective Date and thereafter, and (iv) containing covenants substantially similar to those under the Indenture.<br><br>**Voting**.   Holders of Senior Notes are impaired under the Plan. Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan. |
| **General Unsecured Claims** | **Treatment**.  Each holder of an allowed general unsecured claim shall receive cash in an amount equal to such allowed general unsecured claim on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such allowed general unsecured claim.<br><br>**Voting**.  Holders of allowed general unsecured claims are unimpaired under the Plan. Holders of allowed general unsecured claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.   Holders of allowed general unsecured claims are not entitled to vote to accept or reject the Plan. |
| **Intercompany Claims** | **Treatment**.  Each allowed claim held by one Debtor against another Debtor (each, an "***Intercompany Claim***") shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Requisite Noteholders, either:<br><br>• reinstated; or<br><br>• canceled and released without any distribution on account of such claims.<br><br>**Voting**.  Holders of Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of allowed Intercompany Claims are not entitled to vote to accept or reject the Plan. |
| **Intercompany Interests** | **Treatment**.  Interests in a Debtor held by another Debtor (each, an "***Intercompany Interest***") shall be, at the option of the Debtors, with the consent (such consent not to be unreasonably withheld) of the Requisite Noteholders, either: |

<table>
<tr>
<td></td>
<td>

- reinstated; or

- canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

**Voting**.  Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, depending on the treatment selected above.  Holders of allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.
</td>
</tr>
<tr>
<td>

**Investco Convertible Preferred Interests**
</td>
<td>

**Treatment**.  On the Effective Date, Investco Convertible Preferred Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and each holder of an allowed Investco Convertible Preferred Interests shall receive its pro rata share of the Preferred Equity Distribution.

- "*Investco Convertible Preferred Interests*" means the issued and outstanding Series A Convertible Preferred Stock of LTR Investco, Inc., and any options, warrants, rights and other instruments evidencing such interest (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

- "*Preferred Equity Distribution*" means the distribution of (i) penny warrants exercisable into New Equity constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the MIP and future equity issuances), (ii) warrants exercisable into New Equity constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the MIP and future equity issuances), at an initial strike price implied by a post-Restructuring equity value of $300 million, and (iii) warrants exercisable into New Equity constituting 5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of the MIP and future equity issuances), at an initial strike price implied by a post-Restructuring equity value of $457 million (subparts (i) - (iii), collectively, the "*Warrants*").  The strike price on each of the Warrants shall
</td>
</tr>
</table>

| | |
|---|---|
| | be increased or decreased to reflect appropriate adjustment on account of any capital contributions made to (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is distributed or deemed to have been distributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date.  Each class of the Warrants shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of such Warrants shall be entitled only to participation in the portion of the proceeds in excess of the applicable strike price.<br><br>**Voting**.   Holders of Investco Convertible Preferred Interests are impaired under the Plan.  Each holder of an Investco Convertible Preferred Interests will be entitled to vote to accept or reject the Plan. |
| **Investco Preferred Interests** | **Treatment**.  On the Effective Date, Investco Preferred Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and at the option of the Debtors, with the consent of the Requisite Noteholders, there shall be either (i) no distribution to holders of Investco Preferred Interests on account of such Investco Preferred Interests; or (ii) a pro rata distribution to holders of Investco Preferred Interests on account of such Investco Preferred Interests in the form of penny warrants or options exercisable into, or alternatively, restricted units representing, New Equity constituting 1.0% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances).<br><br>&bull; "*Investco Preferred Interests*" means the issued and outstanding Series A Senior Preferred Stock of LTR Investco, Inc., and any options, warrants, rights and other instruments evidencing such interest (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.<br><br>**Voting**.  Holders of Investco Preferred Interests are impaired under the Plan.  Each holder of an Investco Preferred Interest will, if there is no distribution to the holders of Investco Preferred Interests, be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and each holder of an Investco Preferred Interest will not be entitled to vote to accept or |

| | reject the Plan. If there is a distribution to the holders of Investco Preferred Interests, then each holder of an Investco Preferred Interest will be entitled to vote to accept or reject the Plan. |
|---|---|
| **Investco Common Interests** | **Treatment**.  On the Effective Date, Investco Common Interests will be canceled, released, and extinguished, and will be of no further force or effect, and holders of Investco Common Interests will not receive any distribution on account of such Investco Common Interests.<br><br> • "***Investco Common Interests***" means the issued and outstanding common stock of LTR Investco, Inc., and any options, warrants, rights and other instruments evidencing such interest (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.<br><br>**Voting**.  Holders of Investco Common Interests are impaired under the Plan.  Holders of Investco Common Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Investco Common Interests are not entitled to vote to accept or reject the Plan. |
| **Section 510(b) Claims** | **Allowance**.  A section 510(b) claim, if any such claim exists, may only become allowed by final order of the Bankruptcy Court.  The Debtors are not aware of any valid section 510(b) claim and believe that no such claim exists.<br><br>**Treatment**.  On the Effective Date, allowed section 510(b) claims, if any, will be discharged, canceled, released, and extinguished, and will be of no further force or effect, and holders of allowed section 510(b) claims will not receive any distribution on account of such allowed claim.<br><br>**Voting**.  Holders of section 510(b) claims are impaired under the Plan.  Holders (if any) of allowed section 510(b) claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders (if any) of allowed section 510(b) claims are not entitled to vote to accept or reject the Plan. |
| | <div align="center">**OTHER GENERAL PROVISIONS**</div> |
| **Corporate Governance, Structure** | The documentation evidencing the corporate governance for the Reorganized Debtors and New LTR Holdings, including charters, |

<table>
<tr><td></td><td>

bylaws, limited liability company agreements, operating agreements, shareholder agreements, and/or other organizational documents ("***Organizational Documents***"), in each case shall be acceptable to the Requisite Noteholders.  In addition, the Reorganized Debtors' corporate structure shall be acceptable to the Requisite Noteholders.

Without limiting the foregoing, the Organizational Documents shall be amended and restated for the Reorganized Debtors in a manner consistent with section 1123(a)(6) of the Bankruptcy Code.  In addition, the Plan shall provide that holders of New Equity (including warrants and options exercisable into New Equity) shall, as a condition to receiving the New Equity, be deemed to be a party to, and bound by (regardless of whether such holder executes a signature page thereto), the limited liability company agreement of New LTR Holdings as well as one or more securityholders' agreements (collectively, the "***Securityholders Agreement***"), in each case in form and substance acceptable to the Consenting Noteholders, setting forth such holders' relative rights and obligations (including as to voting, transferability, and other matters) with respect to the New Equity and equity-linked interests and related governance matters.  The Plan shall provide that any prepetition shareholders' agreement or investor rights agreement, and any related-party management services agreements, including the Clairvest Management Fee Agreement, will be canceled and superseded by the Securityholders Agreement. The Securityholders Agreement shall contain customary shareholder protections with respect to tag-along rights, preemptive rights, drag-along obligations, and protection against self-dealing.  The Securityholders Agreement shall also contain customary structural anti-dilution protections for stock splits or other subdivisions, stock dividends, and stock combinations.

Any claims arising from the cancellation or rejection of any prepetition organizational documents, shareholders' agreement or investor rights agreement, and any related-party management services agreements, including the Clairvest Management Fee Agreement, will be waived and will not be pursued.

</td></tr>
<tr><td>

**Management Incentive Plan**

</td><td>

After the Effective Date, the Reorganized Debtors, including New LTR Holdings, shall implement a management incentive plan on terms approved by the initial board of directors of New LTR Holdings (the "***MIP***").

The MIP shall include, in the aggregate, the following consideration: (i) subject to reduction by the distribution to the Investco Preferred

</td></tr>
</table>

9

Interests, if any, penny warrants or options exercisable into, or alternatively, restricted units representing, New Equity constituting 2.5% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances) (the "**Management Warrants**"); (ii) options (the "**Management Options**") (A) to purchase New Equity constituting 2.5% of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), at an initial strike price implied by a post-Restructuring equity value of $157 million; and (B) to purchase New Equity constituting 10% of the total equity of New LTR Holdings (calculated as of the Effective Date and subject to dilution on account of future equity issuances), (xx) one third (1/3) of which are exercisable at an initial strike price implied by a post-Restructuring equity value of $232 million, (yy) one third (1/3) of which are exercisable at an initial strike price implied by a post-Restructuring equity value of $300 million, and (zz) one third (1/3) of which are exercisable at an initial strike price implied by a post-Restructuring equity value of $457 million. The Management Warrants shall have a nine (9) year tenor and be exercisable without cash payment at the implied values set forth above, provided that the holder of Management Warrants and Management Options shall be entitled only to participation in the portion of the proceeds in excess of the applicable strike price. The strike price on each of the Management Warrants and Management Options shall be increased or decreased to reflect appropriate adjustment on account of any capital contributions made to (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is contributed or deemed to have been contributed) or distributions or dividends, other than redemptions, from (whether in cash, cash equivalents, promissory obligations, or the fair market value of other property which is distributed or deemed to have been distributed, but excluding payment of any yield on any preferred equity securities) New LTR Holdings from and after the Effective Date. The Management Options shall vest over a five (5) year period from grant with 20% of such Management Options vesting each year, subject in each case to continued employment with the Reorganized Debtors through each such vesting date, and subject to customary repurchase and forfeiture provisions. For the avoidance of doubt, allocation of the Management Warrants and Management Options shall be made at the discretion of the board of directors of New LTR Holdings.

| | |
|---|---|
| **Employment Agreements, Other Compensation, and** | The Definitive Documents shall include, no later than the filing of a customary plan supplement, details regarding key executive employment agreements and system-wide benefits plans to the extent different from existing compensation and benefit plans. The terms of |

| | |
|---|---|
| **Benefit Plans** | such agreements and plans shall be acceptable to the Requisite Noteholders. |
| **Reorganized Debtors' Initial Board of Directors** | The Plan shall designate the chief officers and the number of members of the initial board of directors of the Reorganized Debtors and New LTR Holdings, as determined by the Requisite Noteholders.<br><br>The initial board of directors of New LTR Holdings shall consist of five (5) members, designated as follows:  (a) Clearlake Capital Group, L.P. or its affiliates ("***Clearlake***") is entitled to designate two (2) directors, (b) the Consenting Noteholders other than Clearlake are entitled to designate one (1) director, (c) the Chief Executive Officer of the Reorganized Company shall be a director, and (d) the holders of a majority of New Equity shall be entitled to appoint one (1) director.  One (1) board observer shall be elected by the existing holders of Investco Convertible Preferred Interests that hold a majority of the warrants (and shares issuable upon exercise thereof) issued in connection with the Restructuring, for so long as such holders continue to hold at least 50% of each series of such warrants (and shares issuable upon exercise thereof).<br><br>The Company's senior officers as of the Petition Date shall continue to occupy such roles until and upon the Effective Date. |
| **Cancellation of Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided herein, all instruments, certificates, plans (including the 2012 Stock Option Plan of Debtor LTR Investco, Inc.), agreements and other documents evidencing debt of the Debtors or equity interests in Debtor LTR Investco, Inc. shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| **Issuance of New Equity** | The issuance of the New Equity under the Plan will be exempt from SEC registration under section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act of 1933, as applicable. |
| **Executory Contracts and Unexpired Leases** | The treatment (e.g., assumption, assumption and assignment, and/or rejection) of all executory contracts and unexpired leases to which the Debtors are party shall be acceptable to the Requisite Noteholders.<br><br>The Plan shall provide for a "deemed assume" structure in respect of the Debtors' executory contracts and unexpired leases. |

| | |
|---|---|
| **Avoidance Actions, Commercial Tort Claims** | To the extent not subject to the releases or exculpation under the Plan, avoidance actions arising under Chapter 5 of the Bankruptcy Code and commercial tort claims against any and all vendors with which the Debtors will have an ongoing relationship following the Effective Date shall vest in the applicable Reorganized Debtor. |
| **Releases, Exculpations, and Injunctions** | The Plan shall provide for customary release, exculpation, and injunction provisions, which shall be acceptable to the Requisite Noteholders and shall include, among others, the Reorganized Debtors, the Noteholders, the holders of Investco Convertible Preferred Interests, Investco Preferred Interests and the holders of Investco Common Interests. |
| **Fees and Expenses** | The Company shall be responsible, and the Plan shall provide, for the payment in cash on the Effective Date, of all documented fees and expenses incurred by the Consenting Noteholders in connection with the evaluation, negotiation and implementation of the Restructuring, including legal counsel, financial advisors and other expenses, as set forth in that certain letter agreement, dated July 22, 2016, between the Company and the Consenting Noteholders. |
| **Tax Matters** | The Restructuring and the Plan shall be structured to achieve favorable tax attributes and treatment to the extent practicable, which structure shall be acceptable to the Requisite Noteholders. |
| **Other Plan Terms** | The Plan shall contain all other customary terms otherwise reasonably acceptable to the Requisite Noteholders. |

12

## EXHIBIT B

### FORM OF JOINDER AGREEMENT FOR CONSENTING NOTEHOLDERS

This Joinder Agreement to the Restructuring Support Agreement, dated as of August [●], 2016 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among (i) LTR Holdco, Inc. ("**Parent**"), (ii) Light Tower Rentals, Inc. (the "**Issuer**"), (iii) LTR Investco, Inc. ("**Holdings**"), (iv) the subsidiary guarantors signatory thereto (the "**Subsidiary Guarantors**" and together with Parent, Holdings, the Issuer and their direct and indirect subsidiaries, the "**Company**"), is executed and delivered by [_____] (the "Joining Party") as of [_____], 2016.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.      Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Noteholder" and a "Party" for all purposes under the Agreement.

2.      Representations and Warranties.  With respect to the aggregate principal amount of Senior Notes set forth below its name on the signature page hereof, the Joining Party hereby makes the representations and warranties of the Consenting Noteholders set forth in Section 8 of the Agreement to each other Party to the Agreement.

3.      Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING NOTEHOLDER]**


By: _____
Name:
Title:

Principal Amount of Senior Notes:  $_____

Notice Address:

_____
_____
_____
Fax:
Attention:
Email:

                              Acknowledged:

                              **LIGHT TOWER RENTALS, INC.**

                              By: _____
                              Name:
                              Title:


                              **LTR HOLDCO, INC.**

                              By: _____
                              Name:
                              Title:


                              **LTR INVESTCO, INC.**

                              By: _____
                              Name:
                              Title:

## **EXHIBIT C**

## EQUITY CAPITALIZATION

| Name | Class | Number of Shares |
|------|-------|------------------|
| Clairvest Equity Partners III Limited Partnership | Common | █████████ |
| CEP III Co-Investment Limited Partnership | Common | ███████ |
| Mojopa, Ltd. | Common | ███████ |
| Avary Family Limited Partnership | Common | ███████ |
| Pat Bond[1] | Series A Senior Preferred | █████ |
| Keith Muncy[2] | Series A Senior Preferred | █████ |
| Nina Valles | Series A Senior Preferred | █████ |
| Mark Beckstrom | Series A Senior Preferred | █████ |
| StepStone Capital Partners III, L.P. | Series A Preferred | ████████ |
| StepStone Capital Partners III Offshore Holdings, L.P. | Series A Preferred | ███████ |
| SCP III Holdings SCS | Series A Preferred | ██████ |
| StepStone Atlantic Fund, L.P. | Series A Preferred | ████████ |
| StepStone K Strategic Opportunities Fund, L.P. | Series A Preferred | ████████ |
| StepStone Ferro Opportunities Fund, L.P. | Series A Preferred | ███████ |
| Allstate Insurance Company | Series A Preferred | ████████ |
| Allstate Life Insurance Company | Series A Preferred | ████████ |
| Allstate Life Insurance Company of New York | Series A Preferred | ████████ |
| Allstate Retirement Plan Trust | Series A Preferred | ███████ |
| USS-Constitution Co-Investment Fund II, LP | Series A Preferred | ████████ |
| Ironsides Co-Investment Fund III, LP | Series A Preferred | ████████ |
| Ironsides Co-Investment Fund III-QC, LP | Series A Preferred | ████ |

---

[1] Pat Bond owns ██████ shares of common stock.

[2] Keith Muncy owns ██████ shares of common stock.

## ANNEX A

### EXCLUDED LEASES

1. Potential Lease Agreement between Light Tower Rentals, Inc., as tenant, and Imperial Industrial Park LLC (which, for the avoidance of doubt, is not an affiliate of the Company), as landlord, for lease of 100 Imperial Industrial Park, Oakdale, PA 15071, commencing on September 1, 2016.

## ANNEX B

**EXCLUDED SALES OF ASSETS**

1. Approximately 20 miles of 10 inch lay-flat hose and associated reels. (Approximate value: $600,000 - $700,000)